No. 25-1792

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

CASA, INC.,

*Plaintiff-Appellant,*

v.

KRISTI NOEM & UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland, Case No. 8:25-cv-1484-TDC
Before the Honorable Theodore D. Chuang

## APPELLANT'S EMERGENCY MOTION FOR POSTPONEMENT OF AGENCY ACTION PENDING APPEAL AND REQUEST FOR ADMINISTRATIVE STAY

Ryan C. Downer
Sarah L. Bessell
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
700 14th St. #400
Washington, D.C. 20005
Tel. (202) 319-1000

Jonathan L. Backer
Rupa Bhattacharyya
Julia Gegenheimer
Mary B. McCord
Joseph Mead
Samuel P. Siegel
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY AND PROTECTION
GEORGETOWN LAW
600 New Jersey Ave. NW
Washington, D.C. 20001
Phone: (202) 661-6671

*Counsel for Plaintiff-Appellant CASA, Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 25-1792          Caption: CASA, Inc. v. Noem

Pursuant to FRAP 26.1 and Local Rule 26.1,

CASA, Inc.
(name of party/amicus)


who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?          ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:




3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?          ☐ YES ☑ NO
     If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jonathan L. Backer          Date:    July 14, 2025

Counsel for: Plaintiff-Appellant CASA, Inc.

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................ii

LOCAL RULE 27(A) STATEMENT ...........................................................v

INTRODUCTION .......................................................................................1

BACKGROUND..........................................................................................3

    I.    Temporary Protected Status......................................................3

    II.   Afghanistan's TPS Designation and Its Termination ............5

    III.  Cameroon's TPS Designation and Its Termination...............7

    IV.  This Lawsuit................................................................................9

STANDARD OF REVIEW........................................................................12

ARGUMENT .............................................................................................13

    I.    CASA's Members Will Be Irreparably Harmed
        Absent a Postponment of Agency Action Pending
        Appeal, and the Balance of the Equities and Public
        Interest Tip Sharply in Favor of Granting Relief................13

    II.   CASA Is Likely to Succeed on the Merits of Its
        Arbitrary and Capricious Claims ..........................................16

        A.  The District Court Properly Concluded that It
            Had Authority to Adjudicate CASA's Arbitrary
            and Capricious Claims ......................................................16

        B.  The Terminations of Afghanistan's and
            Cameroon's TPS Designations Were Preordained..........20

CONCLUSION ..........................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Appalachian Voices v. United States Department of Interior*,
 25 F.4th 259 (4th Cir. 2022) ................................................. 21

*Career Colleges & Schools of Texas v. United States
 Department of Education*, No. 23-50491, 2023 WL 9864371
 (5th Cir. Aug. 7, 2023) ......................................................... 12

*CASA de Maryland, Inc. v. Wolf*,
 486 F. Supp. 3d 928 (D. Md. 2020) ................................ 14, 16

*Cowpasture River Preservatio Ass'n v. Forest Service*,
 911 F.3d 150 (4th Cir. 2018) ............................................... 26

*Delgadillo v. Carmichael*,
 332 U.S. 388 (1947) ............................................................. 13

*Department of Commerce v. New York*,
 588 U.S. 752 (2019) ....................................................... 21, 24

*Feldman v. Arizonz Secretary of State's Office*,
 843 F.3d 366 (9th Cir. 2016) ............................................... 13

*Garland v. Aleman Gonzalez*,
 596 U.S. 543(2022) .............................................................. 20

*Grimmett v. Freeman*,
 No. 22-1844, 2022 WL 3696689 (4th Cir. Aug. 25, 2022) ................... 12

*League of Women Voters of United States v. Newby*,
 838 F.3d 1 (D.C. Cir. 2016) ................................................. 15

*Lovo v. Miller*,
 107 F.4th 199 (4th Cir. 2024)........................................... 16, 17

*McNary v. Haitian Refugee Center, Inc.*,
 498 U.S. 479 (1991) ....................................................... 17, 18

ii

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................. 12

*Padilla v. Kentucky,*
   559 U.S. 356 (2010) ............................................................. 13

*Ramos v. Nielsen,*
   336 F. Supp. 3d 1075 (N.D. Cal. 2018) ............................. 28

*Reno v. Catholic Social Services, Inc.,*
   509 U.S. 43 (1993) ............................................................... 18

*Rodriguez v. Robbins,*
   715 F.3d 1127 (9th Cir. 2013) ............................................ 15

*Roe v. United States Department of Defense,*
   947 F.3d 207 (4th Cir. 2020) ................................... 15, 20, 21

*Saget v. Trump,*
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................... 22, 28

*Texas v. Biden,*
   10 F.4th 538 (5th Cir. 2021) ............................................... 15

**Statutes**

5 U.S.C.
   § 705 ...................................................................... 3, 9, 12, 27
   § 706(2)(A) ............................................................. 2, 20, 26

8 U.S.C.
   § 1160(e)(1) .......................................................................... 17
   § 1252(f)(1) .............................................................. 10, 16, 19
   § 1254a(a)(1) .......................................................................... 3
   § 1254a(a)(1)(A) ..................................................................... 4
   § 1254a(a)(1)(B) ..................................................................... 4
   § 1254a(b) ........................................................................... 3, 4
   § 1254a(b)(1)(C) ..................................................................... 7
   § 1254a(b)(3) .......................................................................... 5

<b><u>Page(s)</u></b>

8 U.S.C.
  § 1254a(b)(3)(A) ............................................................... 5, 22
  § 1254a(b)(3)(B) ............................................................... 5, 22
  § 1254a(b)(3)(C) ..................................................................... 5
  § 1254a(b)(5)(A) ............................................................ 10, 16
  § 1254a(c) ................................................................................ 4
  § 1254a(d)(4) ........................................................................ 4
  § 1254a(f)(3) .......................................................................... 4
  § 1254a(f)(4) .......................................................................... 4

## Other Authorities

87 Fed. Reg. 30,976 (May 20, 2022) .......................................... 5

87 Fed. Reg. 34,706 (June 7, 2022) .......................................... 7

88 Fed. Reg. 65,728 (Sept. 25, 2023) ....................................... 6

88 Fed. Reg. 69,945 (Oct. 10, 2023) ........................................ 8

90 Fed. Reg. 20,309 (May 13, 2025) .............................. 6, 7, 9, 24

90 Fed. Reg. 23,697 (June 4, 2025). ............................... 8, 9, 24

90 Fed. Reg. 8443 (Jan. 20, 2025) ........................................ 24

Federal Rule of Appellate Procedure 8(a)(1)(C) ..................... 12

Federal Rule of Appellate Procedure 8(a)(2) .......................... 12

Federal Rule of Appellate Procedure 8(a)(2)(A)(i) ................. 12

Federal Rule of Civil Procedure 62(d) ..................................... 11

Government Accountability Office, *Temporary Protected Status:*
  *Steps Taken to Inform and Communicate Secretary of Homeland*
  *Security's Decisions* (2020),
  https://www.gao.gov/assets/gao-20-134.pdf .......................... 24

H.R. Rep. No. 100-627 (1988) .................................................. 4

## LOCAL RULE 27(a) STATEMENT

Pursuant to Local Rule 27(a), Plaintiff-Appellant CASA, Inc., informed counsel for the Defendants-Appellees on July 13, 2025, that CASA intended to file this motion. Counsel for Appellees stated that they would not be able to provide their position on the motion until 1:00 P.M. on July 14, 2025. In the interest of providing this Court as much time as possible to review this motion, CASA is filing before receiving a response from counsel for Appellees.

## INTRODUCTION

Thousands of Afghan and Cameroonian nationals have lawfully lived and worked in the United States for years under the protection of Temporary Protected Status (TPS), which provides safe haven to nationals from countries where conditions are dangerous or unstable. This appeal concerns Secretary of Homeland Security Kristi Noem's recent decisions to terminate both Afghanistan's and Cameroon's TPS designations. Those terminations are scheduled to go into effect ***today*** for Afghanistan and on August 4, 2025, for Cameroon, threatening TPS holders with loss of their legal status and work authorization. Without an immediate stay of these terminations, current TPS holders will face a devastating choice—abandoning their homes, relinquishing their employment, and uprooting their lives to a return to a country where they face the threat of severe physical harm or even death, or remaining in the United States in a state of legal uncertainty while they wait for other immigration processes to play out.

Among other claims, Plaintiff-Appellant CASA, Inc., challenges the Afghanistan and Cameroon TPS terminations under the Administrative Procedure Act (APA), as "arbitrary, capricious . . . [and] not in accordance

with law." 5 U.S.C. § 706(2)(A). Specifically, CASA contends that Secretary Noem did not terminate Afghanistan's or Cameroon's TPS designations based on the factors set forth in the TPS statute—which are focused on the conditions in the countries in question.

Instead, the district court found that CASA had plausibly alleged "that the Afghanistan and Cameroon Terminations were made pursuant to a general policy or practice of engaging in preordained terminations of TPS designations in order to reduce the number of non-white immigrants and thus were arbitrary and capricious in that they relied on factors Congress did not intend for [the Secretary of Homeland Security] to consider." App.233–244-CASA.[1] It also concluded that the administrative record "only bolsters" those allegations. App.240-CASA. And it noted that "certain CASA members will likely face irreparable harm from these actions"—including the possibility of "retribution from the Taliban if forced to return" to Afghanistan, App.244-CASA—and that the "grave risks" that Afghans and Cameroonians face if returned to their

---

[1] "App.___-CASA" refers to the page numbers in the appendix attached to this motion including the materials required by Federal Rule of Appellate Procedure 8 and Fourth Circuit Rule 8. "D. Ct. Dkt. ___" refers to the docket entry numbers in the district court.

countries of origin weighed in favor of granting relief, App.241-CASA. But the court declined to grant such relief because it found the existing record not yet sufficiently developed to establish a likelihood of success on the merits. But even if further factual development is needed before final judgment, the existing record is sufficient to establish CASA's entitlement to relief under 5 U.S.C. § 705, which exists for the specific purpose of maintaining the status quo while APA litigation proceeds.

This Court should immediately grant a stay of agency action pending appeal so that Afghan and Cameroonian TPS holders are spared the irreparable harms that the district court recognized.

## BACKGROUND

### I. Temporary Protected Status

TPS provides temporary immigration relief to foreign nationals in the United States who cannot safely return to their home nation because of armed conflict, natural disasters, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. § 1254a(a)(1), (b). Congress created TPS in 1990 to provide "a more formal and orderly mechanism for the selection, processing, and registration" of individuals "from countries experiencing turmoil," rather than relying on the prior

practice of ad hoc presidential action for those purposes. H.R. Rep. No. 100-627, at 4 (1988).

Under the TPS statute, the Secretary of Homeland Security may designate a country for protected status for renewable periods of up to 18 months "after consultation with appropriate agencies of the Government." 8 U.S.C. § 1254a(b). Once a country has been designated for TPS, nationals of that country (and individuals with no nationality who last habitually resided in that country) who are present in the United States and meet other stringent criteria may remain lawfully in the United States for the duration of the designation. *Id.* § 1254a(a)(1)(A), (c). TPS holders may not be detained or removed on the basis of their immigration status. *Id.* § 1254a(d)(4). And the Secretary "shall authorize" those with TPS to "engage in employment in the United States" and provide them with an employment authorization document. *Id.* § 1254a(a)(1)(B); *see also id.* § 1254a(f)(3), (4) (detailing other benefits associated with TPS).

Once a country has been designated for TPS, the Secretary must periodically review the conditions in that country and "determine whether the conditions for such designation . . . continue to be met."

8 U.S.C. § 1254a(b)(3)(A). The statute provides strict procedures and timeframes that must be followed when conducting this review. *Id.* § 1254a(b)(3). At the end of that process, the Secretary must make one of two decisions: Either extend the TPS designation for at least six months, *see id.* § 1254a(b)(3)(C), or terminate the designation, *id.* § 1254a(b)(3)(B). Notice of either decision must be published in the Federal Register. *Id.* § 1254a(b)(3)(A).

## II. Afghanistan's TPS Designation and Its Termination

Afghanistan was initially designated for TPS on May 20, 2022, due to armed conflict and an ongoing "humanitarian disaster." Designation of Afghanistan for Temporary Protected Status, 87 Fed. Reg. 30,976, 30,977 (May 20, 2022). This designation was based on an armed conflict between the Taliban and the Islamic State in Iraq and the Levant-Khorasan Province (ISIS-K), an insurgent group designated by the United States as a foreign terrorist organization, as well as on other dangerous conditions, including internal displacement, economic instability, the inaccessibility of food and healthcare, and violence targeting women and girls. *Id.* at 30,978–30,984. On September 25, 2023, then-Secretary of Homeland Security Alejandro Mayorkas

extended Afghanistan's TPS designation for a period of 18 months, until May 20, 2025, citing the continuing conflict between Taliban and ISIS-K and the persistence of the other dangerous conditions that prompted the country's designation. Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65,728, 65,728, 65,730–65,733 (Sept. 25, 2023).

On May 13, 2025, the Department of Homeland Security (DHS) published a notice in the Federal Register stating that Secretary of Homeland Security Kristi Noem had terminated Afghanistan's TPS designation. Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,309 (May 13, 2025). According to the termination notice, the Secretary determined that there were "notable improvements in the security and economic situation such that requiring the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety due to armed conflict or extraordinary and temporary conditions." *Id.* at 20,310. The Secretary also concluded that an extension of Afghanistan's TPS designation would be "'contrary to the national interest'" because doing so would be at odds with President Trump's directive in Executive Order 14,159 to roll back

TPS designations and would not "put American interests first." *Id.* at 20,311 (quoting 8 U.S.C. § 1254a(b)(1)(C)). Based on those considerations, the Secretary terminated Afghanistan's TPS designation with an effective date of July 14, 2025. *Id.*

## III. Cameroon's TPS Designation and Its Termination

Cameroon was initially designated for TPS on June 7, 2022, due to armed conflict between government forces and armed separatists in the country, as well as deadly attacks by multiple terrorist organizations, including Boko Haram. Designation of Cameroon for Temporary Protected Status, 87 Fed. Reg. 34,706, 34,708–34,709 (June 7, 2022). On October 10, 2023, Secretary Mayorkas extended TPS for Cameroon for a period of 18 months, until June 7, 2025, in light of the ongoing conflict between the government and non-state armed groups and separatist groups, which had led to widespread kidnapping, displacement, and destruction of civilian infrastructure that left many Cameroonians without access to health services and education. Extension and

Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945, 69,945, 69,947–69,948 (Oct. 10, 2023).

On June 4, 2025, DHS published a notice stating that Secretary Noem had terminated Cameroon's TPS designation. Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697, 23,697 (June 4, 2025). The notice acknowledged that "two major conflicts . . . remain active" in Cameroon but asserted that they "are contained in limited regions that primarily impact only three of the ten regions comprising Cameroon." *Id.* at 23,698. The Secretary therefore concluded that "Cameroonian aliens can return to the majority of areas in Cameroon that do not pose a serious threat to personal safety." *Id.* The notice also stated that there were no longer extraordinary circumstances warranting TPS designation, but even if there were, extending the designation would be "contrary to the national interest" for essentially the same reasons set forth in the Afghanistan termination

notice. *Id.* Based on those considerations, the Secretary terminated Cameroon's TPS designation with an effective date of August 4, 2025. *Id.*

## IV. This Lawsuit

CASA is a membership organization dedicated to advancing immigrants' rights. Its members include Afghan and Cameroonian TPS holders who rely on TPS to lawfully live and work in the United States, and who fear the prospect of being removed from the United States and relocated to countries experiencing dangerous conditions. App.196-CASA. On behalf of those members, CASA brought several claims under the APA; sought declarations that Afghanistan's and Cameroon's TPS designations are automatically extended by at least six months by operation of the TPS statute; and brought claims that the terminations violated the Fifth Amendment's equal protection component. App.197-CASA. CASA moved for summary judgment or, in the alternative, a stay of agency action under 5 U.S.C. § 705 with respect to its APA and declaratory relief claims. App.197-CASA. Because DHS delayed the effective date of termination of each country's TPS designation by only 60 days, 90 Fed. Reg. at 20,311; 90 Fed. Reg. at 23,697, CASA filed its motion before DHS had produced an

9

administrative record for either termination decision. It did so to ensure the district court sufficient time to rule before the terminations took effect. DHS produced the two administrative records after CASA had filed its reply brief. *See* D. Ct. Dkt. 58, 59, 70. On July 10, 2025, the district court denied CASA's motion. App.242-CASA.

The district court found CASA's claims justiciable, rejecting Defendants' arguments that two different provisions of the Immigration and Nationality Act (INA)—8 U.S.C. § 1254a(b)(5)(A) and 8 U.S.C. § 1252(f)(1)—barred CASA's claims and requested relief. App.200–214-CASA. With regard to CASA's APA claims, the court held that "CASA has plausibly alleged . . . that the Afghanistan and Cameroon terminations were made pursuant to a general policy or practice of engaging in preordained terminations of TPS designations in order to reduce the number of non-white immigrants and thus were arbitrary and capricious in that they relied on factors Congress did not intend for [DHS] to consider." App.233–234-CASA. The court denied Defendants' summary judgment on those claims because "the administrative record . . . only bolsters CASA's arguments." App.234-CASA. The court also concluded that termination of Afghanistan's and Cameroon's TPS

designations poses "grave risks" to CASA's members who confront the prospect of returning to dangerous and unstable countries, and that the balance of the equities and public interest are "in CASA's favor." App.240–241-CASA. But the court nevertheless held that CASA was not entitled to either summary judgment on its arbitrary and capricious claims or a stay of agency action under Section 705 because "the factual record was not sufficiently developed at the time of the briefing on the Motions and may still require further development." App.235-CASA; *see also* App.239–240-CASA.

On July 11, 2025, CASA asked the district court to issue a stay of the agency action pending appeal under Rule 62(d) of the Federal Rules of Civil Procedure. App.244–246-CASA. As of this filing, the district court has yet to rule on that request and further delay is "impracticable"

in light of the Afghanistan termination taking effect today. Fed. R. App. P. 8(a)(2)(A)(i).

## STANDARD OF REVIEW

This Court may "grant[] an injunction while an appeal is pending." Fed. R. App. P. 8(a)(1)(C), (2).[2] The Court considers: (1) whether the movant "has made a strong showing that [it] is likely to succeed on the merits"; (2) whether the movant "will be irreparably injured absent" an injunction; (3) whether an injunction "will substantially injure the other parties"; and (4) "where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009); *see also Grimmett v. Freeman*, No. 22-1844, 2022 WL 3696689, at *1–2 (4th Cir. Aug. 25, 2022) (granting an injunction pending appeal and citing *Nken* for the governing standard). The third and fourth factors "merge" where, as here, "the Government is the opposing party." *Nken*, 556 U.S. at 435. "The standard for evaluating an injunction pending appeal" is thus "similar to that employed by district courts in

---

[2] CASA seeks a stay of agency action under 5 U.S.C. § 705, not an "injunction." Fed. R. App. P. 8(a)(1)(C). Despite this distinction in nomenclature, courts have granted Section 705 relief pursuant to Rule 8. *See, e.g.*, *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, No. 23-50491, 2023 WL 9864371, at *1 (5th Cir. Aug. 7, 2023).

deciding whether to grant a preliminary injunction." *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016).

## ARGUMENT

### I. CASA's Members Will Be Irreparably Harmed Absent a Postponement of Agency Action Pending Appeal, and the Balance of the Equities and Public Interest Tip Sharply in Favor of Granting Relief

CASA's members will plainly be irreparably harmed absent immediate action from this Court. It is beyond question that removal from this country—"the equivalent of banishment or exile," *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) (quoting *Delgadillo v. Carmichael*, 332 U.S. 388, 390–391 (1947))—will seriously harm CASA's members. Indeed the district court found that "certain CASA members will likely face irreparable harm from these actions." App.240-CASA. For example, "B.S., an Afghan TPS holder, faced death threats in Afghanistan because of her work as an interpreter for United States and international agencies, such that she may well face retribution from the Taliban if forced to return." App.240-CASA. "M.A., another Afghan TPS holder who fled Afghanistan in 2021 after having worked on U.S.-funded

programs in Afghanistan, also reasonably fears retribution if he returns." App.240-CASA.

B.S. and M.A. are just two of the more than 11,000 Afghans and 5,000 Cameroonians whose lives will be upended by the termination of the TPS designations for those countries. Removal would rip many of these TPS holders and their families away from their homes, jobs, families, neighbors, and communities. *See* App.182–186-CASA. Severe economic harm will also ensue if the purported terminations take effect, as many CASA members rely on their TPS-based employment authorization to provide for themselves and their families. *See* App.182–186-CASA. This loss of income is yet another form of irreparable harm. *See CASA de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 969 (D. Md. 2020) (finding agency action caused irreparable harm where plaintiffs' members would be required to wait an additional 215 days to apply for work authorization and then wait indefinitely for a decision).

The "grave risks" that Afghans and Cameroonians face also demonstrate that the balance of the equities and the public interest weigh in favor of granting relief. App.241-CASA. That is especially so, the district court noted, "in light of the United States' long and proud

history as a haven for the displaced and the dispossessed." App.241-CASA. And with respect to Afghans, there is "also the moral imperative of protecting Afghans who participated in actions that directly or indirectly supported American troops and interests, because great nations do not leave their allies behind." App.241-CASA.

In addition, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (same). To the contrary, the public "undoubtedly has an interest in seeing its governmental institutions follow the law. *Roe v. U.S. Dep't of Defense*, 947 F.3d 207, 230–231 (4th Cir. 2020) (citation omitted). In contrast to the serious harms that TPS holders face, Defendants will face no material consequence from an order from this Court that merely pauses an "unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). An "agency cannot itself violate [the

law], then claim irreparable harm because it is held to account for such violations." *Wolf*, 486 F. Supp. 3d at 970.

## II. CASA Is Likely to Succeed on the Merits of Its Arbitrary and Capricious Claims

### A. The District Court Properly Concluded that It Had Authority to Adjudicate CASA's Arbitrary and Capricious Claims

Defendants argued below that CASA's arbitrary and capricious claims were barred by 8 U.S.C. § 1254a(b)(5)(A) and 8 U.S.C. § 1252(f)(1). App.200-CASA. The district court properly rejected both arguments. App.207, 213–214-CASA.

#### 1. Section 1254a(b)(5)(A)

Section 1254a(b)(5)(A) bars "judicial review of any determination . . . with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. As this Court has explained, there is a "well-settled and strong presumption that when a statutory provision is reasonably susceptible to divergent interpretation, [courts] adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *Lovo v. Miller*, 107 F.4th 199, 206 (4th Cir. 2024) (cleaned up). That presumption "can only be overcome by clear and

convincing evidence of congressional intent to preclude judicial review." *Id.* (cleaned up).

The word "determination" used in Section 1254a(b)(5)(A) has a well-established meaning in the context of statutes barring judicial review: it prevents courts from entertaining challenges to the substance of an agency's decisions but does not preclude review of other challenges, including to the practices and policies used when arriving at those decisions. For example, in *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), the Supreme Court considered the scope of a statute that precluded "judicial review of a determination respecting an application for adjustment of status" made pursuant to the Special Agricultural Workers (SAW) amnesty program (unless the determination was made during a deportation or exclusion proceeding). *Id.* at 491 (quoting 8 U.S.C. § 1160(e)(1)).

*McNary* held that "the reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." *Id.* at 492. It further reasoned that had Congress intended to limit judicial review "to encompass challenges to INS procedures and practices, it could easily have used broader statutory

language," such as "all causes . . . arising under" the statute, or "all questions of law and fact." *Id.* at 494. The Court thus held that the statute prohibited "direct review of individual denials of SAW status" but not "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Id.* at 492; *see also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 53, 56 (1993) (holding that statute barring judicial review of "determinations respecting an application for adjustment of status" did not preclude challenges to the "legality of a regulation without referring to or relying on the denial of any individual application" (cleaned up)).

As the district court recognized, Section 1254a(b)(5)(A)'s language "is nearly identical to the comparable language at issue in *McNary* and *Reno*." App.204-CASA. The court therefore correctly concluded that Section 1254a(b)(5)(A) "is best read as barring judicial review only of 'a single act rather than a group of decisions or a practice or procedure employed in making decisions,' specifically the act of authorizing, extending, or terminating a TPS designation for a particular foreign state." App.204-CASA (quoting *Reno*, 509 U.S. at 56). That conclusion

accords with how courts across the country have interpreted Section 1254a(b)(5)(A). App.204–205-CASA (collecting cases).

Based on that reading of Section 1254a(b)(5)(A), the district court properly held that that provision does not bar CASA's arbitrary and capricious claims "if construed narrowly." App.207-CASA. As the court observed, those claims "challeng[e] a general policy or practice to terminate TPS designations on a preordained basis in order to reduce the number of non-white immigrants in the United States" and not the substance of Secretary Noem's individual determinations to terminate Cameroon's and Afghanistan's TPS designations. App.208-CASA.

### 2. Section 1252(f)(1)

Section 1252(f)(1) bars courts other than the Supreme Court from "enjoin[ing] or restrain[ing] the operation of the provisions of *part IV*" of subchapter II of Chapter 12 of Title 8 of the U.S. Code—i.e., the INA. 8 U.S.C. 1252(f)(1) (emphasis added). But as the district court correctly concluded, the TPS statute "falls outside of Part IV and is instead located in Part V" of the INA, as "the Supreme Court has repeatedly and consistently" stated. App.211–212-CASA (collecting cases). That the TPS statute "bears no relationship to the other provisions in Part IV,"

which "all relate to 'the implementation and enforcement of immigration laws governing the inspection, apprehension, examination, and removal of aliens,'" confirms that Section 1252(f)(1) "does not apply to bar CASA's claims." App.212–213-CASA (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549–550 (2022)).

But even if Section 1252(f)(1) applies to CASA's claims, the district court also correctly concluded that it would not "provide a basis for outright dismissal" because the provision does not preclude "forms of relief beyond injunctive relief" like "declaratory relief and vacatur," which CASA ultimately seeks here, as other courts have recognized. App.213–214-CASA (collecting cases).

## B. The Terminations of Afghanistan's and Cameroon's TPS Designations Were Preordained

CASA is likely to succeed on the merits of its claims that the decisions to terminate the TPS designations for Afghanistan and Cameroon were "arbitrary, capricious . . . [or] not in accordance with law." 5 U.S.C. § 706(2)(A). "To comply with the APA, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Roe*, 947 F.3d at 220 (cleaned up). Courts must set aside

agency action under the APA if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citation omitted). Nor can agency action based on "contrived reasons" be sustained. *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). While courts "accord substantial deference to an agency's final action and presume it valid," APA review does not "reduce judicial review to a rubber stamp of agency action." *Roe*, 947 F.3d at 220 (citation omitted). The Court's review must be "searching and careful," to determine "whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) (cleaned up).

The TPS statute sets forth a clear process for making, reviewing, and terminating TPS determinations. *See* pp. 3–5, *supra*. "Congress's use of the word 'shall' in the periodic review and termination provisions of the statute evinces its intent to *require* the Secretary to follow the

enumerated procedure." *Saget v. Trump*, 375 F. Supp. 3d 280, 346 (E.D.N.Y. 2019) (quoting 8 U.S.C. § 1254a(b)(3)(A)–(B)). And "Congress's use of 'shall,' specifically in requiring the Secretary to 'review the conditions in the foreign state,' evinces its intent that the Secretary undertake a periodic review grounded in fact—*i.e.*, based on objective conditions in the foreign country and regardless of any government official's political motives—and in good faith." *Id.* (quoting 8 U.S.C. § 1254a(b)(3)(A)). The "requirement that the Secretary publish notice of a termination decision in the Federal Register, 'including the basis for the determination,' further evinces Congress's intent in this regard." *Id.* at 347 (quoting 8 U.S.C. § 1254a(b)(3)(B)). Although the Secretary "exercises discretion to make the determination she deems fit," she must "base that discretion on the 'conditions in the foreign state' and on consultations with appropriate Government officials." *Id.* (quoting 8 U.S.C. § 1254a(b)(3)(A)). "[T]he Secretary may not provide sham or pretextual justifications as the basis for the decision under the statute, and the Secretary must review the conditions of the foreign state." *Id.*

As the district court noted, several features of the Secretary's termination decisions demonstrate that they were not based on the

considerations set forth in the statute, but instead were preordained decisions, a part of the Administration's broader effort to reduce the number of non-white immigrants in the United States. For example, the President has made "numerous public statements"—both "during his presidential campaign and as president"—"disparately disparag[ing] non-white immigrants." App.228–229-CASA (collecting statements). So has Secretary Noem. App.229-CASA. And there are multiple instances in which the Trump Administration has taken actions "to curtail immigration from countries viewed as having non-white populations," even while it has "removed immigration barriers for white immigrants." App.229-CASA (contrasting the vacatur of TPS extensions for Venezuela and Haiti and the termination of a parole program for Cubans, Haitians, Venezuelans, and Nicaraguans with government actions allowing white Afrikaners to enter the United States).

The process leading to Secretary Noem's terminations support CASA's claims that these actions were part of the Administration's effort to reduce the number of non-white immigrants in this country. *See* App.230–232-CASA. For example, the notices terminating both the Afghanistan and Cameroon TPS designations each invoke Executive

Order 14,159, which directed Secretary Noem and other cabinet officials to "rescind policies that led to increased or continued presence of illegal aliens in the United States," including by "ensuring that the TPS designations are consistent with the TPS statute and are 'made for only as long as may be necessary to fulfill the textual requirements of that statute.'" 90 Fed. Reg. at 20,311 (Afghanistan notice) (quoting Exec. Order 14,159, § 16, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025)); *see also* 90 Fed. Reg. at 23,698 (same for Cameroon notice). As the district court noted, because TPS holders "have legal status in the United States and thus are not actually 'illegal aliens,' invocation of the stated policy of Executive Order 14,159 of curtailing illegal immigration reveals a 'mismatch between the decision the Secretary made and the rationale she provided.'" App.230–231-CASA (alteration omitted) (quoting *Dep't of Commerce*, 588 U.S. at 783).

The process followed with respect to the Afghanistan and Cameroon terminations deviated from the standard process for such determination in other ways. TPS review typically begins with career specialists preparing an objective conditions report, a process spanning months. Government Accountability Office, *Temporary Protected Status: Steps*

*Taken to Inform and Communicate Secretary of Homeland Security's Decisions*, 17–26 (2020), https://www.gao.gov/assets/gao-20-134.pdf.   In contrast, Secretary Noem terminated the TPS designations for Cameroon and Afghanistan "less than three months into the Trump Administration."   App.231-CASA.   As a result of that "compressed timeline" a "key agency"—the United States Customs and Immigration Services (USCIS)—was unable to gather current information relevant to whether the TPS designations for these countries should be extended. App.231–232-CASA.  That "provides additional support for CASA's claim that the TPS terminations were made as part of" a preordained effort to reduce the number of non-white immigrants in this country. App.232-CASA.

So too does the fact that "Secretary Noem's findings appear to be inconsistent with certain information in the administrative record." App.232-CASA.  With respect to Afghanistan, USCIS prepared a report covering the time period from June 1, 2023, through November 13, 2024, concluding that Afghanistan's population faces "dire challenges, including a collapsing economy and health care system, ubiquitous food insecurity exacerbated by drought, and widespread insecurity due to

decades of armed conflict and insurgency that is entering a new, dangerous phase." App.232-CASA; *see also* App.056–091-CASA. With respect to Cameroon, the administrative record included a December 2, 2024 letter from then-Secretary of State Antony Blinken, recommending extending Cameroon's TPS designation for 12 months "in part because of 'ongoing armed conflict' between the Government of Cameroon and terrorist groups such as Boko Haram, 'ongoing violence' between the Government and multiple armed separatist groups, and human rights abuses by both Government forces and armed groups." App.232-CASA; *see also* App.112–113-CASA.

Together, these facts demonstrate that CASA will likely be able to show that the Secretary's decision was not based on the considerations set forth in the TPS statute, but instead was part of the Trump Administration's broader effort to reduce the number of non-white immigrants lawfully in this country. The decision to terminate the TPS designations for Afghanistan and Cameroon were therefore "arbitrary, capricious . . . [and] not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150, 179 (4th Cir. 2018) (setting aside agency action that was a "preordained decision"

and where the agency "reverse engineered" its explanation to justify the outcome), *rev'd on other grounds*, 590 U.S. 604 (2020).

In denying CASA's motion for relief, the district court noted that the considerations above were "sufficient to permit these claims to proceed." App.235-CASA. But it determined that the "development of a more robust record" was needed for it to conclude that CASA was likely to succeed on its claim. App.240-CASA. That is incorrect. The considerations cited above are more than sufficient to demonstrate that CASA is likely to succeed on the merits of its APA claim. Indeed, as the district court recognized, other courts have issued relief based on similar evidence to the kind CASA has put forth here. *See* App.234-CASA (collecting cases).

To be sure, those courts had more evidence before them before granting relief. But none conditioned their orders on a particular quantum of evidence. For the reasons explained, the record before the district court was more than sufficient to grant a temporary postponement of the termination decisions while it proceeded to reach a final decision on the merits. And "justice" would best be served by postponing the agency actions challenged here, 5 U.S.C. § 705, where—

contrary to past agency practice—Defendants provided only 60 days' notice before the Afghanistan and Cameroon TPS terminations took effect, affording CASA significantly less time to develop a record than in other cases that granted relief based on similar claims. *See, e.g.*, *Saget*, 375 F. Supp. 3d at 339 (20 months between when termination decision was announced and when it took effect); *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082–1084 (N.D. Cal. 2018) (reviewing TPS terminations for four countries announced between 13 and 20 months before they took effect); *see also* App.241-CASA (observing that DHS "has regularly provided transition periods that significantly exceed the statutory minimum of two months of notice when terminating a TPS designation").

# CONCLUSION

For all the foregoing reasons, this Court should grant a stay of the terminations of the TPS designations for Afghanistan and Cameroon pending appeal.

July 14, 2025                                Respectfully submitted,

                                            /s/ Jonathan L. Backer
Ryan C. Downer                              Jonathan L. Backer
Sarah L. Bessell                            Rupa Bhattacharyya
WASHINGTON LAWYERS' COMMITTEE  Julia Gegenheimer
FOR CIVIL RIGHTS AND URBAN                  Joseph W. Mead
AFFAIRS                                     Mary B. McCord
700 14th St. #400                           Samuel P. Siegel†
Washington, D.C. 20005                      INSTITUTE FOR CONSTITUTIONAL
Tel. (202) 319-1000                         ADVOCACY
                                              AND PROTECTION
                                            Georgetown University Law
                                            Center
                                            600 New Jersey Ave., N.W.
                                            Washington, D.C. 20001
                                            Phone: (202) 661-6671

                                            *Counsel for Plaintiff-Appellant
                                            CASA, Inc.*

† *Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this response complies with the type-volume requirements of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,177 words. This response was prepared in 14-point Century Schoolbook font, a proportionally spaced typeface, using Microsoft Word.

/s/ Jonathan L. Backer
Jonathan Backer
Counsel for Plaintiff-Appellant
CASA, Inc.

# CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I have also emailed a copy of the foregoing to the following counsel for Defendants-Appellees:

SARAH L. VUONG
Assistant Director

WILLIAM H. WEILAND
Senior Litigation Counsel

AMANDA B. SAYLOR
LAUREN BRYANT
CATHERINE ROSS
ERIC SNYDERMAN
ANNA L. DICHTER
JEFFREY HARTMAN
CARLTON F. SHEFFIELD
Trial Attorneys
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
(202) 598-6837
Sarah.L.Vuong@usdoj.gov
William.H.Weiland@usdoj.gov
Amanda.B.Saylor@usdoj.gov
Lauren.E.Bryant@usdoj.gov
Catherine.Ross@usdoj.gov
Eric.M.Snyderman@usdoj.gov
Anna.L.Dichter@usdoj.gov

Jeffrey.M.Hartman@usdoj.gov
Carlton.F.Sheffield2@usdoj.gov

/s/ Jonathan L. Backer
Jonathan Backer
Counsel for Plaintiff-Appellant
CASA, Inc.