# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

CASA, INC.,

*Plaintiff-Appellant*,

v.

KRISTI NOEM & UNITED STATES
DEPARTMETN OF HOMELAND SECURITY,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland, Case No. 8:25-cv-1484-TDD
Before the Honorable Theodore D. Chuang

**PLAINTIFFS' EMERGENCY MOTION FOR POSTPONEMENT
OF AGENCY ACTION PENDING APPEAL**

**APPENDIX**

# TABLE OF CONTENTS

**Page**

First Amended Complaint (May 20, 2025) (D. Ct. Dkt. 41)......... App.001-CASA

Supplement to the First Amended Complaint (June 5, 2025) (D. Ct. Dkt. 55)......................................................................... App.040-CASA

Blinken Letter to Mayorkas (Nov. 20, 2024) (Afghanistan AR, D. Ct. Dkt. 59-3) ......................................................................... App.047-CASA

U.S. Citizenship and Immigration Services, Afghanistan: Temporary Protected Status (TPS) Considerations (Nov. 2024) (Afghanistan AR, D. Ct. Dkt. 59-3) ................................................................. App.056-CASA

U.S. Citizenship and Immigration Services, Afghanistan: Temporary Protected Status (TPS) Considerations (Addendum) (Afghanistan AR, D. Ct. Dkt. 59-3)..................................................... App.094-CASA

Rubio Letter to Noem (Afghanistan AR, D. Ct. Dkt. 59-3)........................ .................................................................................. App.099-CASA

Decision Memo, Temporary Protected Status for Afghanistan (Mar. 20, 2025) (Afghanistan AR, D. Ct. Dkt. 59-3)........................... App.101-CASA

Blinken Letter to Mayorkas (Dec. 2, 2024) (Cameroon AR, D. Ct. Dkt. 70-3)...................................................................... App.112-CASA

U.S. Citizenship and Immigration Services, Republic of Cameroon: Temporary Protected Status (TPS) Considerations (Nov. 2024) (Cameroon AR, D. Ct. Dkt. 70-3) ......................................App.128-CASA

U.S. Citizenship and Immigration Services, Cameroon Temporary Protected Status Country Conditions Addendum (Cameroon AR, D. Ct. Dkt. 70-3) ...............................................................App.159-CASA

Decision Memo, Temporary Protected Status for Cameroon (Apr. 3, 2025) (Cameroon AR, D. Ct. Dkt. 70-3) .............................App.163-CASA

Amended Declaration of George Escobar, Chief of Programs and Services for CASA, Inc. (May 19, 2025) (D. Ct. Dkt. 64-2) App.179-CASA

Memorandum Opinion (July 10, 2025) (D. Ct. Dkt. 76) ....App.188-CASA

Order (July 10, 2025) (D. Ct. Dkt. 77) ................................App.243-CASA

Pre-Motion Letter Re: Motion for Stay of Agency Action Pending Appeal (July 11, 2025) (D. Ct. Dkt. 79) ...........................................App.244-CASA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

|  |  |
|---|---|
| CASA, INC.,<br>8151 15th Avenue<br>Hyattsville, MD 20528<br><br>       *Plaintiff,*<br><br> v.<br><br>KRISTI NOEM, Secretary of Homeland<br>Security, in her official capacity,<br>2707 Martin Luther King Jr. Ave, SE<br>Washington, D.C. 20528<br><br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY,<br>2707 Martin Luther King Jr. Ave, SE<br>Washington, D.C. 20528<br><br>       *Defendants.* | **Case No.:** 8:25-cv-1484<br><br>**FIRST AMENDED COMPLAINT** |

## INTRODUCTION

1. Plaintiff CASA, Inc., challenges U.S. Secretary of Homeland Security Kristi Noem's unlawful attempt to terminate the Temporary Protected Status (TPS) designation for Afghanistan, and her failure to publish notice that Cameroon's TPS designation has been extended for six months. Each designation was first made in 2022, in response to the prolonged armed conflicts, hunger, and human rights abuses afflicting both countries. Each designation was extended in 2023 for similar reasons. Under the designations, thousands of Afghans and thousands of Cameroonians have been able to lawfully live and work in this country.

2. Afghanistan's TPS designation period was set to expire on the date of the filing of this amended complaint, May 20, 2025. On May 13, 2025, the Department of Homeland Security

(DHS) published a notice in the Federal Register announcing the termination of Afghanistan's TPS designation, effective July 14, 2025. *See* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309 (May 13, 2025).

3.      Cameroon's TPS designation is set to expire on June 7, 2025. On April 11, 2025, various news outlets reported that that Secretary Noem had terminated Cameroon's designation on April 7, based on an email to the media from DHS Assistant Secretary for Public Affairs Tricia McLaughlin. But, to date, Secretary Noem has not effectuated any termination of Cameroon's TPS designation by publishing a notice in the Federal Register.

4.      Because Secretary Noem failed to follow the procedures set forth in the TPS statute for terminating a country's TPS designation, both Afghanistan's and Cameroon's TPS designations are extended by at least six months by operation of law. Congress established a strict process for terminating TPS designations, one that required Secretary Noem to publish notice of her decision in the Federal Register at least 60 days before the current designation period ends. *See* 8 U.S.C. § 1254a(b)(3)(B). The statute further prescribes what happens when the Secretary fails to follow that process: the TPS designation is automatically extended for at least another six months. *Id.* § 1254a(b)(3)(C).

5.      Congress required the Secretary to abide by this process for good reason. Although a TPS designation is temporary by design, individuals who benefit from a designation order their lives around it. Termination may leave them without income or the ability to support and protect themselves and their families. It may also require them to return to their countries of origin or move elsewhere to rebuild a life—including by finding jobs, housing, and medical care—with few or no community connections. Accordingly, Congress required the Secretary to give these

individuals adequate notice so that they could prepare to depart. Secretary Noem failed to follow these basic steps.

6.    Secretary Noem's attempted termination of Afghanistan's TPS designation is unlawful for additional reasons. The TPS statute makes clear the reasons why a country may be designated: because there is an ongoing armed conflict within the country and, due to that conflict, requiring nationals of that country to return would seriously threaten their personal safety, 8 U.S.C. § 1254a(b)(1)(A); because the country is unable to handle the return of nationals due to a natural disaster, *id.* § 1254a(b)(1)(B); or because there are extraordinary and temporary conditions in the country that prevent nationals from returning safely, unless the Secretary concludes that allowing those nationals to remain in the United States is "contrary to the national interest," *id.* § 1254a(b)(1)(C). A termination of the designation may occur if—and only if—the Secretary determines that the country "no longer continues to meet" those conditions. *Id.* § 1254a(b)(3)(B).

7.    Yet the Federal Register notice makes clear that the Secretary's decision was not driven by these considerations. Instead, it was a preordained decision directed by the President, a part of the Trump Administration's broader effort to reduce the number of nonwhite immigrants in this country. The decision to terminate Afghanistan's TPS designation is therefore unlawful. *See Roe v. Dep't of Defense*, 947 F.3d 207, 220 (4th Cir. 2020) (agencies may not rely on "factors which Congress has not intended it to consider" (cleaned up)); *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (agency action may not be based on "contrived reasons").

8.    Secretary Noem's decision to terminate Afghanistan's TPS designation is also unlawful because it was driven at least in part by racial animus. That animus is evidenced by the Trump Administration's efforts to eliminate lawful immigration status for noncitizens from countries the Administration believes are predominantly non-white, while simultaneously

3

removing immigration barriers to white noncitizens.  The departure from the regular process used to terminate TPS with respect to the designation for Afghanistan, as well as President Donald Trump's and Secretary Noem's explicitly racist attacks on non-white immigrants, further demonstrate that the termination decision was based at least in part on racial animus.

9.    For these reasons, CASA respectfully asks the Court to declare unlawful and set aside the decision to terminate the TPS designations for Afghanistan as "arbitrary [and] capricious," "not in accordance with law," and "without observance of procedure required by law" under the Administrative Procedure Act.  5 U.S.C. § 706(2)(A), (D).  CASA further requests that this court permanently enjoin enforcement of and declare unlawful the attempted termination of Afghanistan's TPS designation.

10.    CASA also asks this Court to declare that the Afghanistan and Cameroon TPS designations have been automatically extended by at least six months—until at least November 20, 2025, for Afghanistan and until at least December 7, 2025, for Cameroon.

## JURISDICTION AND VENUE

11.    This action arises under the Administrative Procedure Act, 5 U.S.C. § 551 et seq., the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Fifth Amendment of the United States Constitution.

12.    The Court has federal question jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).

13.    Venue is proper in this District under 28 U.S.C. § 1391(e) and in this division because Defendants are an officer of the United States acting in her official capacity and an agency thereof; Plaintiff CASA, Inc., has its principal place of business in this division and District; and

App.004-CASA

a substantial part of the events or omissions giving rise to this action are occurring in this division and District.

**PARTIES**

14.     Plaintiff CASA, Inc., is a national nonprofit membership-based immigrant rights organization headquartered in Prince George's County, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia.  Founded in 1985, CASA has more than 173,000 lifetime members, including over 100 Afghan members and more than 5,700 members from Cameroon. These two groups of members include many TPS beneficiaries, as do CASA's other member groups.  CASA's members are predominantly noncitizens.

15.     CASA's mission is to create a more just society by building power and improving the quality of life in working Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities.  In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia, as well as a more limited suite of remote services to members across the United States.

16.     Among the services that CASA provides are free immigration legal consultations for members and full legal representation for members applying for TPS, as well as for members applying for other types of immigration status.  CASA has developed specific resources to help members apply for TPS and to educate communities about TPS designations.  Since its founding, CASA has provided direct assistance on approximately 1,000 TPS applications for members. Beyond those members, many more CASA members, including those from Afghanistan and Cameroon, have obtained TPS without being directly represented by CASA, either by submitting applications on their own or with assistance from private counsel or other non-profit organizations.

17.    In addition to the legal services CASA offers members seeking TPS, the organization is a leader in advocating for TPS nationally. CASA serves as a founding member of the TPS Funding Collaborative, which has raised more than $3 million to support organizations advocating for TPS.

18.    To become a CASA member, an individual must apply for membership, pay dues (or have the dues requirement waived), and subscribe to the principles of CASA. A CASA member shares CASA's values, envisions a future of full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in working-class and immigrant communities. CASA members play an important role in deciding what campaigns CASA works on and how CASA serves the community.

19.    One of many CASA members affected by the challenged actions is A.F., an Afghan citizen living in Virginia who currently has TPS under Afghanistan's TPS designation. A.F. depends on TPS for his work authorization, which allows him to support himself, his mother, and his brother financially. Losing TPS will almost certainly lead A.F. to lose his job and would put him at risk of being removed to a country where he has no family or other ties because he has never lived there.

20.    M.A. is another impacted Afghan CASA member who lives in Virginia and has TPS under Afghanistan' TPS designation. M.A. relies on TPS for his work authorization, which is his only source of income and the sole financial support for M.A.'s wife and two young children in Afghanistan. Without TPS, M.A. will likely lose his job and his health insurance, which he receives through his employer. Losing TPS also places M.A. at risk of removal to Afghanistan, where he fears for his and his family's physical safety and security—especially that he will be targeted by the Taliban for his connections to the United States.

App.006-CASA

21.     Afghan CASA member B.S., who lives in Washington, is also affected by the challenged actions.  She and her family all have TPS under Afghanistan's TPS designation.  Losing TPS exposes B.S. and her family to financial insecurity.  It further places B.S., her husband, and her two young children at increased risk of removal to a country where she previously faced threats of violence, where she fears her family would face retribution from the Taliban based on their association with the United States, and where she worries that she and her children would otherwise be subject to government oppression.

22.     Among CASA's impacted Cameroonian members is J.K., who lives in Maryland and has TPS under Cameroon's TPS designation until June 7, 2025.  J.K. suffers from several serious health issues, which can be life-threatening.  She relies on work authorization pursuant to her TPS.  Without her TPS work authorization and other protections, J.K. faces uncertainty over whether she could receive and afford the medical care she requires.

23.     Cameroonian CASA member O.M. is also affected by the challenged actions.  O.M. lives in Maryland, works as a home health aide, and has TPS under Cameroon's TPS designation.  Losing TPS would put O.M.'s livelihood and financial stability in jeopardy.  It would also increase her risk of being removed to a country where she had previously suffered physical abuse and fears she would face violence and instability once more.

24.     Another impacted Cameroonian CASA member is C.N., who lives in Maryland and has TPS under Cameroon's TPS designation.  C.N. works as a hairstylist, actively contributes to her local community, and is a vocal member of the Cameroonian community in the United States.  Losing TPS would expose C.N. to financial hardship and increase her risk of being removed to a country where she fears she would be in danger of physical violence.

App.007-CASA

25.    D.L. is a Cameroonian CASA member who is impacted by the challenged actions. D.L. lives in Maryland and has TPS under Cameroon's TPS designation.  His wife, who is pregnant, and his brother depend on D.L. for their family's income.  Losing TPS would expose D.L and his family to severe economic hardship and additionally place him at risk of removal to a country where he has experienced persecution.

26.    D.T. is another Cameroonian CASA member who has TPS under Cameroon's TPS designation and is impacted by the challenged actions.  D.T. lives in Maryland, works as an assisted-living caregiver, and helps support his wife and three children, including two children who are United States citizens.  Losing TPS would expose D.T. and his family to severe economic hardship and the resulting risk of his removal, to Cameroon or elsewhere, could separate him from his U.S.-citizen children.

27.    Defendant U.S. Department of Homeland Security is a cabinet agency of the United States responsible for administering federal immigration laws and programs, including TPS.

28.    Defendant Kristi Noem is the Secretary of Homeland Security.  She is sued in her official capacity.

## STATUTORY FRAMEWORK

29.    TPS provides temporary immigration relief to foreign nationals in the United States who cannot safely return to their home nation because of an armed conflict, natural disasters, or other "extraordinary and temporary conditions in the foreign state."  8 U.S.C. § 1254a(a)(1), (b). Congress created TPS in 1990 to provide "a more formal and orderly mechanism for the selection, processing, and registration" of individuals "from countries experiencing turmoil," rather than relying on ad hoc presidential action for those purposes.  H.R. Rep. No. 100-627, at 4 (1988).

30.    Under the TPS statute, the Secretary of Homeland Security may designate a country for TPS if the Secretary, after consultation with appropriate agencies of the Government, finds that

8

App.008-CASA

(A) . . . there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

(B) . . . (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected, (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and (iii) the foreign state officially has requested designation under this subparagraph; or

(C) . . . there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1).[1]

31.     TPS allows nationals of a designated country (and individuals with no nationality who last habitually resided in the designated country) who are present in the United States at the time of the designation and meet other stringent eligibility criteria to remain lawfully in the United States for the duration of the designation. *Id.* § 1254a(a)(1)(A), (c).

32.     To be eligible for protected status, individuals from a designated country must have been physically present in the United States continuously since the most recent designation date and have continuously resided in the United States "since such date as the [Secretary] may designate"; meet criteria for admissibility as an immigrant; not have a disqualifying criminal history (i.e., more than one misdemeanor conviction or a felony conviction); and submit an

---

[1] The statute originally provided the Attorney General with this authority. While the text continues to refer to the Attorney General, in 2003, Congress transferred authority for TPS designation, extension, and termination to the Secretary of the Department of Homeland Security. 6 U.S.C. § 557; *see* Homeland Security Act of 2002, Pub. L. No. 107-296, tit. XV, § 1517, 116 Stat. 2135, 2311 (2002). Thus, references to the Attorney General in the TPS statute are now deemed to refer to the Secretary of Homeland Security. *See* 8 U.S.C. § 1103(a).

9

App.009-CASA

application, documentation, and fees, among other requirements.  *Id.* § 1254a(c)(1); 8 C.F.R. §§ 244.2, 244.4, 244.9.

33.    Congress made clear that TPS beneficiaries will be able to live and work in the United States without fear of removal.  The TPS statute forbids DHS from removing or detaining those with TPS from the United States.  8 U.S.C. § 1254a(a)(1)(A), (d)(4).  Individuals with TPS also are authorized to "engage in employment" in the United States, and the Secretary must provide TPS recipients with an "'employment authorized' endorsement or other appropriate work permit." *Id.* § 1254a(a)(1)(B).   Such work authorization is "effective throughout the period" that a noncitizen has TPS.  *Id.* § 1254a(a)(2).  TPS also allows a noncitizen to "travel abroad with prior consent" of the Secretary, *id.* § 1254a(f)(3), and constitutes "lawful status as a nonimmigrant" for purposes of adjustment of status to lawful permanent residence or other changes of nonimmigrant classification, *id.* § 1254a(f)(4).

34.    Once a country is designated for TPS, the designation "shall remain in effect until the effective date of the termination of the designation."  *Id.* § 1254a(b)(2)(B).

35.    After a country is designated for TPS, the statute provides a process for the Secretary to review that designation.  *See generally Saget v. Trump*, 375 F. Supp. 3d 280, 346–347 (E.D.N.Y. 2019) (reviewing the statute's "plain[] outline[]" of the procedures the Secretary must follow in deciding whether to terminate TPS for a recipient country).  At least 60 days before the end of the initial designation period or any extended designation period, the Secretary shall, "after consultation with appropriate agencies of the Government," "review the conditions in the foreign state (or part of such foreign state) for which designation is in effect" and "determine whether the conditions for such designation under this subsection continue to be met."   8 U.S.C. § 1254a(b)(3)(A).  The Secretary "shall provide on a timely basis for the publication of notice of

App.010-CASA

each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." *Id.*

36.　　The statute also details the process that must be followed to terminate a TPS designation.　The Secretary may terminate a designation only if, following her periodic review (which is to occur at least 60 days before the end of the TPS designation), she determines that the designated country "no longer continues to meet the conditions of designation." *Id.* § 1254a(b)(3)(A)–(B).　The statute provides no other permissible grounds for termination. *See id.*

37.　　Should the Secretary determine that the designated country no longer meets the conditions of designation, she "shall terminate the designation by publishing notice in the Federal Register of [her] determination . . . (including the basis for the determination)." *Id.* § 1254a(b)(3)(B).　The termination "shall not be effective earlier than 60 days after the date the notice is published." *Id.*　And the termination "shall only apply to documentation and authorization issued or renewed after the effective date of the publication notice" of the termination or, "at the [Secretary's] option, after such period after the effective date of the determination as the [Secretary] determines to be appropriate in order to provide for an orderly transition." *Id.* § 1254(d)(3).

38.　　If the Secretary does *not* determine that a country's TPS designation should be terminated or fails to memorialize a determination in the Federal Register, "the period of designation of the foreign state *is extended* for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C) (emphases added).　In other words, a failure to terminate a TPS designation consistent with the procedures set forth in the statute results in the automatic extension of that designation by at least six months.

App.011-CASA

The TPS statute requires DHS to publish the duration of any extension of a TPS designation in the Federal Register.  *Id.* § 1254a(b)(3)(A), (C).

39.    These procedural requirements serve an important purpose.    A country is designated for TPS only if the Secretary concludes that the conditions in the country are dire, and that requiring nationals of those countries to return would pose a threat to their safety (or that the country is unable to handle their return).  Securing TPS allows individuals to live full lives in the United States—to be free from detention on the basis of their immigration status, to work, and to contribute to their communities.  And while a TPS designation is temporary by design, Congress has mandated that a termination occur in an orderly way, to allow those who rely on TPS to have adequate notice so that they may make necessary arrangements, including potentially preparing to return to their countries of origin.  As detailed below, *see* ¶¶ 105–111, *infra*, the failure to follow these basic procedural requirements inflicts great harm on those who have TPS, as well as the families and communities who rely on them.

## FACTUAL BACKGROUND

### A.  Afghanistan's TPS Designation and DHS's Attempt to Terminate It

40.    Afghanistan was initially designated for TPS on May 20, 2022, due to armed conflict and an ongoing "humanitarian disaster."   Designation of Afghanistan for Temporary Protected Status, 87 Fed. Reg. 30,976, 30,977 (May 20, 2022).

41.    The TPS designation came after the Taliban took over in Kabul in 2021, the culmination of its 20-year insurgency against the government of Afghanistan and U.S. and NATO forces.  *Id.*  Even before the withdrawal of U.S. and NATO troops, the conflict had taken a "high toll on Afghan civilians":  the United Nations Assistance Mission in Afghanistan recorded more than 116,000 civilian deaths and injuries between 2009 and June 2021.  *Id.* at 30,978.

12

42.     Armed conflict continued after the withdrawal of U.S. and NATO troops.  *Id.*  The Taliban targeted old adversaries, including former Afghan police and military personnel.  *Id.*  The Islamic State in Iraq and the Levant-Khorasan Province (ISIS-K) also posed an increasing threat to civilians.  *Id.*  This group, which the U.S. Department of State designated as a foreign terrorist organization in 2016, was waging its own insurgency against the Taliban.  *Id.* at 30,978–30,979.  Conflicts between the two groups frequently resulted in civilian casualties.  *Id.* at 30,979.  Among other things, ISIS-K claimed responsibility for the August 26, 2021, suicide attack outside Kabul airport.  *Id.*  By November of 2021, ISIS-K was present in nearly all of Afghanistan's provinces, and the number of ISIS-K attacks had increased by more than five-and-a-half times from the previous year.  *Id.*

43.     Afghanistan also faced significant challenges due to the destruction of vital infrastructure.  *Id.*  The Taliban reportedly had targeted power stations, dug up roads, destroyed cell towers, and damaged schools and medical facilities during its insurgency.  *Id.*  The country's education system was also "at risk of complete collapse due to the economic crisis," and the conflict had "left the Afghan countryside 'littered with abandoned and decaying power plants, prisons, schools, factories, office buildings and military bases.'"  *Id.* (citation omitted).

44.     Afghans faced a host of other dangers, including undetonated "[e]xplosive remnants of war," *id.*; rising internal displacement, *id.* at 30,980; a "cessation of purchasing power of the Afghan population as a result of the termination of international assistance once used to pay salaries," *id.*; lack of access to food, potable water, and healthcare, *id.* at 30,980–30,981; and human rights abuses against women and girls, ethnic minorities, and the disabled, *id.* at 30,981–30,984.

13

45.     On September 25, 2023, then-Secretary of Homeland Security Alejandro Mayorkas

extended TPS for Afghanistan for an additional 18 months, until May 20, 2025 (the "2023

Afghanistan Extension").  Extension and Redesignation of Afghanistan for Temporary Protected

Status, 88 Fed. Reg. 65,728, 65,728 (Sept. 25, 2023).  This extension allowed Afghans who already

had TPS to re-register.  *Id.*  In the same notice, Secretary Mayorkas redesignated Afghanistan for

TPS, allowing Afghan nationals (or individuals having no nationality who last habitually resided

in Afghanistan) to apply for TPS for the first time if they met certain conditions.  *Id.* at 65,729.

46.     In extending and redesignating TPS for Afghanistan, Secretary Mayorkas explained

that since the August 2021 Taliban takeover, the "conflict and insurgency [had] continue[d] to

cause insecurity and widespread harm throughout the country."  *Id.* at 65,730.  He further cited the

ongoing conflict between the Taliban and ISIS-K.  *Id.* at 65,731.  The human rights situation in

Afghanistan had developed into a "worsening crisis," as the Taliban responded aggressively to any

resistance to its rule with "summary killings, disappearances, information blackouts, and physical

abuse."  *Id.*  The Taliban had also adopted an "extremely repressive" regime with respect to women

and girls—against whom sexual violence "occur[ed] regularly"—and ethnic and religious

minorities.  *Id.*  The humanitarian situation in Afghanistan was also "dire, with 15 million people

facing acute food insecurity, as well as limited access to clean water and healthcare, destruction of

infrastructure, and economic disability."  *Id.* at 65,732.

47.     Consistent with past practice, the 2023 Afghanistan Extension established a 60-day

re-registration period for existing TPS beneficiaries.  *Id.* at 65,728.  It further established a

registration period during which first-time applications could be submitted.  *Id.*  It also provided

instructions on how beneficiaries could register or re-register, and how they could obtain an

employment authorization document (EAD), including by identifying which forms needed to be

App.014-CASA

filled out, what supporting documentation was required, and where the relevant materials needed to be mailed. *Id.* at 65,733–65,737.

48.    Due to the redesignation of Afghanistan in the 2023 Afghanistan extension, an estimated 14,600 individuals became eligible to apply for TPS. Jill H. Wilson, Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred Enforced Departure* 9 (updated Dec. 5, 2024). As of May 13, 2025, approximately 11,700 nationals of Afghanistan (or persons having no nationality who last habitually resided in Afghanistan) had received TPS. *See* 90 Fed. Reg. at 20,311.

49.    On May 13, 2025, DHS published a notice in the Federal Register that Secretary Noem had terminated Afghanistan's TPS designation. *Id.* at 20,309.

50.    Among other things, the notice stated that the Secretary had concluded based on her own review and consultations with the Department of State that there have been "notable improvements in the security and economic situation such that requiring the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety due to armed conflict or extraordinary and temporary conditions." *Id.* at 20,310.

51.    The notice further stated that "[b]y statute, the Secretary is prohibited from designating a country for TPS or extending a TPS designation on the basis of extraordinary and temporary conditions if she finds that 'permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* at 20,310–20,311 (quoting 8 U.S.C. § 1254a(b)(1)(C)).

52.    It further stated that in an executive order, "the President referenced the 'millions of illegal aliens who crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding

15

App.015-CASA

Federal laws.'" *Id.* at 20,311 (quoting Exec. Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8,443, 8,443 (Jan. 20, 2025) (brackets omitted)).

53.     The Federal Register notice also explained that President Trump had clearly "articulated an array of policy imperatives bearing upon the national interest in his recent immigration and border-related executive orders and proclamations," including Executive Order 14,159, in which President Trump "underscored that enforcing the immigration laws 'is critically important to the national security and public safety of the United States.'" *Id.* (quoting Exec. Order 14,159, 90 Fed. Reg. at 8,443).

54.     The notice continued by stating that "[i]n furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States," and that "[t]he directed actions include ensuring that the TPS designations are consistent with the TPS statute and 'made for only so long as may be necessary to fulfill the textual requirements of that statute.'" *Id.* (quoting Exec. Order 14,159, 90 Fed. Reg. at 8,446).

55.     In addition, the notice stated that "[t]he Department has considered the national interest factors and determined that continuing to permit Afghan nationals (and aliens having no nationality who last habitually resided in Afghanistan) to reside in the United States on TPS would be inconsistent with E.O. 14159 and otherwise contrary to the U.S. national interest, especially in light of the Secretary's determination that they may return in safety." *Id.*

56.     It further noted that "DHS records indicate that there are Afghan nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety,

App.016-CASA

and national security," and that the "Secretary accordingly took account of those cases in making her determination." *Id.*

57.    And the notice stated that "[c]ontinuing to permit these Afghan nationals to remain in the United States does not champion core American interests or put American interests first," in light of the President's directive that "'the foreign policy of the United States shall champion core American interests and always put America and American citizens first.'" *Id.* (quoting Exec. Order 14,150, *America First Policy Directive to the Secretary of State*, 90 Fed. Reg. 8,337, 8,337 (Jan. 20, 2025)). "U.S. foreign policy interests are best served and protected by curtailing policies that facilitate or encourage destabilizing migration." *Id.*

58.    The notice further indicated that the termination of Afghanistan's TPS designation would not take effect until 60 days after it was published in the Federal Register (July 14, 2025), and automatically extended the validity of certain EADs previously issued under Afghanistan's TPS designation until the termination takes effect. *Id.* at 20,311–20,312.

**B.  TPS Designations for Cameroon**

59.    Cameroon was initially designated for TPS on June 7, 2022, due to the conflict between government forces and armed separatists in the country, as well as deadly attacks by multiple terrorist organizations. *See* Designation of Cameroon for Temporary Protected Status, 87 Fed. Reg. 34,706, 34,706 (June 7, 2022).

60.    Since 2016, armed conflict has raged throughout the Anglophone regions of Cameroon, which make up approximately 20 percent of the country's population, due to the emergence of an Anglophone separatist movement. *Id.* at 34,708.[2]  Since that time, over 6,000

---

[2] *See also* Nalova Akua, *"What Were You Expecting?  A Bloodless War?": How Cameroon Became Trapped in a Forgotten Standoff*, The Guardian (Nov. 21, 2024), https://perma.cc/5936-WJRG.

App.017-CASA

people have died and at least a million have been displaced either internally or to neighboring countries.[3]  The conflict has caused the country's economy and basic infrastructure to collapse, and led to widespread human rights abuses, including torture and sexual violence.[4]

61.    In designating Cameroon for TPS, Secretary Mayorkas cited the extreme violence between government forces and armed separatists, noting the crisis was "more severe than any other in contemporary Cameroon." *Id.* at 34,708.  The notice additionally stated that one in three people in certain regions were in need of humanitarian aid.  *Id.*

62.    The notice also described attacks by Boko Haram and other terrorist organizations in the country, as well as a growing humanitarian crisis that led to economic deterioration, destruction of critical infrastructure, and increasing food insecurity.  *Id.* at 34,709.

63.    On October 10, 2023, Secretary Mayorkas extended TPS for Cameroon for a period of 18 months, until June 7, 2025 (the "2023 Cameroon Extension").  Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945, 69,945 (Oct. 10, 2023).  This extension allowed Cameroonians who already had TPS to re-register.  In the same notice, Secretary Mayorkas redesignated Cameroon for TPS, allowing nationals of Cameroon to apply for TPS for the first time if they met certain conditions.  *Id.*

64.    In deciding to extend the designation, Secretary Mayorkas again cited the ongoing armed conflict between the government and nonstate armed groups, as well as conflicts between the government and the Anglophone separatist groups.  *Id.* at 69,947.  These battles had led to widespread killing, kidnapping, displacement, and destruction of civilian infrastructure.  *Id.*  The Secretary also noted that the conflict had resulted in the destruction of hundreds of homes and left

---

[3] *Id.*

[4] *Id.*

App.018-CASA

many in Cameroon without access to health services and education. *Id.* at 69,947–69,948. In addition, individuals who had engaged in peaceful protests had been abducted, tortured, and shot. *Id.* at 69,948. Children had also been abducted for use as child soldiers. *Id.* at 69,947. At the time of the 2023 Cameroon Extension, one in every six people in Cameroon needed humanitarian assistance and protection, but providing that assistance was difficult because armed groups controlled the movement of goods in areas under their control. *Id.* at 69,948. An estimated three million people faced food insecurity; and the country was experiencing a cholera outbreak. *Id.* at 69,949.

65.     Consistent with past practice, the 2023 Cameroon Extension established a 60-day re-registration period for existing TPS beneficiaries. *Id.* at 69,945. It further established a registration period during which first-time applications could be submitted. *Id.* It also provided instructions on how beneficiaries could register or re-register, and how they could obtain an EAD, including by identifying which forms needed to be filled out, what supporting documentation was required, and where the relevant materials needed to be mailed. *Id.* at 69,949–69,953.

66.     Due to the redesignation of Cameroon in the 2023 Cameroon Extension, an estimated 7,900 individuals became eligible to apply. Jill H. Wilson, Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred Enforced Departure* 11 (updated Dec. 5, 2024). As of September 30, 2024, 3,485 nationals of Cameroon had received TPS. *Id.*

67.     On April 11, 2025, various news outlets reported that that Secretary Noem had terminated Cameroon's TPS designation, based on an email to the media from Assistant Secretary McLaughlin.[5] As of the date of the filing of this First Amended Complaint, DHS has not published

---

[5] *See* Hamed Aleaziz, *Trump Will End Temporary Protections for Afghans and Cameroonians,* N.Y. Times (Apr. 11, 2025), https://tinyurl.com/5e5fruuc; Thomas Mackintosh & Regan Morris,

App.019-CASA

the statutorily required notice of its decision to terminate the designation of Cameroon in the Federal Register. Secretary Noem's acts and omissions have created great uncertainty as to whether Cameroonians with TPS will maintain that status beyond June 7, 2025, whether they will continue to be authorized to work after that date, and whether they will be forced to leave the country after that date.[6]

### C. The Attempted Termination of the TPS Designation for Afghanistan Was Motivated at Least in Part by Racial Animus

68.    In addition to failing to follow the statutorily required process and considering factors beyond those set forth by statute, Secretary Noem's attempted termination of the TPS designation for Afghanistan is invalid because it was motivated at least in part by racial animus. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–266 (1977) (government actions violate equal protection principles "[w]hen there is a proof that a [racially] discriminatory purpose has been a motivating factor" for the action).

69.    Overwhelming evidence supports this claim. *See id.* at 266–267 (identifying factors to consider when determining whether a facially neutral policy is motivated at least in part by racially discriminatory intent). The attempted termination of TPS for Afghanistan is part of a broader effort by the Trump Administration to eliminate lawful immigration status for noncitizens from countries the Administration believes are predominantly non-white, while simultaneously removing immigration barriers to white noncitizens. *See id.* at 266 (whether the "impact of the

---

*Trump to End Protected Status for Afghans and Cameroonians*, BBC (Apr. 11, 2025), https://perma.cc/HA8F-L4C2

[6] Should DHS publish a notice terminating Cameroon's TPS designation after the date of the filing of this First Amended Complaint, CASA reserves the right to submit supplemental pleadings pursuant to Federal Rule of Civil Procedure 15(d).

App.020-CASA

official action . . . bears more heavily on one race than another . . . may provide an important starting point" in the equal protection analysis (internal quotation marks omitted)).

70.     For example, besides the attempted termination of Afghanistan's TPS designation, DHS also purported to vacate the most recent extension of TPS designations for Haiti and Venezuela.  *See* Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10511 (Feb. 24, 2025); Vacatur of 2025 Temporary Protected Status Decision for Venezuela, 90 Fed. Reg. 8805 (Feb. 3, 2025).  *But see Nat'l TPS Alliance v. Noem*, ___ F. Supp. 3d ____, No. 3:25-cv-1766, 2025 WL 957677, at *47 (N.D. Cal. Mar. 31, 2025) (issuing order postponing the Venezuela vacatur), *motion to stay pending appeal denied*, 9th Cir. Case No. 25-2120, 2025 WL 1142444 (Apr. 18, 2025), *motion for stay granted sub nom.*, *Noem v. Nat'l TPS Alliance*, U.S. Supreme Court Case No. 24A1059 (May 19, 2025).

71.     DHS also announced the termination of parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members.  *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025).  *But see Doe v. Noem*, ___ F. Supp. 3d ____, No. 1:25-cv-10495, 2025 WL 1099602 (D. Mass. Apr. 14, 2025) (issuing order staying DHS's *en masse* truncation of all valid grants of parole under this program), *motion to stay pending appeal denied*, 1st Cir. Case No. 25-1384, Doc. # 118281252 (May 5, 2025), *motion to stay filed sub nom.*, *Noem v. Doe*, U.S. Supreme Court Case No. 24A1079 (May 8, 2025).

72.     The Trump Administration also has revoked over 1,000 visas for students participating in the Student and Exchange Visitor Information System program.[7]  The ten countries

---

[7] Joann Ng Hartmann, *New Insights into the Growing Number of Actions Against International Students and Scholars*, NAFSA (Apr. 25, 2025), https://perma.cc/Q7V2-RWYR.

with the greatest number of affected students are India, China, South Korea, Saudi Arabia, Nigeria, Nepal, Bangladesh, Columbia, Mexico, and Iran.[8]  After encountering intense judicial scrutiny from multiple federal courts, Administration officials have recently represented that many students' visas have been restored while DHS develops a new system for reviewing and terminating student visas.[9]

73.     In stark contrast to the Trump Administration's actions toward non-white immigrants, shortly after taking office President Trump signed Executive Order No. 14,204, "Addressing Egregious Actions of the Republic of South Africa," which in part directs the Secretary of State and the Secretary of Homeland Security to "take appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination."  90 Fed. Reg. 9,497 (Feb. 7, 2025).  Afrikaners, who President Trump claims are being targeted by a South African land expropriations law, are descendants of white Dutch, French, and German colonial settlers who arrived in South Africa over 300 years ago.[10]

74.     On May 12, 2025, the first group of white South African refugees arrived in the United States under this program.[11]  The review and approval of their applications was expedited; they were brought to the United States on a government-chartered flight; and they were greeted at

---

[8] *Id.*

[9] Zach Montague & Hamed Aleaziz, *U.S. Restores Legal Status for Many International Students, But Warns of Removals to Come*, N.Y. Times (Apr. 25, 2025), https://tinyurl.com/s9ph5zkm.

[10] Gerald Imray, *Trump Says Some White South Africans Are Oppressed and Could Be Resettled in the U.S. They Say No Thanks*, AP News (Feb. 8, 2025), https://tinyurl.com/s9ph5zkm.

[11] Ximena Bustillo, *First Afrikaners Arrive in U.S. Under Radically Redrawn Refugee Program*, NPR (May 12, 2025), https://perma.cc/TB6M-24FA.

App.022-CASA

Washington Dulles International Airport by government officials.[12]  In explaining why these refugees were being allowed into this country while others—including Afghans—were not, Deputy Secretary of State Christopher Landau said that Afrikaners "could be assimilated easily into our country."[13]

75.    President Trump also has announced that he is creating a new visa program that he is calling the "gold card."[14]  Under this program, noncitizens who, in President Trump's words, are "very high-level people" would be able to purchase a visa for $5 million that allows them to live permanently in the United States and provides them with a pathway to citizenship.[15]  This program will disproportionately reduce immigration barriers to white individuals:  after the United States, Western Europe has the largest percentage (28 percent) of the world's millionaires.[16]  Aside from the United States, the places with the highest proportion of millionaires per capita are Luxembourg, Switzerland, Hong Kong, Australia, New Zealand, Netherlands, and Denmark.[17]

---

[12] *Id.*

[13] *Id.*

[14] Shawn McCreesh, *Trump Plans "Gold Card" Alternative to Green Cards for 'High Level People'*, N.Y. Times (Feb. 25, 2025), https://tinyurl.com/2a7c9szj.

[15] Ryan Mac & Hamed Aleaziz, *Musk's Team Is Building a System to Sell 'Gold Card' Immigrant Visas*, N.Y. Times (Apr. 16, 2025), https://tinyurl.com/bdycjm6c.

[16] *Global Wealth Report 2024*, UBS 23 (2024), https://perma.cc/NST7-WZDR.

[17] *Id.* at 24.

23

76.    The conclusion that the attempted termination of TPS for Afghanistan was motivated at least in part by racial animus is also supported by the fact that Secretary Noem bypassed the standard process for conducting TPS reviews.  *See Arlington Heights*, 429 U.S. at 267 ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.").

77.    TPS review typically begins with career specialists preparing an objective country conditions report, a process spanning months.  This report then informs the U.S. Citizenship and Immigration Services Director's decision memos to the Secretary and, ultimately, the Federal Register notices announcing DHS's decision.  Moreover, the TPS statute requires the Secretary to consult with "appropriate agencies," 8 U.S.C. § 1254a(b)(3)(A), and in the past the Secretary has typically consulted with State Department officials during its review.[18]

78.    For example, during the first Trump Administration, President Trump attempted to terminate the TPS designation of several countries, but only after lengthy periods of review.  The first concerned Sudan.  DHS announced that termination decision in October 2017—nearly nine months into President Trump's first term—and delayed its effective date until more than a full year later.  Termination of the Designation of Sudan for TPS, 82 Fed. Reg. 47,228 (Oct. 11, 2017). Attempted terminations of TPS designations for Nicaragua, El Salvador, Haiti, and Nepal occurred even later during President Trump's first term and provided similarly lengthy deferral of effective dates.  Termination of the Designation of Nicaragua for TPS, 82 Fed. Reg. 59,636 (Dec. 15, 2017) (termination effective January 5, 2019); Termination of the Designation of El Salvador for Temporary Protected Status, 83 Fed. Reg. 2,564 (Jan. 18, 2018) (termination effective September

---

[18] *See* U.S. Gov't Accountability Off., *Temporary Protected Status: Steps Taken to Inform and Communicated Secretary of Homeland Security's Decisions* 2 (2020), https://perma.cc/V7YF-CZ5Y.

App.024-CASA

9, 2019); Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. 2,648 (Jan. 18, 2018) (termination effective July 22, 2019); Termination of the Designation of Nepal for Temporary Protected Status, 83 Fed. Reg. 2,3705 (May 21, 2018) (termination effective June 24, 2019).

79.     In stark contrast to the lengthy process described above, Secretary Noem decided to terminate the TPS designation for Afghanistan less than four months of taking office.

80.     Secretary Noem could not have engaged in the typical review process within the shortened timeframe of at most three months, and any consultation with the State Department or other government agencies was at best cursory.

81.     Moreover, as outlined above, *see* ¶¶ 35–39, 49–58, *supra*, Secretary Noem's attempted termination of Afghanistan's TPS designation failed to comply with the statutorily required timelines and publication requirements that provide certainty to TPS beneficiaries and an orderly transition in the event of a termination.   And the reasons cited for terminating Afghanistan's TPS designation demonstrate that the decision was preordained by presidential directive, a part of the Trump Administration's effort to reduce the number of nonwhite immigrants in this country.  *See* ¶¶ 52–57, *supra*.

82.     President Trump's and Secretary Noem's repeated statements further demonstrate that the attempted termination of the TPS designation for Afghanistan was at least partially motivated by racial animus.  *See Arlington Heights*, 429 U.S. at 268 ("contemporary statements by members of the decisionmaking body" may be "highly relevant" in the racial animus analysis).

App.025-CASA

83.    During his first presidency, President Trump explicitly questioned why the United States would want immigrants from "shithole countries" in Africa rather than places like Norway.[19]

84.    President Trump further disparaged other non-white immigrants, falsely claiming that Haitian visa holders "all have AIDS," and complaining that Nigerian migrants would never "go back to their huts."[20]

85.    President Trump later in his first term falsely equated Middle Eastern and other non-white migrants with crime when discussing a migrant caravan, claiming, "You're going to find MS-13, you're going to find Middle Eastern, you're going to find everything.  And guess what, we're not allowing them in our country.  We want safety, we want safety."[21]

86.    In a March 2024 interview with Right Side Broadcasting Network, President Trump compared non-white immigrants to the fictional serial killer Hannibal Lecter.  He stated "They're rough people, in many cases from jails, prisons, from mental institutions, insane asylums.  You know, insane asylums, that's 'Silence of the Lambs' stuff . . . . We don't want 'em in this country."[22]

---

[19] Josh Dawsey, *Trump Derides Protections for Immigrants from "Shithole" Countries*, Wash. Post (Jan. 12, 2018), https://tinyurl.com/yhuf9p5p.

[20] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://tinyurl.com/23jmwvrb.

[21] *"Bigoted Rhetoric": Trump Warns of Middle Easterners Amongst US-Bound Migrants*, Middle East Eye (Oct. 23, 2018), https://perma.cc/9LFL-D5WV.

[22] Megan Lebowitz & Jake Traylor, *Trump compares migrants to Hannibal Lecter in 'The Silence of the Lambs'*, NBC News (Mar. 4, 2024), https://tinyurl.com/y2dns8je.

App.026-CASA

87. During a June 2024 rally, President Trump repeated a common campaign talking point that "very bad people" from "Congo and Africa," "from Asia," "from the Middle East," and "from South America" have entered the United States "so illegally."[23]

88. President Trump doubled down on these statements during later campaign events. In September 2024, he stated, "They emptied their jails in Venezuela, emptied their criminals, emptied their nests. They call them nests of bad people. They're all now in the United States and they're taking over cities. It's like an invasion from within."[24]

89. During the September 2024 presidential debate, President Trump repeatedly used language seeking to dehumanize and spread misinformation about non-white immigrants, falsely claiming that Haitian immigrants in Springfield, Ohio, were "eating the dogs, the people that came in, they're eating the cats . . . They're eating the pets of the people that live there, and this is what's happening in our country, and it's a shame."[25] Following these inflammatory remarks, Springfield received more than 33 bomb threats, forcing schools to evacuate.[26]

90. Since taking office, during a speech addressed to Republican Senators, President Trump stated that there were "[m]any, many thousands and thousands of murderers" let into the country "from all over the world."[27] He went on to falsely allege that "some of these countries

---

[23] *Speech: Donald Trump Holds Political Rally in Racine, Wisconsin – June 18, 2024*, Roll Call, https://perma.cc/D2LK-FRXW (last visited May 20, 2025).

[24] Ariana Baio, *Trump Says His Mass Deportation Will Begin in Ohio Town Where He Falsely Claimed Haitians Were Eating Pets*, The Independent (Sept. 13, 2024), https://perma.cc/7Z6X-T4ZF .

[25] *Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024), https://tinyurl.com/bdeyphda.

[26] Phil Helsel, *More than 30 Bomb Threats Made in Springfield, Ohio, After False Pets Claims*, NBC News (Sept. 16, 2024), https://tinyurl.com/yv5e9ump.

[27] *Speech: Donald Trump Addresses GOP Senators at Dinner at Mar-a-Lago – February 7, 2025*, Roll Call, https://perma.cc/EXQ5-TSBP (last visited May 20, 2025).

App.027-CASA

allowed [in] every single prisoner . . . . [T]hese are countries also from Africa, from Asia, not just South America, a lot, a lot from South America, but not even the most."[28]

91.    An analysis of President Trump's public comments shows that he has focused his racial animus towards non-white immigrants from across the world. Specifically, he has described immigrants from Venezuela, the Democratic Republic of Congo, El Salvador, Honduras, Mexico, and Guatemala as "criminals" dozens of times.[29]

92.    Research from across the political spectrum flatly contradicts President Trump's association of immigrants, whether documented or undocumented, with criminal activity. According to a 2024 study commissioned by the U.S. Department of Justice's National Institute of Justice and based on Texas criminal records, "undocumented immigrants are arrested at less than half the rate of native-born U.S. citizens for violent and drug crimes and a quarter the rate of native-born citizens for property crimes."[30] The Cato Institute, a libertarian think tank, came to a similar conclusion, noting in a 2020 working paper that, "[t]he illegal immigrant criminal conviction rate was 45 percent below that of native-born Americans in Texas. The legal immigrant criminal conviction rate was 62 percent below that of native-born Americans."[31]

93.    News sources have also repeatedly debunked the claim that any country is

---

[28] *Id.*

[29] *See* Russell Contreras et al., *Trump keeps calling Venezuelan and Congolese migrants criminals*, Axios (Oct. 5, 2024), https://tinyurl.com/yzu5akvy.

[30] U.S. Dep't of Just., Nat'l Inst. of Just., *Undocumented Immigrant Offending Rate Lower Than U.S.-Born Citizen Rate* 1 (2024), https://perma.cc/DBS2-LB8H.

[31] Alex Nowrasteh et al., *Illegal Immigration and Crime in Texas* 4 (Cato Inst., Working Paper No. 60, 2020), https://tinyurl.com/3v9s2xf9; *see also* Ran Abramitzky et al., *Law-Abiding Immigrants: The Incarceration Gap Between Immigrants and the US-born, 1870–2020* 2 (Nat'l Bureau of Econ. Rsch., Working Paper No. 31440, 2024), https://perma.cc/59XW-SULP ("As a group, immigrants have had lower incarceration rates than the US-born for 150 years.").

App.028-CASA

"emptying" prisons and mental health institutions to send people to the United States.[32]

94. President Trump also has repeatedly stated that immigrants are "poisoning the blood of our country," echoing the racist rhetoric of white supremacists.[33] He first used this term in an October 2023 interview, falsely stating that "Nobody has any idea where these people are coming from, and we know they come from prisons. We know they come from mental institutions and insane asylums. We know they're terrorists. Nobody has ever seen anything like we're witnessing right now. It is a very sad thing for our country. It's poisoning the blood of our country. It's so bad, and people are coming in with disease. People are coming in with every possible thing that you could have."[34]

95. In the months that followed, President Trump doubled down on this rhetoric, drawing condemnation from Republican lawmakers.[35] In a December 2023 rally in New Hampshire, President Trump stated "[t]hey're poisoning the blood of our country . . . . [N]ot just in South America, not just [the] three or four countries that we think about, but all over the world.

---

[32] Angelo Fichera, *Fact Checking Trump's Recent Immigration Claims,* N.Y. Times (Dec. 24, 2023), https://tinyurl.com/3wjk2w96; Lori Robertson, et al., *FactChecking Trump's Rally, Fox Interview*, FactCheck.org (Mar. 30, 2023), https://tinyurl.com/4s83pur2; Daniel Dale, *Fact check: Trump's Own Campaign Can't Find Proof for His 'Mental Institutions' Immigration Story*, CNN (Apr. 29, 2023), https://perma.cc/32JU-MK7L; *Fact-checking Over 12,000 of Donald Trump's Quotes About Immigrants,* The Marshall Project (Oct. 21, 2024), https://perma.cc/UNV2-AT9H.

[33] Russell Contreras, *Axios Explains: The Racist History of Trump's "Poisoning the Blood,"* Axios (Dec. 30, 2023), https://tinyurl.com/4u94adu2.

[34] Trip Gabriel, *Trump Escalates Anti-Immigrant Rhetoric With 'Poisoning the Blood' Comment*, N.Y. Times (Oct. 5, 2023), https://tinyurl.com/457zk5ze ("In 'Mein Kampf,' . . . there are several passages in which Hitler used the words 'poison' and 'blood' in attacking people he deemed a threat to the purity of the Aryan race.").

[35] Megan Lebowitz, *Trump Sparks Republican Backlash After Saying Immigrants Are 'Poisoning the Blood' of the U.S.*, NBC News (Dec. 19, 2023), https://tinyurl.com/5693a3f2.

App.029-CASA

They're coming into our country from Africa, from Asia, all over the world."[36]

96.    In March 2024, on multiple occasions, President Trump went even further, stating that immigrants from Latin America were inhuman.  In a speech, he stated: "I don't know if you call them 'people,' in some cases. They're not people, in my opinion."[37]  Later at a campaign rally, President Trump reiterated his association of immigrants with crime and disease: "You ever see the parks of our cities?  They're migrant camps, and I'll not let them turn the USA into a crime-filled, disease-ridden dumping ground, which is what they're doing."[38]  In an interview, President Trump further dehumanized immigrants and said their languages "are, like, from, from the planet Mars."[39]

97.    In April 2024, President Trump continued to broadcast his dehumanizing views regarding immigrants.  He noted, "The Democrats say, 'Please don't call them animals. They're humans.'  I said, 'No, they're not humans, they're not humans, they're animals.'  Nancy Pelosi told me that.  She said, 'Please don't use the word animals when you're talking about these people.'  I said, 'I'll use the word animal because that's what they are.'"[40]

98.    In October 2024, President Trump suggested that immigrants who commit crimes do so because "it's in their genes," and further asserted, "[a]nd we got a lot of bad genes in our

---

[36] Ginger Gibson, *Trump Says Immigrants Are 'Poisoning the Blood of Our Country.' Biden Campaign Likens Comments to Hitler*, NBC News (Dec. 17, 2023), https://tinyurl.com/myvdd3yu.

[37] Maggie Astor, *Trump Doubles Down on Migrants 'Poisoning' the Country*, N.Y. Times (Mar. 17, 2024), https://tinyurl.com/mtfasf49.

[38] WFMY News 2, *Trump Speaks on Border Security, Immigration and Law Enforcement in Greensboro*, YouTube (Mar. 2, 2024), https://tinyurl.com/3rrdbaur.

[39] Lebowitz & Traylor, *supra* note 22.

[40] The National Desk, *Trump on Migrant Criminals: "They're Not Humans. They're Animals . . . That's What They Are,"* YouTube (Apr. 3, 2024), https://tinyurl.com/277wapx6.

App.030-CASA

country right now."[41]

99.    This is in sharp juxtaposition to a statement President Trump made that earlier that year lamenting the dearth of immigrants from "nice countries" like Denmark, Switzerland, and Norway.[42]

100.    Secretary Noem has made clear that she is fully committed to carrying out President Trump's mission to reduce the number of non-white immigrants in this country.

101.    For example, she has repeatedly referred to immigrants as "dirt bags."[43]

102.    And in a CBS News Interview on March 5, 2024, Secretary Noem made disparaging remarks about non-white immigrants, claiming, "We've seen these countries that hate us empty out their prisons, their mental institutions."[44]

103.    Similarly, at her confirmation hearing on January 17, 2025, Secretary Noem falsely conflated TPS holders with criminals, stating, "[T]his extension [of TPS] of over 600,000 Venezuelans . . . is alarming when you look at what we've seen in different states including Colorado with gangs doing damage and harming the individuals and the people that live there."[45]

---

[41] Patrick Svitek, *Trump Suggests 'Bad Genes' to Blame for Undocumented Immigrants Who Commit Murders*, Wash. Post (Oct. 7, 2024), https://tinyurl.com/4ye6bp65.

[42] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants From 'Nice' Countries*, N.Y. Times (Apr. 7, 2024), https://tinyurl.com/47sd77h9.

[43] @Sec_Noem, X (Jan. 28, 2025, 7:35 AM), https://perma.cc/55YD-CGDL ("Getting the dirt bags off the streets."); CBS Mornings, *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, YouTube (Jan. 29, 2025), https://tinyurl.com/44xwtxzy ("These guys are dirtbags. They have come in and perpetuated violence in this country."). The CBS reporter who accompanied Secretary Noem on New York City raids reported that nearly half of those arrested had no criminal history. CBS Mornings, *supra*.

[44] *South Dakota Gov. Kristi Noem calls on Nikki Haley to exit 2024 race*, CBS News (Mar. 4, 2024), https://perma.cc/49GH-PMDL.

[45] *Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025), https://tinyurl.com/yhh4ze7r.

App.031-CASA

104.    Secretary Noem's history of derogatory remarks towards non-white immigrants predated her term as Secretary.  Before her nomination to DHS, she stated, "Venezuela didn't send us their best. They emptied their prisons and sent criminals to America.  Deportations need to start on DAY ONE of [President Trump's] term" in office.[46]

**D. Impact of the Decision to Terminate TPS for Afghanistan and the Failure to Properly Extend the TPS Designation for Cameroon on CASA's Members and Their Communities**

105.    CASA members who received TPS pursuant to the designation of Afghanistan face irreparable harm if that designation is terminated.  These members may lose their jobs, access to critical medical care, and basic services.  They may also be removed to a country where they face oppression, abuse, and physical threats.  This harm is not limited to the TPS holders themselves; some are principal or sole income-earners for their families, and a loss of TPS for these members may also mean a loss of financial security and other basic needs for their parents, siblings, spouses, and children.

106.    The experiences of CASA members vividly illustrate this irreparable harm.  For instance, A.F., an Afghan TPS holder, faces the loss of his job as a project manager if he loses TPS.  In addition to abruptly cutting off his income and depriving his mother and brother of the financial support that A.F. provides them, a TPS termination would leave him vulnerable to

---

[46] @KristiNoem, X (Feb. 26, 2024, 2:19 PM), https://perma.cc/D58Z-4X8H ("Nations like Venezuela are emptying their prisons of dangerous criminals to send them to America."); @KristiNoem, X (Feb. 27, 2024, 8:26 PM), https://perma.cc/Z9J5-8V22 ("Venezuela emptied their prisons and sent criminals to America."); @KristiNoem, Instagram (Mar. 6, 2024), https://tinyurl.com/5nx7w6wc ("Countries like Venezuela are emptying their prisons, their mental institutions, and sending them to America."); @KristiNoem, X (Mar. 14, 2024, 12:24 PM), https://perma.cc/T8KG-82DK ("Remember, Venezuela emptied their prisons and told them to come to America."); @KristiNoem, Instagram (Dec. 9, 2024), https://tinyurl.com/2p5z96n9 ("[N]ations like Venezuela are using our open border to solve their own crime and mental health crises.").

App.032-CASA

removal to a country in turmoil under Taliban rule, where he has no community ties. Particularly in light of the country's economic crisis, its lack of infrastructure to support everyday life, and violence carried out under Taliban rule,[47] A.F. has no prospects for a safe or stable life in Afghanistan.

107.    CASA member and Afghan TPS-holder B.S. fears that TPS termination could lead to her removal to Afghanistan and result in threats to her physical safety. She faces possible targeting and retribution from the Taliban for her connection to the United States—both from currently living in the United States and from having worked for a United States agency in Afghanistan. These fears extend to her family members, including her young children.

108.    Afghanistan TPS termination poses a similar risk of removal and resulting physical safety threat to Afghan TPS-holder M.A., who also fears being targeted by the Taliban for his association with the United States. M.S. further faces the loss of his job, which provides his and his family's sole source of income and is based on his work authorization through TPS, and the accompanying loss of his health insurance.

109.    Furthermore, CASA members who received TPS pursuant to the designation of Cameroon are enduring destabilizing uncertainty from the lack of clarity over Cameroon's TPS designation. These members are valued community members. And they must continue to earn a living and care for their families, all while not knowing whether or when their ability to do so will

---

[47] *See, e.g.*, United Nations Assistance Mission in Afghanistan, Update on the human rights situation in Afghanistan: January – March 2025 Update, https://perma.cc/ECV8-WYSY.

App.033-CASA

be abruptly ended because of a sudden TPS termination that eliminates their work authorization or threatens to separate them from their families.

110.    For example, Cameroonian TPS-holder J.K. faces the harm of not knowing whether Cameroon's TPS designation will be extended.  Although she has not had a conversation with her employer about what will happen if her TPS-based work authorization ends, she thinks that her employer will not allow her to continue working.  In addition, J.K. fled Cameroon more than two decades ago and fears she may suddenly have to return to a country where her physical safety is at risk.  Indeed, Cameroon's infrastructure collapse, clashes between military and paramilitary groups, and terrorist attacks have resulted in widespread human rights abuses, food insecurity, and other forms of physical and economic violence against civilians in the country.[48]

111.    D.T. similarly fled violence in Cameroon.  He is burdened by uncertainty over whether he will have to leave the United States and return to a country where he fears for his life.  D.T.'s concerns are not limited to his own safety and security—they extend to his wife and one of their children, who are also protected by TPS, as well as his two other children, who are United States citizens.  The security of D.T.'s finances and family unit is also precarious, as Cameroon TPS termination would mean the loss of income that supports D.T.'s family and could bring the devastating separation of their family members.

---

[48] *See, e.g.*, U.S. Committee for Refugees and Immigrants, Timeline: Cameroon & the "Anglophone Crisis" (March 28, 2025), https://perma.cc/PZH4-PZ3C; U.S. Department of State, 2023 Country Reports on Human Rights Practices: Cameroon, https://perma.cc/ZR6K-AEPQ.

App.034-CASA

## CAUSES OF ACTION

### Count I
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D)
### (Attempted Afghanistan Termination)

112.    CASA re-alleges and incorporates by reference all of the allegations above.

113.    Defendants' attempted termination of the TPS designation for Afghanistan constitutes "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

114.    The Court is authorized to "hold unlawful and set aside agency action" found to be "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2) (A), (D).

115.    The attempted termination is not effective because the Secretary did not follow the statutory requirement  to publish notice of the termination in the Federal Register at least 60 days before the prior designation expired. 8 U.S.C. § 1254a(b)(3)(B). As a result of that failure, Afghanistan's TPS designation is automatically extended by at least six months. 8 U.S.C. § 1254a(b)(3)(A), (C). Should the Secretary wish to terminate Afghanistan's TPS designation, she needs to do so in a procedurally correct manner by publishing a termination notice at least 60 days before that six-month period expires.

### Count II
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### (Attempted Afghanistan Termination)

116.    CASA re-alleges and incorporates by reference all of the allegations above.

117.    Defendants' attempted termination of the TPS designation for Afghanistan constitutes "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

App.035-CASA

118.    The Court is authorized to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, . . . or not in accordance with law."  5 U.S.C. § 706(2) (A).

119.    An agency's actions are arbitrary, capricious, and not in accordance with law if it relies on "factors which Congress has not intended it to consider," *Roe*, 947 F.3d at 220 (cleaned up), or "contrived reasons," *Dep't of Commerce*, 588 U.S. at 785.  The Federal Register notice makes clear that the decision to terminate Afghanistan's TPS designation was not based on the factors set forth in the TPS statute, but was instead a preordained decision directed by the President, a part of the Trump Administration's broader effort to reduce the number of nonwhite immigrants in this country.

### Count III
### Declaratory Judgment Act, 28 U.S.C. § 2201
### (Attempted Afghanistan Termination)

120.    CASA re-alleges and incorporates by reference all of the allegations above.

121.    Under the Declaratory Judgment Act, this Court is authorized to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief could be sought."  28 U.S.C. § 2201(a).

122.    Afghanistan's current TPS designation was set to expire today, May 20, 2025.  Any termination of Afghanistan's TPS designation needed to be published in the Federal Register at least 60 days before that date (*i.e.*, March 21, 2025).  *See* 8 U.S.C. § 1254a(b)(3)(B).

123.    Because the termination notice was not published in the Federal Register by that date, Afghanistan's TPS designation is automatically extended by at least six months, 8 U.S.C. § 1254a(b)(3)(A), (C), and this Court should so declare.

### Count IV
### Declaratory Judgment Act, 28 U.S.C. § 2201
### (Cameroon TPS Designation)

124.    CASA re-alleges and incorporates by reference all of the allegations above.

App.036-CASA

125.    Under the Declaratory Judgment Act, this Court is authorized to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief could be sought." 28 U.S.C. § 2201(a).

126.    Cameroon's current TPS designation is set to expire on June 7, 2025. Thus, any termination of Cameroon's TPS designation must have been published in the Federal Register at least 60 days before that date (*i.e.*, April 8, 2025). *See* 8 U.S.C. § 1254a(b)(3)(B).

127.    To date, Secretary Noem has not published any termination of Cameroon's TPS designation.

128.    Accordingly, Cameroon's TPS designation is automatically extended by at least six months, 8 U.S.C. § 1254a(b)(3)(A), (C), and this Court should so declare.

**Count V**
**Violation of the Equal Protection Component of the**
**Fifth Amendment's Due Process Clause**
**(Attempted Afghanistan Termination)**

129.    CASA re-alleges and incorporates by reference all of the allegations above.

130.    The equal protection component of the Fifth Amendment's Due Process Clause prohibits the federal government from taking action for which discriminatory intent or purpose is a motivating factor. *See Arlington Heights*, 429 U.S. at 265–266; *N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

131.    Defendants' attempted termination of Afghanistan's TPS designation was motivated at least in part by the Trump Administration's discriminatory intent to terminate TPS for Afghans and render them removable under the immigration laws because of their race, ethnicity, and national origin. The discriminatory intent is evidenced by, *inter alia*, the Trump Administration's efforts to eliminate lawful immigration status for noncitizens from countries that the Administration believes are predominantly non-white, while simultaneously removing

37

immigration barriers to white noncitizens; the procedural and substantive departures from the typical decision-making process for TPS termination determinations; and contemporaneous statements by Secretary Noem and President Trump displaying their animus toward non-white immigrants.

132.    The attempted termination of Afghanistan's TPS designation therefore violates the Fifth Amendment's guarantee of equal protection.

## PRAYER FOR RELIEF

For the foregoing reasons, CASA respectfully requests that this Court:

a. Declare unlawful and set aside the attempted termination of the TPS designation for Afghanistan;

b. Declare that the TPS designation for Afghanistan is extended until at least November 20, 2025;

c. Declare that the TPS designation for Cameroon is extended until at least December 7, 2025;

d. Enter such orders as are necessary to give effect to the foregoing declarations of law;

e. Permanently enjoin enforcement of and declare unlawful the attempted termination of the TPS designation for Afghanistan;

f. Enter such preliminary relief as will preserve the parties' rights and prevent irreparable harm until the Court reaches final judgment;

App.038-CASA

g.   Grant an award of attorneys' fees and costs; and

h.   Grant any other and further relief that this Court may deem fit and proper.

May 20, 2025

Nicholas Katz, Esq. (D. Md. 21920)
CASA, INC.
8151 15th Avenue
Hyattsville, MD 20783
240-491-5743
nkatz@wearecasa.org

Ryan C. Downer*
Sarah L. Bessell (D. Md. 30969)
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. #400
Washington, D.C. 20005
Tel. (202) 319-1000
Fax (202) 319-1010
ryan_downer@washlaw.org
sarah_bessell@washlaw.org

_s/ Jonathan L. Backer_
Jonathan L. Backer (D. Md. 20000)
Rupa Bhattacharyya*
Julia Gegenheimer[†]
Joseph W. Mead (D. Md. 22335)
Mary B. McCord (D. Md. 21998)
Samuel P. Siegel[†]
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
  AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Phone: (202) 661-6671
Fax: (202) 661-6730
jb2845@georgetown.edu
jg1370@georgetown.edu
jm3468@georgetown.edu
mbm7@georgetown.edu
rb1796@georgetown.edu
ss5427@georgetown.edu

*Attorneys for Plaintiff CASA, Inc.*

*Admitted pro hac vice.*

[†]*Admitted pro hac vice.  DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.*

App.039-CASA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

---

CASA, INC.,
8151 15th Avenue
Hyattsville, MD 20528

                *Plaintiff*,

    v.

KRISTI NOEM, Secretary of Homeland
Security, in her official capacity,
2707 Martin Luther King Jr. Ave, SE
Washington, D.C. 20528


U.S. DEPARTMENT OF HOMELAND
SECURITY,
2707 Martin Luther King Jr. Ave, SE
Washington, D.C. 20528

                *Defendants*.

**Case No.:** 8:25-cv-1484

---

## SUPPLEMENT TO THE FIRST AMENDED COMPLAINT

Plaintiff CASA, Inc., hereby supplements its First Amended Complaint, ECF No. 41, under Rule 15(d) of the Federal Rules of Civil Procedure:

1.      On June 4, 2025, the Department of Homeland Security (DHS) published a notice in the Federal Register that Secretary of Homeland Security Kristi Noem had terminated Cameroon's Temporary Protected Status (TPS) designation.  Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697 (June 4, 2025).

2.      The notice acknowledged that "two major conflicts . . . remain active" in Cameroon but asserted that they "are contained in limited regions that primarily impact only three of the ten regions comprising Cameroon."  *Id.* at 23,698.  The Secretary therefore concluded that "Cameroonian aliens can return to the majority of areas in Cameroon that do not pose a serious threat to personal safety." *Id.*

3.      The notice further stated that although "crime is prevalent in some regions of Cameroon, the generalized criminal activity in those regions does not form a sufficient basis for extraordinary and temporary conditions for TPS." *Id.*; *see also* 8 U.S.C. § 1254a(b)(1)(C).

4.      But "even assuming there remain extraordinary and temporary conditions that prevent Cameroonian nationals from safely returning," the Secretary stated that "it is contrary to the national interest to permit Cameroonian nationals (or aliens having no nationality who last habitually resided in Cameroon) to remain temporarily in the United States." *Id.*; *see also* 8 U.S.C. § 1254a(b)(1)(C).

5.      According to the notice, President Donald Trump had "clearly articulated an array of policy imperatives bearing upon the national interest in his recent immigration and border-related executive orders and proclamations," including Executive Order 14,159, in which President Trump "underscored that enforcing the immigration laws 'is critically important to the national

security and public safety of the United States.'" *Id.* (quoting Exec. Order 14,159, 90 Fed. Reg. at 8,443).

6.    The notice continued by stating that "[i]n furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States," and that "the directed actions" include "ensur[ing] that the TPS designations are consistent with the TPS statute and 'are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute.'" *Id.* (quoting Exec. Order 14,159, 90 Fed. Reg. at 8,446).

7.    In addition, the notice stated that "[t]he Department has reappraised the national interest factors and determined, in its discretion, that continuing to permit Cameroonian nationals (and aliens having no nationality who last habitually resided in Cameroon) to reside in the United States would be inconsistent with both [the TPS statute] and E.O. 14159 in light of the Secretary's determination that they may return in safety." *Id.*

8.    The notice further indicated that the termination of Cameroon's TPS designation would not take effect until 60 days after it was published in the Federal Register (August 4, 2025), and automatically extended the validity of certain Employment Authorization Documents previously issued under Cameroon's TPS designation until the termination takes effect. *Id.* at 23,699.

2

## SUPPLEMENTAL CAUSES OF ACTION

### Count VI
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D)
### (Attempted Cameroon Termination)

9.      CASA re-alleges and incorporates by reference all of the allegations above and those in the First Amended Complaint, ECF No. 41.

10.     Defendants' attempted termination of the TPS designation for Cameroon constitutes "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

11.     The Court is authorized to "hold unlawful and set aside agency action" found to be "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2) (A), (D).

12.     The attempted termination is not effective because the Secretary did not follow the statutory requirement to publish notice of the termination in the Federal Register at least 60 days before the prior designation period expired. 8 U.S.C. § 1254a(b)(3)(B). As a result of that failure, Cameroon's TPS designation is automatically extended by at least six months. 8 U.S.C. § 1254a(b)(3)(A), (C). Should the Secretary wish to terminate Cameroon's TPS designation, she needs to do so in a procedurally correct manner by publishing a termination notice at least 60 days before that six-month period expires.

### Count VII
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### (Attempted Cameroon Termination)

13.     CASA re-alleges and incorporates by reference all of the allegations above and those in the First Amended Complaint.

App.043-CASA

14.    Defendants' attempted termination of the TPS designation for Cameroon constitutes "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

15.    The Court is authorized to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, . . . or not in accordance with law." 5 U.S.C. § 706(2)(A).

16.    An agency's actions are arbitrary, capricious, and not in accordance with law if it relies on "factors which Congress has not intended it to consider," *Roe v. Dep't of Def.*, 947 F.3d 207, 220 (4th Cir. 2020) (cleaned up), or "contrived reasons," *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019), or fails to "articulate a satisfactory explanation for its action," *Motor Vehicle Mfrs Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 23, 43 (1983). The Federal Register notice makes clear that the decision to terminate Cameroon's TPS designation was not based on the factors set forth in the TPS statute, but was instead a preordained decision directed by the President, a part of the Trump Administration's broader effort to reduce the number of nonwhite immigrants in this country. Moreover, the notice does not contain sufficient explanation for (1) how the armed conflicts and other extraordinary and temporary conditions in Cameroon have changed in any meaningful way since DHS extended the country's TPS designation in 2023; or (2) why further extension of Cameroon's TPS designation would be "contrary to the national interest," 8 U.S.C. § 1254a(b)(1)(C).

**Count VIII**
**Violation of the Equal Protection Component of the**
**Fifth Amendment's Due Process Clause**
**(Attempted Cameroon Termination)**

17.    CASA re-alleges and incorporates by reference all of the allegations above and those in the First Amended Complaint.

App.044-CASA

18.    The equal protection component of the Fifth Amendment's Due Process Clause prohibits the federal government from taking action for which discriminatory intent or purpose is a motivating factor.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–266 (1977); *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

19.    Defendants' attempted termination of Cameroon's TPS designation was motivated at least in part by the Trump Administration's discriminatory intent to terminate TPS for Cameroonians and render them removable under the immigration laws because of their race, ethnicity, and national origin.  The discriminatory intent is evidenced by, *inter alia*, the Trump Administration's efforts to eliminate lawful immigration status for noncitizens from countries that the Administration believes are predominantly non-white, while simultaneously removing immigration barriers to white noncitizens; the procedural and substantive departures from the typical decision-making process for TPS termination determinations; and contemporaneous statements by Secretary of Homeland Security Kristi Noem and President Trump displaying their animus toward non-white immigrants.

20.    The attempted termination of Cameroon's TPS designation therefore violates the Fifth Amendment's guarantee of equal protection.

## SUPPLEMENTAL PRAYER FOR RELIEF

For the foregoing reasons, in addition to the other relief requested in the First Amended Complaint, CASA respectfully requests that this Court:

i.    Declare unlawful and set aside the attempted termination of the TPS designation for Cameroon; and

j.    Permanently enjoin enforcement of and declare unlawful the attempted termination of the TPS designation for Cameroon.

App.045-CASA

June 5, 2025

_____/s/_____

Nicholas Katz, Esq. (D. Md. 21920)          Jonathan L. Backer (D. Md. 20000)
CASA, INC.                                  Rupa Bhattacharyya*
8151 15th Avenue                            Julia Gegenheimer*
Hyattsville, MD 20783                       Joseph W. Mead (D. Md. 22335)
240-491-5743                                Mary B. McCord (D. Md. 21998)
nkatz@wearecasa.org                         Samuel P. Siegel[†]
                                            INSTITUTE FOR CONSTITUTIONAL ADVOCACY
Ryan C. Downer*                               AND PROTECTION
Sarah L. Bessell (D. Md. 30969)             Georgetown University Law Center
WASHINGTON LAWYERS' COMMITTEE FOR           600 New Jersey Ave., N.W.
CIVIL RIGHTS AND URBAN AFFAIRS              Washington, D.C. 20001
700 14th St. #400                           Phone: (202) 661-6671
Washington, D.C. 20005                      Fax: (202) 661-6730
Tel. (202) 319-1000                         jb2845@georgetown.edu
Fax (202) 319-1010                          jg1370@georgetown.edu
ryan_downer@washlaw.org                     jm3468@georgetown.edu
sarah_bessell@washlaw.org                   mbm7@georgetown.edu
                                            rb1796@georgetown.edu
                                            ss5427@georgetown.edu

                                            *Attorneys for Plaintiff CASA, Inc.*

*Admitted pro hac vice.*

[†]*Admitted pro hac vice. DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.*

App.046-CASA

THE SECRETARY OF STATE
WASHINGTON

November 20, 2024

The Honorable
Alejandro N. Mayorkas
Secretary of the Department of Homeland Security
Washington, DC  20528

Dear Mr. Secretary:

The Department of State assesses that ongoing armed conflict and extraordinary and temporary conditions currently exist in Afghanistan, preventing Afghan nationals in the United States (or noncitizens having no nationality who last habitually resided in Afghanistan) from safely returning to Afghanistan.  The Department therefore supports the extension and redesignation of temporary protected status (TPS) for 18 months based on armed conflict and extraordinary and temporary conditions in Afghanistan.

The ongoing armed conflict in Afghanistan, primarily between the Taliban and ISIS-K, continues to result in significant violence and instability.  ISIS-K attacks against Taliban fighters, civilians, and protected sites, including mosques, have targeted various communities and caused numerous civilian casualties.

The humanitarian situation in Afghanistan has continued to deteriorate significantly since the Taliban takeover.  The country faces a collapsing public sector, a worsening economic crisis, drought, food insecurity, and a lack of access to essential services.  The Taliban's restrictions on women's rights, exacerbated by the August release of the Promotion of Virtue and Prevention of Vice Edict released, and their interference with humanitarian aid has escalated the crisis further.  UNHCR reports 3.25 million internally displaced persons inside Afghanistan and 5.5 million Afghan refugees and asylum-seekers in the region, with many Afghans unable to return safely due to the ongoing violence and humanitarian emergencies.  UNHCR issued a

non-return advisory for Afghans in 2021 and renewed this advisory in 2023, urging states to suspend the forcible return of Afghan nationals.

Given the volatility of the current situation, including ongoing violence, a deteriorating security environment, and significant humanitarian needs, I recommend you extend and re-designate Afghanistan for TPS for 18 months. To help inform your decision, the Department has prepared the attached country conditions assessment.

Sincerely,

Antony J. Blinken

Enclosure:
    As stated.

SENSITIVE BUT UNCLASSIFIED

**(SBU) Department of State Recommendation Regarding
Designation of Temporary Protected Status (TPS)
for Afghanistan – November 2024**

**I.      Statutory Basis for Designation**

**Have the conditions under which the foreign state was designated for
Temporary Protected Status ceased to exist?**

(SBU) No.  The ongoing armed conflict in Afghanistan, primarily between the
Taliban and ISIS-K, persists as a source of significant violence and instability.
Foreign Terrorist Organization (FTO) ISIS-K conducts attacks against Taliban
fighters, civilians, and protected sites, including mosques, targeting various
communities, including Hazara, Shia, and Sufi, and causing numerous civilian
casualties.

(U) The humanitarian situation in Afghanistan has continued to deteriorate
significantly since the Taliban takeover.  The country faces a collapsing
public sector, a worsening economic crisis, drought, food insecurity, and a
lack of access to essential services.  The Taliban's restrictions on women's
rights, exacerbated by the August release of the Promotion of Virtue and
Prevention of Vice Edict[1] and their interference with humanitarian aid has
escalated the crisis further.  UNHCR reports 3.25 million internally
displaced persons inside Afghanistan and 55 million Afghan refugees and
asylum-seekers in the region[2], with many Afghans unable to return safely
due to the ongoing violence and humanitarian emergencies.  UNHCR issued
a non-return advisory for Afghans in 2021 and renewed this advisory in
2023, urging states to suspend the forcible return of Afghan nationals.

**Armed conflict**

**Is the foreign state still involved in an ongoing, internal, armed conflict?**

---

[1] https://news.un.org/en/story/2024/08/1153631
[2] https://www.unhcr.org/countries/afghanistan

SENSITIVE BUT UNCLASSIFIED
-2-

(SBU) Yes.  The ongoing armed conflict in Afghanistan is primarily driven by ISIS-K, a transnational affiliate of ISIS, which seeks to replace the governments of Afghanistan, Iran, Turkmenistan, Uzbekistan, Tajikistan, the Kyrgyz Republic, and Kazakhstan with a new entity guided by the group's strict interpretation of Islam.  Since 2021, ISIS-K has been engaged in violent confrontations with the Taliban, targeting Taliban fighters, civilians, and protected sites, including mosques.  The United States designated ISIS-K an FTO in 2016.  The Taliban's efforts to consolidate control and curb terrorism have led ISIS-K to brand the Taliban as an apostate regime.  This conflict has included numerous ISIS-K attacks on Shia communities, Sufi gatherings, and diplomatic missions, causing significant civilian casualties.

(U) In September, ISIS-K orchestrated an attack on Shia Muslims gathered to welcome pilgrims returning from Iraq.  The attack reportedly killed 15 and wounded six.[3]  Also in September, ISIS-K claimed responsibility for a suicide bombing in Kabul that killed six individuals.  Additionally, ISIS-K claimed responsibility for a suicide bombing in Kandahar in March.  The attacker detonated a suicide belt among a group of around 150 Taliban members queuing at a bank, killing 21 and injuring at least 50.[4]

(U) The violence has had a profound impact on civilians, with data from the Armed Conflict Location and Event Data Project (ACLED)[5] indicating at least 837 instances of violence where civilians were targeted and 657 related fatalities from January 2023 to October 2024.   During this period, there were 1,605 violent events in Afghanistan, with 1,990 fatalities overall. Thirty-six percent of all violent events and 52 percent of all fatalities were attributed to armed clashes, while 11 percent of violent events and 22 percent of fatalities were attributed to remote violence and explosions. The Taliban's harsh and often indiscriminate responses to ISIS-K activities have further exacerbated the violence, leading to significant numbers of civilian casualties and forcibly displaced persons.  The Department of State

---

[3] https://www.voanews.com/a/is-claimed-attack-kills-14-shiite-muslims-in-afghanistan/7782808.html
[4] https://www.bbc.com/news/world-asia-68625242
[5] https://acleddata.com/knowledge-base/acled-methodology-and-coding-decisions-around-political-violence-and-demonstrations-in-afghanistan/

considers ACLED reporting to be credible, underscoring the continued threat to personal safety in Afghanistan.

**If so, would the return of nationals of the foreign state to that state (or to the part of the state) still pose a serious threat to their safety?**

(U) Yes.  Civilian fatalities from the ongoing armed conflict between the Taliban and ISIS-K continue to pose a serious threat to the safety of nationals returning to Afghanistan.  ISIS-K, in addition to engaging in force-on-force action with the Taliban, conducts targeted attacks on civilians.

(U) So far in 2024, ISIS-K has been responsible for several attacks in Afghanistan.  On March 15, ISIS-K carried out a suicide bombing at a mosque in Herat, killing 20 worshippers and injuring dozens.  Shortly after, on March 21, an ISIS-K suicide bomber detonated outside the Kabul Bank in Kandahar, killing 21 and injuring at least 51.  On June 25, a coordinated assault on a government building in Jalalabad led to the deaths of 10 security personnel and 15 civilians.  In addition, on September 2, a bombing at a prosecution service office in Kabul resulted in six deaths, followed by a September 12 attack in Daykundi Province that killed 14 people and injured several others.  Throughout 2024, there have also been multiple targeted bus bombings aimed at civilians, causing numerous casualties.  These attacks underscore the persistent threat posed by ISIS-K against civilians in Afghanistan throughout the year.

**Environmental Disaster**

**Does there continue to be a substantial, but temporary, disruption of living conditions in the foreign state affected by an earthquake, flood, drought, epidemic, or other environmental disaster?**

(U) N/A.

App.051-CASA

**Is the foreign state still unable, temporarily, to handle adequately the return to the state of nationals of the state?**

(U) N/A.

**Does the foreign state continue to support the TPS designation for its nationals in the United States?**

(U) N/A.

**Extraordinary and Temporary Conditions**

**Has the foreign state continued to experience extraordinary and temporary conditions that prevent nationals of the state from returning to the state in safety?**

(SBU) Yes.  The Taliban takeover resulted in a dramatic drop-off of international development assistance, a decline in foreign investment, and a mass exodus of educated professionals, leading to a severe humanitarian crisis.  As of March 2024, UNHCR reported 3.25 million internally displaced persons[6].  Additionally, since August 2021, more than 5.5 million Afghans have fled to neighboring countries.  UNHCR issued a non-return advisory for Afghans in 2021 and renewed this advisory in 2023, urging states to suspend forcible returns due to the large-scale humanitarian emergency and security risks.

(SBU) Afghans face a collapsing public sector, economic crisis, drought, food insecurity, and ongoing security threats.  The Taliban has imposed severe and increased restrictions on women's rights, including the 2024 edict, Promotion of Virtue and the Prevention of Vice, which includes multiple provisions regulating the personal lives of Afghans, especially women.  The morality law details significant restrictions governing individuals' daily behavior, from the way Afghans dress to how they cut their hair and pray.

---

[6] https://www.unhcr.org/countries/afghanistan

App.052-CASA

It also grants "muhtasib," or accountability inspectors, within the so-called Ministry for the Promotion of Virtue and Prevention of Vice arbitrary and potentially severe enforcement authorities to punish Afghans who do not follow the new rules while in public.  These morality police, as many Afghans call them, are empowered to administer disciplinary action such as admonishments, fines, and detention of up to three days without having to collect evidence, prove guilt, or present alleged rulebreakers to any law enforcement apparatus within either the Ministry of Interior or the Ministry of Justice.  Human rights conditions have deteriorated, with reports of public lashings, amputations, and summary executions.  The situation for religious minorities has worsened, with increased violence against Shia mosques and Sufi gatherings.  Other vulnerable groups such as ethnic and religious minorities, persons with disabilities, and members of the LGBTQI+ community face widespread discrimination and mistreatment.

(SBU) The Taliban's interference with humanitarian aid has amplified the crisis[7].  Public health services have been severely disrupted, with significant health impacts.  Economic uncertainty and a contraction of public services have hindered many households' ability to meet their basic needs.  The cumulative effects of conflict, displacement, and climatic shocks – including drought, earthquakes, and floods – have left approximately 23.7 million people, more than half of the country's population, in need of humanitarian assistance in 2024, according to the 2024 Humanitarian Needs and Response Plan for Afghanistan.  Four earthquakes, each measuring 6.3 magnitude, struck northwestern Afghanistan's Herat Province in October 2023, resulting in widespread humanitarian need in the province.  Afghanistan is experiencing drought-like conditions, with acute food insecurity affecting millions.  In addition, severe flooding in northeastern, northern, and western Afghanistan in May caused hundreds of deaths and significant damage to agricultural land and critical infrastructure.  Following the Government of Pakistan's September 2023 announcement of its intent to repatriate undocumented Afghans, more than 610,000 Afghans have returned from Pakistan, with most returnees requiring food assistance, health services, and

---

[7] https://www.usaid.gov/humanitarian-assistance/afghanistan

App.053-CASA

USCA4 Appeal: 25-1792    Doc: 4-2    Filed: 07/14/2025    Pg: 57 of 249    Total Pages:(57 of 249)
Case 8:25-cv-01484-TDC    Document 59-3    Filed 06/13/25    Page 12 of 89
SENSITIVE BUT UNCLASSIFIED
-6-

livelihood opportunities in their areas of return, further straining Afghanistan's ability to take additional returns.  Additionally, Taliban restrictions continue to hinder aid operations in the country and limit women and girls' access to humanitarian assistance.

(SBU) Decreased funding has significantly impacted the delivery of humanitarian aid.  The U.S. government is the largest donor of humanitarian assistance in Afghanistan, providing approximately $2.2 billion in humanitarian funding, including more than $1.7 billion from USAID, since August 2021.  With USAID support, humanitarian partners continue to provide emergency food and nutrition assistance, health care services, livelihood, cash assistance, protection, shelter, water, sanitation, and hygiene support to populations in need countrywide.  However, the suspension of more than $8 billion in international donor assistance following the Taliban takeover caused a massive shock to the economy, reducing the gross domestic product by 35 percent and causing a liquidity crisis.  This reduction in funding and ongoing security challenges have limited food distribution, import of goods, and repair of agricultural infrastructure, further exacerbating the humanitarian crisis.

(SBU) Violence by the Taliban against anti-Taliban resistance forces, as well as civilians associated with the pre-2021 government, poses additional threats to Afghans, including women leaders and members of minority groups.  There are regular and ongoing reports of a high number of Taliban-led retribution attacks against former Afghan government and security officials, exacerbating the violence and instability in the region.  The UN Special Rapporteur and the UN Assistance Mission in Afghanistan (UNAMA) continue to report targeted killings of individuals associated with the pre-2021 Afghan government[8].  For example, in January 2023, Mursal Nabizada, a former member of Afghanistan's parliament, was killed by unknown gunmen at her home in Kabul.  The ongoing extraordinary situation prevents Afghan nationals from returning safely.

---

[8] https://unama.unmissions.org/

**Would permitting nationals of the foreign state to remain temporarily in the United States be contrary to the national interest of the United States?**

(SBU) No. It is not contrary to the national interest of the United States to permit those who would meet the eligibility requirements of TPS to remain in the United States temporarily. Allowing Afghan nationals to remain in the United States under TPS aligns closely with the President's stated commitment to Afghan allies.

## II.    Discretionary Factors:

**What, if any, additional information relevant to this decision should be brought to the attention of the Department of Homeland Security?**

(SBU) The lack of access to passports for Afghan nationals outside of Afghanistan, including in the United States, makes it nearly impossible for Afghans with missing or expired identity documents to travel to third countries. This would be especially problematic for Afghans who may otherwise be forced to depart the United States should TPS be discontinued. The continuation of TPS helps to avert such situations while providing a critical identity document for individuals who remain in the United States.

## III.    Recommendation

(SBU) The Department of State recommends that TPS for Afghanistan be extended and that Afghanistan be redesignated for TPS for 18 months on the basis of ongoing armed conflict and extraordinary and temporary conditions.

App.055-CASA



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
Refugee, Asylum and International Operations Directorate
STAR Division, Research Branch
5900 Capital Gateway Drive
Camp Springs, MD 20529

# Afghanistan: Temporary Protected Status (TPS) Considerations[1]

## Contents

Overview .................................................................................................................. 3

International Aid and Corruption ............................................................................ 4

Tribes, Ethnicity, and Language ............................................................................ 7

History of Conflict and Toll on Civilians .............................................................. 8

Current Armed Conflict and Security Situation ................................................... 12

    Islamic State Khorasan Province (ISKP), the Risk to Civilians, and the Taliban Response .... 15

    Hazaras Targeted by ISKP and the Taliban ........................................................ 17

Internal Displacement ......................................................................................... 19

Infrastructure Challenges .................................................................................... 21

Explosive Remnants of War including Landmines .............................................. 22

Harsh Taliban Governance – Damage to Security and Society ........................... 23

Challenges for Women and Girls ........................................................................ 25

    Domestic and Sexual Violence .......................................................................... 27

    Forced Marriage ................................................................................................. 27

    Discrimination in Society and Risks of Nonconformity ..................................... 28

    Access to Education and Employment ................................................................ 29

Economic Insecurity ........................................................................................... 31

---

[1] The reporting period for this report is June 1, 2023, to November 13, 2024.

**Contact Us:**    RAIOResearch@uscis.dhs.gov

Food Insecurity, Drought, and Access to Water .......................................................... 32

Lack of Access to Healthcare ..................................................................................... 34

Challenges for Persons with Disabilities .................................................................... 35

Conclusion .................................................................................................................. 36

App.057-CASA

# Overview

Afghanistan is a landlocked South Asian country of rugged mountains and deserts, with a complex history influenced by its bordering neighbors including Pakistan, Iran, China, and the former Soviet republics of Tajikistan, Uzbekistan, and Turkmenistan. Now home to approximately 40 million people,[2] its citizens have been subjected to many decades of armed conflict and instability, with shifting control pushed by warlordism, domestic insurgency, and the aims of foreign powers.

The city of Kabul has been the seat of power for two centuries, yet 70 to 80 percent of the population reside in the countryside where in many areas localized authority exerts more influence than weak centralized governance.[3] Afghanistan's 34 provinces contain regional urban centers including Mazar-e-Sharif in the north, Jalalabad in the east, Kandahar in the south, and Herat in the west. The Afghan people are a patchwork of distinct ethnic groups, with Pashtuns dominating for centuries, while Tajiks, Hazaras, Uzbeks, and others have played regional and coalition-based roles.[4]

99.7 percent of Afghans are Muslim,[5] and Islam is deeply woven into Afghan identity including the concepts of unity and *jihad*, particularly resisting foreign infidel invaders.[6] Though they are not part of the Afghan tradition of moderate Islam, recent history has seen the presence of global jihadists in Afghanistan, including the Taliban's harboring of al Qaeda, and the importation of overt sectarian violence with the rise of Islamic State – Khorasan Province (ISKP) and their targeting of Shias.[7]

Approximately half of all Afghans currently live in poverty, with rates particularly high among women. The United Nations Office for the Coordination of Humanitarian Affairs (OCHA) estimates that nearly 24 million people require humanitarian assistance to survive in 2024 as the country continues to "reel from decades of war and grapple with climate-induced crises, recurrent natural disasters, entrenched poverty, and barriers to women's participation in public life."[8] While Afghanistan experienced minimal economic stabilization in 2023, nearly 65% of families are still encountering economic shock. OCHA reports that these economic conditions will continue throughout 2024, contributing to food insecurity for roughly 16 million people in Afghanistan.[9]

---

[2] Afghanistan, CIA World Factbook, available at: https://www.cia.gov/the-world-factbook/countries/afghanistan/ (last visited November 4, 2024).

[3] Carter Malkasian, *The American War in Afghanistan*, p. 12 (Oxford University Press, 2021) (citing Thomas Barfield, *Afghanistan: A Cultural and Political History* (Princeton University Press, 2010); Afghanistan, World Bank: Data, available at: http://data.worldbank.org/country/AF (last visited November 4, 2024); Barnett Rubin, *Afghanistan: What Everyone Needs to Know*, pp.42-43 (Oxford University Press, 2021).

[4] Barnett Rubin, *Afghanistan: What Everyone Needs to Know*, p.15 (Oxford University Press, 2021); Carter Malkasian, *The American War in Afghanistan*, p. 13 (Oxford University Press, 2021).

[5] Afghanistan, CIA World Factbook, available at: https://www.cia.gov/the-world-factbook/countries/afghanistan/ (last visited November 4, 2024).

[6] Carter Malkasian, *The American War in Afghanistan*, pp. 17-18 (Oxford University Press, 2021).

[7] Carter Malkasian, *The American War in Afghanistan*, pp. 53-67 (Oxford University Press, 2021); Explainer: Who Are Islamic State-Khorasan And What Are They After?, Radio Free Europe / Radio Liberty, August 27, 2021, available at: https://gandhara.rferl.org/a/islamic-state-khorasan-expainer/31431763.html (last visited Nov. 26, 2024).

[8] Afghanistan Humanitarian Needs and Response Plan 2024 Summary, United Nations Office for the Coordination of Humanitarian Affairs (OCHA), January 8, 2024, available at: https://www.unocha.org/publications/report/afghanistan/afghanistan-humanitarian-needs-and-response-plan-2024-summary (last visited Nov. 26, 2024).

[9] Afghanistan Humanitarian Needs and Response Plan 2024 Summary, United Nations Office for the Coordination of Humanitarian Affairs (OCHA), January 8, 2024, available at: https://www.unocha.org/publications/report/afghanistan/afghanistan-humanitarian-needs-and-response-plan-2024-summary (last visited Nov. 26, 2024).

App.058-CASA

Afghanistan: TPS Considerations – November 2024

In August 2021, the Taliban took full control of the country after waging a 20-year insurgency against the foreign-backed Afghan government and entrenched U.S. and NATO forces. Though the Taliban have seated an interim government, they have not been officially recognized by the international community.[10] Within weeks of taking power in August 2021, the Taliban began issuing a number of bans and decrees, stripping the rights of women and rolling back their access to education and employment.[11] In April of 2022, Taliban officials issued a ban on opium poppy farming, resulting in an approximate 95% decline in cultivation by 2023.[12] This has led to an estimated $1 billion loss of income annually for the nearly 7 million Afghans who were involved in this sector.[13]

Afghanistan sits on the precipice of a humanitarian disaster, with numerous challenges including economic stagnation, instability, severe food insecurity, infrastructure failings, and a crumbling healthcare system.[14]

## International Aid and Corruption

Governments in Afghanistan have depended on economic aid from world-power patrons for nearly 200 years.[15] On June 24, 2020, John F. Sopko, U.S. Special Inspector General for Afghanistan Reconstruction (SIGAR), indicated that foreign aid comprised 75% of Afghanistan's annual budget.[16] Since 2002, the United States Congress has appropriated approximately $146 billion for Afghanistan relief and reconstruction to "build the Afghan National Security Forces, promote good governance, conduct development assistance, and engage in counter-narcotics and anti-corruption efforts."[17] Yet the deployment of aid has been criticized as subject to corruption among Afghan and foreign actors,[18] with serious waste, fraud, and mismanagement.[19]

---

[10] Abubakar Siddique, Which Countries Have Relations With The Taliban's Unrecognized Government?, Radio Free Europe/Radio Liberty, May 30, 2024, available at: https://www.rferl.org/a/afghanistan-taliban-russia-diplomacy/32972530.html (last visited Nov. 26, 2024).

[11] *Tracking the Taliban's (Mis)Treatment of Women*, United States Institute of Peace (USIP), https://www.usip.org/tracking-talibans-mistreatment-women (last visited November 4, 2024); Christina Goldbaum, World Opens to the Taliban Despite Their Shredding of Women's Rights, The New York Times, October 24, 2024, available at: https://www.nytimes.com/2024/10/24/world/asia/afghanistan-taliban-diplomacy.html (last visited Nov. 26, 2024).

[12] Trouble In Afghanistan's Opium Fields: The Taliban War On Drugs, International Crisis Group, September 12, 2024, available at: https://www.crisisgroup.org/asia/south-asia/afghanistan/340-trouble-afghanistans-opium-fields-taliban-war-drugs#:~:text=The%20Taliban%20have%20instituted%20a,not%20further%20undermine%20vulnerable%20populations (last visited Nov. 26, 2024).

[13] William Byrd, As Taliban Poppy Ban Continues, Afghan Poverty Deepens, United States Institute of Peace (USIP), June 20, 2024, available at: https://www.usip.org/publications/2024/06/taliban-poppy-ban-continues-afghan-poverty-deepens (last visited Nov. 26, 2024).

[14] Vanda Felbab-Brown, The Taliban's three years in power and what lies ahead, The Brookings Institution, August 14, 2024, available at: https://www.brookings.edu/articles/the-talibans-three-years-in-power-and-what-lies-ahead/ (last visited Nov. 26, 2024); Afghanistan's economy has 'basically collapsed'*: UNDP*, UN News, March 7, 2024, available at: https://news.un.org/en/story/2024/03/1147387 (last visited Nov. 26, 2024).

[15] Thomas Barfield, *Afghanistan: A Cultural and Political History*, p.6, (Princeton University Press), 2010.

[16] Prepared Remarks of John F. Sopko, Special Inspector General for Afghanistan Reconstruction, SIGAR, p.1, June 24, 2020, available at: https://www.sigar.mil/pdf/speeches/SIGAR_IWA_Speech_2020-06-24.pdf (last visited Nov 26, 2024).

[17] About SIGAR, U.S. Special Inspector General for Afghanistan Reconstruction (SIGAR), available at: <https://www.sigar.mil/about/index.aspx?SSR=1> (last visited November 5, 2024).

[18] *Afghans, Under Fire for Corruption, Accuse Donors of Hypocrisy*, Foreign Policy, Dec. 2, 2020, available at: Afghans, Under Fire for Corruption, Accuse Donors of Hypocrisy (last visited Nov. 26, 2024).

[19] How Corruption Played a Role in the Demise of the Afghan Government, The Diplomat, October 13, 2021,available at: https://thediplomat.com/2021/10/how-corruption-played-a-role-in-the-demise-of-the-afghan-

4

Afghanistan: TPS Considerations – November 2024

For example, the United States spent $83 billion in training, equipping, and paying Afghanistan's security forces since 2001,[20] yet there are reports that corrupt officials added fictitious military personnel to their rosters in order to collect their wages, in effect undermining morale and a true assessment of the military's readiness.[21] Corruption played a significant role in Afghan forces' inability to prevent the Taliban from taking power in August 2021:

> Over time, the ever-increasing corruption and predation by the Afghan government ground down the ability of many dedicated security professionals to build a sustainable security sector. Reliable-enough logistics and supplies for troops could not get off the ground because contracts were riddled with kickbacks (if they were fulfilled at all) and because some of the weapons, ammunition, food, and other necessities were diverted for personal gain. A corrupt personnel system meant promotions and key jobs went to politically connected Afghans or those who paid bribes rather than those most willing and able to fight. Troops faced battle knowing they may not be fed or paid because money and resources were being siphoned off. If they were wounded, they had to bribe medical staff for care and then pay for their food and medical supplies out of their own pockets. If they were killed, their widows would probably not receive their pensions without bribes or connections, leaving their families destitute. All of these problems degraded the ability of the Afghan government to hire, supply, and retain a competent force willing and able to fight.[22]

In its 2020 Corruption Perceptions Index (CPI), Transparency International ranked Afghanistan 165th out of 180 countries surveyed, with a score of 19 out of 100.[23] CPI explains that the score is a perceived level of public sector corruption, where 0 means highly corrupt and 100 means very clean.[24] While Afghanistan's overall ranking improved to 150th out of 180 countries in 2021, it has since tumbled back down the chart to 162nd out of 180 countries in the latest 2023 Transparency International rankings.[25] This all comes as Taliban officials had pledged to end the rampant corruption under the previous Islamic Republic of Afghanistan government.[26]

---

government/ (last visited Nov. 25, 2024); U.S. Left Afghanistan Littered With Decaying Factories, Schools, Offices, Wall Street Journal, September 6, 2021, available at: https://www.wsj.com/articles/u-s-left-afghanistan-littered-with-decaying-factories-schools-offices-11630933200 (last visited Nov. 26, 2024).

[20] Why the Afghan Army Folded, The Atlantic, August 17, 2021, available at: https://www.theatlantic.com/ideas/archive/2021/08/us-afghanistan-taliban-training/619774/ (last visited Nov. 26, 2024)

[21] Afghanistan's ghost soldiers undermined fight against Taliban - ex-official, BBC News, November 10, 2021, available at: https://www.bbc.com/news/world-asia-59230564 (last visited Nov. 26, 2024); Prepared Remarks of John F. Sopko, Special Inspector General for Afghanistan Reconstruction, SIGAR, p.1, June 24, 2020, available at: https://www.sigar.mil/pdf/speeches/SIGAR_IWA_Speech_2020-06-24.pdf (last visited Nov 26, 2024).

[22] Corruption and Self-Dealing in Afghanistan and Other U.S.-Backed Security Sectors, Carnegie Endowment for International Peace, Sept. 9, 2021, available at: https://carnegieendowment.org/2021/09/09/corruption-and-self-dealing-in-afghanistan-and-other-u.s.-backed-security-sectors-pub-85303 (last visited Nov. 26, 2024).

[23] Afghanistan, Transparency International, available at: https://www.transparency.org/en/cpi/2020/index/afg, (last visited November 5, 2024).

[24] The ABCs of the CPI: How the Corruption Perceptions Index is calculated, Transparency International, December 20, 2021, available at: https://www.transparency.org/en/news/how-cpi-scores-are-calculated (last visited Nov. 26, 2024).

[25] Afghanistan, Transparency International, available at: https://www.transparency.org/en/cpi/2023/index/afg, (last visited November 29, 2024).

[26] Daniel F. Runde, Annie Pforzheimer, Thomas Bryja, & Caroline Smutny, The Future of Assistance for Afghanistan: A Dilemma, Center for Strategic and International Studies (CSIS), June 13, 2024, available at: https://www.csis.org/analysis/future-assistance-afghanistan-dilemma (last visited Nov. 26, 2024).

App.060-CASA

Afghanistan: TPS Considerations – November 2024

The U.N. Assistance Mission in Afghanistan (UNAMA) asserted that "[u]nless steadily addressed, corruption will continue to be a significant conflict driver, increasing public mistrust and discontent, encouraging criminality and illicit activities, and undermining the legitimacy of the State."[27] The Afghanistan Analysts Network reported that "[g]iven the scale of the economic crisis, foreign assistance is vital," yet "[m]ost aid and Afghanistan's currency reserves [has been] frozen and the banking sector virtually closed down" and the Taliban "had no plans for how they would run the Afghan state without aid."[28] Corruption and dependence on now-stalled foreign aid constitute continuing serious impediments to meeting Afghanistan's current humanitarian challenges.

While international aid and assets were frozen when the Taliban came to power in August 2021 in order to prevent funds flowing to them, aid has since slowly restarted.[29] At least half of the Taliban's cabinet members are on UN sanctions lists, and some prominent Taliban ministers are U.S. - Specially Designated Global Terrorists (SDGTs), creating legal and moral hurdles for working with them.[30] Meanwhile, some Afghans assert that the limited assistance that is arriving is being misappropriated by the Taliban, as "[t]he only people who have received any aid are those who belong to the Taliban, particularly relatives of those Taliban members who were killed or injured while fighting for them."[31] Other reports indicate that Taliban officials are benefiting from international aid through the establishment of fraudulent nongovernmental organizations or by extorting and infiltrating existing NGOs to siphon off international donor aid.[32]

Despite being dislodged from Afghanistan in August 2021, the U.S. and United Nations have transferred nearly $3.8 billion in international aid to Afghanistan under the new Taliban regime. While this aid has been critical in supporting millions of Afghans in need, reports indicate there is still a large portion of the population in need.[33] Over half the population, more than 23 million people, need urgent humanitarian

---

[27] Fighting Corruption in Afghanistan, U.N. Assistance Mission in Afghanistan (UNAMA), p. 6, Aug. 2021, available at:
https://unama.unmissions.org/sites/default/files/fighting_corruption_in_afghanistan_stepping_up_transparency_integrity_and_accountability_english_10_aug_21.pdf (last visited Nov. 26, 2024). Note that this report covered the period from January 2020 to May 2021, thus "the State" refers to the former government of Afghanistan.
[28] Killing the Goose that Laid the Golden Egg: Afghanistan's economic distress post-15 August, Afghanistan Analysts Network, November 11, 2021, available at: https://www.afghanistan-analysts.org/en/reports/economy-development-environment/killing-the-goose-that-laid-the-golden-egg-afghanistans-economic-distress-post-15-august/ (last visited Nov. 26, 2024).
[29] 'Brink of Collapse': How Frozen Assets & Halted Foreign Aid Are Impacting the Afghan People, PBS, October 12, 2021, available at: https://www.pbs.org/wgbh/frontline/article/taliban-takeover-how-frozen-assets-foreign-aid-impacts-afghanistan/ (last visited Nov. 26, 2024).
[30] Afghans Accuse The Taliban Of Misappropriating Foreign Aid, Radio Free Europe / Radio Liberty, October 27, 2021 available at: https://gandhara.rferl.org/a/afghanistan-taliban-foreign-aid-misappropriation/31532541.html (last visited Nov. 26, 2024).
[31] Afghans Accuse The Taliban Of Misappropriating Foreign Aid, Radio Free Europe / Radio Liberty, October 27, 2021 available at: https://gandhara.rferl.org/a/afghanistan-taliban-foreign-aid-misappropriation/31532541.html (last visited Nov. 26, 2024); Ruchi Kumar, Charities say Taliban intimidation diverts aid to Taliban members and causes, NPR, June 23, 2023, available at: https://www.npr.org/sections/goatsandsoda/2023/06/23/1180464339/charities-say-taliban-intimidation-diverts-aid-to-taliban-members-and-causes (last visited Nov. 26, 2024).
[32] U.S. watchdog says the Taliban are benefiting from international aid through 'fraudulent' NGOs, PBS News, October 23, 2023, available at: https://www.pbs.org/newshour/politics/u-s-watchdog-says-the-taliban-are-benefiting-from-international-aid-through-fraudulent-ngos (last visited Nov. 26, 2024).
[33] Gul Maqsood Sabit, Can Afghanistan's Economy Survive Without Aid?, The Diplomat, September 14, 2024, available at: https://thediplomat.com/2024/09/can-afghanistans-economy-survive-without-aid/ (last visited Nov. 26, 2024); Jacques Follorou, US aid is still vital to Afghanistan, Le Monde, August 28, 2024, available at: https://www.lemonde.fr/en/international/article/2024/08/28/us-aid-is-still-vital-to-afghanistan_6722732_4.html#:~:text=The%20Consolidated%20Appropriations%20Act%20for,t%20do%20without%20the%20US (last visited Nov. 26, 2024).

App.061-CASA

USCA4 Appeal: 25-1792   Doc: 4-2   Filed: 07/14/2025   Pg: 65 of 249   Total Pages:(65 of 249)
Case 8:25-cv-01484-TDC   Document 59-3   Filed 06/13/25   Page 38 of 89
Afghanistan: TPS Considerations – November 2024

assistance, while an estimated 12.4 million Afghans face acute food insecurity as the country reels from its worst drought in 27 years.[34] OCHA has reported that it requires $3.1 billion to properly address the humanitarian crisis, but have only secured 37.5% of this amount, leaving a funding gap of $1.9 billion for 2024.[35]

## Tribes, Ethnicity, and Language

The Afghan constitution of 2004 recognized 14 ethnic groups, yet only Pashtuns (40%), Tajiks (30%), Hazaras (15%), and Uzbeks (10%)[36] were large enough to participate in the national political arena.[37] The word "Afghan" originally referred to Pashtuns, who have been the dominant ethnic group in Afghan society and government, including the former governments of President Hamid Karzai and President Ashraf Ghani, as well as the Taliban.[38] Pashtuns have largely been organized in patrilineal tribes, speaking Pashto, and constituting the majority in the South and Southeast but spread throughout the country.[39] Tajiks are typically Sunni Muslims and Persian speakers who "loosely identif[y] themselves around communities . . . and specific leaders rather than tribes,"[40] concentrated in mountainous northern areas and larger cities such as Kabul, Herat, Mazar-i-Sharif, Panjshir, and Parwan.[41] Uzbeks are concentrated in the northern border area opposite Uzbekistan, speaking Dari and Uzbeki.[42] Hazaras are distinct in that they are the only ethnic group who are almost exclusively Shia Muslims, and many of whom have Central Asian or East Asian facial features.[43] They speak Persian dialects including Hazargi and Dari, and reside primarily in the Central Highlands (Hazarajat), Kabul, and Mazar-i-Sharif.[44] Hazaras have a strong group feeling and hierarchy within families in villages, but a large number act as individuals in urban areas.[45]

Islam's unifying influence notwithstanding, ethnicity has been a source of division among Afghan nationals.[46] "Individual Afghans [have] had some connection to their own tribe or community, rather than a common whole. The tribal system [has been] . . . naturally divided. Absence of hierarchy and an emphasis on revenge [has] meant tribes [have] . . . almost always [been] at odds with each other."[47] Dr. Thomas Barfield cautioned, however, that "[i]t is a mistake to see Afghan ethnic groups as fixed 'nationalities' that have some overriding commonality and history that demands political unity," as there are divisions and

---

[34] Millions of Afghans endure crisis three years after Taliban takeover, International Rescue Committee, August 14, 2024, available at: https://www.rescue.org/article/millions-afghans-endure-crisis-three-years-after-taliban-takeover (last visited Nov. 26, 2024).

[35] Afghanistan, United Nations Office for the Coordination of Humanitarian Affairs (OCHA), available at: https://www.unocha.org/afghanistan, (last visited November 5, 2024).

[36] Uzbeks are often grouped with Turkmen to reach the estimate of 10% of the population. *See, e.g.*, Thomas Barfield, Afghanistan: A Cultural and Political History, p.27, (Princeton University Press, 2010).

[37] Barnett Rubin, *Afghanistan: What Everyone Needs to Know*, p.15 (Oxford University Press, 2021); Carter Malkasian, *The American War in Afghanistan*, p. 13 (Oxford University Press, 2021).

[38] Barnett Rubin, *Afghanistan: What Everyone Needs to Know*, p.15 (Oxford University Press, 2021).

[39] Barnett Rubin, *Afghanistan: What Everyone Needs to Know*, p.15 (Oxford University Press, 2021).

[40] Carter Malkasian, *The American War in Afghanistan*, p. 19 (Oxford University Press, 2021).

[41] Barnett Rubin, *Afghanistan: What Everyone Needs to Know*, p.15 (Oxford University Press, 2021); Carter Malkasian, *The American War in Afghanistan*, p. 19 (Oxford University Press, 2021).

[42] Barnett Rubin, *Afghanistan: What Everyone Needs to Know*, p.15 (Oxford University Press, 2021).

[43] Barnett Rubin, *Afghanistan: What Everyone Needs to Know*, p.17 (Oxford University Press, 2021). Note that there are a few Hazara Sunnis, and some Shias among other ethnic groups in Afghanistan, though the rise of sectarian violence against Shias has targeted Hazaras.

[44] Barnett Rubin, *Afghanistan: What Everyone Needs to Know*, p.15 (Oxford University Press, 2021); Carter Malkasian, *The American War in Afghanistan*, p. 13 (Oxford University Press, 2021).

[45] Carter Malkasian, *The American War in Afghanistan*, p. 19 (Oxford University Press, 2021).

[46] Carter Malkasian, *The American War in Afghanistan*, p. 19 (Oxford University Press, 2021).

[47] Carter Malkasian, *The American War in Afghanistan*, p. 19 (Oxford University Press, 2021).

App.062-CASA

conflict within ethnic groups, and alliances across ethnicities.[48] "Afghan rulers [have] depended on the tribes to maintain order in the countryside. Without their cooperation, the state was often too weak to do so on its own."[49]

## History of Conflict and Toll on Civilians[50]

Afghanistan has suffered decades of armed conflict that has taken a significant toll on the civilian population. Through much of the 20th century, Afghanistan was a monarchy, though Soviet Union assistance fostered rising Communist sentiment, countered by a growing Islamist movement and resistance to foreign interference.[51] In 1973, with backing of the Soviet Union, Mohammed Daoud Khan overthrew the Afghan Constitutional monarchy and declared himself President.[52] In 1974, Islamists failed in a counter-coup attempt and fled to Peshawar, Pakistan, where they formed an alliance of Mujahideen factions and engaged in a cross-border insurgency.[53] On April 27, 1978, the People's Democratic Party of Afghanistan (PDPA), a small, factionalized Marxist-Leninist party, took power in a *coup d'état*, an event that marked the beginning of Afghanistan's civil war.[54] On December 24, 1979, the Soviet Union airlifted thousands of troops into Kabul, and three days later a Soviet force assassinated self-proclaimed President Hafizullah Amin and installed Babrak Karmal.[55] The Soviet presence soon grew to approximately 115,000 troops, and all aspects of government quickly came under the supervision of Soviet advisers, including the state security agency, which was reorganized and placed under the control of Dr. Najibullah.[56]

Soviet forces occupied Afghanistan for 10 years against constant Mujahideen insurgency, a period characterized by severe abuses against civilians committed by all parties to the conflict.[57] Afghanistan became the world's leading producer of refugees and displaced persons, with two to three million internally

---

[48] Thomas Barfield, Afghanistan: A Cultural and Political History, p.18-19, (Princeton, NJ: Princeton University Press, 2010).

[49] Carter Malkasian, *The American War in Afghanistan*, p. 21 (Oxford University Press, 2021).

[50] Please note that this is a historical section and the majority of this information is from outside of the reporting period.

[51] The Forgotten War: Human Rights Abuses and Violations of the Laws Of War Since the Soviet Withdrawal, Human Rights Watch, February 1991, available at: https://www.hrw.org/legacy/reports/1991/afghanistan/ (last visited Nov. 26, 2024); Afghanistan: A Cultural and Political History, Thomas Barfield, p.87, 213, Princeton University Press (2012).

[52] Thomas Barfield, Afghanistan: A Cultural and Political History, p.170, (Princeton, NJ: Princeton University Press, 2010).

[53] Hizb-i-Islami - Gulbuddin (HIG), Janes, Feb. 25, 2014, available at: http://janes.ihs.com/TerrorismInsurgencyCentre/Display/1320831 (last visited Nov. 26, 2024).; Afghanistan: Communism, Rebellion, and Soviet Intervention, Library of Congress Country Studies, 2001, available at: http://countrystudies.us/afghanistan/29.htm (last visited Nov. 26, 2024); The Forgotten War: Human Rights Abuses and Violations of the Laws Of War Since the Soviet Withdrawal, Human Rights Watch, February 1991, available at: https://www.hrw.org/legacy/reports/1991/afghanistan/ (last visited Nov. 26, 2024);.

[54] The Forgotten War: Human Rights Abuses and Violations of the Laws Of War Since the Soviet Withdrawal, Human Rights Watch, February 1991, available at: https://www.hrw.org/legacy/reports/1991/afghanistan/ (last visited Nov. 26, 2024);

[55] The Forgotten War: Human Rights Abuses and Violations of the Laws Of War Since the Soviet Withdrawal, Human Rights Watch, February 1991, available at: https://www.hrw.org/legacy/reports/1991/afghanistan/ (last visited Nov. 26, 2024).

[56] The Forgotten War: Human Rights Abuses and Violations of the Laws Of War Since the Soviet Withdrawal, Human Rights Watch, February 1991, available at: https://www.hrw.org/legacy/reports/1991/afghanistan/ (last visited Nov. 26, 2024).

[57] By All Parties to the Conflict: Violations of the Laws of War in Afghanistan, Human Rights Watch, March 1988, available at: https://www.hrw.org/legacy/reports/1988/afghan0388.pdf (last visited Nov. 26, 2024).

App.063-CASA

Afghanistan: TPS Considerations – November 2024

displaced and over 5.5 million fleeing to Iran, Pakistan, and beyond.[58] The United States, Pakistan, China, Iran, and Saudi Arabia supplied money and arms to the Mujahideen to counter Soviet efforts, and in 1986 the United States began providing Stinger missiles to shoot down Soviet helicopter gunships.[59]

In 1989, Soviet forces withdrew and left a Communist Afghan government in place, yet civil war continued as the Mujahideen sought control, with the help of foreign backers.[60] In 1992, President Najibullah's government fell, and a devastating phase of the civil war began as rival Mujahideen factions fought for dominance.[61] This period took a severe toll on the civilian population, as civilians were directly targeted and infrastructure was destroyed on a large scale, including in much of Kabul.[62]

During this period, Pashtun religious students, religious scholars, and former anti-Soviet fighters formed the Taliban as an effort to drive the Mujahideen warlords from power, end the civil war, and ultimately establish a Sharia-based Islamic Emirate free from foreign control and corruption.[63] The Taliban first defeated tribal factions to take Kandahar in the south in 1994.[64] They fought in waves against Mujahideen forces, gaining territory until they took Kabul in 1996.[65] By 1998 they took Mazar-e-Sharif in the north where they massacred 5,000 to 6,000 Hazara citizens in revenge for earlier executions of Taliban fighters.[66]

The Taliban controlled most of Afghanistan from 1996 to 2001, imposing a harsh interpretation of Sharia law, removing women from public life, enforcing strict moral codes, and exacting draconian punishments for transgressions including dismemberment and public executions.[67] They continued to fight for territory north of Kabul against the Tajik-dominated army of Ahmed Shah Massoud, driving out the Tajik inhabitants, poisoning wells, damaging irrigation ditches, and destroying homes.[68] The Taliban committed mass executions of Hazara men in 2000 and 2001 as collective punishment for suspected collaboration with opposing forces.[69] With the Taliban harboring al-Qaeda and Osama bin Laden after the attacks of September 11, 2001, U.S. forces began airstrikes and a ground invasion that, in concert with actions by remaining Mujahideen fighters under the Northern Alliance, drove the Taliban from most of Afghanistan by mid-November 2021, causing them to revert to insurgency for the next 20 years.[70]

---

[58] Afghanistan: The Forgotten Crisis, Barnett Rubin (WRITENET), December 1, 1996, available at: https://www.refworld.org/reference/countryrep/writenet/1996/en/96430 (last visited Nov. 26, 2024).

[59] Carter Malkasian, *The American War in Afghanistan*, p. 30 (Oxford University Press, 2021).

[60] The Forgotten War: Human Rights Abuses and Violations of the Laws Of War Since the Soviet Withdrawal, Human Rights Watch, February 1991, available at: https://www.hrw.org/legacy/reports/1991/afghanistan/ (last visited Nov. 26, 2024).; Paul Fitzgerald and Elizabeth Gould, Invisible History: Afghanistan's Untold Story, pp.213-14, City Lights Books (2009).

[61] The Forgotten War: Human Rights Abuses and Violations of the Laws Of War Since the Soviet Withdrawal, Human Rights Watch, February 1991, available at: https://www.hrw.org/legacy/reports/1991/afghanistan/ (last visited Nov. 26, 2024).

[62] The Forgotten War: Human Rights Abuses and Violations of the Laws Of War Since the Soviet Withdrawal, Human Rights Watch, February 1991, available at: https://www.hrw.org/legacy/reports/1991/afghanistan/ (last visited Nov. 26, 2024).

[63] Carter Malkasian, *The American War in Afghanistan*, pp. 36-39 (Oxford University Press, 2021).

[64] Carter Malkasian, *The American War in Afghanistan*, pp. 39-40 (Oxford University Press, 2021).

[65] Carter Malkasian, *The American War in Afghanistan*, pp. 40-42 (Oxford University Press, 2021).

[66] Carter Malkasian, *The American War in Afghanistan*, pp. 42-43 (Oxford University Press, 2021).

[67] Carter Malkasian, *The American War in Afghanistan*, pp. 43 (Oxford University Press, 2021).

[68] Carter Malkasian, *The American War in Afghanistan*, pp. 49 (Oxford University Press, 2021).

[69] Massacres of Hazaras in Afghanistan, Human Rights Watch, February 1, 2001, available at: https://www.hrw.org/report/2001/02/01/massacres-hazaras-afghanistan (last visited Nov. 26, 2024).

[70] Carter Malkasian, *The American War in Afghanistan*, pp. 58-67 (Oxford University Press, 2021).

App.064-CASA

Afghanistan: TPS Considerations – November 2024

In December 2001, based on the Bonn Agreement, an Afghan interim government was formed, led by Hamid Karzai,[71] a Pashtun, who subsequently won the first post-Taliban government presidential elections in October 2004.[72] The Taliban reorganized and increased their presence substantially by 2006 in Wardak, Logar, Zabul, and Uruzgan provinces and began expanding along the western edge of Kabul province.[73] Other anti-government elements (AGEs) operating in Afghanistan included Hezb-e Islami led by Gulbuddin Hekmatyar (HIG), the Haqqani Network,[74] and al-Qaeda affiliates.[75] The insurgency against the newly constituted Afghan government was characterized by asymmetric warfare: AGEs used roadside and suicide bombs and complex attacks, intimidation of civilians, and targeted killings to destabilize the country.[76] This was countered by searches, clearance operations, and bombings by the Afghan National Security Forces (ANSF) and international military forces.[77] The security situation deteriorated after 2005.[78] The conflict deepened throughout 2007 and 2008, directly affecting approximately one third of the country.[79]

From 2010 onwards, the Taliban-led insurgency spread from the country's south into areas in the northern, eastern, western, and central regions of Afghanistan.[80] By the end of 2014, a transition of security responsibility from the NATO-led International Security Assistance Force (ISAF) to the Afghan National Defense and Security Forces (ANDSF) was completed.[81] After the 2014 international military withdrawal,

---

[71] The Cost of War, Afghan Experiences of Conflict, 1978-2009, Oxfam International, p.13, November 2009, available at: https://www-cdn.oxfam.org/s3fs-public/file_attachments/afghanistan-the-cost-of-war_14.pdf (last visited Nov. 26, 2024).

[72] Election of Karzai Is Declared Official, New York Times, November 4, 2004, available at: https://www.nytimes.com/2004/11/04/world/asia/election-of-karzai-is-declared-official.html (last visited Nov. 26, 2024).

[73] The Insurgency in Afghanistan's Heartland, International Crisis Group, pp.6-7, June 27, 2011, available at: https://d2071andvip0wj.cloudfront.net/207-the-insurgency-in-afghanistan-s-heartland.pdf (last visited Nov. 26, 2024).

[74] The Insurgency in Afghanistan's Heartland, International Crisis Group, pp.14-15, June 27, 2011, available at: https://d2071andvip0wj.cloudfront.net/207-the-insurgency-in-afghanistan-s-heartland.pdf (last visited Nov. 26, 2024).

[75] The situation in Afghanistan and its implications for international peace and security, Report of the Secretary-General, A/68/910–S/2014/420, UN Security Council, para. 21, June 18, 2014, available at: https://unama.unmissions.org/sites/default/files/n1442913.pdf (last visited Nov. 26, 2024).

[76] Afghanistan – Protection of Civilians in Armed Conflict, Midyear Report 2014, U.N. Assistance Mission in Afghanistan (UNAMA), pp. 12-32, July 2014, available at: https://unama.unmissions.org/sites/default/files/english20edited20light.pdf (last visited Nov 26, 2024).

[77] Afghanistan – Protection of Civilians in Armed Conflict, Midyear Report 2014, U.N. Assistance Mission in Afghanistan (UNAMA), pp. 44-60, July 2014, available at: https://unama.unmissions.org/sites/default/files/english20edited20light.pdf (last visited Nov 26, 2024).

[78] Afghanistan, Annual Report on Protection of Civilians in Armed Conflict, 2008, U.N. Assistance Mission in Afghanistan (UNAMA), p.1, January 2009, available at: https://unama.unmissions.org/sites/default/files/unama_09february-annual20report_poc202008_final_11feb09.pdf (last visited Nov 26, 2024).

[79] Afghanistan, Annual Report on Protection of Civilians in Armed Conflict, 2008, U.N. Assistance Mission in Afghanistan (UNAMA), p.1, January 2009, available at: https://unama.unmissions.org/sites/default/files/unama_09february-annual20report_poc202008_final_11feb09.pdf (last visited Nov 26, 2024

[80] Report of the Secretary-General on children and armed conflict in Afghanistan, (Reporting Period: 1 September 2010 – 31 December 2014), S/2015/336, UN Security Council, p. 2, May 15, 2015, available at: https://unama.unmissions.org/sites/default/files/may_2015_-_report_of_the_secretary-general_on_children_and_armed_conflict_in_afghanistan.pdf (last visited Nov. 26, 2024).

[81] Inteqal: Transition to Afghan lead, NATO, updated November 17, 2020, available at: https://www.nato.int/cps/en/natohq/topics_87183.htm (last visited Nov. 26, 2024).

App.065-CASA

the Taliban rapidly expanded their presence countrywide.[82] A 2017 report by the U.N. Secretary-General noted that the Taliban had been able to control larger parts of the country, but the emergence of Islamic State Khorasan Province (ISKP) added "a new, dangerous dimension" to the situation.[83] ISKP, a branch of the Islamic State active in Central and South Asia, emerged in Afghanistan in 2014, after defections with Tehrik-e-Taliban (TTP), al-Qaeda, and other Taliban fighters active in both Afghanistan and Pakistan. "ISKP adheres to the broader Islamic State's ideology, which seeks to establish a global, transnational caliphate that is governed by Islamic jurisprudence."[84] In 2018, fighting intensified particularly in the east, south-east, and in some areas in the south.[85] The Taliban "made territorial gains in sparsely populated areas, and advanced their positions in areas that had not seen fighting in years."[86] Human Rights Watch noted that, although the Taliban claimed to target government and foreign military facilities only, their indiscriminate use of force killed and injured hundreds of civilians.[87]

Beginning in 2019, the United States engaged with the Taliban to establish an agreement to withdraw troops, with various efforts over the next two years seeking assurances that the Taliban would meet counter-terrorism pledges and participate in the ongoing intra-Afghan peace talks.[88] In April 2021, President Biden announced complete U.S. withdrawal by September 11, and U.S. troops departed their largest base at Bagram in early July[89] as the Taliban rapidly took territory including regional urban centers.[90] The Taliban took Kabul on August 15, and the last U.S. forces departed Afghanistan on August 30.[91]

Armed conflict has taken a high toll on Afghan civilians. The U.N. Assistance Mission in Afghanistan (UNAMA) recorded 116,076 civilian deaths and injuries due to armed conflict from 2009 until June 2021, with the last six months of that period showing record numbers of girls and women killed and injured, as

---

[82] Afghanistan: Growing Challenges, International Crisis Group, April 30, 2017, available at:
https://www.crisisgroup.org/asia/south-asia/afghanistan/afghanistan-growing-challenges (last visited Nov. 26, 2024).
[83] Special report on the strategic review of the United Nations Assistance Mission in Afghanistan, Report of the Secretary-General, A/72/312–S/2017/696, UN Security Council, p. 3, August 10, 2017, available at:
https://unama.unmissions.org/sites/default/files/special_report_on_the_strategic_review_of_the_united_nations_assistance_mission_in_afghanistan.pdf (last visited Nov. 26, 2024).
[84] Catrina Doxsee, Jared Thompson and Grace Hwang, Examining Extremism: Islamic State Khorasan Province (ISKP), Center for Strategic and International Studies (CSIS), September 8, 2021, available at:
https://www.csis.org/blogs/examining-extremism/examining-extremism-islamic-state-khorasan-province-iskp (Nov. 29, 2024).
[85] Afghanistan – Protection of Civilians in Armed Conflict, Annual Report 2018, U.N. Assistance Mission in Afghanistan (UNAMA), p. 8, February 2019, available at:
(https://unama.unmissions.org/sites/default/files/afghanistan_protection_of_civilians_annual_report_2018_final_24_feb_2019_0.pdf (last visited Nov. 25, 2024).
[86] Afghanistan – Protection of Civilians in Armed Conflict, Annual Report 2018, U.N. Assistance Mission in Afghanistan (UNAMA), p. 8, February 2019, available at:
(https://unama.unmissions.org/sites/default/files/afghanistan_protection_of_civilians_annual_report_2018_final_24_feb_2019_0.pdf (last visited Nov. 25, 2024).
[87] World Report 2019 - Afghanistan, Human Rights Watch, January 17, 2019, available at:
https://www.hrw.org/world-report/2019/country-chapters/afghanistan (last visited Nov. 26, 2024).
[88] The U.S. War in Afghanistan: 1999 - 2021, Council on Foreign Relations, 2021, available at:
https://www.cfr.org/timeline/us-war-afghanistan (last visited Nov. 26, 2024).
[89] U.S. Leaves Its Last Afghan Base, Effectively Ending Operations, New York Times, July 4, 2021, available at:
https://www.nytimes.com/2021/07/02/world/asia/afghanistan-bagram-us-withdrawal.html (last visited Nov. 26, 2024).
[90] The U.S. War in Afghanistan: 1999 - 2021, Council on Foreign Relations, 2021, available at:
https://www.cfr.org/timeline/us-war-afghanistan (last visited Nov. 26, 2024).
[91] The U.S. War in Afghanistan: 1999 - 2021, Council on Foreign Relations, 2021, available at:
https://www.cfr.org/timeline/us-war-afghanistan (last visited Nov. 26, 2024).

App.066-CASA

USCA4 Appeal: 25-1792     Doc: 4-2        Filed: 07/14/2025      Pg: 70 of 249      Total Pages:(70 of 249)
Case 8:25-cv-01484-TDC     Document 59-3     Filed 06/13/25     Page 43 of 89
Afghanistan: TPS Considerations – November 2024

well as record numbers of overall child casualties.[92] Civilians were caught in the crossfire during ground engagements, were struck by artillery shells, mortars, and rockets, and were injured or killed by explosive remnants of war.[93]

From June to December 2020, UNAMA conducted 132 interviews with a diverse set of victims from all regions of Afghanistan to assess the impacts of conflict. Of the victims interviewed, 82 percent suffered long-term or permanent disabilities, 100 percent reported negative effects on their emotional well-being, 87 percent suffered financial loss, 15 percent were forced to move homes, and 64 percent reported negative effects on their ability to participate in social life.[94]

In 2023, UNAMA reported that 1,095 Afghan civilians had been killed and 2,679 had been wounded between August 15, 2021, and May 2023. Regular UNAMA updates continue to demonstrate that there has been no slowing of civilian casualties in Afghanistan.[95] From July to September of 2024, UNAMA documented 28 civilian casualties and 44 civilians wounded from various attacks throughout the country.[96]

## Current Armed Conflict and Security Situation

Despite the withdrawal of U.S. and NATO troops and disbanding of the Afghan military in August 2021, conflict-related violence has persisted in parts of Afghanistan.[97] After the Taliban took control of the country on August 15, 2021, there have been various armed groups resisting Taliban rule. Perhaps the most well-known group is the National Resistance Front (NRF), which is led by Ahmad Massoud, who formed

---

[92] Afghanistan: Protection of Civilians in Armed Conflict – Annual Report 2020, U.N. Assistance Mission in Afghanistan, February 2021, available at:
https://unama.unmissions.org/sites/default/files/afghanistan_protection_of_civilians_report_2020_revs3.pdf (last viewed Nov. 26, 2024); Afghanistan: Protection of Civilians in Armed Conflict – Midyear Update 1 January to 30 June, U.N. Assistance Mission in Afghanistan, July 2021, available at:
https://unama.unmissions.org/sites/default/files/unama_poc_midyear_report_2021_26_july.pdf (last visited Nov. 26, 2024).
[93] Afghanistan: Protection of Civilians in Armed Conflict – Annual Report 2020, U.N. Assistance Mission in Afghanistan, February 2021, available at:
https://unama.unmissions.org/sites/default/files/afghanistan_protection_of_civilians_report_2020_revs3.pdf (last visited Nov. 26, 2024).
[94] Afghanistan: Protection of Civilians in Armed Conflict – Annual Report 2020, U.N. Assistance Mission in Afghanistan, p. 80, February 2021, available at:
https://unama.unmissions.org/sites/default/files/afghanistan_protection_of_civilians_report_2020_revs3.pdf (last visited Nov. 26, 2024).
[95] Over 1,000 Afghan civilians killed since Taliban takeover: UN, Al Jazeera, June 27, 2023, available at:
https://www.aljazeera.com/news/2023/6/27/over-1000-afghan-civilians-killed-since-taliban-takeover-un (last viewed Nov. 26, 2024).
[96] Update on the human rights situation in Afghanistan: July-September 2024 Update, U.N. Assistance Mission in Afghanistan, p.4, October 31, 2024, available at: https://unama.unmissions.org/sites/default/files/english_-_unama_-_update_on_hr_situation_in_afghanistan_-_july-sept_2024.pdf (last viewed Nov. 26, 2024).
[97] Human rights situation in Afghanistan: July - September 2023 Update, U.N. Assistance Mission in Afghanistan, p.3, October 23, 2023, available at:
https://unama.unmissions.org/sites/default/files/human_rights_situation_in_afghanistan_jul-sep_2023.pdf (last visited Nov. 26, 2024); Update on the human rights situation in Afghanistan: July-September 2024 Update, U.N. Assistance Mission in Afghanistan, p.4, October 31, 2024, available at:
https://unama.unmissions.org/sites/default/files/english_-_unama_-_update_on_hr_situation_in_afghanistan_-_july-sept_2024.pdf (last viewed Nov. 26, 2024).

App.067-CASA

Afghanistan: TPS Considerations – November 2024

the group during the August 2021 Taliban takeover.[98] The Islamic State Khorasan Province (ISKP) is another well-known entity that was active in Afghanistan prior to the Taliban's August 2021 takeover.[99] Other groups, such as the Afghanistan Liberation Movement (ALM) and the Afghanistan Freedom Front (AFF), who formed in the Spring of 2022, occasionally partner with the NRF to carry out attacks against the Taliban.[100] While these groups have remained active in parts of the country, no group been able to hold significant territory and have lacked sufficient coordination and resources to seriously contest Taliban rule.[101]

Civilians face a continuing risk of harm due to ground engagements and asymmetric warfare, particularly between the Taliban and ISKP, as well as direct punitive targeting by Taliban fighters and sectarian attacks on the Shiite minority by ISKP.[102] Taliban forces have also clashed with remaining resistance fighters in Panjshir Province, Iranian security forces in the west, and Pakistani forces along the Durant line.[103] Other groups such as the Turkestan Freedom Tigers, the National Resistance Council, the National Liberation Front of Afghanistan (NLFA), the Unknown Soldiers of Hazaristan, the allegedly Hazara-centered Freedom and Democracy Front and the Freedom Corps have also targeted Taliban forces.[104]

The Armed Conflict Location & Event Data Project (ACLED) recorded over "1,000 incidents of violence targeting civilians by the Taliban between the fall of Kabul on 15 August 2021 and 30 June 2023, accounting for 62% of all attacks on civilians in the country. This places the Taliban regime in Afghanistan among the world's top government or de facto state perpetrators of violence targeting civilians domestically

---

[98] Afghanistan - Security Situation, European Union Agency for Asylum (EUAA), p.45, August 2022, available at: https://coi.euaa.europa.eu/administration/easo/PLib/2022_08_EUAA_COI_Report_Afghanistan_Security_situation. pdf (last visited Nov. 26, 2024).

[99] Afghanistan - Security Situation, European Union Agency for Asylum (EUAA), p.50, August 2022, available at: https://coi.euaa.europa.eu/administration/easo/PLib/2022_08_EUAA_COI_Report_Afghanistan_Security_situation. pdf (last visited Nov. 26, 2024).

[100] Masood Farivar, Afghan 'Fighting Season' Ushers in New Anti-Taliban Groups, VOA News, April 28, 2022, available at: https://www.voanews.com/a/afghan-fighting-season-ushers-in-new-anti-taliban-groups/6542148.html (last visited Nov. 26, 2024); Taliban Searches Houses In Kabul After Rocket Attack Claimed By Freedom Front, Radio Free Europe/Radio Liberty, October 22, 2024, available at: https://www.rferl.org/a/afghanistan-taliban-kabul-airport-attack/33168412.html (last visited Nov. 26, 2024).

[101] Afghanistan - Country Focus, European Union Agency for Asylum (EUAA), p.17, December 2023, available at: https://coi.euaa.europa.eu/administration/easo/PLib/2023_12_EUAA_COI_Report_Afghanistan_Country_Focus.pdf (last visited Nov. 26, 2024); Afghanistan - Country Focus, European Asylum Support Office (EASO), January 2022, available at:
https://coi.euaa.europa.eu/administration/easo/PLib/2022_01_EASO_COI_Report_Afghanistan_Country_focus.pdf (last visited Nov. 26, 2024).

[102] Afghanistan - Security Situation, European Union Agency for Asylum (EUAA), p.45, August 2022, available at: https://coi.euaa.europa.eu/administration/easo/PLib/2022_08_EUAA_COI_Report_Afghanistan_Security_situation. pdf (last visited Nov. 26, 2024); Ayaz Gul, IS-claimed attack kills 14 Shiite Muslims in Afghanistan, VOA News, September 13, 2024, available at: https://www.voanews.com/a/is-claimed-attack-kills-14-shiite-muslims-in-afghanistan/7782808.html (last visited Nov. 26, 2024).

[103] Regional Overview: South Asia and Afghanistan 5-11 March 2022, ACLED, March 2022, available at: https://acleddata.com/2022/03/16/regional-overview-south-asia-and-afghanistan-5-11-march-2022/ (last visited Nov. 26, 2024); Regional Overview: South Asia and Afghanistan 19-25 February, ACLED, February 2022, available at: https://acleddata.com/2022/03/03/regional-overview-south-asia-and-afghanistan-19-25-february-2022/ (last visited Nov. 26, 2024); Jon Gambrell, Iran, Taliban exchange heavy gunfire in conflict over water rights on Afghan border, PBS News, May 27, 2023, available at: https://www.pbs.org/newshour/world/iran-taliban-exchange-heavy-gunfire-in-conflict-over-water-rights-on-afghan-border (last visited Nov. 26, 2024).

[104] Country Guidance: Afghanistan, European Union Agency for Asylum (EUAA), p., 22 May 2024, available at: https://euaa.europa.eu/publications/country-guidance-afghanistan-may-2024 (last visited Nov. 26, 2024).

App.068-CASA

Afghanistan: TPS Considerations – November 2024

since August 2021, behind only the military junta in Myanmar."[105] General instability in the country, including instability caused by deep economic challenges, exacerbates the problem of establishing security and thwarting the rise of further extremism.[106]

The Taliban itself presents serious impediments to peace, such as the appointment of five members of the Haqqani family to high posts including the Ministry of Interior, despite the Haqqani family's reputation for operating a brutal terrorist organization, commonly known as the Haqqani Network, and committing attacks that killed high numbers of civilians.[107] The Taliban appears committed to maintaining its methods of warfare that have taken a heavy toll on civilians, resulting in human rights violations, intimidation, ill-treatment, excessive use of force, arbitrary arrests, incommunicado detention, use of torture in detention, killings, abductions, enforced disappearances and corporal and capital punishments.[108] Additionally, although the Taliban pledged to not allow al-Qaeda to threaten the security of the United States and any of its allies from Afghan soil, veteran Taliban leaders with deep relationships with al-Qaeda organizers have returned to positions of power, in which a U.N. Security Council report from 2024 confirms concerns that the Taliban are once again providing safe haven for global jihadists.[109] The United States Institute of Peace (USIP) has reported on the nuanced relationship the Taliban has with al-Qaeda since the August 2021 takeover:

> In the first year of Taliban rule [2021], al-Qaeda began to rear its head in Afghanistan. The group started messaging more actively. Its then-leader Zawahiri issued more statements than he had in a long time, with some inciting violence. Zawahiri's presence in Kabul, Afghanistan, marked the peak of al-Qaeda's post-takeover activity […] Longstanding fears were affirmed […] when the U.S. government located al-Qaeda leader Aimen al-Zawahiri in Kabul, Afghanistan, before killing him in a drone strike. The fact that the Taliban would bring Zawahiri back to Kabul, despite repeated assurances to U.S. negotiators both before and after the Doha agreement that they had distanced themselves from al-Qaeda, significantly elevated concerns.[110]

In July 2024, SIGAR's report to Congress elaborated on the Taliban's concerning relationship with the Taliban:

> The U.S. Office of the Director of National Intelligence has assessed that 'al Qaeda has reached an operational nadir in Afghanistan and Pakistan,' but the Taliban remain tolerant of al Qaeda and

---

[105] Two Years Of Repression: Mapping Taliban Violence Targeting Civilians in Afghanistan, ACLED, August 11, 2023, available at: https://acleddata.com/2023/08/11/two-years-of-repression-mapping-taliban-violence-targeting-civilians-in-afghanistan/ (last visited Nov 26. 2024).

[106] Ahmad Mukhtar, Afghanistan after 3 years of Taliban rule: Women silenced and oppressed as ISIS and al Qaeda regroup, CBS News, August 28, 2024, available at: https://www.cbsnews.com/news/afghanistan-taliban-new-rules-women-rights-quashed-isis-al-qaeda-regroup-3-years/ (last visited Nov. 26, 2024); Afghanistan: UN warns of growing crisis under increasingly authoritarian Taliban rule, UN News, September 18, 2024, available at: https://news.un.org/en/story/2024/09/1154491 (last visited Nov. 26, 2024).

[107] Hardliners get key posts in new Taliban government, BBC News, September 7, 2021, available at: https://www.bbc.com/news/world-asia-58479750 (last visited Nov. 26, 2024).

[108] Country Guidance: Afghanistan, European Union Agency for Asylum (EUAA), p.19, May 2024, available at: https://euaa.europa.eu/publications/country-guidance-afghanistan-may-2024 (last visited Nov. 26, 2024).

[109] Lynne O'Donnell, Al Qaeda Is Back—and Thriving—in Afghanistan, Foreign Policy, March 22, 2024, available at: https://foreignpolicy.com/2024/03/22/al-qaeda-taliban-afghanistan-gold-mining/ (last visited Nov. 26, 2024); *see also*, Ahmad Mukhtar, The Taliban vowed to cut ties with al Qaeda, but the terror group appears to be growing in Afghanistan, CBS News, February 1, 2024, available at: https://www.cbsnews.com/news/afghanistan-taliban-al-qaeda-growing/ (last visited Nov. 29, 2024).

[110] Asfandyar Mir, Two Years Under the Taliban: Is Afghanistan a Terrorist Safe Haven Once Again?, United States Institute of Peace (USIP), August 15, 2023, available at: https://www.usip.org/publications/2023/08/two-years-under-taliban-afghanistan-terrorist-safe-haven-once-again (last visited Nov. 29, 2024).

App.069-CASA

USCA4 Appeal: 25-1792    Doc: 4-2    Filed: 07/14/2025    Pg: 73 of 249    Total Pages:(73 of 249)
Case 8:25-cv-01484-TDC    Document 59-3    Filed 06/13/25    Page 46 of 89
Afghanistan: TPS Considerations – November 2024

permit the group to maintain safe haven in Afghanistan. Earlier this year, a UN sanctions monitoring team reported that al Qaeda's general command has about a dozen senior leaders in Afghanistan, while another UN sanctions monitoring team added that 'al-Qaida remains strategically patient, cooperating with other terrorist groups in Afghanistan and prioritizing its ongoing relationship with the Taliban.'[111]

## Islamic State Khorasan Province (ISKP), the Risk to Civilians, and the Taliban Response

The threat of ISKP is ever-present in Afghanistan, having had devastating consequences on the local population. ISKP, the Islamic State offshoot that claimed responsibility for the August 26, 2021 suicide attack outside the Kabul airport, has been behind some of the deadliest attacks against Afghan civilians, specifically the Hazaras in urban areas, using IED and suicide attacks.[112] Its record includes a 2020 assault by gunmen on a maternity ward in Kabul, killing 16 mothers and pregnant women, as well as two children and seven other people.[113] In 2022, ISKP carried out a suicide bombing at a Shia neighborhood education center in Kabul, killing 53 people, including 46 girls and young women.[114] In 2024, ISKP continued carrying out attacks within Afghanistan,[115] but also expanded its footprint to carry out bombings in Iran[116] and Russia,[117] killing nearly 100 and 143 people in those attacks, respectively.

Founded in 2015, ISKP has recruited Afghans including disaffected Taliban elements, members of other insurgent groups such as the Islamic Movement of Uzbekistan (IMU), and foreign fighters from Pakistan and elsewhere.[118] The U.S. State Department designated it a "foreign terrorist organization" in January 2016, and U.S. forces engaged in significant operations, in concert with former Afghan government forces and sometimes also with the Taliban,[119] to reduce its numbers and to reclaim the small swaths of territory that it held.[120]

---

[111] July 30, 2024 Quarterly Report to Congress, SIGAR – Special Inspector General for Afghanistan Reconstruction, pp. 10-11, July 30, 2024, available at: https://www.sigar.mil/pdf/quarterlyreports/2024-07-30qr-section3.pdf (last visited Nov. 29, 2024).

[112] Country Guidance: Afghanistan, European Union Agency for Asylum (EUAA), p.112, May 2024, available at: https://euaa.europa.eu/publications/country-guidance-afghanistan-may-2024 (last visited Nov. 26, 2024).

[113] Explainer: Who Are Islamic State-Khorasan And What Are They After?, Radio Free Europe / Radio Liberty, August 27, 2021, available at: https://gandhara.rferl.org/a/islamic-state-khorasan-expainer/31431763.html (last visited Nov. 26, 2024).

[114] ISIL claims responsibility for deadly Kabul attack, Al Jazeera, September 3, 2024, available at: https://www.aljazeera.com/news/2024/9/3/isil-claims-responsibility-for-deadly-kabul-attack (last visited Nov. 26, 2024).

[115] At least three killed in suicide bombing in Afghan city of Kandahar, Al Jazeera, March 21, 2024, available at: https://www.aljazeera.com/news/2024/3/21/at-least-three-killed-in-suicide-bombing-in-afghan-city-of-kandahar (last visited Nov. 26, 2024).

[116] Parisa Hafezi, Elwely Elwelly & Clauda Tanios, Islamic State claims responsibility for deadly Iran attack, Tehran vows revenge, Reuters, January 4, 2024, available at: https://www.reuters.com/world/middle-east/iran-vows-revenge-after-biggest-attack-since-1979-revolution-2024-01-04/ (last visited Nov. 26, 2024).

[117] The death toll in the Moscow concert hall attack rises to 143, while 80 others remain hospitalized, AP News, March 27, 2024, available at: https://apnews.com/article/russia-concert-hall-shooting-toll-moscow-crocus-ce45e104781c108ff3b7f8a9d45fcef7 (Nov. 26, 2024).

[118] Terrorist Groups in Afghanistan, Congressional Research Service, p.1, April 2, 2024, available at: https://crsreports.congress.gov/product/pdf/IF/IF10604 (last visited Nov. 26, 2024).

[119] The Islamic State: Background, Current Status, and U.S. Policy, Congressional Research Service, p.1, May 6, 2024, available at: https://crsreports.congress.gov/product/pdf/IF/IF10328 (last visited Nov. 26, 2024).

[120] Explainer: Who Are Islamic State-Khorasan And What Are They After?, Radio Free Europe / Radio Liberty, August 27, 2021, available at: https://gandhara.rferl.org/a/islamic-state-khorasan-expainer/31431763.html (last visited Nov. 26, 2024).

App.070-CASA

As a Sunni organization, a feature of ISKP's attacks is large scale IED and suicide bombings of Hazara Shia mosques and neighborhoods, which have dramatically increased sectarian violence in Afghanistan.[121] Currently, some reports show that ISKP having roughly 3,000 members, ranging from an organization that can capture territory to a network of covert cells depending on the environment, consistently posing a threat regardless of its structure.[122] While other reports indicate that ISKP has upwards of 9,000 members, exerting influence in various provinces across Afghanistan, ISKP's strongholds are near the Nangahar and Kunar provinces, bordering Pakistan. Taliban officials have expressed serious concern over how easily ISKP can coordinate attacks, recruit fighters, and have access to resources such as weapons and vehicles.[123] The Taliban have long engaged in efforts to eradicate the organization, and they continue to fight a renewed ISKP insurgency, frequently resulting in civilian casualties.[124]

ACLED reports on attacks by ISKP in Afghanistan including engagements with the Taliban and targeting of civilians. For the period from July 1, 2022 to September 30, 2023, ACLED's data, in conjunction with the UN Secretary General, indicated a significant decrease in ISKP activity, describing ISKP's capacities as "limited" and "degraded." ACLED data also revealed a decrease of events involving the ISKP in 2023 (49 events in total) compared to 2022 (199 events).[125] Data from a 2024 Center for Strategic and International Studies (CSIS) report corroborates this trend of declining attacks from ISKP in Afghanistan, revealing that the group has carried out fewer than 10 attacks per month in the country since January 2023.[126] CSIS writes:

> Its operations in Afghanistan reached an all-time high as the Taliban took over, and it maintained a higher tempo for an unusually long time. Though the group's attacks in Afghanistan have been limited since late 2022, concluding that the group has been seriously weakened based on those trends is premature. ISKP has had an erratic attack pattern with sharp peaks and low valleys since its inception in 2015. It conducts waves of attacks that draw counterterrorism pressure, and then it temporarily launches fewer operations as it adapts to the pressure and losses.[127]

---

[121] Country Guidance: Afghanistan, European Union Agency for Asylum (EUAA), p.64, May 2024, available at: https://euaa.europa.eu/publications/country-guidance-afghanistan-may-2024 (last visited Nov. 26, 2024).

[122] Tricia Bacon, The Islamic State in Khorasan Province: Exploiting a Counterterrorism Gap, Center for Strategic and International Studies (CSIS), April 11, 2024, available at: https://www.csis.org/analysis/islamic-state-khorasan-province-exploiting-counterterrorism-gap (Nov. 26, 2024).

[123] Janatan Sayeh, ISKP's transnational reemergence, Foundation for Defense of Democracies (FDD), June 10, 2024, available at: https://www.fdd.org/analysis/op_eds/2024/06/10/iskps-transnational-reemergence/ (last visited Nov. 26, 2024).

[124] Dan De Luce, Mushtaq Yusufzai & Tom Winter, The enemy of my enemy: Biden admin weighs working with the Taliban to combat ISIS-K, NBC, July 3, 2024, available at: https://www.nbcnews.com/investigations/biden-admin-weighs-cooperation-taliban-counter-isis-k-rcna159789 (last visited Nov. 26, 2024).

[125] Country Guidance: Afghanistan, European Union Agency for Asylum (EUAA), p.21, May 2024, available at: https://euaa.europa.eu/publications/country-guidance-afghanistan-may-2024 (last visited Nov. 26, 2024).

[126] Tricia Bacon, The Islamic State in Khorasan Province: Exploiting a Counterterrorism Gap, Center for Strategic and International Studies (CSIS), April 11, 2024, available at: https://www.csis.org/analysis/islamic-state-khorasan-province-exploiting-counterterrorism-gap (Nov. 26, 2024).

[127] Tricia Bacon, The Islamic State in Khorasan Province: Exploiting a Counterterrorism Gap, Center for Strategic and International Studies (CSIS), April 11, 2024, available at: https://www.csis.org/analysis/islamic-state-khorasan-province-exploiting-counterterrorism-gap (Nov. 26, 2024).

App.071-CASA

Afghanistan: TPS Considerations – November 2024

Dr. Antonio Giustozzi, a leading Afghan counter-terrorism expert, echoed these reports, adding that ISKP encountered a financial crisis in 2023 and the group has in turn restructured and transitioned towards an underground system – pivoting to work with mobile bases and small cells to further the groups agenda.[128]

Hazaras Targeted by ISKP and the Taliban

Throughout Afghanistan's history, Hazaras have faced severe abuse, including enslavement, mass killings, and systematic discrimination under different rulers in Afghanistan.[129] Though they made progress in achieving parity with other ethnic groups over the last two decades, they were particular targets of harm by the Taliban during their first rule from 1996-2001, and were excluded from almost all government positions and educational opportunities by Pashtun-dominated governments before.[130]

During the Taliban's 1996-2001 era, the Hazaras had their homelands wrested from their control as the Taliban carried out a campaign of targeted killings.[131] On August 8, 1998, Taliban forces captured Mazar-i Sharif in the north and massacred 5,000 to 6,000 Hazara citizens in revenge for earlier executions of Taliban fighters.[132] Human Rights Watch reported that Hazaras were also singled out in Mazar-i Sharif by the Taliban because they are Shi'a.[133] "The Taliban are Sunni Muslims and followers of a strict conservative sect that considers the Shi'a to be infidels."[134] The Taliban committed mass executions of Hazara men in 2000 and 2001 as collective punishment for suspected collaboration with opposing forces.[135] In early 2001, Hazaras were forced "to dangle from cliff faces to drill holes for explosives the Taliban used to topple the ancient Buddha statues of Bamian, carved from sandstone cliffs more than 1,500 years ago [and constituting part of the cultural heritage of the traditional Hazara homeland]."[136]

More recently, in 2018, hundreds of Hazara families were driven from their homes and 50 were killed during Taliban offensives against government forces and Hazara militias in the provinces of Uruzgan and Ghazni.[137] In 2021, there were reports of the Taliban massacring nine Hazaras after taking control of Ghazni

---

[128] Antonio Giustozzi, The Islamic State in Khorasan between Taliban counter-terrorism and resurgence prospects, International Centre for Counter-Terrorism (ICCT), January 30, 2024, available at: https://www.icct.nl/publication/islamic-state-khorasan-between-taliban-counter-terrorism-and-resurgence-prospects (last visited Nov. 26, 2024).

[129] Country Guidance: Afghanistan, European Union Agency for Asylum (EUAA), p.62, May 2024, available at: https://euaa.europa.eu/publications/country-guidance-afghanistan-may-2024 (last visited Nov. 26, 2024)..

[130] Thomas Barfield, *Afghanistan: A Cultural and Political History*, pp.26-27, (Princeton University Press, 2010)

[131] Abubakar Siddique & Mansoor Khosrow, Afghanistan's Shi'ite Minority Suffers 'Systematic Discrimination' Under Taliban Rule, Radio Free Europe/Radio Liberty, July 17, 2023, available at: https://www.rferl.org/a/afghanistan-taliban-shiite-persecution-discrimination/32507042.html (last visited Nov. 26, 2024).

[132] Carter Malkasian, *The American War in Afghanistan*, pp. 42-43 (Oxford University Press, 2021); Afghanistan: The Massacre in Mazar-i Sharif, November 1998 Vol. 10, No. 7 (C), Human Rights Watch, 1998, available at: https://www.hrw.org/legacy/reports98/afghan/Afrepor0.htm (last visited Nov. 26 2024).

[133] Afghanistan: The Massacre in Mazar-i Sharif, November 1998 Vol. 10, No. 7 (C), Human Rights Watch, 1998, available at: https://www.hrw.org/legacy/reports98/afghan/Afrepor0.htm (last visited Nov. 26, 2024).

[134] Afghanistan: The Massacre in Mazar-i Sharif, November 1998 Vol. 10, No. 7 (C), Human Rights Watch, 1998, available at: https://www.hrw.org/legacy/reports98/afghan/Afrepor0.htm (last visited Nov. 26, 2024).

[135] Massacres of Hazaras in Afghanistan, Human Rights Watch, February 1, 2001, available at: https://www.hrw.org/report/2001/02/01/massacres-hazaras-afghanistan (last visited Nov. 26, 2024).

[136] They Are Thriving After Years of Persecution but Fear a Taliban Deal, New York Times, March 27, 2019, available at: https://www.nytimes.com/2019/03/27/world/asia/afghanistan-hazaras-taliban-peace-talks.html (last visited Nov. 26, 2024).

[137] They Are Thriving After Years of Persecution but Fear a Taliban Deal, New York Times, March 27, 2019, available at: https://www.nytimes.com/2019/03/27/world/asia/afghanistan-hazaras-taliban-peace-talks.html (last visited Nov. 26, 2024).

App.072-CASA

Afghanistan: TPS Considerations – November 2024

province in July 2021.[138] Further, there were reports that the Taliban forcibly evicted Hazaras from their homes, including 700 from the central province of Daikundi in late September 2021.[139] Human Rights Watch reported that in early October 2021, the Taliban and associated militias forcibly evicted hundreds of Hazara families from their homes and lands in various provinces, including Helmand, Balkh, Daikundi, Uruzgan, and Kandahar provinces. A former United Nations political analyst said that he saw eviction notices telling residents that if they did not comply, they "had no right to complain about the consequences."[140] Since the August 2021 takeover, Taliban fighters have also been filmed firing rocket-propelled grenades into the cavities where the Bamiyan Buddhas once stood while reciting Taliban slogans, despite the Taliban's pledge to protect the site.[141] Most recently, reports from 2024 reveal that the Taliban is still engaged in displacing Hazaras from their land, or threatening to do so if they do not provide cash compensation.[142] The U.S. Department of State Afghanistan Country Report on Human Rights Practices, published in April 2024, states:

> There were many reports of the Taliban forcibly evicting or allowing the forced eviction of Hazara families from their land.  In August, Hazara homes in Uruzgan Province were reportedly burned, fruit trees cut down, and pasture lands confiscated.  According to a prominent Hazara figure, at least 13 Hazara residents in a village in the province had reportedly been killed in the past two years as part of a campaign against the Hazara community to forcibly displace them from their native lands and homes.[143]

As highlighted earlier, Hazaras are also enduring a pattern of increasing sectarian attacks from ISKP. Dr. Patricia Gossman, Associate Asia Director at Human Rights Watch (HRW), stated that ISKP "has repeatedly carried out devastating attacks that appear designed to spread terror and inflict maximum suffering particularly on Afghanistan's Hazara community."[144] HRW reports that between 2015 and mid-2021, ISKP was responsible for killing and injuring more than 2,000 Afghan civilians, primarily in Kabul, Jalalabad, and Kandahar. Since the August 2021 Taliban takeover, these ISKP attacks have continued – killing and injuring over 700 Hazara.[145] ACLED and other outlets have corroborated much of this data,

---

[138] Afghanistan: Taliban responsible for brutal massacre of Hazara men – new investigation, Amnesty International, August 19, 2021, available at: https://www.amnesty.org/en/latest/news/2021/08/afghanistan-taliban-responsible-for-brutal-massacre-of-hazara-men-new-investigation/ (last visited Nov. 26, 2024).
[139] Afghan Hazaras Fear The Worst After Forced Taliban Evictions, Radio Free Europe/Radio Liberty, October 6, 2021, available at: https://gandhara.rferl.org/a/afghanistan-hazaras-taliban/31496224.html (last visited Nov. 26, 2024).
[140] Afghanistan: Taliban Forcibly Evict Minority Shia, Human Rights Watch, October 22, 2021, available at: https://www.hrw.org/news/2021/10/22/afghanistan-taliban-forcibly-evict-minority-shia (last visited Nov. 26, 2024).
[141] Video Shows Taliban Using Remnants Of Bamiyan Buddhas For Target Practice, Radio Free Europe/Radio Liberty, November 10, 2021, available at: https://gandhara.rferl.org/a/bamiyan-buddhas-taliban-target/31555276.html (last visited Nov. 26, 2024).
[142] Taliban Wants Cash To Settle Land Dispute; Threaten Eviction of Hazaras, If Unpaid, Afghanistan International, August 3, 2024, available at: https://www.afintl.com/en/202408035413 (last visited Nov. 26, 2024).
[143] 2023 Country Reports on Human Rights Practices: Afghanistan, U.S. Department of State, pp.13-14, April 22, 2024, available at: https://www.state.gov/wp-content/uploads/2024/02/528267_AFGHANISTAN-2023-HUMAN-RIGHTS-REPORT.pdf (last visited Nov. 26, 2024).
[144] Afghanistan: Surge in Islamic State Attacks on Shia, Human Rights Watch, October 25, 2021, available at: https://www.hrw.org/news/2021/10/25/afghanistan-surge-islamic-state-attacks-shia (last visited Nov. 26, 2024).
[145] Fereshta Abbasi, Attacks Target Afghanistan's Hazaras, Human Rights Watch, May 3, 2024, available at: https://www.hrw.org/news/2024/05/03/attacks-target-afghanistans-hazaras (last visited Nov. 26, 2024).

App.073-CASA

Afghanistan: TPS Considerations – November 2024

documenting the relentless ISKP attacks against Hazaras.[146] On January 6, 2024, HRW reported "a similar attack on a bus in Dasht-e Barchi, a predominantly Hazara neighborhood of Kabul, killed five people, including at least one child, and injured 14. Dasht-e Barchi has been the site of numerous ISKP attacks. When ISKP claimed responsibility for the January 6 attack, they said it was part of their 'kill them wherever you find them' campaign against 'infidels.'"[147] On April 21, 2024, Al Arabiya reported that "one person was killed and three others wounded by an explosion in Kabul […] with ISIS claiming responsibility for the sticky bomb attack. The improvised explosive device (IED) was detonated in the Kot-e-Sangi neighborhood, near an enclave of the historically persecuted Shiite Hazara community, which has been targeted by the militant group in the past.[148] On April 29, 2024, Al Jazeera reported that an ISKP member stormed a Shia mosque in western Herat province and opened fire on worshippers, killing at least six individuals.[149] On September 12, 2024, media outlet KabulNow reported on another attack against the Hazara community which killed and injured at least twenty people, writing that "the victims […] were traveling to the border region to welcome pilgrims returning from Karbala, Iraq, when they were ambushed and attacked by armed men. ISKP, who views Shia Hazaras as 'heretics,' took credit for the attack via its news outlet hours after the incident, stating that it targeted Hazaras.[150] This continuous barrage has taken a severe toll on Afghan Hazara Shias and reflects the lack of security in Afghanistan. Reuters summarized the situation, stating that "[w]ith more than 400 Shi'ite mosques in Kabul alone, total security is impossible, and no one knows where the next attack will come."[151]

## Internal Displacement

As of September 30, 2024, UNHCR reported that there were approximately 3.22 million conflict-induced internally displaced persons (IDPs) in Afghanistan.[152] The U.N. International Organization for Migration (IOM) predicts there will be 900,000 newly displaced individuals in Afghanistan in 2024, stating the critical situation of IDPs in the country:[153]

---

[146] Two Killed, Four Wounded After Blasts Hit Kabul Shi'ite Neighborhood, Radio Free Europe/Radio Liberty, December 10, 2021, available at: https://gandhara.rferl.org/a/31603830.html (last visited Nov. 26, 2024); Regional Overview: South Asia and Afghanistan 22-28 January 2022, ACLED, January 2022, available at: https://acleddata.com/2022/02/03/regional-overview-south-asia-and-afghanistan-22-28-january-2022/ (last visited Nov. 26, 2024); see also, Regional Overview: South Asia and Afghanistan 11 December 2021 to 7 January *2022*, ACLED, January 2022 available at: https://acleddata.com/2022/01/13/regional-overview-south-asia-and-afghanistan-11-december-2021-7-january-2022/ (last visited Nov. 26, 2024).

[147] Fereshta Abbasi, Attacks Target Afghanistan's Hazaras, Human Rights Watch, May 3, 2024, available at: https://www.hrw.org/news/2024/05/03/attacks-target-afghanistans-hazaras (last visited Nov. 29, 2024).

[148] Blast claimed by ISIS kills one in Afghan capita*l*, Al Arabiya News, April 21, 2024, available at: https://english.alarabiya.net/News/world/2024/04/21/blast-claimed-by-isis-kills-one-in-afghan-capital- (last visited Nov. 26, 2024).

[149] Gunman kills at least six in attack on mosque in Afghanistan's Herat, Al Jazeera, April 30, 2024, available at: https://www.aljazeera.com/news/2024/4/30/gunman-kills-at-least-six-in-attack-on-mosque-in-afghanistans-herat (last visited Nov. 29, 2024).

[150] ISKP Claims Responsibility for Attack on Hazaras in Central Afghanistan, Kabul Now, September 13, 2024, available at: https://kabulnow.com/2024/09/iskp-claims-responsibility-for-attack-on-hazaras-in-central-afghanistan/ (last visited Nov. 26, 2024).

[151] For Afghan Hazaras, where to pray can be life and death choice, Reuters, October 21, 2021, available at: https://www.reuters.com/world/asia-pacific/afghan-hazaras-where-pray-can-be-life-death-choice-2021-10-21/ (last visited Nov. 26, 2024).

[152] UNHCR Afghanistan Situation Update #39, UNHCR Operation Data Portal, October 29, 2024, available at: https://data.unhcr.org/en/documents/details/112110 (last viewed Nov. 29, 2024).

[153] Afghanistan Crisis Response Plan 2024, UN International Organization for Migration (IOM), April 26, 2024, available at: https://crisisresponse.iom.int/response/afghanistan-crisis-response-plan-2024 (last visited Nov. 29, 2024).

App.074-CASA

Afghanistan: TPS Considerations – November 2024

> Among the most basic and dire needs of IDPs in Afghanistan are health, protection, and emergency assistance. Only 19 percent of surveyed communities have a functional health clinic located within the confines of their community and the lack thereof of female healthcare workers often determines whether women and girls can access care, and thus IDPs struggle to find vital medical and psychological support needed to overcome the effects of recent political developments and the rapidly deteriorating living conditions around the country.[154]

The Internal Displacement Monitoring Centre's (IDMC) 2020 report explained that in additional to conflict induced displacement, Afghanistan "is regularly affected by a variety of natural hazards, including floods, landslides, earthquakes, and drought, which destroy homes and infrastructure and cause many to flee their homes, including some already displaced by conflict and violence."[155] These concerns are still prevalent today in Afghanistan, as the IDMC 2024 report stated:

> Earthquakes triggered 491,000 movements, the highest figure since 2015. More than three-quarters of these were recorded in Afghanistan's western province of Herat, which was hosting the country's largest number of people displaced by conflict when a series of earthquakes and their aftershocks forced hundreds of thousands from their homes […] The disaster aggravated the overall humanitarian situation as damage to roads and bridges disrupted the supply of aid […] The damage the earthquakes caused to septic tanks, drainage systems, wells and water pumps worsened the impacts of the previous years' droughts, leaving IDPs and host communities with ever less access to clean water and sanitation. Some of those who lost their homes also lost their safe water facilities, resulting in heightened risk of contamination and disease.[156]

Additionally, land disputes and related conflicts have led to further insecurity, fueling IDPs. Ethnicity has sometimes become an element of these disputes since the Taliban took power.[157] The European Union Agency for Asylum (EUAA) explained that the Taliban have consistently and overwhelmingly supported Pashtun communities in conflicts with non-Pashtun neighbors over property and land, writing:

> Tensions between settled and nomadic communities have intensified in various provinces, leading to forced evictions and displacement of minority groups, including Hazaras, Uzbeks, and Tajiks. The Taliban's involvement in land disputes, particularly siding with Pashtun Kuchis, has resulted in the eviction of local populations. According to one source, these conflicts were attributed to complex land dispute dynamics and as a strategy of the Taliban to gain political and military control over affected areas.[158]

---

[154] Uprooted in Afghanistan: Stories of Internal Displacement, UN International Organization for Migration (IOM), available at: https://roasiapacific.iom.int/stories/uprooted-afghanistan-stories-internal-displacement, (last visited November 8, 2024).
[155] Afghanistan: Country Information, Internal Displacement Monitoring Centre, December 31, 2020, available at: https://www.internal-displacement.org/countries/afghanistan (last visited Nov. 26, 2024).
[156] Global Report on International Displacement (GRID) 2024, Internal Displacement Monitoring Centre, pp.40, 44, May 14, 2024, available at: https://www.internal-displacement.org/countries/afghanistan (last visited Nov. 26, 2024).
[157] Amin Kawa, Endless Extortion and Taliban Oppression: The Persistent Crisis of Land Seizures and Forced Relocations, Hasht e Subh Daily, August 6, 2024, available at: https://8am.media/eng/endless-extortion-and-taliban-oppression-the-persistent-crisis-of-land-seizures-and-forced-relocations/ (last visited Nov. 26, 2024).
[158] Country Guidance: Afghanistan, European Union Agency for Asylum (EUAA), p.91, May 2024, available at: https://euaa.europa.eu/publications/country-guidance-afghanistan-may-2024 (last visited Nov. 26, 2024).

App.075-CASA

Afghanistan: TPS Considerations – November 2024

## Infrastructure Challenges

As Afghanistan faces significant humanitarian and economic challenges, it must also address its struggling infrastructure concerns throughout the country. The World Bank predicts Afghanistan's economy will continue to decline and stagnate throughout 2025, all while dealing with the humanitarian concerns plaguing the country.[159] As international aid has failed to return to pre-August 15, 2021 levels, the Taliban simply do not have the budget to address many of the infrastructure concerns throughout the country. Taliban officials were hoping international donors would return, but the international community has cited the regime's policies towards women as a stumbling block that must be addressed before any agreements can be made.[160] Therefore, the Taliban government knows much of the responsibility and have spent a significant share of their meagre budget on railways, dams, irrigation, and road repairs, with a focus on water infrastructure.[161] A 2024 report from the International Crisis Group explained the predicament:

> Fertile parts of the country could grow high-value substitutes, such as pomegranate, figs, almond, 'hing' (asafoetida) and pistachio, but all of these require upfront investment and time before they reach profitability, along with better infrastructure […] Donors walked away from infrastructure projects worth more than $2.8 billion when the Taliban took over – including energy, transportation, and irrigation works that were in part designed to bolster agriculture. Almost none have restarted.[162]

Some critical infrastructure projects that are capable of driving economic transformation in Afghanistan are currently in the works, such as the Turkmenistan-Afghanistan-Pakistan-India (TAPI) pipeline, the Aynak copper extraction project, and the Central Asia South Asia Electricity Transmission and Trade Project (CASA-1000); however, these projects are at risk due to security challenges, and political and governance instability in the country.[163] Compounding these issues are natural disasters that continue to plague and batter infrastructure for some of the most vulnerable communities in Afghanistan. An OCHA report from July 2024 documented the heavy rainfall and flooding:

> On 15 and 16 July, these events caused extensive damage and destruction of private properties, civilian infrastructure, including power lines and sanitation facilities, and agricultural land in 29 districts […] Reports indicate 58 fatalities and 380 injured […] This year's heavy rains and floods hit the Afghan people after a three-year period of drought-like conditions following the worst drought in 30 years in 2021/2022 […] in many provinces weak water management systems, dated and porous sanitation infrastructure, insufficient drainage channels, deforestation and traditional

---

[159] The World Bank In Afghanistan, The World Bank, available at:
https://www.worldbank.org/en/country/afghanistan/overview (last visited November 8, 2024).
[160] International community must not normalise Taliban rule in Afghanistan, Office of the High Commissioner for Human Rights (OHCHR), August 14, 2024, available at: https://www.ohchr.org/en/press-releases/2024/08/international-community-must-not-normalise-taliban-rule-afghanistan (last visited Nov. 26, 2024).
[161] Bibi Amina Hakimi, Various Infrastructure Projects Initiated in Past Solar Year 1402: Ministry, TOLO News, March 19, 2024, available at: https://tolonews.com/business-187903 (last visited Nov. 26, 2024).
[162] Trouble In Afghanistan's Opium Fields: The Taliban War On Drugs, International Crisis Group, September 12, 2024, available at: https://www.crisisgroup.org/asia/south-asia/afghanistan/340-trouble-afghanistans-opium-fields-taliban-war-drugs#:~:text=The%20Taliban%20have%20instituted%20a,not%20further%20undermine%20vulnerable%20populations (last visited Nov. 26, 2024).
[163] Hamayun Khan, Charting Afghanistan's Economic Future: Recommendations for Reform, The Henry L. Stimson Center, June 12, 2024, available at: Charting Afghanistan's Economic Future: Recommendations for Reform (last visited Nov. 26, 2024).

App.076-CASA

Afghanistan: TPS Considerations – November 2024

mud-based building structures are exacerbating or causing the large-scale damage impacting often already vulnerable and at times marginalized communities.[164]

Despite these mounting challenges, analysts state that if the Taliban are able to organize priorities and effectively implement many of the large infrastructure projects throughout the country, they will be effective in the growth of the country's economy.[165]

## Explosive Remnants of War including Landmines

Over the past few decades, the Taliban's insurgency tactics, specifically suicide and explosive attacks, have claimed the lives of thousands of Afghan citizens. Throughout these years of conflict, the Taliban have also planted thousands of landmines and explosives on roads, agricultural lands, water canals, residential areas, and public facilities. OCHA recently reported that "at least 300 people have fallen victim to mines and explosives in the first six months of this year. The Taliban have also stated that approximately 1,200 kilometers of Afghan soil is contaminated with mines and that since the beginning of this year, 111 incidents of mine explosions have been recorded, resulting in nearly 70 deaths and 180 injuries."[166] The United Nations Mine Action Service (UNMAS) provides additional history of the danger of these deadly mines in Afghanistan:

> Since 1989, about 45,300 Afghan civilians have been recorded to have been killed or injured by landmines and explosive remnants of war (ERW). The average monthly civilian casualties from explosive devices in Afghanistan currently stand at around 50 individuals. ERW from armed clashes caused nearly 86 percent of the casualties recorded during January 2023 to August 2024. In the same year, more than 89% percent of the ERW casualties were children. Humanitarian mine action partners in Afghanistan have cleared more than 14 million items of ERW, some 759,752 anti-personnel (AP) mines, some 35,052 anti-vehicle (AV) mines, and some 12,938 Abandoned Improvised Mines since 1989. A total of 35,642 hazardous areas have been cleared or otherwise canceled since 1989 […] Some 5,245 identified hazards remain, representing nearly 1,210 km$^2$ of land, threatening about 1,746 communities, impeding safe movement of civilians and humanitarians, reducing safe access to socio-economic opportunities and impeding development.[167]

Media agencies report that in April 2024, nine children were killed after finding and playing with an old land mine when it inadvertently detonated, and that 292 Afghan civilians have died due to landmines in the first six months of 2024.[168] The U.N. General Assembly Security Council echoed these concerns, stating

---

[164] Afghanistan: Humanitarian Update, July 2024, United Nations Office for the Coordination of Humanitarian Affairs (OCHA), September 10, 2024, available at:
https://www.unocha.org/publications/report/afghanistan/afghanistan-humanitarian-update-july-2024 (last visited Nov. 26, 2024).
[165] Infrastructure Projects to Start in 2024: Islamic Emirate, TOLO News, January 6, 2024, available at:
https://tolonews.com/business-186837 (last visited Nov. 26, 2024).
[166] Amin Kawa, Planted Mines and Child Casualties: Citizens Hold Taliban Responsible for Mine Placement, Hasht e Subh Daily, July 23, 2024 available at: https://8am.media/eng/planted-mines-and-child-casualties-citizens-hold-taliban-responsible-for-mine-placement/ (last visited Nov. 26, 2024).
[167] Afghanistan, United Nations Mine Action Service (UNMAS), October 2024, available at:
https://www.unmas.org/en/programmes/afghanistan (last visited Nov. 26, 2024).
[168] 9 children dead after old land mine explodes in Afghanistan, CBS News, April 2, 2024, available at
https://www.cbsnews.com/news/9-children-dead-old-land-mine-explodes-afghanistan/ (last visited Nov. 26, 2024);
292 civilians fall victim to landmines in 1st half of 2024, Pajhwok News, July 23, 2024, available at:
https://pajhwok.com/2024/07/23/292-civilians-fall-victim-to-landmines-in-1st-half-of-2024/ (last visited Nov. 26, 2024).

App.077-CASA

that "explosive remnants of war and improvised mines continued to pose a threat to civilians and humanitarian personnel across Afghanistan […] A total of 230 land release teams were tasked with clearing 93 contaminated areas affecting 73,261 people, including women and girls, and contributed to a reduction in accidents from scrap metal collection performed largely by young men and boys."[169]

The Taliban have reportedly agreed to permit organizations such as the HALO Trust (Hazardous Area Life-Support Organization), a British-American charity in Afghanistan that has been clearing land mines for decades, to continue its work in the country.[170] However, as with many of the issues Afghanistan faces, certain organizations have paused their work due to their grievances with the Taliban. The Danish Refugee Council notes that the Directorate of Mine Action Coordination (DMAC) has overseen "the entire mine clearance programme of Afghanistan" as a specialized branch of Afghanistan's State Ministry for Disaster Management and Humanitarian Affairs.[171] Yet, "[a]s a result of recent events and changing power dynamics in the country and subsequent pausing of especially Western bilateral support, authorities such as DMAC are at a risk of collapsing."[172]

## Harsh Taliban Governance – Damage to Security and Society

The Taliban's takeover of the country presents significant challenges and unknowns regarding meeting Afghanistan's current crises and creating stability. While the Taliban have formed an interim government, they have not yet been recognized by any country or the United Nations.[173] The Taliban's government has been criticized for excluding non-Pashtuns from government positions and stripping the basic rights of women and girls.[174] The EUAA summarized the current state:

> The human rights situation has gradually deteriorated, and sources noted the tendency of the *de facto* administration in developing into a theocratic police state, ruling through an atmosphere of fear and abuse. Human rights violations by the *de facto* authorities or by Taliban members included intimidation, ill-treatment, excessive use of force, arbitrary arrests, incommunicado detention, use of torture in detention, killings, abductions, enforced disappearances and corporal and capital

---

[169] The situation in Afghanistan and its implications for international peace and security, U.N. General Assembly Security Council, p. 10, February 28, 2024, available at:
https://unama.unmissions.org/sites/default/files/sg_report_on_afghanistan_march_2024.pdf (last visited Nov. 26, 2024).

[170] Clearing Afghanistan's Landmines One Careful Step a Time, VOA News, Nov. 21, 2021, available at:
https://www.voanews.com/a/clearing-afghanistan-s-landmines-one-careful-step-a-time/6318080.html (last visited Nov. 26, 2024); To Walk the Earth in Safety, U.S. Department of State's Bureau of Political-Military Affairs (PM/WRA), p.52, 2023, available at: https://www.state.gov/wp-content/uploads/2024/04/FY24-To-Walk-the-Earth-in-Safety.pdf (last visited Nov. 26, 2024).

[171] Afghan mine action capacity at risk, ReliefWeb (Danish Refugee Council), Jan. 16, 2022, available at:
https://reliefweb.int/report/afghanistan/afghan-mine-action-capacity-risk (last visited Nov. 26, 2024).

[172] Afghan mine action capacity at risk, ReliefWeb (Danish Refugee Council), Jan. 16, 2022, available at:
https://reliefweb.int/report/afghanistan/afghan-mine-action-capacity-risk (last visited Nov. 26, 2024).

[173] Riazat Butt, The Taliban have ruled Afghanistan for 3 years. Here are 5 things to know, AP News, August 14, 2024, available at: https://apnews.com/article/afghanistan-taliban-takeover-three-years-what-to-know-9d949d0555de84a003333f7ab7d0ef96 (last visited Nov. 26, 2024); Abubakar Siddique, Which Countries Have Relations With The Taliban's Unrecognized Government?, Radio Free Europe/Radio Liberty, May 30, 2024, available at: https://www.rferl.org/a/afghanistan-taliban-russia-diplomacy/32972530.html (last visited Nov. 26, 2024).

[174] Pauline Rouquette, Afghan women erased by the Taliban as the international community looks on, France 24, August 31, 2024, available at: https://www.france24.com/en/asia-pacific/20240831-afghanistan-women-erased-taliban-international-community-looks-on (last visited Nov. 26, 2024); *Tracking the Taliban's (Mis)Treatment of Women*, United States Institute of Peace (USIP), https://www.usip.org/tracking-talibans-mistreatment-women (last visited November 4, 2024).

App.078-CASA

USCA4 Appeal: 25-1792    Doc: 4-2    Filed: 07/14/2025    Pg: 82 of 249    Total Pages:(82 of 249)
Case 8:25-cv-01484-TDC    Document 59-3    Filed 06/13/25    Page 55 of 89
Afghanistan: TPS Considerations – November 2024

punishments, including following a *de facto* court judgment. Moreover, it was reported that free speech and peaceful political activity have been violently suppressed and the civil space has shrunk.[175]

The Taliban's exclusive all-male government has left minority groups without significant representation, allegedly driving recruitment for ISKP and creating further instability and security risks in the country.[176] The Taliban's courting of Chinese investment and willingness to deport alleged Muslim militants to China has caused some ethnic Chinese Uighurs to join ISKP, with one high profile attack in Kunduz by a Uighur ISKP member in October 2021.[177]

Despite their pledge not to do so, reports indicate that the Taliban has been targeting old adversaries including former Afghan government, police, and military personnel as well as their families, exacerbating the potential for escalating armed conflict.[178] ACLED has compiled data documenting these attacks stating that "since the fall of Kabul, former government and security officials have been the most targeted civilian group by the Taliban in the country, according to the salient identity categories that ACLED tracks. From 16 August 2021 to 30 June 2023, ACLED records over 400 acts of violence targeting former government and security officials, with 290 incidents committed by the Taliban."[179] Civilians living in areas where armed anti-Taliban groups have formed have also been targeted for violence by the Taliban regime, including beatings, torture, and extrajudicial killings. As a result, attacks on Afghan civilians have often taken place in the context of Taliban raids on villages in search of NRF fighters as the Taliban accuses civilians of supporting these groups and then detaining, torturing, or killing them.[180] An incident in July 2022 resulted in the death of a young boy at his home in Kasa Tarash valley of Deh Salah district after the Taliban carried out house-to-house searches following clashes with the NRF.[181] Initially, there was

[175] Country Guidance: Afghanistan, European Union Agency for Asylum (EUAA), p.19, May 2024, available at: https://euaa.europa.eu/publications/country-guidance-afghanistan-may-2024 (last visited Nov. 26, 2024).

[176] Jason Burke, Islamic State 'recruiting from Tajikistan and other central Asian countries', The Guardian, March 24, 2024, available at: https://www.theguardian.com/world/2024/mar/24/islamic-state-recruiting-militants-from-tajikistan-and-other-central-asian-countries (last visited Nov. 26, 2024).

[177] ISIS Puts China On Notice by Recruiting Minorities for Attacks in Afghanistan, Newsweek, October 21, 2021, available at: https://www.newsweek.com/isis-put-china-notice-ethnic-minority-attacks-afghanistan-1640973 (last visited Nov. 26, 2024); Pakistan using informal intelligence channels to prop up Taliban fight against ISIS, Washington Post, October 23, 2021, available at: https://www.washingtonpost.com/world/2021/10/23/afghanistan-isis-pakistan-intelligence/ (last visited Nov. 26, 2024).

[178] Barbara Marcolini, Sanjar Sohail & Alexander Stockton, The Taliban Promised Them Amnesty. Then They Executed Them., The New York Times, April 12, 2022, available at: https://www.nytimes.com/interactive/2022/04/12/opinion/taliban-afghanistan-revenge.html (last visited Nov. 26, 2024); Monika Evstatieva, Three years after the U.S. withdrawal, former Afghan forces are hunted by the Taliban, NPR, September 25, 2024, available at: https://www.npr.org/2024/09/25/nx-s1-5099028/former-afghan-army-and-police-hunted-by-the-taliban (last visited Nov. 26, 2024).

[179] Two Years Of Repression: Mapping Taliban Violence Targeting Civilians in Afghanistan, ACLED, August 11, 2023, available at: https://acleddata.com/2023/08/11/two-years-of-repression-mapping-taliban-violence-targeting-civilians-in-afghanistan/ (last visited Nov 26. 2024).

[180] Two Years Of Repression: Mapping Taliban Violence Targeting Civilians in Afghanistan, ACLED, August 11, 2023, available at: https://acleddata.com/2023/08/11/two-years-of-repression-mapping-taliban-violence-targeting-civilians-in-afghanistan/ (last visited Nov 26. 2024); Akmal Dawi, Afghan Insurgent Groups Step Up Attacks, Political Campaign Against Taliban, VOA News, December 5, 2023, available at, https://www.voanews.com/a/afghan-insurgent-groups-step-up-attacks-political-campaign-against-taliban-/7386099.html (last visited Nov. 26, 2024); Country Guidance: Afghanistan, European Union Agency for Asylum (EUAA), p.35, May 2024, available at: https://euaa.europa.eu/publications/country-guidance-afghanistan-may-2024 (last visited Nov. 26, 2024).

[181] Two Years Of Repression: Mapping Taliban Violence Targeting Civilians in Afghanistan, ACLED, August 11, 2023, available at: https://acleddata.com/2023/08/11/two-years-of-repression-mapping-taliban-violence-targeting-civilians-in-afghanistan/ (last visited Nov 26. 2024).

App.079-CASA

Afghanistan: TPS Considerations – November 2024

optimism that the Taliban regime would honor its promises of amnesty, peace, and security. However, that has rapidly faded, as they reports also show them targeting media and journalists,[182] artists and musicians,[183] barbers and those working in fashion,[184] civil society participants and protestors,[185] creating a climate of fear and intimidation that has many Afghans self-censoring, adopting conservative attire, and abandoning former employment and public life. Additionally, reports indicate that many former female judges are still in hiding."[186] The Taliban have exacerbated insecurity by forcing thousands of people from their homes, including Hazaras as well as people connected to the former government, and redistributing their property to Taliban supporters.[187] To round out their brutal rule since taking over in August 2021, the Taliban have reinstituted Sharia law, once again carrying out executions and amputations of hands for criminal offenses. In February 2024, the Taliban executed several men in soccer stadiums by firing squads for different offenses but have also flogged, stoned, or amputated the body parts of hundreds of people for crimes such as theft and adultery.[188]

## Challenges for Women and Girls

Under the previous Afghan government, Afghan women generally enjoyed advancements in employment, health care, education, and political representation, among other areas.[189] However, even before August 2021 "discrimination, harassment, and violence against women reportedly was endemic in government-

---

[182] Sakhidad Hatif, The Taliban targeted us, beat us and chased us out. This is how we run our Afghan newspaper from exile, The Guardian, May 1, 2024, available at:
https://www.theguardian.com/commentisfree/2024/may/01/taliban-afghanistan-newspaper-exile-us-reporters (last visited Nov. 26, 2024); The Taliban warn journalists and experts against cooperating with Afghanistan International TV, AP News, May 9, 2024, available at: https://apnews.com/article/afghanistan-taliban-media-freedom-d49b156688dd0ddad2e632c6fd6fe641 (last visited Nov. 26, 2024).

[183] Rebecca L. Root, Rescuing artists from the Taliban, Nikkei Asia, April 21, 2024, available at: Rescuing artists from the Taliban, (last visited Nov. 26, 2024); Sanjay Sethi & Johanna Bankston, Afghanistan's artists and cultural heritage are on the brink of obliteration, Euro News, January 12, 2023, available at:
https://www.euronews.com/culture/2023/12/01/afghanistans-artists-and-cultural-heritage-are-on-the-brink-of-obliteration (last visited Nov. 26, 2024).

[184] Lex Harvey, No music, no Western-style haircuts: UN report details life in Afghanistan under Taliban's moral enforcers, CNN, July 10, 2024, available at: https://www.cnn.com/2024/07/10/asia/afghanistan-taliban-life-un-report-intl-hnk/index.html (last visited Nov. 26, 2024).

[185] Afghanistan: Taliban continues its persecution of women's rights activists, journalists and artists, CIVICUS Monitor, February 7, 2024, available at: https://monitor.civicus.org/explore/afghanistan-taliban-continues-its-persecution-of-womens-rights-activists-journalists-and-artists/ (last visited Nov. 26, 2024).

[186] Maya Oppenheim, 'Without reason, I cry. I can't sleep': The Afghan judges trapped in hiding, fearing reprisal from the Taliban, Independent, April 7, 2024, available at: https://www.the-independent.com/asia/south-asia/afghan-judges-women-hiding-taliban-b2523877.html (last visited Nov. 26, 2024; Escape from Kabul – and Those Left Behind, National Association of Women Judges (NAWJ), January 24, 2023, available at:
https://www.nawj.org/past-webinars/escape-from-kabul-and-those-left-behind (last visited Nov. 26, 2024).

[187] Taliban Wants Cash To Settle Land Dispute; Threaten Eviction of Hazaras, If Unpaid, Afghanistan International, August 3, 2024, available at: https://www.afintl.com/en/202408035413 (last visited Nov. 26, 2024); Sanchita Bhattacharya, Intensifying persecution of Hazaras in Afghanistan, Genocide Watch, June 11, 2024, available at: https://www.genocidewatch.com/single-post/intensifying-persecution-of-hazaras-in-afghanistan (last visited Nov. 26, 2024).

[188] Abubakar Siddique, Taliban Returns Its 'Eye For An Eye' Justice To Afghanistan, Radio Free Europe/Radio Liberty, March 5, 2024, available at: https://www.rferl.org/a/afghanistan-taliban-justice-executions/32848930.html (last visited Nov. 26, 2024).

[189] Afghanistan: UN experts say 20 years of progress for women and girls' rights erased since Taliban takeover, Office of the High Commissioner for Human Rights (OHCHR), March 8, 2023, available at:
https://www.ohchr.org/en/press-releases/2023/03/afghanistan-un-experts-say-20-years-progress-women-and-girls-rights-erased (last visited Nov. 26, 2024).

App.080-CASA

Afghanistan: TPS Considerations – November 2024

controlled areas and in government ministries."[190] Since the Taliban takeover in 2021, the status of women and girls has become increasingly restrictive, with the Taliban re-imposing "frightening" laws on women to silence and eliminate their participation in everyday life.[191] Taliban officials situate the protection of women's rights within a *sharia* law framework.[192] In August 2024, the Taliban issued new vice and virtue laws in order to prevent vice and promote virtue among Afghan women.[193] Under the 1996-2001 Taliban administration, "the Vice and Virtue Ministry became a notorious symbol of abuse, particularly against women and girls."[194] Human Rights Watch summarizes the situation writing that the "Taliban have persistently attacked women's autonomy, oppressing them from every angle. They have banned girls and women from education beyond sixth grade, many forms of employment, and from public life. Having reduced women and girls to the status of non-humans, they severely restrict their movement, denying them any sense of agency or autonomy."[195]

Women activists and former members of public life have been targeted with severe violence since the Taliban came to power. For example, ACLED reported for the week of October 30 to November 5, 2021, that four women civil society activists were killed in Balkh province.[196] Reporting reveals that this mistreatment is continuing today:[197]

> The Taliban have since detained a steady flow of women, silencing them and terrorizing their families. Most have been protesters, but others, including women running underground schools, have also been targeted […] You haven't heard of most of the detained women. Families are terrified into concealing their arrests, hoping silence might buy their release or reduce abuses in custody. Families struggle to locate the detained women, who are effectively forcibly disappeared.[198]

---

[190] Afghan Women and Girls: Status and Congressional Action, Congressional Research Service, p. 1, updated August 18, 2021, available at: https://crsreports.congress.gov/product/pdf/IF/IF11646 (last visited Nov. 26, 2024).

[191] Annie Kelly & Zahra Joya, 'Frightening' Taliban law bans women from speaking in public, The Guardian, August 26, 2024, available at: https://www.theguardian.com/global-development/article/2024/aug/26/taliban-bar-on-afghan-women-speaking-in-public-un-afghanistan (last visited Nov. 26, 2024).

[192] Afghanistan: Background and U.S. Policy: In Brief Congressional Research Service, p. 7, February 17, 2022, available at: https://crsreports.congress.gov/product/pdf/R/R45122 (last visited Nov. 26, 2024).

[193] Taliban vice and virtue laws provide 'distressing vision' for Afghanistan, warns UN envoy, AP News, August 25, 2024, available at: https://apnews.com/article/afghanistan-taliban-vice-virtue-laws-women-b6db61e124116c712c867d2e1a4532ba (last visited Nov. 26, 2024).

[194] Afghanistan: Taliban 'Vice' Handbook Abusive, Human Rights Watch, October 29, 2021, available at: https://www.hrw.org/news/2021/10/29/afghanistan-taliban-vice-handbook-abusive (last visited Nov. 26, 2024).

[195] Sahar Fetrat, Taliban's Relentless Assault on Afghan Women's Bodies, Autonomy, Human Rights Watch, August 27, 2024, available at: https://www.hrw.org/news/2024/08/27/talibans-relentless-assault-afghan-womens-bodies-autonomy (last visited Nov. 26, 2024).

[196] Regional Overview: South Asia and Afghanistan 30 October to 5 November 2021, ACLED, November 2021, available at: https://acleddata.com/2021/11/11/regional-overview-south-asia-and-afghanistan-30-october-5-november-2021/ (last visited Nov. 26, 2024).

[197] Afghanistan: Taliban's arbitrary arrests and detention of women and girls over dress code must end immediately, UN experts say, Office of the High Commissioner for Human Rights (OHCHR), February 2, 2024, available at: https://www.ohchr.org/en/press-releases/2024/02/afghanistan-talibans-arbitrary-arrests-and-detention-women-and-girls-over (last visited Nov. 26, 2024).

[198] Heather Barr & Sahar Fetrat, Women's Rights Activists Under Attack in Afghanistan, Human Rights Watch, November 30, 2023, available at: https://www.hrw.org/news/2023/11/30/womens-rights-activists-under-attack-afghanistan (last visited Nov. 26, 2026).

App.081-CASA

Afghanistan: TPS Considerations – November 2024

Domestic and Sexual Violence

Violence targeting women and girls is pervasive in Afghanistan.[199] Studies cited by the former Ministry of Women's Affairs showed that greater than half of Afghan women reported physical abuse, and 17 percent reported sexual violence, with rampant underreporting.[200] In 2009, the government passed the Elimination of Violence Against Women law, providing "women and girls with legal protection from domestic violence" and establishing "services for survivors of violence, including access to free health care, legal aid, and shelters."[201] Even in this legal context, "Afghanistan placed near the bottom of every list when it came to protections for women, and at the top in terms of the need for safe houses, counseling and courts that could help keep women safe."[202] Since August 2021, specialized courts and prosecution units, "responsible for enforcing the 2009 Law on the Elimination of Violence Against Women, have been discontinued."[203] Many legal professionals involved with women's protections from sexual, domestic, and other violence went into hiding or fled the country, and almost all shelters have closed.[204] As shelters are dwindling, some survivors were reportedly sent to prison while individuals convicted of gender-based violence were released by the Taliban.[205]

Forced Marriage

Sixty percent of women reported being in forced marriages, according to studies cited by the former Ministry of Women's Affairs.[206] Reports indicate that women were forced to marry Taliban fighters prior

---

[199] Human Rights Council Hears that the Severity of Violations against Women and Girls in Afghanistan Might Amount to Crimes against Humanity..., Office of the High Commissioner for Human Rights (OHCHR), June 18, 2024, available at: https://www.ohchr.org/en/news/2024/06/human-rights-council-hears-severity-violations-against-women-and-girls-afghanistan (last visited Nov. 26, 2024).
[200] Threats and Fear Cause Afghan Women's Protections to Vanish Overnight, The New York Times, Sept. 4, 2021, updated October 7, 2021, available at: https://www.nytimes.com/2021/09/04/world/middleeast/afghanistan-women-shelter-taliban.html (last visited Nov. 26, 2024).
[201] Afghan Women Fleeing Violence Lose Vital Protection, Human Rights Watch, September 24, 2021, available at: https://www.hrw.org/news/2021/09/24/afghan-women-fleeing-violence-lose-vital-protection (last visited Nov. 26, 2024).
[202] Threats and Fear Cause Afghan Women's Protections to Vanish Overnight, The New York Times, Sept. 4, 2021, updated October 7, 2021, available at: https://www.nytimes.com/2021/09/04/world/middleeast/afghanistan-women-shelter-taliban.html (last visited Nov. 26, 2024).
[203] Experts decry measures to 'steadily erase' Afghan women and girls from public life, United Nations News, January 17, 2022, available at: https://news.un.org/en/story/2022/01/1109902 (last visited Nov. 26, 2024).
[204] Sara Perria, Protections for women facing violence have vanished under the Taliban, The New Humanitarian, April 20, 2022, available at: https://www.thenewhumanitarian.org/news-feature/2022/04/20/afghanistans-empty-womens-shelters (last visited Nov. 26, 2024).
[205] Lynzy Billing, The Last Safe Spaces, Elle, June 12, 2024, available at: https://www.elle.com/culture/career-politics/a60861609/afghanistan-womens-rights-shelters-2024/ (last visited Nov. 26, 2024).
[206] Threats and Fear Cause Afghan Women's Protections to Vanish Overnight, The New York Times, Sept. 4, 2021, updated October 7, 2021, available at: https://www.nytimes.com/2021/09/04/world/middleeast/afghanistan-women-shelter-taliban.html (last visited Nov. 26, 2024).

App.082-CASA

USCA4 Appeal: 25-1792    Doc: 4-2    Filed: 07/14/2025    Pg: 86 of 249    Total Pages:(86 of 249)
Case 8:25-cv-01484-TDC    Document 59-3    Filed 06/13/25    Page 59 of 89

Afghanistan: TPS Considerations – November 2024

to the conquest of Kabul in 2021.[207] Although the Taliban have denied the occurrence of forced marriage, local activists insist the practice occurs, stating that women are being married as "sexual slaves."[208] Additionally, many parents are pursuing early marriages for their daughters in the belief that "securing a spouse for their girls is better than seeing them forced to marry members of the Taliban."[209] Religious leaders in Takhar and Badakhshan were instructed "to refer girls older than 15 and widows younger than 45" to the "Mujahideen Cultural Commission" for marriage to Taliban fighters, according to a statement shared on social media featuring Taliban insignia.[210] UNHCR mentions increasing reports "of early and forced marriage of girls and women by family members," demonstrating that gender-based violence "often stems from within the family."[211] UNICEF "received credible reports of families in Afghanistan offering daughters as young as 20 days old for future marriage in return for a dowry."[212] Contributing to these issues, the World Food Program (WFP) reported that deteriorating climate crises in Afghanistan are compelling some families to marry off their young daughters in order to ensure the survival of their other children and have one less mouth to feed.[213]

Discrimination in Society and Risks of Nonconformity

As of August 2024, there are no women in Afghanistan in any leadership position, anywhere, either at the national or provincial levels.[214] The "By-Law of the Commission for Preaching and Guidance, Recruitment and Propagation of Virtue and the Prevention of Vice," a manual used by the Taliban in a number of provinces since August 2021, places "tough restrictions on the conduct of women and girls."[215] It provides

---

[207] Country of Origin Information (COI) Brief Report – Afghanistan: Recent developments in the security situation, impact on civilians and targeted individuals, Ministry of Immigration and Integration, The Danish Immigration Service, p. 19, September 2021, available at:
https://www.ecoi.net/en/file/local/2060188/Afghanistan_Targetedindiv_FINAL.pdf (last visited Nov. 26, 2024) (Citing As Taliban Expand Control, Concerns About Forced Marriage and Sex Slavery Rise, Foreign Policy, July 23, 2021, available at: https://foreignpolicy.com/2021/07/23/afghanistan-taliban-women-gender/ (last visited Nov. 26, 2024) and Return To The 'Dark Days': Taliban Reimposes Repressive Laws On Women In Newly Captured Areas in Afghanistan, Radio Free Europe / Radio Liberty, July 14, 2021), available at:
https://gandhara.rferl.org/a/taliban-repression-afghan-women/31358597.html (last visited Nov. 26, 2024).
[208] Country Policy and Information Note Afghanistan: Fear of the Taliban [Version 1.0], UK Home Office, p. 33-34, October 2021, available at: https://www.ecoi.net/en/file/local/2061589/AFG_CPIN_Fear_of_the_Taliban.pdf (last visited Nov. 26, 2024). (Citing Taliban trying to force Afghan girls as young as 13 into marriage, The National, August 3, 2021), available at: https://www.thenationalnews.com/world/asia/2021/08/03/taliban-trying-to-force-afghan-girls-as-young-as-13-into-marriage/ (last visited Nov. 26, 2024).
[209] Abubakar Siddique, Afghans Increasingly Marrying Off Young Daughters To Avoid Forced Unions With Taliban, Radio Free Europe/Radio Liberty, December 1, 2022, available at: https://www.rferl.org/a/afghanistan-early-marriage-avoid-taliban/32157525.html (last visited Nov. 26, 2024).
[210] Country Policy and Information Note Afghanistan: Fear of the Taliban [Version 1.0], UK Home Office, p. 33-34, October 2021, available at: https://www.ecoi.net/en/file/local/2061589/AFG_CPIN_Fear_of_the_Taliban.pdf (last visited Nov. 26, 2024). (Citing Taliban trying to force Afghan girls as young as 13 into marriage, The National, August 3, 2021), available at: https://www.thenationalnews.com/world/asia/2021/08/03/taliban-trying-to-force-afghan-girls-as-young-as-13-into-marriage/ (last visited Nov. 26, 2024).
[211] Afghanistan Protection Analysis Update, UNHCR – UN High Commissioner for Refugees, p. 8 [Section 2.1.4], October 2021, available at: https://www.ecoi.net/en/file/local/2063726/afg_protection_analysis_update_q3_final.pdf (last visited Nov. 26, 2024).
[212] Afghanistan: Girls at increasing risk of child marriage, UN News, November 12, 2021, available at: https://news.un.org/en/story/2021/11/1105662 (last visited Nov. 26, 2024).
[213] Fatima Framarz, Climate Crises in Afghanistan Forcing Families to Marry Off Young Daughters, Says WFP, Kabul Now, June 18, 2024, available at: https://kabulnow.com/2024/06/36069/ (last visited Nov. 26, 2024).
[214] Dianne Penn, Afghanistan: Taliban rule has erased women from public life, sparked mental health crisis, UN News, August 13, 2024, available at: https://news.un.org/en/story/2024/08/1153151 (last visited Nov. 26, 2024).
[215] Afghanistan: Taliban 'Vice' Handbook Abusive, Human Rights Watch, October 29, 2021, available at: https://www.hrw.org/news/2021/10/29/afghanistan-taliban-vice-handbook-abusive (last visited Nov. 26, 2024).

App.083-CASA

Afghanistan: TPS Considerations – November 2024

instruction on which family members qualify to be a *mahram*, or chaperone, for women and older girls, and commands women to wear a veil when in the presence of non-*mahrams*.[216] The manual also requires women to wear a hijab and veil in public with the Taliban codifying morality laws requiring women to cover their faces.[217] In some parts of the country, women face restricted freedom of movement and have been attacked or blocked from receiving social services such as healthcare when, leaving their home without a *mahram*.[218]

Protests by women demanding access to employment, education, and advocating for human rights protections have been met with beatings, detentions, and threats by Taliban fighters.[219] On International Women's Day 2024, small groups of Afghan women gathered to "demand restrictions on their freedoms be lifted, despite recent Taliban crackdowns on protests that have seen activists detained."[220] Women's rights activists have accused the "Taliban of killing at least 18 women's rights activists in mysterious circumstances in several provinces of Afghanistan over the past two years."[221] Other reports reveal that the Taliban have also rolled back the rights of women to divorce their husbands, stating that they will deliver "justice" under Islamic law of Sharia. While instituting this new Sharia judicial system, the BBC explains the Taliban's logic:

> The Taliban have also systematically removed all judges – both male and female – and replaced them with people who supported their hardline views. Women were also declared unfit to participate in the judicial system. 'Women aren't qualified or able to judge because in our Sharia principles the judiciary work requires people with high intelligence,' says Abdulrahim Rashid, director of foreign relations and communications at Taliban's Supreme Court.[222]

<u>Access to Education and Employment</u>

When the Taliban took control of the country in August 2021, it only took a few weeks before the Taliban had issued a decree banning education for girls past the 6th grade.[223] In the early transition period under the new Taliban government, attitudes towards education for girls and women varied as many senior Taliban

---

[216] Afghanistan: Taliban 'Vice' Handbook Abusive, Human Rights Watch, October 29, 2021, available at: https://www.hrw.org/news/2021/10/29/afghanistan-taliban-vice-handbook-abusive (last visited Nov. 26, 2024).
[217] Mohammad Yunus Yawar & Charlotte Greenfield, Taliban codify morality laws requiring Afghan women to cover faces, men to grow beards, Reuters, August 23, 2024, available at: https://www.reuters.com/world/asia-pacific/taliban-codify-morality-laws-requiring-afghan-women-cover-faces-men-grow-beards-2024-08-23/ (last visited Nov 26, 2024).
[218] Naqiba Barekzai, Abida Spozhmai &Khujasta Kabiri, 'All Doors Are Closed' For Single And Unaccompanied Afghan Women Under The Taliban, Radio Free Europe/Radio Liberty, January 31, 2024, available at: https://www.rferl.org/a/afghanistan-taliban-restrictions-single-women-widows/32799903.html (last visited Nov. 26, 2024).
[219] Mahjooba Nowrouzi, What happened to the women who took on the Taliban?, BBC News, June 14, 2024, available at: https://www.bbc.com/news/articles/c9xxklr0070o (last .
[220] Afghan women stage rare protests, braving Taliban reprisals, Al Jazeera, March 8, 2024, available at: https://www.aljazeera.com/news/2024/3/8/afghan-women-stage-rare-protests-braving-taliban-reprisals (last visited Nov. 26, 2024).
[221] Protesting women accuse Taliban of killing women's rights activists in Afghanistan, Kabul Now, August 23, 2024, available at: https://kabulnow.com/2023/08/protesting-women-accuse-taliban-of-killing-womens-rights-activists-in-afghanistan/ (last visited Nov. 26, 2024).
[222] Mamoon Durrani & Kawoon Khamoosh, A child bride won the right to divorce - now the Taliban say it doesn't count, BBC News, September 25, 2024, available at: https://www.bbc.com/news/articles/cx24evnk5d2o (last visited Nov. 26, 2024).
[223] Riazat Butt, Taliban deliberately deprived 1.4 million Afghan girls of schooling, United Nations agency says, PBS News, August 15, 2024, available at: https://www.pbs.org/newshour/world/taliban-deliberately-deprived-1-4-million-afghan-girls-of-schooling-united-nations-agency-says (last viewed Nov. 26, 2024).

App.084-CASA

USCA4 Appeal: 25-1792    Doc: 4-2    Filed: 07/14/2025    Pg: 88 of 249    Total Pages:(88 of 249)
Case 8:25-cv-01484-TDC    Document 59-3    Filed 06/13/25    Page 61 of 89
Afghanistan: TPS Considerations – November 2024

officials spent years overseas and were exposed to societies that included education for both girls and boys.[224] Therefore, access to education for girls varied during this early period, depending on the student's location and family and the attitudes of the local Taliban leaders.[225] The Taliban allowed some middle and high schools to reopen in the north, "where women have long played a more prominent role in society than in the Taliban's southern heartland."[226] However, with time, additional bans were implemented, when in December 2022, the Taliban suspended university education for women until further notice, impacting over 100,000 female students.[227] Over 3 years later since the takeover, extensive reporting demonstrates that the Taliban have effectively shut the door on education for women and girls in Afghanistan. The Taliban have deprived over 1.4 million girls access to education, with Afghanistan standing out as "the only country in the world where secondary and higher education is strictly forbidden to girls and women."[228]

As with the bans on education, it only took weeks after the August 2021 takeover before the Taliban decreed that women stay home and not report to duty for any government positions or institutions.[229] Soon after, these employment bans spread to other sectors such as NGOs, businesses, and the private sector.[230] As a result, the participation levels of women in the work force have dropped 25% from last year.[231] Reports are conflicting as to how many women are currently employed in the Afghan labor market, with data ranging from 4.8% on the low end to 16.5% on the high end.[232] With the very limited number of women who do have the opportunity to work in Afghanistan, given the restrictions on education and training, they generally occupy low level positions.[233] To underline the current state of women's affairs, the Georgetown Institute

---

[224] Who Gets to Go to School? (3): Are Taleban attitudes starting to change from within? Afghanistan Analysts Network, Feb. 7, 2022, available at: https://www.afghanistan-analysts.org/en/reports/rights-freedom/who-gets-to-go-to-school-3-are-taleban-attitudes-starting-to-change-from-within/ (last visited Nov. 26, 2024).

[225] Country of Origin Information (COI) Brief Report – Afghanistan: Recent developments in the security situation, impact on civilians and targeted individuals, Ministry of Immigration and Integration, The Danish Immigration Service, p. 20, Sept. 2021 (Citing Sune Engel Rasmussen: 8, 9 [interview conducted by report authors]), available at: https://www.ecoi.net/en/file/local/2060188/Afghanistan_Targetedindiv_FINAL.pdf (last visited Nov. 26, 2024).

[226] Taliban *Allow Girls to Return to Some High Schools, but With Big Caveats,* The New York Times, Oct. 27, 2021, updated Nov. 3, 2021, available at: https://www.nytimes.com/2021/10/27/world/asia/afghan-girls-school-taliban.html?searchResultPosition=8 (last visited Nov. 26, 2024).

[227] Despite enormous challenges, some girls in Afghanistan are still finding ways to learn, CARE, August 21, 2023, available at: https://www.care.org/news-and-stories/girls-education-afghanistan/ (last visited Nov. 26, 2024).

[228] Afghanistan: 1.4 million girls still banned from school by de facto authorities, UNESCO, August 15, 2024, available at: https://www.unesco.org/en/articles/afghanistan-14-million-girls-still-banned-school-de-facto-authorities (last visited Nov. 26, 2024).

[229] *Tracking the Taliban's (Mis)Treatment of Women*, United States Institute of Peace (USIP), https://www.usip.org/tracking-talibans-mistreatment-women (last visited November 4, 2024).

[230] FAQs: Afghan women three years after the Taliban takeover, UN Women – Europe and Central Asia, August 20, 2024, available at: https://eca.unwomen.org/en/stories/explainer/2024/08/faqs-afghan-women-three-years-after-the-taliban-takeover-0 (last visited Nov. 26, 2024).

[231] A 'window of hope' for the women of Afghanistan: business training to address missing jobs, CARE, June 3, 2024, available at: https://www.care.org/news-and-stories/a-window-of-hope-for-afghanistan-women-business-training-to-address-missing-jobs/ (last visited Nov. 26, 2024).

[232] Private Sector Development: A Case Study on Generating Employment through Small and Medium Business Development, Danish Refugee Council, July 4, 2023, available at: https://reliefweb.int/report/afghanistan/private-sector-development-case-study-generating-employment-through-small-and-medium-business-development (last visited Nov. 26, 2024); *see also*: Riazat Butt, An Afghan woman wanted to be a doctor. Now she makes pickles as the Taliban restricts women's roles, LA Times, July 7, 2024, available at: https://www.latimes.com/world-nation/story/2024-07-07/an-afghan-woman-wanted-to-be-a-doctor-now-she-makes-pickles-as-the-taliban-restricts-womens-roles (last visited Nov. 29, 2024).

[233] Riazat Butt, An Afghan woman wanted to be a doctor. Now she makes pickles as the Taliban restricts women's roles, LA Times, July 7, 2024, available at: https://www.latimes.com/world-nation/story/2024-07-07/an-afghan-woman-wanted-to-be-a-doctor-now-she-makes-pickles-as-the-taliban-restricts-womens-roles (last visited Nov. 29, 2024).

App.085-CASA

USCA4 Appeal: 25-1792    Doc: 4-2    Filed: 07/14/2025    Pg: 89 of 249    Total Pages:(89 of 249)
Case 8:25-cv-01484-TDC    Document 59-3    Filed 06/13/25    Page 62 of 89
Afghanistan: TPS Considerations – November 2024

for Women, Peace and Security Index of 2023 has ranked Afghanistan in last place, 177 out of 177 countries, in measuring women's engagement and inclusion.[234]

## Economic Insecurity

The World Bank Group (WBG) has forecasted a grim outlook for Afghanistan's economy in 2025, as the country is currently struggling to overcome deflationary headwinds.[235] WBG cited several internal and external forces in their report, ultimately explaining that the situation on the ground is likely to worsen, writing:

> A 26% contraction in real GDP growth, coupled with declining external financing avenues for off-budget expenditures, paints a stark picture of Afghanistan's economic prospects. Structural deficiencies in the private sector, together with waning international support for essential services, are anticipated to impede any appreciable economic progress. This economic stagnation is poised to deepen poverty and unemployment where half of the population is already trapped in poverty, and 15 million people are facing food insecurity.[236]

The WBG explains that the Taliban takeover has resulted in a drastic decline in international aid, "leaving the nation without any internal engines of growth, and the recent return of Afghan migrants and an earthquake in Herat have intensified these challenges. The October 2023 earthquake damaged critical infrastructure, reducing GDP growth by estimated 0.5-0.8 percent. With no policy levers to stimulate aggregate demand, the economy remains stagnant, with low demand driving a noticeable deflation."[237] The April 2022 ban on opium cultivation resulted in a near $1.3 billion loss in farmers' incomes, equivalent to approximately 8% of GDP. "According to United Nation's Office on Drugs and Crime (UNODC), the opiate economy's value has contracted by 90 percent, the area under cultivation declined by 95 percent and has cost Afghan 450,000 jobs at the farm level alone and doesn't include the high economic losses downstream."[238] Consequently, as farmers repurpose roughly "200,000 hectares of land previously dedicated to illicit crops towards food production, it has led to downward pressure on domestic food prices, albeit at the expense of heightened unemployment."[239] A reduced money supply, in which the Afghani has appreciated 22.8 percent against the US dollar since August 2021, and a widening trade deficit, are other issues that could present potential challenges for Afghanistan's economy in 2025. Melinda Good, World Bank Country Director for Afghanistan summarizes the economic outlook:

[234] Afghanistan, Georgetown University's Women Peace and Security Index, available at: https://giwps.georgetown.edu/country/afghanistan/ (last accessed November 8, 2024).
[235] Navigating Challenges: Confronting Economic Recession and Deflation, World Bank Group (WBG), p.10, April 2024, available at: https://thedocs.worldbank.org/en/doc/18a1ccff0457effb0a456c0d4af7cce2-0310012024/original/Afghanistan-Development-Update-April-2024.pdf (last visited Nov. 26, 2024).
[236] Afghanistan's Economic Decline Continues but Private Sector Can Support Growth, Says World Bank, World Bank Group (WBG), May 2, 2024, available at: https://www.worldbank.org/en/news/press-release/2024/05/02/afghanistan-s-economic-decline-continues-but-private-sector-can-support-growth-says-world-bank (last visited Nov. 26, 2024).
[237] Navigating Challenges: Confronting Economic Recession and Deflation, World Bank Group (WBG), p.10, April 2024, available at: https://thedocs.worldbank.org/en/doc/18a1ccff0457effb0a456c0d4af7cce2-0310012024/original/Afghanistan-Development-Update-April-2024.pdf (last visited Nov. 26, 2024).
[238] Navigating Challenges: Confronting Economic Recession and Deflation, World Bank Group (WBG), p.10, April 2024, available at: https://thedocs.worldbank.org/en/doc/18a1ccff0457effb0a456c0d4af7cce2-0310012024/original/Afghanistan-Development-Update-April-2024.pdf (last visited Nov. 26, 2024).
[239] Navigating Challenges: Confronting Economic Recession and Deflation, World Bank Group (WBG), p.10, April 2024, available at: https://thedocs.worldbank.org/en/doc/18a1ccff0457effb0a456c0d4af7cce2-0310012024/original/Afghanistan-Development-Update-April-2024.pdf (last visited Nov. 26, 2024).

App.086-CASA

USCA4 Appeal: 25-1792    Doc: 4-2    Filed: 07/14/2025    Pg: 90 of 249    Total Pages:(90 of 249)
Case 8:25-cv-01484-TDC    Document 59-3    Filed 06/13/25    Page 63 of 89
Afghanistan: TPS Considerations – November 2024

Afghanistan's long-term growth prospects depend on a significant shift from its previous reliance on consumption-driven growth and international aid to a more resilient, private sector-led economy that capitalizes on the country's strengths. For a sustainable future, Afghanistan needs to address harmful gender policies, invest in health and education, and focus on the comparative advantages it has in the agricultural and extractive sectors."[240]

## Food Insecurity, Drought, and Access to Water

While Afghanistan has experienced marginal improvements in food security since the large degradation in the situation following the Taliban's takeover in August 2021, over a third of Afghanistan's population, 14.2 million people, are still experiencing high levels of acute food insecurity.[241] Climatic shock, drought, economic stagnation, high food prices, unemployment, and internal displacement are some of the leading causes contributing to the continued food insecurity in Afghanistan,[242] as roughly 6.5 million Afghan children, nearly three out of ten, experienced emergency levels of hunger in 2024.[243] Additionally, nearly 2.4 million Afghans are likely to experience "emergency levels of hunger, which is one level above famine."[244] As such, humanitarian food assistance needs are expected to increase throughout the winter of 2025, peaking from February to April 2025, assisting approximately 8-9 million people.[245] More generally, the World Food Program (WFP) explains that 1 in 4 Afghans do not know where there next meal will come from.[246] The Integrated Food Security Phase Classification (IPC) summarized the current situation food insecurity in Afghanistan, writing:

> Despite the stress placed on the economy and institutional support systems in 2021, which was near total collapse, households have reported improvement in their capacity to meet basic needs since then. The slight improvement in the food security situation can be attributed to humanitarian and livelihood support initiatives, as well as enhanced purchasing power at the household level. However, poverty still impacts one out of every two Afghans. Difficulties in agriculture brought on by the irregular onset of El Nino and lingering effects of the drought remain and are coupled with widespread economic fragility and new shocks, including the ongoing influx of returnees from Pakistan and the Herat earthquakes.[247]

---

[240] Afghanistan's Economic Decline Continues but Private Sector Can Support Growth, Says World Bank, World Bank Group (WBG), May 2, 2024, available at: https://www.worldbank.org/en/news/press-release/2024/05/02/afghanistan-s-economic-decline-continues-but-private-sector-can-support-growth-says-world-bank (last visited Nov. 26, 2024).

[241] Afghanistan: Acute Food Insecurity Situation for March - April 2024 and Projection for May - October 2024, Integrated Food Security Phase Classification, p.1, 2024, available at: https://www.ipcinfo.org/ipc-country-analysis/details-map/en/c/1157027/?iso3=AFG (last visited Nov. 26, 2024).

[242] Afghanistan: Acute Food Insecurity Situation for March - April 2024 and Projection for May - October 2024, Integrated Food Security Phase Classification, p.2, 2024, available at: https://www.ipcinfo.org/ipc-country-analysis/details-map/en/c/1157027/?iso3=AFG (last visited Nov. 26, 2024).

[243] Afghanistan: Nearly three in ten children forecast to experience crisis levels of hunger in 2024, Save the Children, May 27, 2024, available at: https://www.savethechildren.net/news/afghanistan-nearly-three-ten-children-forecast-experience-crisis-levels-hunger-2024 (last visited Nov. 26, 2024).

[244] Rahim Faiez, Nearly 3 out of 10 children in Afghanistan face crisis or emergency level of hunger in 2024, AP News, May 29, 2024, available at: https://apnews.com/article/children-afghanistan-face-crisis-hunger-91a1e7550711f32bb37c9de187a3423d (last visited Nov. 26, 2024).

[245] Below-average precipitation likely for 2024/25 season despite early season rainfall, Famine Early Warning Systems Network (FEWS NET), p.1, October 2024, available at: https://fews.net/middle-east-and-asia/afghanistan/food-security-outlook/october-2024 (last visited Nov. 26, 2024).

[246] Afghanistan, World Food Program (WFP), available at: https://www.wfp.org/emergencies/afghanistan-emergency (last accessed November 12, 2024).

[247] Afghanistan Facing Famine, Human Rights Watch, Nov. 11, 2021, available at: https://www.hrw.org/news/2021/11/11/afghanistan-facing-famine (last visited Nov. 26, 2024).

App.087-CASA

In 2023, the International Rescue Committee has listed Afghanistan as one of the top ten countries at risk of climate disaster as it has been enduring its worst drought in 27 years, while simultaneously experiencing intense flooding, resulting in diminished food production and scores of internally displaced families.[248] Reports reveal that drought and other extreme weather events have internally displaced "at least 38,000 people in Afghanistan in the first six months of this year – of whom about half are children – which is more than in the whole of 2023."[249] Data indicates that for 2023, Afghanistan has only experienced 45% to 60% of the average precipitation compared with previous years, causing 25 of the 34 provinces to suffer from severe or catastrophic drought conditions, impacting the livelihood of many Afghans.[250] As a result of these conditions, the United Nations Office for the Coordination of Humanitarian Affairs (OCHA) has announced the formation of a task force to assess drought conditions, possibly allocating $10 million to manage the situation.[251] The New York Times reported on the conditions in many of these provinces, writing:

> Half of one village, the entirety of the next have departed in the years since the water dried up […] Several years of punishing drought has displaced entire swaths of Afghanistan, one of the nations most vulnerable to climate change, leaving millions of children malnourished and plunging already impoverished families into deeper desperation. And there is no relief in sight […] With three-quarters of the country's 34 provinces experiencing severe or catastrophic drought conditions, few corners of the country are untouched by the disaster.[252]

In addition to drought and severe weather events, many Afghans are dealing with water scarcity issues. Afghanaid reports that as these climatic shocks impact the country, water scarcity is becoming more of a concern, especially for women and girls. Currently only 42% of Afghans have access to safe drinking water.[253] Other reports reveal that residents in from various parts of Afghanistan, ranging from parts Helmand province to Kabul, have been forced to leave their homes due to lack of access to clean drinking water.[254] Meanwhile, residents in Kabul have pleaded with Taliban officials to drill deeper wells to address the water scarcity, explaining that water is currently only available through their taps once a month.[255]

---

[248] 10 countries at risk of climate disaster, International Rescue Committee (IRC), November 3, 2023, available at: https://www.rescue.org/article/10-countries-risk-climate-disaster (last visited Nov. 26, 2024).

[249] Afghanistan: Extreme weather forces more people from their homes in first six months of 2024 than all of 2023, Save the Children, August 6, 2024, available at: https://www.savethechildren.org/us/about-us/media-and-news/2024-press-releases/afghanistan-extreme-weather-forces-more-people-from-their-homes (last visited Nov. 26, 2024).

[250] Hadia Ziaei, NGOs Warn of Adverse Effects of Lack of Rainfall in Afghanistan, TOLO News, February 7, 2024, available at: https://tolonews.com/afghanistan-187306 (last visited Nov. 26, 2024).

[251] Lailuma Qadiri, Special Team Formed to Assess Drought in Afghanistan: OCHA, TOLO News, November 12, 2024, available at: https://tolonews.com/afghanistan-191625 (last visited Nov. 26, 2024).

[252] Lynsey Addario and Victoria Kim, Barren Fields and Empty Stomachs: Afghanistan's Long, Punishing Drought, The New York Times, March 19, 2024, available at: https://www.nytimes.com/2024/03/19/world/asia/afghanistan-drought-photos-climate-change.html (last visited Nov. 26, 2024).

[253] The water crisis in Afghanistan is making the situation for women and girls much harder, Afghanaid, March 7, 2024, available at: https://www.afghanaid.org.uk/news/the-water-crisis-in-afghanistan-is-making-the-situation-for-women-and-girls-much-harder (last visited Nov. 26, 2024).

[254] Water Crisis in Nawzad Forces Residents to Abandon Homes, TOLO News, November 13, 2024, available at: https://tolonews.com/afghanistan-191642 (last visited Nov. 26, 2024).

[255] Kabul Residents Complain of Drinking Water Shortages, TOLO News, August 9, 2024, available at: https://tolonews.com/afghanistan-190160 (last visited Nov. 26, 2024).

App.088-CASA

Afghanistan: TPS Considerations – November 2024

## Lack of Access to Healthcare

An insufficiently staffed healthcare system predated the Taliban takeover.[256] In 2018, Afghanistan "had a nationwide average of only 4.6 medical doctors, nurses, and midwives per 10,000 people, far below the WHO threshold of 23 per 10,000 people," indicating a critical shortage that was more pronounced in rural areas.[257] By September 2021, the WHO asserted that the healthcare system was on the brink of collapse.[258] The World Bank and other organizations froze approximately $600 million in health care aid, leaving at risk the effective deployment of a variety of treatments, surgeries, immunizations, and procedures.[259] Although the UN Development Program (UNDP) extended $15 million in aid to approximately 23,000 Afghan healthcare workers, "millions of vulnerable Afghans continue to be at risk of losing access to primary healthcare" and "the recent escalation in conflict and resulting upheaval has only exacerbated needs and further complicated an extremely challenging context."[260] Other emergency measures planned by the United Nations and the European Union include a polio vaccination campaign and additional aid.[261]

In the interim, Afghan citizens continue to endure an unstable and unreliable healthcare system, with women having even greater challenges to healthcare access given the Taliban's heightened restrictions.[262] Currently, the WHO reports that a significant portion of the population, roughly 9.5 million individuals, residing in over 20,000 villages, remain with limited or no access to basic healthcare services.[263] With the continuing humanitarian crisis impacting the country coupled with dwindling international funding, the healthcare sector struggles to meet the demand of the Afghan population, which has resulted in the closure of 262 static and mobile health facilities.[264] Ultimately, after the August 2021 Taliban takeover, the already weak public healthcare system was dramatically affected by the pause in aid flows, lack of skilled staff, shortage of medical supplies, medication, working conditions, and harassment by the Taliban regime.[265] The WHO highlights the concerns on these healthcare limitations:

---

[256] Quarterly Report to the United States Congress, SIGAR – Special Inspector General for Afghanistan Reconstruction, p. 139, October. 30, 2021, available at: https://www.ecoi.net/en/file/local/2063773/2021-10-30qr.pdf (last visited Nov. 26, 2024).

[257] Quarterly Report to the United States Congress, SIGAR – Special Inspector General for Afghanistan Reconstruction, p. 139, October. 30, 2021, available at: https://www.ecoi.net/en/file/local/2063773/2021-10-30qr.pdf (last visited Nov. 26, 2024).

[258] Afghanistan's healthcare system on brink of collapse, as hunger hits 95 per cent of families, United Nations, September 22, 2021, available at: https://news.un.org/en/story/2021/09/1100652 (last visited Nov. 26, 2024).

[259] Health Care in Afghanistan Is Crumbling, Aid Groups Warn, The New York Times, September 12, 2021, available at: https://www.nytimes.com/2021/09/12/health/afghanistan-health-taliban.html (last visited Nov. 26, 2024).

[260] Salaries for Afghanistan health workers sends 'message of hope' to millions, UN News, November 10, 2021, available at: https://news.un.org/en/story/2021/11/1105282 (last visited Nov. 26, 2024).

[261] With aid slow to enter Afghanistan, public health facilities are turning many patients away, The Washington Post, Oct 20, 2021, available at: https://www.washingtonpost.com/world/asia_pacific/afghanistan-health-care-hospitals/2021/10/19/f552bc96-2c4a-11ec-b17d-985c186de338_story.html (last visited Nov. 26, 2024).

[262] Afghanistan: WHO Health Emergency Appeal 2024, World Health Organization (WHO), p.1, January 15, 2024, available at: https://cdn.who.int/media/docs/default-source/documents/emergencies/2024-appeals/afghanistan---who-2024-health-emergency-appeal.pdf?sfvrsn=b87cf11a_1&download=true (last visited Nov. 26, 2024).

[263] Afghanistan: WHO Health Emergency Appeal 2024, World Health Organization (WHO), p.1, January 15, 2024, available at: https://cdn.who.int/media/docs/default-source/documents/emergencies/2024-appeals/afghanistan---who-2024-health-emergency-appeal.pdf?sfvrsn=b87cf11a_1&download=true (last visited Nov. 26, 2024).

[264] Afghanistan: WHO Health Emergency Appeal 2024, World Health Organization (WHO), p.1, January 15, 2024, available at: https://cdn.who.int/media/docs/default-source/documents/emergencies/2024-appeals/afghanistan---who-2024-health-emergency-appeal.pdf?sfvrsn=b87cf11a_1&download=true (last visited Nov. 26, 2024).

[265] Country Guidance: Afghanistan, European Union Agency for Asylum (EUAA), p.99, May 2024, available at: https://euaa.europa.eu/publications/country-guidance-afghanistan-may-2024 (last visited Nov. 26, 2024).

App.089-CASA

Afghanistan: TPS Considerations – November 2024

The most severe repercussions of this protracted health emergency are borne by Afghan women and children, who find themselves on the margins of society and increasingly vulnerable to adverse health outcomes, particularly concerning reproductive, maternal, newborn, and child health. Tragically, preventable maternal mortality claims the lives of 21 mothers every day, a staggering 148 infants.[266]

Doctors Without Borders (MSF) echoes these concerns relating to the lack of access to basic healthcare, explaining that "we receive children in [a] very critical condition; and some are dying just as they arrive in the health facility, either because they are brought late, or because of the long distance their parents had to travel to get to the hospital."[267]

## Challenges for Persons with Disabilities

In Afghanistan, people with mental and physical disabilities are regularly discriminated against and stigmatized by society and potentially even family members.[268] Women, displaced persons and returned migrants with mental health issues are particularly vulnerable as there is a lack of appropriate infrastructure and care that covers the needs of people with disabilities.[269] As the past five decades have been a violent and turbulent period for Afghanistan, a significant portion of the population is grappling with various forms of disabilities.[270] While official and accurate data is difficult to obtain, a 2018 report by the previous Afghan government estimated there were approximately 1.2 million Afghans with disabilities, with 41% being women.[271] However, it should be noted that only half of the country was surveyed as the other half of the country resided in Taliban controlled areas, making the survey difficult to execute.[272] Disabled Afghan women face particularly egregious discrimination and isolation in Afghan society today under the Taliban, as compared to years prior. Despite many disabled women overcoming endless challenges to complete their university studies, they now face gender employment bans set in place by the Taliban, rendering their education accomplishments useless. In a report for USIP, Belquis Ahmadi writes:

The ban on women's employment, combined with the absence of a comprehensive support program for disabled individuals, has forced many disabled women to resort to begging on the streets, enduring deplorable conditions. But […] the Taliban's requirement for women to be accompanied by a mahram — a close male relative — has further compounded the challenges faced by women

---

[266] Afghanistan: WHO Health Emergency Appeal 2024, World Health Organization (WHO), p.1, January 15, 2024, available at: https://cdn.who.int/media/docs/default-source/documents/emergencies/2024-appeals/afghanistan---who-2024-health-emergency-appeal.pdf?sfvrsn=b87cf11a_1&download=true (last visited Nov. 26, 2024).
[267] Dying to reach health care in Afghanistan, Doctors Without Borders (MSF), June 17, 2024, available at: https://www.doctorswithoutborders.org/latest/dying-reach-health-care-afghanistan (last visited Nov. 26, 2024).
[268] Country Guidance: Afghanistan, European Union Agency for Asylum (EUAA), p.93, May 2024, available at: https://euaa.europa.eu/publications/country-guidance-afghanistan-may-2024 (last visited Nov. 26, 2024).
[269] Country Guidance: Afghanistan, European Union Agency for Asylum (EUAA), p.93, May 2024, available at: https://euaa.europa.eu/publications/country-guidance-afghanistan-may-2024 (last visited Nov. 26, 2024).
[270] Belquis Ahmadi, The Challenges Facing Afghans with Disabilities, United States Institute of Peace (USIP), February 29, 2024, available at: https://www.usip.org/publications/2024/02/challenges-facing-afghans-disabilities (last visited Nov. 26, 2024).
[271] Belquis Ahmadi, The Challenges Facing Afghans with Disabilities, United States Institute of Peace (USIP), February 29, 2024, available at: https://www.usip.org/publications/2024/02/challenges-facing-afghans-disabilities (last visited Nov. 26, 2024).
[272] Belquis Ahmadi, The Challenges Facing Afghans with Disabilities, United States Institute of Peace (USIP), February 29, 2024, available at: https://www.usip.org/publications/2024/02/challenges-facing-afghans-disabilities (last visited Nov. 26, 2024).

App.090-CASA

Afghanistan: TPS Considerations – November 2024

and girls with disabilities, as even the harrowing and dangerous act of begging is now no longer an option for many as they are excluded from all public life.[273]

Despite these challenges and restrictions, there are some limited options for Afghans with disabilities. The International Committee of the Red Cross (ICRC) has facilitated vocational training for 189 people with disabilities, including 75 men and 114 women, from January 2024 to August 2024.[274] Through the Physical Rehabilitation Programme (PRP), the ICRC has been helping people with disabilities in Afghanistan since 1988, providing assistive devices such as prostheses and orthoses and essential services like physiotherapy.[275]

# Conclusion

Afghanistan's civilian population faces dire challenges, including a collapsing economy and health care system, ubiquitous food insecurity exacerbated by drought, and widespread insecurity due to decades of armed conflict and insurgency that is entering a new, dangerous phase. The Taliban's August 2021 takeover continues to pose substantial impediments to meeting these challenges. Taliban authorities violently target citizens and foster continued armed conflict and inter-ethnic strife. International cooperation and the receipt of aid have been compromised, leading to the further displacement of civilians. The severe restrictions, ranging from education to employment, on women foreclose the meaningful participation of half the population in remedying these concerns.

---

[273] Belquis Ahmadi, The Challenges Facing Afghans with Disabilities, United States Institute of Peace (USIP), February 29, 2024, available at: https://www.usip.org/publications/2024/02/challenges-facing-afghans-disabilities (last visited Nov. 26, 2024).

[274] Afghanistan: Vocational training empowers people with disabilities and fosters social inclusion, International Committee of the Red Cross, September 18, 2024, available at: https://www.icrc.org/en/article/afghanistan-vocational-training-empowers-people-disabilities-and-fosters-social-inclusion (last visited Nov. 26, 2024).

[275] Afghanistan: Vocational training empowers people with disabilities and fosters social inclusion, International Committee of the Red Cross, September 18, 2024, available at: https://www.icrc.org/en/article/afghanistan-vocational-training-empowers-people-disabilities-and-fosters-social-inclusion (last visited Nov. 26, 2024).

App.091-CASA

PRE-DECISIONAL/DELIBERATIVE

**Attachment A - Temporary Protected Status (TPS) Legal Authority**

Pursuant to section 244(b)(1) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254a(b)(1), the Secretary of Homeland Security, after consultation with appropriate agencies of the Government, may designate a foreign state (or part thereof) for TPS. The Secretary may then grant TPS to eligible nationals of that foreign state (or in the case of an alien having no nationality who last habitually resided in that state). INA § 244(b)(1) sets forth three possible bases on which the Secretary may designate a foreign state for TPS:

- Ongoing armed conflict in the foreign state and, due to such conflict, requiring the return of aliens who are nationals of that state would pose a serious threat to their personal safety;
- An earthquake, flood, drought, epidemic, or other environmental disaster in a foreign state has resulted in a substantial, but temporary, disruption of living conditions in the area affected, the foreign state is unable to handle adequately the return of aliens who are nationals of the state, *and* the foreign state has officially requested TPS designation; or
- Extraordinary and temporary conditions exist in the foreign state that prevent nationals of the state from returning in safety, unless the Secretary finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

An initial TPS designation is at the discretion of the Secretary but may not be less than 6 months or exceed 18 months. INA § 244(b)(2).

At least 60 days before the expiration of a TPS designation, the Secretary, after consultation with appropriate agencies of the Government, shall review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met and, if so, the length of an extension of the TPS designation (6-, 12-, or 18- months). *See* INA § 244(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for the TPS designation, she or he must terminate the designation. *See* INA § 244(b)(3)(B). Although the Secretary must make her or his determination on extension or termination at least 60 days before the expiration of the TPS designation, publication of the required *Federal Register* notice announcing the decision must be "on a timely basis." INA § 244(b)(3)(A). If the Secretary does not make a decision under INA § 244(b)(3)(A) that the foreign state no longer meets the conditions for designation, there is an automatic, minimum six-month extension of a country's TPS designation.
*See* INA § 244(b)(3)(C).

After the Secretary designates a country for TPS, nationals of the country (and persons without nationality who last habitually resided in the country) may apply for TPS, but they must individually demonstrate their eligibility pursuant to the criteria established in INA § 244(c) and the TPS regulations at 8 CFR § 244.1 *et seq*. These criteria include, but are not limited to, requirements that the applicant show continuous physical presence in the United States since the effective date of the country designation and continuous residence since such date as the Secretary determines; admissibility as an immigrant (with limited exceptions); that the applicant

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

Attachment A: TPS Legal Authority
Page 2

is not ineligible under certain mandatory criminal history, terrorism, and national security bars as
specified in INA § 244(c)(2)(A)-(B); and that the applicant is registering for TPS in accordance
with regulatory procedures in 8 CFR §§ 244.2–244.9.

If granted TPS, the alien receives employment authorization and an Employment Authorization
Document, if requested, that is valid for the duration of the TPS designation. TPS is a temporary
benefit that does not, by itself, provide aliens with a basis for seeking lawful permanent resident
(LPR) status or any other immigration status. However, receipt of TPS benefits will not bar an
otherwise eligible alien from adjusting to LPR status or acquiring another lawful immigration
status. When a TPS country's designation ends, TPS beneficiaries return to the same
immigration status, if any, that they held prior to TPS (unless that status has expired or been
terminated) or any other status they may have acquired while registered for TPS.

PRE-DECISIONAL/DELIBERATIVE

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Refugee, Asylum and International Operations Directorate
STAR Division, Research Branch
5900 Capital Gateway Drive
Camp Springs, MD 20529



# Afghanistan: Temporary Protected Status (TPS) Considerations (Addendum)[1]

## Safety of Return to Afghanistan/Repatriation

➢ "Upon arrival in Afghanistan, not all returnees are treated equally. Those with PoR cards who opted to return voluntarily receive a package of assistance from UNHCR. They are given one-off cash assistance of 375 USD per individual "to cover transportation and other immediate needs upon arrival" and each family should be granted 700 USD three months after arriving in their place of origin (see information about UNHCR's care package here). Since 15 September 2023, some 109,700 individuals returning from Pakistan have been provided with cash assistance in Kabul, Kandahar and Jalalabad encashment centres, including over 69,500 PoR cardholders, the UNHCR reported in its 16 September 2024 update. However, undocumented returnees and ACC cardholders receive no assistance from UNHCR. They get more limited help, packages of food and non-food items, from IOM."[2]

➢ "The lack of job opportunities, together with an insufficiency of aid, are two key difficulties facing returnees. Nearly half (47 percent [of the 240 households]) of those surveyed by Save the Children said there were no jobs in Afghanistan, with 81 percent saying they did not have skills that could lead to employment. Among our interviewees, only two have been lucky enough to find work – of a sort. Hashim Khan from Kandahar said he had managed to open a shop in a cabin *(ghorfa)* in the district where his family lived. However, his earnings could not meet the needs of his family."[3]

---

[1] The addendum covers the period from November 14, 2024 – February 20, 2025.

[2] Jelena Bjelica & Ali Mohammad Sabawoon, *Returning from Pakistan: How are Afghan returnees coping back in their homeland?*, Afghanistan Analysts Network, Sept. 29, 2024.

[3] Jelena Bjelica & Ali Mohammad Sabawoon, *Returning from Pakistan: How are Afghan returnees coping back in their homeland?*, Afghanistan Analysts Network, Sept. 29, 2024.

## Tourism in Afghanistan

➢ "Mr. Lin, 43, is part of a small but growing vanguard of venturesome tourists making their way to Afghanistan, disregarding dire warnings issued by their governments. The State Department advises Americans not to travel to Afghanistan 'due to terrorism, risk of wrongful detention, civil unrest, kidnapping and crime.' Over the past three years, Taliban officials say, 14,500 foreign tourists have visited the isolated, poverty-stricken nation. They have arrived with hard currency that Afghanistan desperately needs. Many tourists have experienced the country's traditional hospitality while visiting its famous mosques, its towering mountain ranges, its scenic high deserts and the remains of the renowned Buddha statues in Bamiyan."[4]

➢ "Reports indicate that interest from foreign visitors, particularly from China, has grown since the Taliban took control in August 2021, with 7,000 tourists visiting the country in 2023—a remarkable increase of 913% from 2021, according to the Tourism Directorate in Kabul. Afghanistan, long characterised by years of conflict, is witnessing a shift as the Taliban government promotes tourism in a bid to reshape its global image. Tourists are sharing their experiences on social media, highlighting the peaceful countryside, welcoming locals, and the cultural heritage, according to reports by South China Morning Post, (SCMP). Visitors have been drawn to the destination's colourful history, culture and scenic landscapes [...] Despite the upsurge in tourism, challenges remain. Female tourists face restrictions, requiring them to cover up and avoid certain areas, including popular sites such as Band-e Amir National Park. Additionally, while the security situation has improved, visitors must obtain written permission from the Taliban to visit tourist attractions and document their experiences."[5]

## International Aid and Corruption

➢ RAIO Research did not encounter new COI on the requested information on this topic within the limited time constraints.

## Current Armed Conflict and Security Situation

➢ "While overall security has improved and previously inaccessible areas are now reachable in Afghanistan, significant challenges persist. This is especially true for women and girls, with a new morality law that codifying already repressive decrees by the de facto authorities, barring them from schools, universities, workplaces and public spaces. The Islamic Republics of Iran and Pakistan host some 8 million Afghans, the largest refugee population globally. While the two countries have hosted

---

[4] David Zucchino, *Ignoring Warnings, a Growing Band of Tourists Venture to Afghanistan*, The New York Times, Dec. 29, 2024.
[5] *Chinese tourists are now travelling to... Afghanistan?!*, Travel Weekly Asia, Nov. 13, 2024.

Afghans for decades, the situation has become increasingly challenging, with economic fragility reducing livelihoods opportunities, a spiralling cost of living crisis, and rising instances of xenophobia, deepening hardship for already vulnerable Afghans."[6]

➢ "The overall security situation in Afghanistan has significantly improved since the end of large-scale conflict in 2021, with only 2 per cent of households reporting conflict-related shocks for the second consecutive year, a sharp drop from 60 per cent in 2021."[7]

## Internal Displacement

➢ RAIO Research did not encounter new COI on the requested information on this topic within the limited time constraints.

## Infrastructure Challenges

➢ RAIO Research did not encounter new COI on the requested information on this topic within the limited time constraints.

## Explosive Remnants of War including Landmines

➢ RAIO Research did not encounter new COI on the requested information on this topic within the limited time constraints.

## Taliban Governance – Damage to Security and Society

➢ RAIO Research did not encounter new COI on the requested information on this topic within the limited time constraints.

## Challenges for Women and Girls

➢ RAIO Research did not encounter new COI on the requested information on this topic within the limited time constraints.

## Economy

➢ "The events of August 15, 2021, triggered a sharp contraction and reconfiguration of the Afghan economy and approaches to international aid. Reduced aid drove a steep

---

[6] *Regional Refugee Response Plan for Afghanistan Situation 2024-2025 - Mid-Term Update 2025*, United Nations High Commission for Refugees (UNHCR), p.7, Feb. 19, 2025.
[7] *Afghanistan 2025: Humanitarian Needs and Response Plan*, Humanitarian Action, Dec. 19, 2024.

decline in aggregate demand and widespread disruptions to public services. Afghanistan lost access to the international banking system and offshore foreign exchange reserves as the central bank assets were frozen. Disruption and uncertainty led to sharp declines in investment confidence, and tens of thousands of highly skilled Afghans fled the country. Following two years of severe contraction, Afghanistan's economy has shown modest growth primarily driven by private consumption. GDP growth of 2.7% in 2023/24 has recouped only about 10% of past economic losses, indicative of the slow and fragile nature of the recovery [...] The partial recovery, coupled with falling food prices, has contributed to a gradual improvement in household welfare. But most Afghan households continue to struggle to meet basic needs and poverty remains widespread. Vulnerable groups, including women, children, and displaced populations, continue to bear the brunt of the economic hardship, due to the lack of social protection mechanisms. Despite improvements in reported welfare, the economic recovery has been uneven, with rural centers benefiting more than urban areas. The lack of job opportunities, coupled with ongoing displacement of population, has exacerbated regional disparities."[8]

➢ "On the demand side, Afghanistan's economic recovery was largely driven by strong private consumption, thanks to lower domestic prices, higher remittances, ongoing humanitarian aid (including cash transfers and assistance to returned refugees2), and better harvests, despite limited ITA support. According to the national account statistics recently published by the National Statistics and Information Authority (NSIA), private consumption increased by 6.2 percent in 2023/24 driven by better agriculture harvest and lower domestic prices. ITA spending on goods and services grew slightly by 1.1 percent, but investment overall dropped by 5.8 percent. Public investment was limited due to reduced funding, and private investment remained low as businesses lacked confidence in the future. A recent survey showed that the number of businesses worried about uncertainty rose from 11 to 20 percent. Many businesses turned to imports, which offer more stable costs and supply chains in uncertain times. This shift contributed to a negative trade balance, with exports down 9 percent and imports up slightly by 0.7 percent, helped by a stronger currency and lower global food and fuel prices."[9]

➢ "Afghanistan's GDP has shown some growth after two years of sharp decline, mainly driven by private consumption. However, the recovery has been modest, regaining only 10 percent of the losses from the last two years, and lagging the regional average and neighboring countries. At this current pace, it could take over a decade for the economy to return to pre-Taliban levels [...] The industrial sector saw a 2.6 percent increase, partially reversing the 5.7 percent decline from the previous year [...] The services sector, which accounts for nearly 45 percent of Afghanistan's economy, grew

---

[8] WorldBank.Org, Where We Work : Afghanistan – Overview, https://www.worldbank.org/en/country/afghanistan/overview (last visited Feb. 21, 2025).
[9] *Afghanistan Development Update*, The World Bank, p.12, Dec. 2024.

by 2.3 percent in 2023-24, marking a modest recovery from the 6.5 percent contraction the previous year [...] Overall, the economy, measured by the value produced in agriculture, industry, and services, grew by 2.3 percent in 2023/24, after shrinking by 6.4 percent the previous year."[10]

**Food Insecurity, Drought, and Access to Water**

➤ "Since peaking in November 2021 when approximately 22.8 million people – 55 per cent of the population – were classified as acutely food insecure, the levels of acute food insecurity in Afghanistan continue to marginally but steadily improve, in part due to the sustained scale-up of humanitarian food and agricultural food assistance over the past three years. However, levels of food insecurity still remain high and above pre-2021 levels, with an estimated 14.8 million people – about one-third of the population projected to experience crisis and emergency levels of food insecurity Integrated Food Security Phase Classification (IPC) 3+ through March 2025."[11]

➤ "The economic contraction, revenue losses and significant reduction in international development assistance that has occurred since the DfA assumed control have limited their capacity to address basic socio-economic and infrastructure needs and respond to shocks from natural disasters, climate change, and population movements, complicating humanitarian and development efforts. While urban areas have seen some improvements in public services, the country still lacks large-scale investments in water infrastructure, agriculture, flood protection, healthcare, education, the social safety net and essential utilities for vulnerable population groups, including persons with disabilities, and essential utilities."[12]

**Lack of Access to Healthcare**

➤ RAIO Research did not encounter new COI on the requested information on this topic within the limited time constraints.

**Challenges for Persons with Disabilities**

➤ RAIO Research did not encounter new COI on the requested information on this topic within the limited time constraints.

---

[10] *Afghanistan Development Update*, The World Bank, p.11, Dec. 2024.
[11] *Afghanistan 2025: Humanitarian Needs and Response Plan*, Humanitarian Action, Dec. 19, 2024.
[12] *Afghanistan 2025: Humanitarian Needs and Response Plan*, Humanitarian Action, Dec. 19, 2024.



THE SECRETARY OF STATE

WASHINGTON

The Honorable
Kristi Noem
Secretary of Homeland Security
2707 Martin Luther King Jr Ave S
Washington, DC  20528

Dear Secretary Noem:

The U.S. Department of State has assessed that permitting nationals of
Afghanistan to remain temporarily in the United States under 8 U.S.C. 1254a
is contrary to the national interest of the United States and that the armed
conflict in Afghanistan between the Taliban and ISIS-K no longer prevents the
returns of Afghan nationals to all regions of Afghanistan without posing a
threat to their personal safety. Accordingly, I recommend that you terminate
the designation of Afghanistan pursuant to 8 U.S.C. 1254a(b)(3)(A)–(B).

Under Executive Order 14150, "the foreign policy of the United States shall
champion core American interests and always put America and American
citizens first." Designating Afghanistan under 8 U.S.C. 1254a(b)(1) does not
champion core American interests or put America and American citizens
first, therefore it is contrary to the foreign policy and the national interest of
the United States. Moreover, the armed conflict in Afghanistan has abated to
such an extent that it is now possible to return Afghan nationals to
Afghanistan without posing a serious threat to their personal safety.
Therefore, the conditions under 8 U.S.C. 1254a(b)(1)(A) no longer apply.

In particular, on January 22, 2025 I determined that "to advance our national
interest," the foreign policy of the United States is that "we must curb mass
migration and secure our borders. The State Department will no longer
undertake any activities that facilitate or encourage mass migration." Then,
on February 21, I further declared, "Securing America's borders and
protecting its citizens from external threats is the first priority foreign affairs
function of the United States."

The designation of Afghanistan is "contrary to the national interest of the United States" under 8 U.S.C. 1254a(b)(1)(C) because it facilitates and encourages mass migration by causing more than 17,000 Afghan beneficiaries to remain in the United States. Indeed, former DHS Secretary Mayorkas's office itself said "DHS cannot provide legal advice but encourages Afghan parolees to seek any more durable immigration pathways, like asylum and adjustment of status."

For these reasons, in consultation with you under 8 U.S.C. 1254a(b)(3)(A), I am recommending that you terminate this designation under 8 U.S.C. 1254a(b)(3)(B).

Sincerely,

Marco Rubio

PRE-DECISIONAL/DELIBERATIVE

UNCLASSIFIED // FOR OFFICIAL USE ONLY



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

March 20, 2025

**DECISION**

MEMORANDUM FOR THE SECRETARY AND THE DEPUTY SECRETARY

FROM:          Kika M. Scott
               Senior Official Performing the Duties of the Director

SUBJECT:       **Temporary Protected Status for Afghanistan**



PRE-DECISIONAL/DELIBERATIVE

App.101-CASA

App.102-CASA

App.103-CASA

App.104-CASA

App.105-CASA

App.106-CASA

App.107-CASA

App.109-CASA

Terminate Afghanistan's designation on the basis of no longer meeting the extraordinary
and temporary conditions statutory standard

Approve/date _____

3-21-25

Terminate Afghanistan's designation on the basis of improved conditions as it relates to ongoing conflict

Approve/date _____

3-21-25

**THE SECRETARY OF STATE**
**WASHINGTON**

December 2, 2024

The Honorable
Alejandro N. Mayorkas
Secretary of the Department of Homeland Security
Washington, DC   20528

Dear Secretary Mayorkas:

The Department of State assesses that armed conflict and extraordinary and temporary conditions in Cameroon currently prevent Cameroonian nationals (or noncitizens having no nationality who last habitually resided in Cameroon) from returning to certain regions of Cameroon in safety, and therefore supports its extension for Temporary Protected Status (TPS) for 12 months on the basis of those conditions.  Because there have been some improvements in country conditions and redesignation might risk delay by the Government of Cameroon in working to improve the situation within the country, we do not recommend that Cameroon be redesignated for TPS.

There is an ongoing armed conflict in the Far North Region between the Government of Cameroon and terrorist groups Boko Haram and Islamic State – West Africa Province (ISIS-WA) and the return of nationals to some portions of the Far North Region of Cameroon would pose a serious threat to their safety.  Boko Haram and ISIS-WA remain active in some portions of the Far North Region; there were at least 352 terrorist attacks in the Far North in 2024 that resulted in the death of 256 civilians.  UNHCR estimates that approximately 454,000 people are internally displaced in this region. There is also ongoing violence between the Government of Cameroon and multiple armed separatist groups in the Northwest and Southwest Regions. There are credible reports of human rights abuses by both government forces and armed groups.  Since the violence began in 2017, approximately 7,000 people have been killed in these two regions, including at least 700 civilians in the past two years, and separatists have killed or kidnapped suspected government sympathizers and local leaders.  Separatists have

App.112-CASA

burned schools and hospitals, gunned down schoolchildren, mutilated and beheaded those suspected to be government sympathizers, and kidnapped government officials and tribal and religious leaders.  The United Nations estimates that 3.4 million people in the country need humanitarian assistance, primarily in Northwest, Southwest, and Far North regions, and an estimated 2.5 million people in Cameroon face acute food insecurity.

Given ongoing armed conflict, an improving but still problematic human rights and security environment, and food scarcity, we assess that individuals returning to some areas of Cameroon are currently unable to do so in safety.  I therefore recommend you extend TPS for Cameroon for 12 months, at which time conditions should be revaluated.  To help inform your decision, the Department has prepared the attached country conditions assessment.

Sincerely,

Antony J. Blinken

Enclosures:
    As stated.

SENSITIVE BUT UNCLASSIFIED

**(U) DEPARTMENT OF STATE RECOMMENDATION REGARDING RENEWAL OR REDESIGNATION OF TEMPORARY PROTECTED STATUS (TPS) FOR CAMEROON – November 2024**

I.      **Statutory Basis for Designation**

    A. ***Armed conflict***

       **1. Is there an ongoing armed conflict within the foreign state?**

(SBU) Yes.  There is an ongoing armed conflict in the broader Lake Chad Basin involving several countries, including Cameroon, and the terrorist groups Boko Haram and Islamic State – West Africa Province.  This conflict extends into the Far North Region of Cameroon.

       **a. If so, would the return of nationals of the foreign state to that state (or to the part of the state) pose a serious threat to their personal safety?**

App.114-CASA

**threat to their personal safety?**

(SBU) Yes, although the risk is generalized to the population, and specific groups do not appear disproportionately targeted.  In some portions of the Far North Region where Boko Haram and ISIS-West Africa (ISIS-WA) remain active, there is risk of terrorist attacks and threats to personal safety.  However, the conflict does not pose risks in other parts of the country.  The Far North Region comprises approximately seven percent of the land of Cameroon, along the border with Nigeria and Chad, and within that seven percent, Boko Haram and ISIS-WA are active only in the areas closest to the Nigerian border.  Deaths have decreased over time despite attack event frequency increasing.  Armed Conflict Location and Event Data (ACLED) reports that, as of November, there were 352 reported terrorist attacks on civilians in the Far North in 2024, resulting in the death of 256 civilians.  By comparison, in 2017, 324 deaths occurred in 125 civilian targeting events.  There were six improvised explosive devices (IEDs) or suicide bombings attributed to these terrorist groups in 2023, and 11 in 2024 as of November, significantly down from the high of 63 in 2017.  According to UNHCR

SENSITIVE BUT UNCLASSIFIED
CMR Termination AR - 0051

<u>SENSITIVE BUT UNCLASSIFIED</u>
-2-

estimates, as of February 2024, approximately 454,000 people are internally displaced in this region which also hosts approximately 121,000 Nigerian refugees.[i]  As of October 2024, there have been no significant acts of terrorism conducted by Boko Haram or ISIS-WA in the Cameroonian capital Yaoundé or major port city Douala, and recent attacks have been exclusive to specific areas in the Far North region.  Both groups appear to be focused on local objectives in the tri-border area of Nigeria, Cameroon, and Chad.

**B.** *Environmental Disaster*

1. **Has the foreign state in question recently experienced an environmental disaster (such as earthquake or hurricane), or a public health emergency (such as an epidemic)?**

(U) N/A.

a. **If so, did this result in a substantial, but temporary, disruption of living conditions in the area affected?**

<span style="color:red">App.116-CASA</span>

(U) N/A.

**2. Is the foreign state unable, temporarily, to handle adequately the return to the state of its nationals?**

(U) N/A.

**3. Has the foreign state officially requested TPS for its nationals in the United States?**

(U) N/A.

### C. *Extraordinary and Temporary Conditions*

SENSITIVE BUT UNCLASSIFIED
CMR Termination AR - 0082

SENSITIVE BUT UNCLASSIFIED

-3-

### 1. Has the foreign state experienced extraordinary and temporary conditions that prevent nationals of the state from returning to the state in safety?

(SBU) Yes. Nationals of Cameroon can return in safety to much of the country, including the two most populous cities, Yaoundé and Douala, but extraordinary and temporary conditions persist, making it unsafe to return to some parts of the country, particularly the Northwest and Southwest Regions.

(U) In addition to the armed conflict between the Government of Cameroon and terrorist groups Boko Haram and ISIS-WA, which is localized to the Far North Region, there is also ongoing violence between the Government of Cameroon and multiple armed separatist and criminal groups in the Northwest and Southwest Regions.

(SBU) The violence in the Northwest and Southwest Regions initially arose after peaceful protests in 2016 over long-standing grievances by the English-speaking population that form a majority in those two regions were met by government force. Armed separatists began attacks in 2017 and issued unilateral declarations of independence later that year, and both the government forces and armed groups have committed human rights abuses against civilians. To date approximately 7,000 people have been killed in the two regions, including at least 700 civilians in the past two years, according to ACLED data. Separatists have burned schools and hospitals, gunned down schoolchildren, mutilated and beheaded those suspected to be government sympathizers, and kidnapped government officials, teachers, businesspeople, and tribal and religious leaders. Throughout the eight years of the crisis, Cameroonian children have repeatedly been prevented from attending school due to lockdowns called by diaspora separatist leaders, with schoolchildren and educators killed. Approximately 41 of the schools in the Northwest and Southwest regions remain closed for the 2024-2025 school year, according to the United Nations.[ii] There have also been death threats by individuals affiliated with U.S.-based separatist leaders against

App.118-CASA

civil society leaders, diplomats, and others working to finding solutions to the crisis.

(U) According to ACLED data, there was a decrease in events that involved violence against civilians (as ACLED refers to them) in the Northwest and Southwest regions from 2023 to 2024, though there continue to be events involving violence against civilians in those regions.  In 2023, ACLED recorded 1,140 events involving violence by all parties (as ACLED refers to them) against civilians; in 2024, the number of recorded events involving violence by all parties against civilians is 886 as of November 2024.[iii]  This includes a decrease in IED attacks by separatists in the two regions, from 61 in 2023, to 39 in 2024 as of October, according to ACLED data.[iv]  In marked contrast to earlier phases of the crisis, ACLED data indicate there has been a decrease in acts of violence against civilians (VAC) attributed to the military in 2024, 198 VAC events in 2023 compared to 93 through October 2024.[v]  The violence in the Northwest and Southwest regions has not spread outside the crisis area in the past year, though displacements have affected other regions.  In February 2024, UNHCR assessed that more than 580,000 individuals were internally displaced from their homes in these two regions with approximately 60 percent relocating to other towns in the Northwest and Southwest and 40 percent to other areas, namely to Yaoundé, Douala, and the neighboring West Region.[vi]

(SBU) The Government of Cameroon has made some efforts to secure, stabilize, and begin reconstruction of the crisis areas, but the underlying causes of the crisis have not been resolved and armed separatist groups remain active.  The Government of Cameroon has changed the military commanders in the Northwest and Southwest regions, which has led to improved civil/military relations and increased security for the general population.  While representatives of the government (under the direction of the Prime Minister) participated in closed-door, Canadian-supported talks with separatist leaders, the Government of Cameroon did not continue the initiative once it was made public in early 2023.

USCA4 Appeal: 25-1792    Doc: 4-2    Filed: 07/14/2025    Pg: 123 of 249    Total Pages:(123 of 249)
Case 8:25-cv-01484-TDC    Document 70-3    Filed 06/25/25    Page 63 of 400
SENSITIVE BUT UNCLASSIFIED
-5-

(U) The UNOCHA estimated that, as of June 2024, 3.4 million people in the country need humanitarian assistance, primarily in the Northwest, Southwest, and Far North regions, down from 4.7 million in 2023.  According to the Famine Early Warning Systems Network, Integrated Food Security Phase Classification (IPC) Phase 3 Crisis level food insecurity in the Northwest and Southwest regions are expected to persist until May 2025 and in the Far North food security is projected to deteriorate to IPC 3 Crisis levels due to depletion of food stocks from the October harvest.[vii]  An estimated 2.5 million people in Cameroon face acute food insecurity.  Overall, insecurity has had significant negative economic repercussions on the affected regions.

(SBU) On February 10, 2022, Human Rights Watch (HRW) released a report alleging that at least 40 of 190 Cameroonian deportees from the United States in 2019 and 2020 were abused by Cameroonian authorities upon return.  This report was allegedly based on interviews with unnamed deportees (mostly failed asylum seekers) and family members.  According to Human Rights Watch, detainees reported arbitrary detention, torture, and extortion.  Prior to the HRW report, no independent reports of abuse were made to the U.S. Embassy in Yaoundé that mirror or relate to the allegations reported by HRW.  The Embassy has also not received any additional information or details on these allegations since.  In FY2024, 12 Cameroonians were removed from the United States by the Department of Homeland Security.  No concerns were brought to the attention of Embassy Yaoundé about the treatment by Cameroonian officials of these removed individuals.  At present, we assess that Cameroonians in the United States from the Northwest and Southwest could face threats to their safety if returned to those regions.

(SBU) Severe seasonal flooding in the Far North region began in September and is ongoing.  Roughly 26,000 people have been displaced with widespread damage to housing, schools, infrastructure, and health facilities.

SENSITIVE BUT UNCLASSIFIED

-6-

   **2.  Would permitting nationals of the foreign state to remain temporarily in the United States be contrary to the national interest of the United States?**

(SBU) No.  The Department does not assess that extending TPS would be contrary to the national interest of the United States at this time, though the issue has been an intermittent irritant with the Cameroonian government.

**II.  Discretionary Factors**

   **What, if any, additional information relevant to this decision should be brought to the attention of the Department of Homeland Security?**

(SBU) For many years, the Cameroonian government has incorrectly perceived the United States to be at least tolerant, if not outright supportive, of separatist actions.  The April 2022 TPS designation was hailed

supportive, of separatist actions. The April 2022 TPS designation was hailed by separatist leaders as an affirmation of, and a significant victory in, their ongoing efforts to secede from or destabilize Cameroon. When the TPS designation went into effect, Embassy Yaoundé undertook a serious effort to ensure that all actors – the government, the separatist groups, and the Cameroonian public – understood that the U.S. government neither supports nor condones violence as a legitimate means to address political grievances, and that U.S. territory is not a safe haven from which advocates of violence can operate with impunity. The November 2022 arrests and the early 2023 convictions of several individuals arrested in prior years for charges related to arms trafficking, has helped demonstrate the U.S. government's impartiality on the political issues in Cameroon. Embassy Yaoundé continues outreach to Cameroonian government leadership for a peaceful resolution to the crisis in the Northwest and Southwest regions of the country and reiterates that those responsible for the violence should be held accountable. A redesignation of TPS, as opposed to an extension, would risk undermining those efforts and could embolden the non-state actors to continue using violence to achieve their stated objectives.

SENSITIVE BUT UNCLASSIFIED
CMR Termination AR - 0366

SENSITIVE BUT UNCLASSIFIED
-7-

(U) Armed groups have received financial and material support from members of the Cameroonian diaspora (including separatist leaders) living in the United States.  In May and July 2021, the United States indicted several U.S. residents of Cameroonian origin on arms trafficking-related charges; those individuals were sentenced in early 2023 to prison terms of between two and six years.  U.S-based separatist leaders conduct fundraising efforts among the diaspora in support of separatist groups and regularly use social media to promote violence.  In November 2022, three U.S. citizens of Cameroonian origin were charged with crimes related to a conspiracy to solicit funds for separatist fighters in Cameroon to be used in attacks against Cameroonian government personnel.

(SBU) The Government of Cameroon may interpret a redesignation of TPS as a deliberate U.S. government action to tarnish the image of Cameroon.  It could also negatively affect cooperation on areas of mutual interest, such as counterterrorism efforts in the Lake Chad Basin, anti-piracy efforts in the Gulf of Guinea, support to refugees from CAR and Nigeria, and collaboration

**Gulf of Guinea, support to refugees from CAR and Nigeria, and collaboration to prevent inroads in the region by malign actors such as the U.S.-sanctioned Wagner Group and the DPRK.**

(SBU) Cameroon plays a key role in regional stability and remains a capable partner in countering terrorism in the Lake Chad Region.  Cameroon's military is one of the more tactically proficient forces participating in Multinational Joint Task Force operations against Boko Haram and ISIS-West Africa.  Cameroonian troops also play a valuable role in the United Nations Multidimensional Integrated Stabilization Mission in the Central African Republic.  Furthermore, Cameroon has played a leadership role for maritime security in the Gulf of Guinea, where pirates threaten shipping lanes used by major U.S. oil and gas companies.

SENSITIVE BUT UNCLASSIFIED
CMR Termination AR - 0067

## III.     Recommendation

(SBU) The Department recommends an extension of Cameroon's TPS designation for 12 months on the basis of armed conflict and extraordinary temporary conditions.

---

i "United Nations High Commissioner for Refugees (UNHCR)." *Refugees and Internally Displaced Persons (September 2024),* "Country - Cameroon." *UNHCR Data Portal*, data.unhcr.org/en/country/cmr. Accessed 21 Oct. 2024.

ii Cameroon, U. (2024, January 21 ). *Cameroon Education Cluster: Operational Presence in South-West & North-West (as of January 2024) - Cameroon*. ReliefWeb (PDF).

iii "Armed Conflict Locator and Event Database (ACLED)."

iv "Armed Conflict Locator and Event Database (ACLED)."

v "Armed Conflict Locator and Event Database (ACLED)."

vi "United Nations High Commissioner for Refugees (UNHCR)." *Refugees and and Internally Displaced Persons (September 2024), UNHCR Operational Data Portal*, 30 September 2024, data.unhcr.org/en/country/cmr. Accessed 22 October 2024.

vii "Cameroon Acute Food Insecurity June - October 2024 -January 2025 Projections." *FEWS NET*, September 2024, fews.net/west-africa/cameroon.

UNCLASSIFIED

# TEMPORARY PROTECTED STATUS (TPS)

**What is TPS?** TPS provides relief from removal to individuals present in the United States who are temporarily unable to return to their country of origin due to ongoing armed conflict, environmental disaster, or other extraordinary and temporary conditions.

**How does it work?** TPS is available only to individuals who were present in the United States *before* the date of their country's designation for TPS. Throughout the period of designation, TPS beneficiaries can neither be detained by DHS on the basis of their immigration status nor removed from the United States. They can obtain from DHS an employment authorization document to work and may be granted travel authorization to depart from, and return to, the United States. TPS does not lead to lawful permanent residence or other immigration status. However, TPS beneficiaries can petition for a change to nonimmigrant status, file for adjustment of their status based on an immigrant petition and apply for any other immigration benefit or protection for which they may be eligible.

**Who makes the decision?** Section 244 of the Immigration and Nationality Act gives the Secretary of Homeland Security (DHS Secretary) the authority to designate a foreign state or part thereof for TPS after consultation with other appropriate government agencies. The statute does not specify that the Secretary of State provide a recommendation, although the Secretary has traditionally done so. The DHS Secretary may grant TPS for a period of 6 to 18 months.

**What are the options for extending or ending TPS?** At least 60 days before the end of a country's TPS designation period, the DHS Secretary, in consultation with appropriate government agencies, reviews conditions in the designated country. Based on the conditions, the DHS Secretary may (a) extend the period of designation for TPS; (b) terminate TPS; or (c) newly designate the country for TPS. An extension prolongs TPS for existing beneficiaries but does not allow for new beneficiaries. A new designation allows the DHS Secretary to expand the number of individuals eligible for

App.126-CASA

2024014228

TPS by establishing new dates from which TPS applicants must have been continuously residing and physically present in the United States. Termination ends a country's TPS designation and establishes a date by which beneficiaries who do not enjoy another lawful immigration status must depart the United States.

**How does the Secretary provide input to DHS?**  PRM serves as the Department lead for TPS.  DHS's USCIS contacts PRM to request that the Department provide a country conditions report and the Secretary's recommendation for a new designation, extension, or termination of TPS. PRM coordinates with other Department bureaus, including the relevant regional bureau, to draft the Department's recommendation package and present it to the Secretary for review.

App.127-CASA

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
Refugee, Asylum and International Operations Directorate
STAR Division, Research Branch
5900 Capital Gateway Drive
Camp Springs, MD 20529



# Republic of Cameroon: Temporary Protected Status (TPS) Considerations[1]

## <u>Summary</u>

The Republic of Cameroon[2] is a "republic dominated by a strong presidency, in which the president retains power over the legislative and judicial branches of government."[3] The nation has been plagued with internal conflict for the past decade via extremist insurgency from groups such as Boko Haram[4] in the Far North region, and the ongoing crisis between the Anglophone (English-speaking) regions and the Francophone (French-speaking) central government of Cameroon.[5] Although ongoing issues such as political repression, gender-based violence,[6] and the continued discrimination toward the LGBTQIA+

---

[1] The reporting period for this report is June 15, 2023 to November 30, 2024.

[2] Cameroon is located at the cusp of West and Central Africa, sharing its longest borders with Nigeria and Chad, while shorter borders are shared with Equatorial Guinea, Gabon, and the Republic of the Congo. The country is also divided into ten administrative regions: Adamawa, Centre, East, Far North, Littoral, North, North-West, West, South, South-West. The country has over two hundred ethnic groups, over two hundred local languages, and consists of a majority Christian and/or Catholic population with a significant Muslim minority. Country Policy and Information Note Cameroon: North-West/South-West crisis, UK Home Office, pg. 4, December 2020, https://www.ecoi.net/en/file/local/2042244/Cameroon_-_North_West_South-West_crisis_-_CPIN_-_v2.0_.pdf (last visited July 18, 2024); The World Factbook: Cameroon, CIA World Factbook, July 08, 2024, https://www.cia.gov/the-world-factbook/countries/cameroon/#geography (last visited July 17, 2024).

[3] 2021 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, April 12, 2022, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/cameroon/, (last visited on July 29, 2024).

[4] Cameroon: Confronting Boko Haram, International Crisis Group, November 16, 2016, https://www.crisisgroup.org/africa/central-africa/cameroon/cameroon-confronting-boko-haram, (last visited on July 24, 2024).

[5] A Second Look at Cameroon's Anglophone Special Status, International Crisis Group, March 31, 2023, https://www.crisisgroup.org/africa/central-africa/cameroon/b188-second-look-cameroons-anglophone-special-status, (last visited November 13, 2024).

[6] Sexual and gender-based violence (SGBV) against women, including prevalence, legislation, availability of state protection, access to support services, in particular in Yaoundé, European Union Agency for Asylum, December 04, 2023, https://www.ecoi.net/en/document/2101762.html, (last visited on July 23, 2024).

---

CMR Termination AR - 0014

community[7] are prevalent, the conflicts between the central Cameroonian government and separatist groups present within the Anglophone (North West & South West) regions, as well as the need to combat extremist groups such as Boko Haram, JAS (Jama'tu Ahlis Sunna Lidda'awati wal-Jihad), and ISIS-WA (ISIS-West Africa) in the Far North region have caused the nation to experience a continued state of insecurity. This state of insecurity has continued to put civilians caught in the middle at a perpetual risk of harm. Amnesty International determined that:

> [N]ine out of Cameroon's ten region[s] were affected by the three major humanitarian crises: the armed conflict in the Lake Chad basin involving Islamic State's West Africa Province (ISWAP) and Jama'tu Ahlis Sunna Lidda'awati wal-Jihad (JAS) armed groups; the armed violence in the North-West and South-West anglophone regions.[8]

Cameroon has an estimated population of 28, 372,687.[9] As such an April 2024, World Food Programme country brief on Cameroon stated of the country's population, "4.7 million people required humanitarian assistance in 2023 – a 21 percent increase from 2022."[10] Although, by July 2024, that number had decreased to "3.4 million, a 28 percent decrease from 2023,"[11] the World Food Programme indicated that between July and August 2024, there was a slight increase of those who were severely food insecure from the previous year.[12] Moreover, in "2023, violent incidents in the North West and South West regions grew by 69% compared to the previous year – the largest annual escalation since 2020."[13]

Furthermore, the ongoing crises throughout the country has resulted in the loss of nearly ten thousand lives,[14] and the internal and external displacement of over two million people.[15] These crises have exacerbated sexual and gender-based violence, the disruption

---

[7] Situation of LGBTIQ persons; legislation; treatment by state; treatment by society; availability of state protection; access to support services, European Union Agency for Asylum, January 31, 2024, https://www.ecoi.net/en/document/2103883.html, (last visited on July 24, 2024).
[8] The State of the World's Human Rights; Cameroon 2023, Amnesty International, April 24, 2024, https://www.amnesty.org/en/location/africa/west-and-central-africa/cameroon/report-cameroon/, (last visited September 06, 2024).
[9] Population, Cameroon, World Health Organization, May 15, 2024,https://data.who.int/countries/120, (last visited December 11, 2024).
[10] WFP Cameroon Country Brief, February 2024, World Food Programme, April 16, 2024, https://reliefweb.int/report/cameroon/wfp-cameroon-country-brief-february-2024, (last visited September 06, 2024.)
[11] WFP Cameroon Country Brief, July 2024, World Food Programme, September 05, 2024, https://reliefweb.int/report/cameroon/wfp-cameroon-country-brief-july-2024, (last visited September 06, 2024).
[12] WFP Cameroon Country Brief, June 2024, World Food Programme, July 22, 2024, https://reliefweb.int/report/cameroon/wfp-cameroon-country-brief-june-2024, (last visited September 06, 2024).
[13] Non-State Armed Groups and Illicit Economies in West Africa: Anglophone separatists, ACLED and GI-TOC, pg. 5, September 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/09/d4248905-7022-462d-a85a-5d2645fc5b22.pdf, (last visited on September 10, 2024).
[14] Cameroon, International Crisis Group, November 2024, https://www.crisisgroup.org/africa/central-africa/cameroon, (last visited December 11, 2024).
[15] Refugees and Internally Displaced Persons in Cameroon Multi Country Office (January 2024), UN High Commissioner for Refugees (UNHCR), February 15, 2024, https://data.unhcr.org/en/documents/details/106655, (last visited on July 30, 2024).

of education for nearly a generation of Cameroonians and has caused millions to continue requiring humanitarian aid.[16]

## Republic of Cameroon| Country Overview

### *Political History & Government[17]*

French Cameroon gained independence in 1960, while British Cameroon gained independence a year later in 1961.[18] Since independence, Cameroon has only had two leaders, Ahmadou Ahidjo from 1960-1982, and Paul Biya from 1982 until present day.[19] Cameroon has been described as an "autocracy with a façade of democratic republican institutions that have not developed a life of their own,"[20] as both of these regimes have been authoritarian and Cameroon, as a result, has not had a "single democratic transfer of power."[21] Paul Biya has ruled Cameroon since the early 1980s predominately with the use of repression, particularly through the "marginalization and targeting" of oppositionists[22] and restricting the media and freedom of expression.[23] The 2023 U.S. Department of State Country Report on Human Rights Practices stated:

> Government officials reportedly denied individuals or organizations the ability to criticize or express views at odds with government policy. Government officials also denied citizens the ability to discuss certain matters of general interest, including expression of views concerning political transition. There were reports individuals

---

[16] Cameroon: Situation Report, UN Office for the Coordination of Humanitarian Affairs (UNOCHA), Lasted updated June 10, 2024, https://reports.unocha.org/en/country/cameroon/, (last visited September 04, 2024).

[17] Please note that this is a historical section and thus the information contained is outside of the reporting period of this report.

[18] Cameroon country profile, BBC News, March 09, 2023, https://www.bbc.com/news/world-africa-13146029, (last visited on July 18, 2024).

[19] History of Cameroon, Encyclopedia Britannica, last updated December 11, 2024,.https://www.britannica.com/place/Cameroon/History, (last visited on December 11, 2024).

[20] BTI 2024 Country Report: Cameroon, Bertelsmann Stiftung, pg.13, March 19, 2024, https://www.ecoi.net/en/file/local/2105824/country_report_2024_CMR.pdf, (last visited on July 19, 2024).

[21] Time to resolve Cameroon's persistent yet forgotten crisis, Institute for Security Studies, October 03, 2023, https://issafrica.org/iss-today/time-to-resolve-cameroons-persistent-yet-forgotten-crisis, (last visited on July 19, 2024).

[22] Cameroon: The Cameroon Anglophone Crisis (2021 – 2023), Austrian Centre for Country of Origin and Asylum Research and Documentation, pg. 5, January 08, 2024, https://www.ecoi.net/en/file/local/2102908/a-12289.pdf, (last visited on July 24, 2024).

[23] 2023 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, April 23, 2024, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/cameroon/, (last visited on July 18, 2024).

who criticized the government privately or in public faced reprisals. . . Police, gendarmes, and other government agents arrested, detained, physically attacked, and intimidated journalists. Journalists practiced self-censorship, refraining from subjects that could be perceived as critical of the government due to harassment and intimidation by the government or by those acting with impunity due to the state's failure to investigate or prosecute attacks on journalists. Journalists and publishers reported cases of telephone harassment and intimidation.[24]

### *Anglophone Crisis Origins*

The Anglophone crisis has its origins in Cameroonian independence,[25] when Francophone Cameroon, and soon after Anglophone Cameroon, were expected to form a solution to the cultural differences between both parts of the country. Anglophone Cameroonians were offered the opportunity to either join Nigeria or unify with Francophone Cameroon, choosing the latter option.[26] Although the expectation was that Francophone and Anglophone Cameroon were to be separate but equal entities, the authoritarian rule by first Ahmadou Ahidjo, and then Paul Biya, has marginalized Anglophone Cameroonians. Francophone Cameroonians have been shown preference while centralized control of the country has consistently been under one individual[27] who has attempted to force Anglophone Cameroonians to assimilate.[28] The marginalization of Anglophone Cameroonians came to a head in 2016, when teachers and lawyers from Anglophone Cameroon protested and went on strike[29] due to the printing of official government materials solely in French, and the belief that the Anglophone educational and judicial system would be completely absorbed, and force Cameroon into a singular Francophone state.[30]

---

[24] 2023 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, April 23, 2024, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/cameroon/, (last visited on July 18, 2024).

[25] Cameroon's Anglophone Crisis at the Crossroads, International Crisis Group, August 02, 2017, https://www.crisisgroup.org/africa/central-africa/cameroon/250-cameroons-anglophone-crisis-crossroads, (last visited on July 19, 2024).

[26] Cameroon: The Cameroon Anglophone Crisis (2021 – 2023), Austrian Centre for Country of Origin and Asylum Research and Documentation, pgs. 4-5, January 08, 2024, https://www.ecoi.net/en/file/local/2102908/a-12289.pdf, (last visited on July 24, 2024).

[27] Cameroon: The Cameroon Anglophone Crisis (2021 – 2023), Austrian Centre for Country of Origin and Asylum Research and Documentation, pgs. 5-6, January 08, 2024, https://www.ecoi.net/en/file/local/2102908/a-12289.pdf, (last visited on July 24, 2024).

[28] Cameroon's Anglophone Crisis at the Crossroads, International Crisis Group, August 02, 2017, https://www.crisisgroup.org/africa/central-africa/cameroon/250-cameroons-anglophone-crisis-crossroads, (last visited on July 19, 2024).

[29] Cameroon's Anglophone Crisis at the Crossroads, International Crisis Group, August 02, 2017, https://www.crisisgroup.org/africa/central-africa/cameroon/250-cameroons-anglophone-crisis-crossroads, (last visited on July 19, 2024).

[30] Cameroon: The Cameroon Anglophone Crisis (2021 – 2023), Austrian Centre for Country of Origin and Asylum Research and Documentation, pgs. 5-6, January 08, 2024, https://www.ecoi.net/en/file/local/2102908/a-12289.pdf, (last visited on July 24, 2024).

The federal government's response to the peaceful protests throughout the Anglophone regions was predominantly violent.[31] In early 2017, secessionist groups began to form in Anglophone Cameroon[32] as protests led to increased rioting, with multiple deaths and the arrests of dozens of Anglophone Cameroonians "including journalists and lawyers."[33] As a result of the escalating conflict, the year 2017 also saw the start of the formation of the "Federal Republic of Ambazonia."[34] The Federal Republic of Ambazonia was established as separatist Anglophone Cameroonians seceded from Cameroon and armed separatist groups began to fight the central government. The conflict has resulted in the deaths of at least six thousand[35] mostly Anglophone Cameroonians.[36] Moreover, millions have been displaced predominantly within and from the Anglophone regions. According to a September 2024 joint report published by Armed Conflict Location & Event Data Project (ACLED) and the Global Initiative Against Organized Crime, "insecurity in the Anglophone region has led to the internal displacement of over 1 million people, with similar numbers of people displaced to other parts of Cameroon and into Nigeria."[37]

**June 15, 2023 – November 30, 2024**

*Security Situation & Armed Conflict*

In January 2024, the Austrian Centre for Country of Origin and Asylum Research and Documentation (ACCORD) indicated that "the violent conflict between the security and defence forces and armed separatist groups reportedly continued to rage in Cameroon's North-West and South-West regions. . . The security situation in the Anglophone regions is reported to be deteriorating, with the insurgency becoming more structured and the crisis

---

[31] Cameroon, United States Holocaust Memorial Museum, date unknown, https://www.ushmm.org/genocide-prevention/countries/cameroon, (last visited on July 23, 2024).

[32] Cameroon's Anglophone Crisis at the Crossroads, International Crisis Group, August 02, 2017, https://www.crisisgroup.org/africa/central-africa/cameroon/250-cameroons-anglophone-crisis-crossroads, (last visited on July 19, 2024).

[33] Cameroon's Anglophone Crisis at the Crossroads, International Crisis Group, August 02, 2017, https://www.crisisgroup.org/africa/central-africa/cameroon/250-cameroons-anglophone-crisis-crossroads, (last visited on July 19, 2024).

[34] On October 01, 2017, armed separatist groups declared that the Northwest and Southwest regions of Cameroon would be the Federal Republic of Ambazonia. Who are Cameroon's 'Ambazonia' secessionists?, Deutsche Welle, September 30, 2019, https://www.dw.com/en/who-are-cameroons-self-named-ambazonia-secessionists/a-50639426, (last visited December 10, 2024).

[35] Cameroon: The Cameroon Anglophone Crisis (2021 – 2023), Austrian Centre for Country of Origin and Asylum Research and Documentation, pg. 12, January 08, 2024, https://www.ecoi.net/en/file/local/2102908/a-12289.pdf, (last visited on July 24, 2024).

[36] Cameroon: The Cameroon Anglophone Crisis (2021 – 2023), Austrian Centre for Country of Origin and Asylum Research and Documentation, pg. 6, January 08, 2024, https://www.ecoi.net/en/file/local/2102908/a-12289.pdf, (last visited on July 24, 2024).

[37] Non-State Armed Groups and Illicit Economies in West Africa: Anglophone separatists, ACLED and GI-TOC, pg. 5, September 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/09/d4248905-7022-462d-a85a-5d2645fc5b22.pdf, (last visited on September 10, 2024).

more complex."[38] The ongoing internal conflicts within Cameroon have resulted in harm against civilians from multiple sides, with Cameroonian security forces, armed separatists, and armed extremist groups all being implicated in human rights violations;[39] including but not limited to, targeting and killing civilians, abductions, and looting.[40]

According to Human Rights Watch, in January 2024, these "human rights abuses" continued to be committed by all the aforementioned parties "across Cameroon's Anglophone regions and in the Far North region."[41] In July 2024, "452 human rights violations were recorded in the northwest and southwest regions, bringing to total 1,811 violations recorded in both regions since January 2024."[42] Additionally, "[m]ost of the infrastructure in rural areas – schools, hospitals, markets and homes have been deliberately destroyed by NSAGs [non-state armed groups][43] (and reportedly [state security forces, known as] SSFs[44]). . ."[45]

*Cameroon Security Forces*
According to the European Union Agency for Asylum (EUAA) in March 2024, "multiple sources describe that state forces have committed conflict-related human rights abuses in Cameroon. . .There were reports that government authorities committed arbitrary arrests, and arbitrary and unlawful killings through excessive use of force in the course of their official duties."[46] The March 2024 query response from the EUAA further expounded on the actions of security forces by stating:

> Human rights violations committed by members of the security forces from 2020 to
> 2023 in the Northwest and Southwest region have been documented, and the

---

[38] Cameroon: The Cameroon Anglophone Crisis (2021 – 2023), Austrian Centre for Country of Origin and Asylum Research and Documentation, pg.86, January 08, 2024, https://www.ecoi.net/en/file/local/2102908/a-12289.pdf, (last visited on July 24, 2024).

[39] Treatment of individuals perceived to be separatists by the state, European Union Agency for Asylum, pg.3, March 04, 2024, https://www.ecoi.net/en/file/local/2105170/2024_03_EUAA_COI_Query_Response_Q20_Treatment_of_Individuals_Perceived_as_Separatists_by_the_State_Cameroon.pdf, (last visited on July 19, 2024).

[40] World Report 2023 – Cameroon, Human Rights Watch, January 12, 2023, https://www.hrw.org/world-report/2023/country-chapters/cameroon, (last visited December 10, 2024).

[41] World Report 2023 – Cameroon, Human Rights Watch, January 12, 2023, https://www.hrw.org/world-report/2023/country-chapters/cameroon, (last visited July 16, 2024).

[42] NSAGs is an acronym for "non-state armed groups." PROTECTION CLUSTER NWSW MONTHLY UPDATE, Global Protection Cluster, July 2024, https://globalprotectioncluster.org/sites/default/files/2024-10/monthly_update_july_2024.pdf, (last visited November 18, 2024).

[43] PROTECTION CLUSTER NWSW MONTHLY UPDATE, Global Protection Cluster, July 2024, https://globalprotectioncluster.org/sites/default/files/2024-10/monthly_update_july_2024.pdf, (last visited November 18, 2024).

[44] SSFs is an acronym for "state security forces." PROTECTION MONITORING UPDATE, July-September 2024, Global Protection Cluster, October 2024, https://globalprotectioncluster.org/sites/default/files/2024-10/pm_quarterly_update_jul-sept.pdf, (last visited November 18, 2024).

[45] PROTECTION MONITORING UPDATE, July-September 2024, Global Protection Cluster, October 2024, https://globalprotectioncluster.org/sites/default/files/2024-10/pm_quarterly_update_jul-sept.pdf, (last visited November 18, 2024).

[46] Treatment of individuals perceived to be separatists by the state, European Union Agency for Asylum, pg.3, March 04, 2024, https://www.ecoi.net/en/file/local/2105170/2024_03_EUAA_COI_Query_Response_Q20_Treatment_of_Individuals_Perceived_as_Separatists_by_the_State_Cameroon.pdf, (last visited on July 19, 2024).

Cameroonian security forces have been responsible for numerous human rights violations, including unlawful killings, rapes, tortures, destruction [and] arbitrary detentions.[47]

Additionally, the EUAA reported:

In February 2024, the Global Centre for the Responsibility to Protect (R2P) described that security forces have committed 'extrajudicial killings and widespread sexual and gender based violence, burned Anglophone villages and subjected individuals with suspected separatist ties to arbitrary detention, torture and ill-treatment' during the conflict. In addition, a report covering July to September 2023, on the human rights situation in the Southwest and Northwest regions of Cameroon by the Centre for Human Rights and Democracy in Africa (CHRDA) affirmed that Cameroonian state forces have 'increased their crackdown' on 'anyone suspected of having links with separatist networks', which has led to 'gross human rights violations and abuses including extrajudicial killing, targeted executions, arbitrary arrests and detention, arson and destruction of civilian property among other violations'.[48]

In January 2024, Human Rights Watch in their World Report on Cameroon, reported:

State forces responded to separatist attacks with counter-insurgency operations that often failed to protect civilians, or targeted them outright. In some instances, such as that outside Bamenda, North-West region, in July [2023], victims may have been fleeing fighting when they were killed. Abusive army raids and killings of civilians may also have been perpetrated against individuals suspected of being separatists or in retaliation for attacks against army positions.[49]

Moreover, security forces have been accused of "detaining humanitarian workers,"[50] "threatening and detaining journalists for reporting on the conflict,"[51] and even carrying

---

[47] Treatment of individuals perceived to be separatists by the state, European Union Agency for Asylum, pg.3, March 04, 2024, https://www.ecoi.net/en/file/local/2105170/2024_03_EUAA_COI_Query_Response_Q20_Treatment_of_Individuals_Perceived_as_Separatists_by_the_State_Cameroon.pdf, (last visited July 18, 2024).

[48] Treatment of individuals perceived to be separatists by the state, European Union Agency for Asylum, pg.4, March 04, 2024, https://www.ecoi.net/en/file/local/2105170/2024_03_EUAA_COI_Query_Response_Q20_Treatment_of_Individuals_Perceived_as_Separatists_by_the_State_Cameroon.pdf, (last visited July 18, 2024).

[49] World Report 2024 – Cameroon, Human Rights Watch, January 11, 2024, https://www.hrw.org/world-report/2024/country-chapters/cameroon, (last visited on July 19, 2024). (Original quote included hyperlinks which were removed.)

[50] Treatment of individuals perceived to be separatists by the state, European Union Agency for Asylum, pg.6, March 04, 2024, https://www.ecoi.net/en/file/local/2105170/2024_03_EUAA_COI_Query_Response_Q20_Treatment_of_Individuals_Perceived_as_Separatists_by_the_State_Cameroon.pdf, (last visited July 18, 2024).

[51] Treatment of individuals perceived to be separatists by the state, European Union Agency for Asylum, pg.6, March 04, 2024,

out "extrajudicial killings,"[52] the "torture cruel, inhuman, or degrading treatment or punishment,"[53] and the "enforced disappearances" of not only separatists but of their supporters.[54] Meanwhile, Amnesty International summarized in November 2023:

> [T]here also has been 'many apparent attempts' by the government 'to silence human rights defenders, activists, academics, lawyers and journalists who speak out against atrocities' in the Anglophone region and those found 'denouncing or documenting atrocities committed by either side have also found themselves targeted with death threats, or targeted with arbitrary arrest and judicial harassment.[55]

### Anglophone Separatist Groups

Armed separatist groups have engaged in continued harm against the civilian population, including but not limited to: abductions, sexual assault, and murder.[56] Human Rights Watch reported in June 2022, "Armed separatist groups are kidnapping, terrorizing, and killing civilians across the English-speaking regions with no apparent fear of being held to account by either their own leaders or Cameroonian law enforcement."[57] This has continued throughout the current reporting period.[58] Additionally, the leadership that had predominantly been based in the diaspora[59] has lost some control of the fighters within Cameroon, which has "encouraged a sense of lawlessness."[60] Moreover, "due to the number of groups, the size, structure, leadership and composition of each Anglophone group varies

---

https://www.ecoi.net/en/file/local/2105170/2024_03_EUAA_COI_Query_Response_Q20_Treatment_of_Individuals_Perceived_as_Separatists_by_the_State_Cameroon.pdf, (last visited July 18, 2024).

[52] 2023 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, April 23, 2024, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/cameroon/, (last visited November 14, 2024).

[53] 2023 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, April 23, 2024, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/cameroon/, (last visited November 14, 2024).

[54] 2023 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, April 23, 2024, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/cameroon/, (last visited November 14, 2024).

[55] Joint Declaration: Cameroon's Universal Periodic Review provides an Opportunity to call on the Cameroon Authorities to protect Human Rights in the Anglophone Regions, Amnesty International, November 13, 2023, https://www.amnesty.org/en/wp-content/uploads/2023/11/AFR1774082023ENGLISH.pdf, (last visited July 19, 2024).

[56] World Report 2024 – Cameroon, Human Rights Watch, January 11, 2024, https://www.hrw.org/world-report/2024/country-chapters/cameroon, (last visited on July 19, 2024).

[57] Cameroon: Separatist Abuses in Anglophone Regions, Human Rights Watch, June 27, 2022, https://www.hrw.org/news/2022/06/27/cameroon-separatist-abuses-anglophone-regions, (last visited July 29, 2024).

[58] Non-State Armed Groups and Illicit Economies in West Africa: Anglophone separatists, ACLED and GI-TOC, September 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/09/d4248905-7022-462d-a85a-5d2645fc5b22.pdf, (last visited on September 10, 2024).

[59] Cameroon Woos Potential Diaspora Investors, But Faces Distrust of Government, VOA News, June 23, 2022, https://www.voanews.com/a/cameroon-woos-potential-disapora-investors-but-faces-distrust-of-government/6629715.html, (last visited November 18, 2024).

[60] Why the spoils of war may outweigh incentives for peace in Cameroon, The New Humanitarian, July 19, 2022, https://www.thenewhumanitarian.org/analysis/2022/07/19/Cameroon-anglophone-crisis-separatism-secession-elusive-peace, (last visited on July 29, 2024).

---

dramatically."[61] Furthermore, according to a September 2024 report from ACLED, "2023 reached the highest level since the start of the Anglophone crisis – with 50 unique armed groups operating in 2023."[62]

In January 2023, President Paul Biya stated that "many rebel groups have been crushed and the threat from separatists has been significantly reduced;" however, country conditions information has thus far not corroborated these claims.[63] Human Rights Watch, in their 2024 World Report on Cameroon, highlighted the following incidents of harm separatist groups committed throughout 2023:

- On May 20, [2023], more than 30 women were abducted by separatists in a North-West village after protesting unlawful taxes imposed by armed groups. A government spokesperson said that some of the women had been tortured.
- During the night from July 16 to 17, [2023,] unidentified alleged separatists killed at least 10 civilians in Bamenda. The assailants who were wearing military uniforms reportedly opened fire in a bar after accusing locals of failing to support the separatists.
- On August 11,[2023], separatists reportedly raided Kekukesim village, killing at least four civilians, including the village chairperson, and burning houses.
- Separatist fighters disrupted the start of the 2023 academic year, planned for September 4, by enforcing a school boycott. On September 7, days after schools reopened, at least three civilians in the South-West were killed in an assault blamed on separatists, who shot at car passengers and set vehicles ablaze. According to the United Nations, at least 2,245 schools are not functioning in the Anglophone regions due to attacks and threats by armed separatists.[64]

In January 2024, ACCORD further assessed that "Anglophone insurgents can be found among multiple political factions and dozens of local militias," and that "as of July 2023, the separatists are reported to have notably upgraded their arsenal, incorporating sophisticated equipment"[65] including but not limited to the increased use of improvised

---

[61] Non-State Armed Groups and Illicit Economies in West Africa: Anglophone separatists, ACLED and GI-TOC, pg. 16, September 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/09/d4248905-7022-462d-a85a-5d2645fc5b22.pdf, (last visited on September 10, 2024).

[62] Non-State Armed Groups and Illicit Economies in West Africa: Anglophone separatists, ACLED and GI-TOC, pg. 13, September 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/09/d4248905-7022-462d-a85a-5d2645fc5b22.pdf, (last visited on September 10, 2024).

[63] Treatment of individuals perceived to be separatists by the state, European Union Agency for Asylum, pg.3, March 04, 2024, https://www.ecoi.net/en/file/local/2105170/2024_03_EUAA_COI_Query_Response_Q20_Treatment_of_Individuals_Perceived_as_Separatists_by_the_State_Cameroon.pdf, (last visited on July 19, 2024).

[64] World Report 2024 – Cameroon, Human Rights Watch, January 11, 2024, https://www.hrw.org/world-report/2024/country-chapters/cameroon, (last visited on July 19, 2024). (Original quote included hyperlinks which were omitted.)

[65] Cameroon: The Cameroon Anglophone Crisis (2021 – 2023), Austrian Centre for Country of Origin and Asylum Research and Documentation, pg. 10, January 08, 2024, https://www.ecoi.net/en/file/local/2102908/a-12289.pdf, (last visited on July 24, 2024).

explosive devices (IEDs).[66] Many of the weapons acquired by separatist groups are smuggled in from Nigeria[67] and purchased with funding from taxation and ransom.[68] Between July and September 2024, the use of IEDs by separatist groups increased within the Anglophone regions.[69]

Moreover, previously it was reported that "no one is immune"[70] to harm from the separatist groups. They have targeted and even killed[71] "public officials, political leaders, teachers, school children, traditional leaders, health workers, aid workers, clergy, military, police, etc."[72] This remained consistent throughout the current reporting period.[73] In addition to that, due to the harm the separatist groups have caused the local communities, there has appeared to be a decrease in support of their actions and their popularity, including from the diaspora,[74] "which has led to a drop in their funding."[75] The drop in

---

[66] Cameroon: North-West and South-West - Situation Report No. 42 (As of 30 April 2022), United Nations Office for the Coordination of Humanitarian Affairs, April 30, 2022, https://reliefweb.int/report/cameroon/cameroon-north-west-and-south-west-situation-report-no-42-30-april-2022, (last visited on July 30, 2024).

[67] Although, Nigeria has become the easiest place for separatist groups to acquire weapons, it is not the only place, as the separatist groups have been known to acquire weapons from "organized crime networks across the Sahel." Q&A: The Evolution of Ambazonian Separatist Groups in Anglophone Cameroon, ACLED, pg. 07, October 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/10/QA-Cameroon-PDF.pdf, (last visited October 23, 2024).

[68] Non-State Armed Groups and Illicit Economies in West Africa: Anglophone separatists, ACLED and GI-TOC, pg. 24, September 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/09/d4248905-7022-462d-a85a-5d2645fc5b22.pdf, (last visited on September 10, 2024).

[69] PROTECTION MONITORING UPDATE, July-September 2024, Global Protection Cluster, October 2024, https://globalprotectioncluster.org/sites/default/files/2024-10/pm_quarterly_update_jul-sept.pdf, (last visited November 18, 2024).

[70] Cameroon: Ambazonians and the Kidnapping Business, JeuneAfrique, May 09, 2022, https://www.jeuneafrique.com/1344633/politique/cameroun-les-ambazoniens-et-le-business-du-kidnapping/ (last visited July 30, 2024).

[71] Cameroon: Separatist Abuses in Anglophone Regions, Human Rights Watch, June 27, 2022, https://www.hrw.org/news/2022/06/27/cameroon-separatist-abuses-anglophone-regions, (last visited July 30, 2024).

[72] 2021 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, April 12, 2022, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/cameroon/, (last visited July 30, 2024).

[73] Non-State Armed Groups and Illicit Economies in West Africa: Anglophone separatists, ACLED and GI-TOC, September 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/09/d4248905-7022-462d-a85a-5d2645fc5b22.pdf, (last visited on September 10, 2024).

[74] Q&A: The Evolution of Ambazonian Separatist Groups in Anglophone Cameroon, ACLED, pg. 04, October 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/10/QA-Cameroon-PDF.pdf, (last visited October 23, 2024).

[75] Q&A: The Evolution of Ambazonian Separatist Groups in Anglophone Cameroon, ACLED, pg. 01, October 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/10/QA-Cameroon-PDF.pdf, (last visited October 23, 2024).

---

TPS Considerations: The Republic of Cameroon

10

funding sources, has led separatist groups to engage in "abductions for ransom,"[76] "looting,"[77] "sale of illicit fuel,"[78] "roadblocks,"[79] "extortion,[80] and a "liberation tax."[81]

Furthermore, violence has still been increasing in the Anglophone regions throughout 2024, as the separatist groups have moved away from the idea of "independence of the region"[82] and instead have focused upon localizing their power through the continued use of illicit activities.[83] Finally, per Human Rights Watch in September 2024, the separatist groups have been focused on attacking civilians and each other, in addition to attacking government forces.[84] This trend appears to be continuing, despite the September 2024 arrest of Lucas Cho Ayaba, a Norway-based separatist leader of the Ambazonia Governing Council.[85] For instance, only a few days after news of Ayaba's arrest, on October 01, 2024, the separatist groups proceeded with celebrating "Ambazonian independence,"[86] in what has been referred to by The Africa Report as in their "customary manner – with lockdowns and kidnappings."[87]

---

[76] Q&A: The Evolution of Ambazonian Separatist Groups in Anglophone Cameroon, ACLED, pg. 01, October 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/10/QA-Cameroon-PDF.pdf, (last visited October 23, 2024).

[77] Q&A: The Evolution of Ambazonian Separatist Groups in Anglophone Cameroon, ACLED, pg. 01, October 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/10/QA-Cameroon-PDF.pdf, (last visited October 23, 2024).

[78] Q&A: The Evolution of Ambazonian Separatist Groups in Anglophone Cameroon, ACLED, pg. 01, October 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/10/QA-Cameroon-PDF.pdf, (last visited October 23, 2024).

[79] Q&A: The Evolution of Ambazonian Separatist Groups in Anglophone Cameroon, ACLED, pg. 01, October 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/10/QA-Cameroon-PDF.pdf, (last visited October 23, 2024).

[80] Q&A: The Evolution of Ambazonian Separatist Groups in Anglophone Cameroon, ACLED, pg. 01, October 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/10/QA-Cameroon-PDF.pdf, (last visited October 23, 2024).

[81] Q&A: The Evolution of Ambazonian Separatist Groups in Anglophone Cameroon, ACLED, pg. 02, October 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/10/QA-Cameroon-PDF.pdf, (last visited October 23, 2024).

[82] Q&A: The Evolution of Ambazonian Separatist Groups in Anglophone Cameroon, ACLED, pg. 09, October 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/10/QA-Cameroon-PDF.pdf, (last visited October 23, 2024).

[83] Non-State Armed Groups and Illicit Economies in West Africa: Anglophone separatists, ACLED and GI-TOC, September 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/09/d4248905-7022-462d-a85a-5d2645fc5b22.pdf, (last visited on September 10, 2024).

[84] Cameroon: Populations at Risk, Global Centre for the Responsibility to Protect, September 01, 2024, https://www.globalr2p.org/countries/cameroon/, (last visited October 23, 2024).

[85] Arrest of Cameroonian Separatist Leader Sends Important Message, Human Rights Watch, September 27, 2024, https://www.hrw.org/news/2024/09/27/arrest-cameroonian-separatist-leader-sends-important-message, (last visited October 23, 2024).

[86] Cameroon's separatists celebrate 'Ambazonian independence,' The Africa Report, October 07, 2024, https://www.theafricareport.com/363799/cameroons-separatists-celebrate-ambazonian-independence/, (last visited October 23, 2024).

[87] Cameroon's separatists celebrate 'Ambazonian independence,' The Africa Report, October 07, 2024, https://www.theafricareport.com/363799/cameroons-separatists-celebrate-ambazonian-independence/, (last visited October 23, 2024).

*Boko Haram[88], Jama'atu Ahlis Sunna Lidda'adati wal-Jihad (JAS), and ISIS-West Africa (ISIS-WA, ISISWAP)*

Insurgent groups that self-identify as Sunni Muslim organizations have been present within Cameroon since at least 2014 and have escalated their attacks over the past decade.[89] According to the EUAA in October 2023:

> In the Far North region of Cameroon, violence caused by Boko Haram and its splinter groups (Jama'atu Ahlis Sunna Lidda'adati wal-Jihad [JAS]) and the Islamic State - West Africa (ISWAP), together with an increase in natural disasters related to climate change, have increased pressure on resources and basic services, especially in already poor and underserved areas, and significantly eroded the protective environment of the population.[90]

The armed extremist groups, most notably, Boko Haram and ISIS-West Africa, have engaged in human rights abuses throughout the Far North region, including but not limited to, "looting, abductions, and murder against both civilians and government forces."[91] For instance, during the previous TPS reporting period between January and April 2022, Boko Haram and ISIS-WA reportedly killed countless civilians and "contributed to the internal displacement of over 378,000 people as of July [2022]."[92] Furthermore, these attacks have "escalated in violence"[93] resulting in the "Cameroonian government deploying hundreds of additional troops to the Far North region."[94] These attacks continued throughout the current reporting period, with nearly 250 attacks[95] and over 100 security incidents[96] from

---

[88] "In spite of the different factions and names, "Boko Haram" was used at times to collectively refer to the various factions, particularly when there was confusion as to which group was responsible for an attack." Boko Haram, Nigerian Islamic group, Encyclopedia Britannica, November 11, 2024, https://www.britannica.com/topic/Boko-Haram, (last visited November 18, 2024).

[89] Curbing Feuds over Water in Cameroon's Far North, International Crisis Group, April 25, 2024, https://www.crisisgroup.org/africa/central-africa/cameroon/b197-curbing-feuds-over-water-cameroons-far-north, (last visited on July 24, 2024).

[90] Security situation in the Far North, Northwest and Southwest regions, European Union Agency for Asylum, pg.3, October 11, 2023, https://www.ecoi.net/en/file/local/2099086/2023_10_EUAA_COI_Query+_Response_Q44_Cameroon_Security_situation.pdf, (last visited July 22, 2024) (World Food Programme, Protection and AAP Analysis, Far Noth Region of Cameroon, September 28, 2023.) (Internal citations omitted).

[91] World Report 2024 – Cameroon, Human Rights Watch, January 11, 2024, https://www.hrw.org/world-report/2024/country-chapters/cameroon, (last visited on July 19, 2024).

[92] World Report 2023 – Cameroon, Human Rights Watch, January 12, 2023, https://www.hrw.org/world-report/2023/country-chapters/cameroon, (last visited July 16, 2024).

[93] World Report 2023 – Cameroon, Human Rights Watch, January 12, 2023, https://www.hrw.org/world-report/2023/country-chapters/cameroon, (last visited July 16, 2024).

[94] World Report 2023 – Cameroon, Human Rights Watch, January 12, 2023, https://www.hrw.org/world-report/2023/country-chapters/cameroon, (last visited July 16, 2024).

[95] World Report 2024 – Cameroon, Human Rights Watch, January 11, 2024, https://www.hrw.org/world-report/2024/country-chapters/cameroon, (last visited on July 19, 2024).

[96] Cameroon: Far North, Situation Report No. 34 July 2023, UN Office for the Coordination of Humanitarian Affairs, September 06, 2023, https://reliefweb.int/report/cameroon/cameroun-extreme-nord-rapport-de-situation-no-34-juillet-2023, (last visited November 14, 2024).

the groups taking place throughout 2023. As of March 2024, the number of displaced Cameroonians within the Far North region had increased to 454,000.[97]

According to Human Rights Watch, since "January [2023] until July 2023, 246 attacks have been reported in the Far North region, causing the deaths of 169 civilians. Most of these deaths were caused by attacks by Islamist groups."[98] The 2023 U.S. Department of State Country Report on Human Rights Practices for Cameroon further stated that there have been reports of Boko Haram recruiting and using child soldiers.[99] The extremist groups have been known to "steal food, supplies, and other necessities"[100] throughout the region, particularly via "extortion" and "taxing" the local communities.[101] Amnesty International corroborated the severity of the attacks from these groups when they reported:

> Armed groups affiliated to ISWAP and JAS, descended from Boko Haram, continued to carry out attacks on villages along the border with Nigeria and on islands in Lake Chad. According to the OCHA, between 1 December 2022 and 30 November 2023, more than 280 civilians were killed by armed groups and more than 210 abducted.[102]

In addition, extremist groups have limited movement of people and restricted religion throughout the Far North region.[103] Moreover, the "Boko Haram conflict has exacerbated the already prevalent practice of child marriage and the sexual abuse of minors in the Far North Region."[104] Furthermore, the 2023 U.S. Department of State Report on International Religious Freedom for Cameroon, highlighted some of the following acts committed by extremist groups:

- In August [2023], ISIS-WA killed eight fishermen on the island of Darak in Lake Chad.

---

[97] 5 things to know about the crisis in Cameroon, Norwegian Refugee Council, March 2024, https://www.nrc.no/feature/2024/5-things-to-know-about-the-crisis-in-cameroon/#:~:text=Rampant%20insecurity%20in%20the%20Far%20North%20region&text=Incursions%2C%20cross%2Dborder%20raids%2C,region%2C%20as%20of%20March%202024, (last visited on November 14, 2024).
[98] World Report 2024 – Cameroon, Human Rights Watch, January 11, 2024, https://www.hrw.org/world-report/2024/country-chapters/cameroon, (last visited on July 19, 2024).
[99] 2023 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, April 23, 2024, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/cameroon/, (last visited on July 18, 2024).
[100] Curbing Feuds over Water in Cameroon's Far North, International Crisis Group, April 25, 2024, https://www.crisisgroup.org/africa/central-africa/cameroon/b197-curbing-feuds-over-water-cameroons-far-north, (last visited on July 24, 2024).
[101] Curbing Feuds over Water in Cameroon's Far North, International Crisis Group, April 25, 2024, https://www.crisisgroup.org/africa/central-africa/cameroon/b197-curbing-feuds-over-water-cameroons-far-north, (last visited on July 24, 2024).
[102] The State of the World's Human Rights; Cameroon 2023, Amnesty International, April 24, 2024, https://www.amnesty.org/en/location/africa/west-and-central-africa/cameroon/report-cameroon/, (last visited July 20, 2024).
[103] Freedom in the World 2024 – Cameroon, Freedom House, 2024, https://freedomhouse.org/country/cameroon/freedom-world/2024, (last visited November 18, 2024).
[104] Freedom in the World 2024 – Cameroon, Freedom House, 2024, https://freedomhouse.org/country/cameroon/freedom-world/2024, (last visited November 18, 2024).

TPS Considerations: The Republic of Cameroon                                                    13

App.140-CASA

- According to media reports, in June [2023], during the feast of Eid al-Adha, ISIS-WA kidnapped 13 individuals, including women and children, in Mordas in the Far North Region and took them to their base in the Lake Chad Basin. The fate of these kidnap victims was unknown at year's end.

- According to media sources, in May [2023], former Boko Haram captive, Ibrahim Ngaroua, who escaped during the year after being held prisoner with his family for several years, told students of the Yaounde-based Heritage Higher Institute of Peace and Development Studies that Boko Haram forced all their captives to read the Quran and publicly flogged anyone for wrongdoing. Ngaroua said that Boko Haram separated the women from the men, forced the women to wear burqas, and used them as sex slaves.[105]

*Intercommunal Violence (Farmer-Herder Conflicts)*

In the Far North region, amid the ongoing conflicts between extremist groups and the Cameroonian government, other inter-communal conflicts have been brewing over the past few years primarily due to climate change,[106] specifically, the rapidly rising temperatures of the Sahel region, coupled with increasingly scare natural resources.[107]

For example, the Choa Arabs and the Musgum community have been fighting over water resources in the Far North region.[108] The conflict between the two groups over the Logone River ignited in 2021, and there have been multiple clashes between the groups throughout 2023. These clashes have resulted in the temporary displacement of thousands whenever there are violent flare ups.[109] The conflict between the two groups has flared as recently as November 2023.[110] Many of the clashes between the groups have been retaliatory in nature, including but not limited to, physical assault, sexual assault, and even murder.[111]

---

[105] 2023 Report on International Religious Freedom: Cameroon, U.S. Department of State, June 26, 2024, https://www.state.gov/reports/2023-report-on-international-religious-freedom/cameroon/, (last visited November 18, 2024).

[106] Uprooted and forgotten, Cameroon's climate refugees living in despair, Radio France Internationale, August 13, 2023, https://www.rfi.fr/en/africa/20230813-cameroon-s-climate-refugees-living-in-despair-lake-chad, (last visited July 22, 2024).

[107] The climate crisis tinderbox in northern Cameroon, African Arguments, May 12, 2022, https://africanarguments.org/2022/05/the-climate-crisis-tinderbox-in-northern-cameroon/, (last visited July 22, 2024).

[108] Curbing Feuds over Water in Cameroon's Far North, International Crisis Group, April 25, 2024, https://www.crisisgroup.org/africa/central-africa/cameroon/b197-curbing-feuds-over-water-cameroons-far-north, (last visited on July 24, 2024).

[109] Curbing Feuds over Water in Cameroon's Far North, International Crisis Group, April 25, 2024, https://www.crisisgroup.org/africa/central-africa/cameroon/b197-curbing-feuds-over-water-cameroons-far-north, (last visited on July 24, 2024).

[110] Curbing Feuds over Water in Cameroon's Far North, International Crisis Group, April 25, 2024, https://www.crisisgroup.org/africa/central-africa/cameroon/b197-curbing-feuds-over-water-cameroons-far-north, (last visited on July 24, 2024).

[111] Curbing Feuds over Water in Cameroon's Far North, International Crisis Group, April 25, 2024, https://www.crisisgroup.org/africa/central-africa/cameroon/b197-curbing-feuds-over-water-cameroons-far-north, (last visited on July 24, 2024).

Moreover, the conflicts within the area have spread to other communities also fighting over resources within the region, such as the Kirdi farmers who have been clashing with Fulani herders.[112] Furthermore, there is ongoing concern that these inter-communal conflicts may make communities "more vulnerable to recruitment into, or collaboration with, jihadist groups. . ."[113]

The farmer-herder conflicts have not been limited to the Far North region. They have also been ignited in the North region,[114] as well as within the context of the Anglophone crisis, as the Fulani Mbororo, a predominantly nomadic and marginalized indigenous group of herders, have formed militias to protect their interests.[115] This group has been targeted by armed separatists throughout the crisis[116] but have also been accused of engaging in human rights violations in their siding with the Cameroonian government, including a massacre of women and children in February 2020.[117] Although the violence perpetuated by ethnic and communal based militias are at lower levels than other forms of violence such as state forces, the levels rose in 2023, an increase by 17% from the previous year.[118] Furthermore, ACLED reported that in the second quarter of 2024, there were over 330 fatalities within the Far North region associated with the ongoing conflicts,[119] an increase from the approximate 200 that had occurred in the previous

---

[112] Curbing Feuds over Water in Cameroon's Far North, International Crisis Group, April 25, 2024, https://www.crisisgroup.org/africa/central-africa/cameroon/b197-curbing-feuds-over-water-cameroons-far-north, (last visited on July 24, 2024).
[113] Curbing Feuds over Water in Cameroon's Far North, International Crisis Group, April 25, 2024, https://www.crisisgroup.org/africa/central-africa/cameroon/b197-curbing-feuds-over-water-cameroons-far-north, (last visited on July 24, 2024).
[114] The Tri-Border Tangle: Arms Trafficking, Crime and Violence in the Borderlands of Chad, Cameroon, and Central African Republic, Global Initiative Against Transnational Organized Crime, pg.10, https://www.ecoi.net/en/document/2114966.html, (last visited November 18, 2024).
[115] With or Against Us: People of the North-West Region of Cameroon Caught Between the Army, Armed Separatists and Militias, Amnesty International, pgs. 17-19, https://www.amnesty.org/en/latest/research/2023/06/human-rights-violations-in-cameroons-anglophone-north-west-region/, (last visited July 31, 2024).
[116] With or Against Us: People of the North-West Region of Cameroon Caught Between the Army, Armed Separatists and Militias, Amnesty International, pg. 19, https://www.amnesty.org/en/latest/research/2023/06/human-rights-violations-in-cameroons-anglophone-north-west-region/, (last visited July 31, 2024).
[117] With or Against Us: People of the North-West Region of Cameroon Caught Between the Army, Armed Separatists and Militias, Amnesty International, pg. 20, https://www.amnesty.org/en/latest/research/2023/06/human-rights-violations-in-cameroons-anglophone-north-west-region/, (last visited July 31, 2024).
[118] Non-State Armed Groups and Illicit Economies in West Africa: Anglophone separatists, ACLED and GI-TOC, pg. 15, September 10, 2024, https://acleddata.com/acleddatanew/wp-content/uploads/2024/09/d4248905-7022-462d-a85a-5d2645fc5b22.pdf, (last visited on September 10, 2024).
[119] CAMEROON, SECOND QUARTER 2024: Update on incidents according to the Armed Conflict Location & Event Data Project (ACLED), ACLED, August 07, 2024, https://www.ecoi.net/en/file/local/2113480/2024q2Cameroon_en.pdf, (last visited November 15, 2024).

---

TPS Considerations: The Republic of Cameroon                                    15

quarter.[120] The 2024 numbers thus far as of August 2024[121] have been nearly identical to the numbers for all of 2023.[122]

### *Impact of the Conflicts, including the impact on Vulnerable Populations*

*The Anglophone Crisis*

As a result of the ongoing crisis, Human Rights Watch estimates that since 2017 until early 2024, "at least 6,000 civilians have been killed by both government forces and separatist fighters,"[123] many of whom were killed deliberately."[124] An ACCORD report summarizing the crisis data from 2021- 2023 stated:

> For the period between 1 January 2021 and 8 December 2023, ACLED reports 1,144 security related incidents coded as battles, explosions/remote violence and violence against civilians in Cameroon's North-West and South-West regions (for 2021, 645 incidents; for 2022, 293 incidents; for 2023, 206 incidents). Of these, 586 incidents or 51 percent are coded as incidents with "civilian targeting", i.e. incidents where civilians are reported to be the main or only target.[125]

*Gender-Based and Sexual Violence*

Sexual harassment is reportedly "widespread"[126] in Cameroon. "Women, girls, and boys are most often the most vulnerable to sexual violence."[127] Additionally, issues such as "discrimination against women" and "domestic violence" are described as "endemic"[128]

---

[120] CAMEROON, FIRST QUARTER 2024: Update on incidents according to the Armed Conflict Location & Event Data Project (ACLED), ACLED, May 08, 2024, https://www.ecoi.net/en/file/local/2109641/2024q1Cameroon_en.pdf, (last visited November 15, 2024).
[121] CAMEROON, SECOND QUARTER 2024: Update on incidents according to the Armed Conflict Location & Event Data Project (ACLED), August 07, 2024, https://www.ecoi.net/en/file/local/2113480/2024q2Cameroon_en.pdf, (last visited December 11, 2024).
[122] CAMEROON, YEAR 2023: Update on incidents according to the Armed Conflict Location & Event Data Project (ACLED), ACLED, April 08, 2024, https://www.ecoi.net/en/file/local/2107093/2023yCameroon_en.pdf, (last visited November 15, 2024).
[123] World Report 2024 – Cameroon – Human Rights Watch, January 11, 2024, https://www.hrw.org/world-report/2024/country-chapters/cameroon, (last visited on July 19, 2024).
[124] 2022 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, March 20, 2023, https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/cameroon/, (last visited July 31, 2024).
[125] Cameroon: The Cameroon Anglophone Crisis (2021 – 2023), Austrian Centre for Country of Origin and Asylum Research and Documentation, pg. 8, January 08, 2024, https://www.ecoi.net/en/file/local/2102908/a-12289.pdf, (last visited on July 31, 2024).
[126] 2023 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, April 23, 2024, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/cameroon/, (last visited on July 18, 2024).
[127] Child Protection Annual Report: 2022, Danish Refugee Council, pg. 18, Last updated July 07, 2023, https://reliefweb.int/report/cameroon/child-protection-annual-report-2022, (last visited September 06, 2024).
[128] Cameroon: Information on domestic violence, including laws; support services available to victims, including mental health services; impact of COVID-19; state protection (2020–April 2022) [CMR201035.F], Immigration and

---

TPS Considerations: The Republic of Cameroon                                              16

with issues such as feminicide reportedly on the rise.[129] Moreover, although sexual assault in general is criminalized, spousal rape is not addressed by the law.[130] Furthermore, country conditions reporting indicates that "customary beliefs and traditions are the most powerful drivers of GBV [ gender-based violence],"[131] and that "[c]ultural and environmental factors continue to hinder both the reporting of GBV incidents (especially those involving children) and participation in GBV risk mitigation and response interventions."[132]

For instance, in May 2024, the Global Protection Cluster, a coalition of nongovernmental agencies, reported:

> Human rights violations and abuses persisted with 80% of gender-based violence being perpetrated against internally displaced persons. Protection monitoring reports highlighted that women and girls were more prone and targeted for GBV type of crimes including sexual crimes, as evidenced by the number of cases reported, including physical assaults. Crimes of rape ranked quite high at 25% followed by the denial of resources. These crimes were mostly perpetrated against local populations by the NSAG as witnessed by cases of kidnappings/abductions of local community members. . . The NSAGs modus operandi remains the same. . .[133]

In April 2024, the Global Protection Cluster also reported:

> The Protection needs are arduous, especially for women and girls, who still lack adequate protection and access to basic services, and are at risk of violence, abduction, rape, gender-based violence, forced and child marriage, and other violations of their rights. . . Gender-based violence contributes to health issues, causes physical injuries, hypertension, sexually transmitted infections, unwanted pregnancies, abortion and even death. Many women and girls have had to make

---

Refugee Board of Canada, June 01, 2022, https://www.ecoi.net/en/document/2077036.html (last visited on July 29, 2024).

[129] Cameroon; Sexual and gender-based violence (SGBV) against women, including prevalence, legislation, availability of state protection, access to support services, in particular in Yaoundé [Q65-2023], European Union Agency for Asylum, pg. 2, December 04, 2023, https://www.ecoi.net/en/file/local/2101762/2023_11_EUAA_COI_Query_Response_Q65_Cameroon_SGBV.pdf, (last visited July 30, 2024).

[130] Women victims of rape: legal framework and treatment by society, European Union Agency for Asylum, pg. 3, January 11, 2024, https://www.ecoi.net/en/file/local/2103238/2024_01_EUAA_COI_Query_Response_Q2_Cameroon_Women_Victims_of_Rape.pdf, (last visited July 30, 2024).

[131] Protection Sector Strategy: Cameroon, Global Protection Cluster, pg. 14, April 2024, https://globalprotectioncluster.org/sites/default/files/2024-05/protection_sector_strategy_cameroon_2024-2026_april_2024.pdf. (last visited November 18, 2024).

[132] PROTECTION CLUSTER NWSW MONTHLY UPDATE, Global Protection Cluster, July 2024, https://globalprotectioncluster.org/sites/default/files/2024-10/monthly_update_july_2024.pdf, (last visited November 18, 2024).

[133] Protection Cluster Key Updates - NWSW Cameroon July 2023 - February 2024, Global Protection Cluster, May 15, 2024, https://globalprotectioncluster.org/sites/default/files/2024-05/protection_cluster_key_updates_-_nwsw_cameroon_july23_-_feb24.pdf, (last visited November 18, 2024).

significant changes in their daily lives due to the fear of violence. They alter their clothing, avoid certain areas, and restrict their activities. This leads to a decrease in women's participation in community activities. . . GBV is rarely reported largely due to the resultant stigma and discrimination faced by the survivors. . . As the crisis protracts and the security situation deteriorates further, thousands of women and girls continue to suffer, and as they perform their domestic chores, fetching firewood and forced to go outside their settlements. Many have reported being attacked and sexually molested by unidentified armed men. Survivors of GBV decry persistent gaps in livelihoods, food security and supply, access to justice, and medical services in some locations. Empirical evidence shows that women and girls have been the most targeted in incidents of abductions, forced/child marriages. GBV has been prevalent during the insurgency in Cameroon and has disproportionately affected women and girls because of their gender. [134]

Moreover, during the current reporting period, by November 2023, there were reportedly nearly sixty cases of femicide that had occurred within Cameroon,[135] twenty of which occurred within less than a two-month span.[136] In a September 2024 report, the United Nations noted that Cameroon faces "significant data gaps and inconsistence in homicide records."[137] However, it is imperative to note that women and girls are not the only ones impacted by sexual violence as, "Sexual and Gender-Based Violence (41 incidents) were the top three reported incidents. 64.4% of the victims were male (including boys), while 35.6% were female (including girls)."[138]

Furthermore, "a 2023 report by the UNOCHA, women are the main victims of GBV, including rape, 'due to the combined effect of preexisting cultural and traditional discriminatory norms and practices, gender discrimination and socio-economic vulnerability caused by the crisis [in the Northwest and Southwest]'."[139] In November 2023, a query response from the EUAA addressing sexual and gender-based violence noted the following:

---

[134] Protection Sector Strategy: Cameroon, Global Protection Cluster, pg. 10, 14, April 2024, https://globalprotectioncluster.org/sites/default/files/2024-05/protection_sector_strategy_cameroon_2024-2026_april_2024.pdf, (last visited November 18, 2024).
[135] Concerns over growing femicide in Africa, Deutsche Welle, December 13, 2023, https://www.dw.com/en/the-77-percent-concerns-over-systematic-killing-of-women-by-their-partners/audio-67713683, (last visited November 14, 2024).
[136] "Our goal is not to divide men and women," Deutsche Welle, May 05, 2023, https://www.dw.com/fr/cameroun-stop-f%C3%A9minicides-viviane-tathi/audio-65572673, (last visited November 14, 2024).
[137] Addressing Homicide: How Cameroon is Closing the Data Gap, United Nations Department of Economic and Social Affairs, September 03, 2024, https://unstats.un.org/UNSDWebsite/capacity-development/data-for-now/story-details/how-cameroon-closing-data-gap, (last visited November 14, 2024).
[138] Brief report on the protection of civilians living under protracted conflict in the Northeast and Southwest regions of the country (covering July 2023 to February 2024), Global Protection Cluster, May 15, 2024, https://www.ecoi.net/en/document/2109156.html, (last visited November 18, 2024).
[139] Cameroon: Women victims of rape: legal framework and treatment by society, European Union Agency for Asylum, pg. 4, https://www.ecoi.net/en/file/local/2103238/2024_01_EUAA_COI_Query_Response_Q2_Cameroon_Women_Victims_of_Rape.pdf, January 11, 2024, (last visited on November 14, 2024).

In May 2022. . . domestic violence and femicides were 'on the rise, but under-reported'. . . As of 2022, there was no specific domestic legislation tackling violence against women. . . [[D]ue to the lack of a specific legislation to address domestic violence, victims had 'little recourse for protection' and there were no provisions to issue orders against abusers. Furthermore, police tended to see domestic violence as a 'private matter.' . .[I]n spite of gender equality provided for by the Constitution, women were not always granted their full rights due to 'traditional legal values and practices'. Sources reported that perpetrators of domestic violence and rape were 'rarely prosecuted.'[140]

Meanwhile, a January 2024 query response from the EUAA further elaborated that:

[I]n the Far North region, most cases of sexual assault are not reported because they are committed by soldiers and important men in the community. . .Many women are afraid to denounce sexual assault or file a judicial complaint for rape and sexual assault because of fear of persecution from the society, death threats and abuse of authority by the military officers.[141]

In January 2024, Cameroon saw a resurgence of the #MeToo movement, when dozens of women and men reported sexual violence being perpetuated by a prominent businessman.[142]  Moreover, a survey regarding gender-based violence in Cameroon published by Afrobarometer, a non-profit, non-partisan survey research network,[143]in November 2024, determined:

GBV continues to be a threat for many Cameroonian women, especially in the country's anglophone Northwest and Southwest regions battered by armed conflict between separatists and government forces. . .[A]bout half of citizens say violence against women and girls is a common occurrence in their community, and GBV ranks as the second-most-important women's-rights issue requiring government and societal action. A slim majority see domestic violence as a criminal matter requiring police involvement, rather than a family matter. Yet a clear majority endorse men's use of physical force against their wives.[144]

---

[140] Sexual and gender-based violence (SGBV) against women, including prevalence, legislation, availability of state protection, access to support services, in particular in Yaoundé, European Union Agency for Asylum, pgs. 2-4, November 28, 2023,
https://www.ecoi.net/en/file/local/2101762/2023_11_EUAA_COI_Query_Response_Q65_Cameroon_SGBV.pdf, (last visited December 11, 2024).
[141] Women victims of rape: legal framework and treatment by society, European Union Agency for Asylum, pg. 5, January 11, 2024,
https://www.ecoi.net/en/file/local/2103238/2024_01_EUAA_COI_Query_Response_Q2_Cameroon_Women_Victims_of_Rape.pdf, (last visited September 06, 2024).
[142] Cameroon's #MeToo Moment, Human Rights Watch, February 01, 2024,
https://www.hrw.org/news/2024/02/01/cameroons-metoo-moment, (last visited November 18, 2024).
[143] About, Afrobarometer, https://www.afrobarometer.org/about/, 2024 (last visited December 11, 2024).
[144] Cameroonians see gender-based violence as a key women's-rights issue but tolerate use of physical force against wives, Afrobarometer, Dispatch No. 893, November 01, 2024, https://www.afrobarometer.org/wp-content/uploads/2024/11/AD893-Cameroonians-see-gender-based-violence-as-a-key-womens-rights-issue-Afrobarometer-30oct24.pdf, (last visited November 15, 2024).

Finally, although it is illegal,[145] and not thought to be a frequent occurrence, female genital mutilation and/or cutting (FGM/C) does occur within Cameroon and impacts "approximately 2% of women aged 15-49"[146] throughout the country; however, it is more prevalent in the "Far North, South West, North West and the Centre regions."[147] It is believed that in regions where it is more prevalent, "approximately 20%"[148] of women and girls have been subjected to the practice. Another form of gender-based violence is, breast ironing.[149] Breast ironing is believed to still be practiced in rural communities.[150] However, there are some estimates that "25 to 50 percent of girls in Cameroon. . . are affected by the practice."[151]

*The LGBTQIA+ Community*

Same-sex relationships are criminalized in Cameroon.[152] According to the EUAA, the government of Cameroon not only enforced these laws, but they failed to provide protection for members of the LGBTQIA+ community, and in some instances inflicted harm.[153] Furthermore, according to the Bertelsmann Stiftung country report on Cameroon

---

[145] Cameroon: Female Genital Mutilation (FGM): legislation; prevalence; societal attitudes; possibility to refuse FGM and consequences for refusal; availability of state protection; access to support services, European Union Agency for Asylum, pg.3, October 05, 2023, https://www.ecoi.net/en/file/local/2098393/2023_10_EUAA_COI_Query_Response_Q48_Cameroon_Female_Genital_Mutilation.pdf, (last visited July 31, 2024).

[146] 2022 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, March 21, 2023, https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/cameroon/, (last visited July 31, 2024).

[147] Cameroon: Female Genital Mutilation (FGM): legislation; prevalence; societal attitudes; possibility to refuse FGM and consequences for refusal; availability of state protection; access to support services, European Union Agency for Asylum, pg.3, October 05, 2023, https://www.ecoi.net/en/file/local/2098393/2023_10_EUAA_COI_Query_Response_Q48_Cameroon_Female_Genital_Mutilation.pdf, (last visited July 31, 2024).

[148] Cameroon: Female Genital Mutilation (FGM): legislation; prevalence; societal attitudes; possibility to refuse FGM and consequences for refusal; availability of state protection; access to support services, European Union Agency for Asylum, pg.3, October 05, 2023, https://www.ecoi.net/en/file/local/2098393/2023_10_EUAA_COI_Query_Response_Q48_Cameroon_Female_Genital_Mutilation.pdf, (last visited July 31, 2024).

[149] Breast ironing: a harmful practice that doesn't get sufficient attention, The Conversation, May 02, 2019, https://theconversation.com/breast-ironing-a-harmful-practice-that-doesnt-get-sufficient-attention-116206, (last visited November 18, 2024).

[150] 2023 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, April 23, 2024, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/cameroon/, (last visited November 18, 2024).

[151] 'It's evil': Breast ironing leaves long-term scars for women in Nigeria, Al Jazeera, July 30, 2024, https://www.aljazeera.com/features/2024/7/30/its-evil-breast-ironing-leaves-long-term-scars-for-women-in-nigeria, (last visited November 18, 2024).

[152] World Report 2024 – Cameroon, Human Rights Watch, January 11, 2024, https://www.hrw.org/world-report/2024/country-chapters/cameroon, (last visited on July 19, 2024).

[153] Situation of LGBTIQ persons; legislation and implementation; treatment by state; treatment by society; availability of state protection; access to support services, European Union Agency for Asylum, pg. 4, January 31, 2024, https://www.ecoi.net/en/file/local/2103883/2024_01_EUAA_COI_Query_Response_Q8_Cameroon_LGBTIQ.pdf, (last visited July 25, 2024).

---

TPS Considerations: The Republic of Cameroon

published in March 2024, the government of Cameroon's treatment of the LGBTQIA+ community consisted of engaging in "prosecuting them more aggressively than any country in the world."[154] This continued throughout 2023,[155] even despite the president's own daughter "coming out."[156]  According to Human Rights Watch, security forces have often treated victims of LGBTQIA+ related antagonism as perpetrators and have "instead arrest[ed] victims."[157] The 2023 U.S. Department of State Country Report on Human Rights Practices for Cameroon further elaborated:

> Consensual same-sex sexual activity between adults was illegal and punishable with imprisonment from six months to five years plus a fine. The government enforced the law. Police often detained LGBTQI+ individuals based solely on their perceived sexual orientation, gender identity, or gender expression, including individuals who had sought police assistance after being the victims of violent crimes. . . LGBTQI+ human rights organizations continued to report arbitrary arrests of LGBTQI+ persons. LGBTQI+ individuals faced significant stigma and violence from their families, communities, and the government, including police. Security forces sometimes harassed, detained, and assaulted persons based on their perceived sexual orientation or gender identity, including individuals found with condoms and lubricants.[158]

The same report also noted that members of the LGBTQIA+ community additionally experienced harm from non-state actors in 2023:

> The LGBTQI+ rights NGO Colibri reported between January and March, it identified 129 cases of nonstate actor violence and harassment, including withholding of paychecks, psychological abuse, family rejection, and physical violence in the form of battery, assault, and rape. In one case, an LGBTQI+ individual was reportedly encouraged by his family to commit suicide, although he did not do so. In a video obtained by human rights activists through social media, a member of the LGBTQI+ community was shown cowering in the corner of a small room while unknown persons off-camera hurled blocks of concrete at him...

> In January, NGO Humanity First Cameroon reported an attack on a gay man after he agreed to meet a man who claimed to be a contact from an LGBTQI+ group on a mobile messaging platform. When he arrived, he was attacked by the man and three

---

[154] BTI 2024 Country Report Cameroon, March 19, 2024, pg. 13, https://www.ecoi.net/en/file/local/2105824/country_report_2024_CMR.pdf  (last visited August 16, 2024).
[155] BTI 2024 Country Report Cameroon, March 19, 2024, pg. 23, Bertelsmann Stiftung, https://www.ecoi.net/en/file/local/2105824/country_report_2024_CMR.pdf  (last visited August 16, 2024).
[156] President's daughter hopes coming out will change anti-gay laws, BBC News, July 10, 2024, https://www.bbc.com/news/articles/c1we656754eo, (last visited September 06, 2024.)
[157] Cameroon: Rising Violence Against LGBTI People, Human Rights Watch, May 11, 2022, https://www.hrw.org/news/2022/05/11/cameroon-rising-violence-against-lgbti-people, (last visited July 22, 2024).
[158] 2023 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, April 23, 2024, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/cameroon/, (last visited on July 18, 2024).

App.148-CASA

others who robbed him, stripped him, and made him admit to being gay on video, which was then disseminated to his family and friends.

Anecdotal reports indicated some members of the LGBTQI+ community were survivors of "corrective rape," forced marriage, and forced pregnancies to compel them to change their sexual orientation or gender identity. Family members of LGBTQI+ individuals also reportedly enlisted traditional healers and psychologists to coerce LGBTQI+ individuals into abandoning their sexual orientation.[159]

*Displaced Persons*

As of the end of 2023, Cameroon had over two million forcibly displaced people,[160] out of an estimated population of 28,372,687.[161] A January 2024 report from ACCORD highlighted, in part, the displacement that has been exacerbated because of the ongoing Anglophone crisis:

Various sources report on mass-displacement due to violence and insecurity caused by the crisis in Cameroon's North-West and South-West. . . UNHCR reported on 638.421 internally displaced persons in the Anglophone regions as of 30 September 2023. . . Amnesty International reported on additional "87,000 people [being displaced] to neighbouring Nigeria, representing 20% of the total population of the two Anglophone regions. . . The crisis has led to a pattern of pendular displacement, where individuals, depending on perceived threats, either move to urban areas or hide in the bush, frequently shifting between their homes and places of refuge. . . Many of the displaced are reported to seek refuge in Douala, the country's economic hub. These displaced individuals face numerous challenges in adapting to city life, often staying with relatives or friends while seeking employment and more suitable housing.[162]

---

[159] 2023 Country Report on Human Rights Practices: Cameroon, U.S. Department of State, April 23, 2024, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/cameroon/, (last visited on July 18, 2024).
[160] Protection Sector Strategy: Cameroon, Global Protection Cluster, pg. 03, April 2024, https://globalprotectioncluster.org/sites/default/files/2024-05/protection_sector_strategy_cameroon_2024-2026_april_2024.pdf., (last visited November 18, 2024).
[161] Population, Cameroon, World Health Organization, May 15, 2024,https://data.who.int/countries/120, (last visited December 11, 2024).
[162] Cameroon: The Cameroon Anglophone Crisis (2021 – 2023), Austrian Centre for Country of Origin and Asylum Research and Documentation, pgs. 13-14, January 08, 2024, https://www.ecoi.net/en/file/local/2102908/a-12289.pdf, (last visited on July 24, 2024).

Furthermore, according to a March 2022 International Crisis Group report, "women and girls make up most of the displaced."[163] This remained consistent as of June 2024[164] and through the current reporting period. In addition, it has been reported that "internally displaced persons and refugees are primarily affected by human trafficking."[165] Moreover, a March 2024 query response from the EUAA further elaborated that, "Internally displaced persons (IDPs) were reported to experience 'an apparent rise' in being trafficked for labor or domestic work. The unstable economic situation of IDPs and their limited possibilities to resort to formal justice were among the reasons why traffickers exploited them."[166] An October 2023 query response from the EUAA also addressed the security situation and displacement in the Far North, North West and South West regions and indicated that:

> [I]n the Far North [region], the number of IDPs increased by 11% between August 2022 and February 2023 due to the floods and the conflict between the military and non-state armed groups. The conflict remained the main reason for displacement, accounting for 87 % of the internal displacement since 2014, according to UNOCHA. . .internal displacement since 2014, according to UNOCHA.
>
> The same source added that, in March 2023, multiple fire incidents struck IDP and refugee sites in the Far North region, causing deaths and shelter destruction. The causes are unknown, but factors like shelter materials and heat during the dry season aggravated the situation. As of July 2023, 3, 655 persons were displaced in the in the NWSW regions due to violence, 'with Meme, Manyu and Fako divisions in the SW and Mezam and Bui divisions in the NW recording the highest number of displacements.' Violence forced around 15,000 people to temporarily flee their homes between January and March 2023, seeking shelter and safety in nearby bushes, villages, and towns.[167]

UNOCHA previously estimated that approximately one million people were internally displaced in Cameroon, with more than half of that number being from the Anglophone

---

[163] Women are suffering in Cameroon's war, but they also hold the key to peace, International Crisis Group, March 09, 2022, https://www.crisisgroup.org/africa/central-africa/cameroon/women-are-suffering-cameroons-war-they-also-hold-key-peace, (last visited July 23, 2024).

[164] Displaced women in Cameroon are rebuilding their lives, Norwegian Refugee Council, June 10, 2024, https://www.nrc.no/perspectives/2024/displaced-women-in-cameroon-are-rebuilding-their-lives/#:~:text=Clashes%20in%20the%20Northwest%20and,these%20regions%20deteriorated%20in%202023, (last visited November 14, 2024).

[165] Trafficking in Human Beings (THB), European Union Agency for Asylum, pg.4, March 18, 2024, https://www.ecoi.net/en/file/local/2105658/2024_03_EUAA_COI_Query_Response_Q24_Cameroon_Trafficking_in_human_beings_THB.pdf, (last visited July 22, 2024).

[166] Trafficking in Human Beings (THB), European Union Agency for Asylum, pg.4, March 18, 2024, https://www.ecoi.net/en/file/local/2105658/2024_03_EUAA_COI_Query_Response_Q24_Cameroon_Trafficking_in_human_beings_THB.pdf, (last visited July 22, 2024).

[167] Security situation in the Far North, Northwest and Southwest regions, European Union Agency for Asylum, pg.9, October 11, 2023, https://coi.euaa.europa.eu/administration/easo/PLib/2023_10_EUAA_COI_Query_Response_Q44_Cameroon_Security_situation.pdf, (last visited July 22, 2024).

regions alone,[168] and some of those individuals have been displaced on multiple occasions.[169] Displacement has not been limited to the conflict within the Anglophone regions. However, that conflict has led to displacement within Francophone regions, particularly due to the disruption of the education system.[170] According to the Danish Refugee Council, a great deal of those displaced are "unaccompanied and separated children."[171]  At the end of 2023, there were over 796,000 people forcibly displaced in the Far North, an increase from the 607,000 who were forcibly displaced the previous year.[172]

Moreover, displacement has been prevalent within the Far North region due in part to "insecurity caused by the non-state armed groups, counterinsurgency, and seasonal natural disasters"[173] In January 2024, there remained an estimated 450,000 IDPs in the Far North region.[174]  In early 2024, fires throughout the Far North region further "devastated several settlements for internally displaced persons."[175] In addition to the fires throughout the Far North region, according to UNICEF, as of September 2024, 365,000 thousand individuals were impacted by heavy rains and flooding,[176] which impacted, "access to education"[177]

---

[168] Cameroon: Anglophone Regions: Security Situation, Office of the Commissioner General for Refugees and Stateless Persons (Belgium), pg. 27, February 20, 2023, https://www.ecoi.net/en/file/local/2102302/COI_Focus_Cameroun_R%C3%A9gions_anglophones_Situation_s%C3%A9curitaire_20230220.pdf, (last visited July 30, 2024).
[169] Cameroon: Anglophone Regions: Security Situation, Office of the Commissioner General for Refugees and Stateless Persons (Belgium), pg. 28, February 20, 2023, https://www.ecoi.net/en/file/local/2102302/COI_Focus_Cameroun_R%C3%A9gions_anglophones_Situation_s%C3%A9curitaire_20230220.pdf, (last visited July 30, 2024).
[170] Cameroon: Anglophone Regions: Security Situation, Office of the Commissioner General for Refugees and Stateless Persons (Belgium), pg. 29, February 20, 2023, https://www.ecoi.net/en/file/local/2102302/COI_Focus_Cameroun_R%C3%A9gions_anglophones_Situation_s%C3%A9curitaire_20230220.pdf, (last visited July 30, 2024).
[171] Child Protection Annual Report: 2022, Danish Refugee Council, pg. 10, Last updated July 07, 2023, https://reliefweb.int/report/cameroon/child-protection-annual-report-2022, (last visited September 05, 2024).
[172] Protection Sector Strategy: Cameroon, Global Protection Cluster, pg. 04, April 2024, https://globalprotectioncluster.org/sites/default/files/2024-05/protection_sector_strategy_cameroon_2024-2026_april_2024.pdf., (last visited November 18, 2024)
[173] Analysis of Forcibly Displaced Persons in Far North Cameroon - February 2024, Global Protection Cluster & UN Office for the Coordination of Humanitarian Affairs (UNOCHA), Last updated on May 15, 2024, https://globalprotectioncluster.org/index.php/publications/1864/communication-materials/analysis-forcibly-displaced-persons-far, (last visited September 06, 2024).
[174] Analysis of Forcibly Displaced Persons in Far North Cameroon - February 2024, Global Protection Cluster & UN Office for the Coordination of Humanitarian Affairs (UNOCHA), Last updated on May 15, 2024, https://globalprotectioncluster.org/index.php/publications/1864/communication-materials/analysis-forcibly-displaced-persons-far, (last visited September 06, 2024).
[175] Cameroon: Situation Report, UN Office for the Coordination of Humanitarian Affairs (UNOCHA), Lasted updated June 10, 2024, https://reports.unocha.org/en/country/cameroon/, (last visited September 04, 2024).
[176] UNICEF Cameroon Humanitarian Flash Update No. 3 (Floods Far North) 25 September 2024, UNICEF, https://reliefweb.int/report/cameroon/unicef-cameroon-humanitarian-flash-update-no-3-floods-far-north-25-september-2024, (last visited November 15, 2024).
[177] UNICEF Cameroon Humanitarian Flash Update No. 3 (Floods Far North) 25 September 2024, UNICEF, https://reliefweb.int/report/cameroon/unicef-cameroon-humanitarian-flash-update-no-3-floods-far-north-25-september-2024, (last visited November 15, 2024).

TPS Considerations: The Republic of Cameroon                                                     24

and "heighten[ed] the risk of cholera and other waterborne diseases, as well as malaria,"[178] resulting in over 25,000 people being displaced.[179]

### *Humanitarian Conditions (Including Education, Healthcare Security, Health Conditions, & Food Insecurity)*

According to "the United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), the education and health sectors are most affected by the security situation."[180] Additionally, all efforts made thus far for peace have fallen through, despite attempts made by the "United Nations, the Catholic church, and regional and international governments."[181]

*Education*

In 2017, Anglophone separatist groups instituted a boycott of schools throughout the North West and South West regions, a boycott that continued into 2023[182] despite some separatist groups reportedly ending the boycott in 2020.[183] It has been estimated that since the start of the Anglophone crisis, "over 700,000 children in Cameroon's two Anglophone regions have had their education disrupted."[184] Specifically, the targeting of schools by

---

[178] UNICEF Cameroon Humanitarian Flash Update No. 3 (Floods Far North) 25 September 2024, UNICEF, https://reliefweb.int/report/cameroon/unicef-cameroon-humanitarian-flash-update-no-3-floods-far-north-25-september-2024, (last visited November 15, 2024).

[179] UNICEF Cameroon Humanitarian Flash Update No. 3 (Floods Far North) 25 September 2024, UNICEF, https://reliefweb.int/report/cameroon/unicef-cameroon-humanitarian-flash-update-no-3-floods-far-north-25-september-2024, (last visited November 15, 2024).

[180] COI Focus Cameroon: Anglophone Regions: Security Situation, The Commissioner General for Refugees and Stateless Persons (Belgium), pg. 49, https://www.ecoi.net/en/file/local/2102302/COI_Focus_Cameroun_R%C3%A9gions_anglophones_Situation_s%C3%A9curitaire_20230220.pdf , (last visited July 29, 2024). This was roughly translated from French.

[181] Why the spoils of war may outweigh incentives for peace in Cameroon, The New Humanitarian, July 19, 2022, https://www.thenewhumanitarian.org/analysis/2022/07/19/Cameroon-anglophone-crisis-separatism-secession-elusive-peace, (last visited on July 29, 2024).

[182] World Report 2024 – Cameroon, Human Rights Watch, January 11, 2024, https://www.hrw.org/world-report/2024/country-chapters/cameroon, (last visited on July 19, 2024).

[183] COI Focus Cameroon: Anglophone Regions: Security Situation, The Commissioner General for Refugees and Stateless Persons (Belgium), pg. 32, https://www.ecoi.net/en/file/local/2102302/COI_Focus_Cameroun_R%C3%A9gions_anglophones_Situation_s%C3%A9curitaire_20230220.pdf , (last visited July 31, 2024).

[184] Cameroon's Anglophone conflict: Children should be able to return to school, International Crisis Group, September 20, 2022, https://www.crisisgroup.org/africa/central-africa/cameroon/cameroons-anglophone-conflict-children-should-be-able-return-school, (last visited July 24, 2024).

---

separatist groups have had a "pernicious impact on girls,"[185] as some parents have chosen to keep girls at home while sending boys to school,[186] which has resulting in girls being "vulnerable to recruitment into sex work."[187] However, for the students who have been able to attend school, they, and teachers, have been targeted for doing so. In June 2022, Human Rights Watch reported:

> Separatist fighters physically assaulted, threatened, and humiliated a group of 11 students, including at least 4 girls, aged from 14 to 18, who were on their way to the Bokova high school on January 12. They shot one of the students in the right leg and seized or destroyed the students' school material. . . On January 19, a group of seven separatist fighters attacked the government high school, in Weh at about 8:30 am, abducting five teachers, including two women, and injuring two students, one of whom was 14. . . The two teachers said that the separatist fighters, some of whom they recognized as their former students, told them that they were being kidnapped for not complying with the separatist-ordered school boycott and for not contributing financially to their struggle for independence. . . In the early morning of February 7, suspected separatist fighters burned a classroom of a government primary school. . . On April 5, another classroom of the school was burned. . . On February 11, between 2 and 2:30 a.m., separatist fighters set fire to three dormitories of an all-girls boarding secondary school.[188]

The assaults on education by separatist and extremist groups, continued throughout the current reporting period, with the Norwegian Refugee Council noting that in 2023, "1.4 million school aged children were in dire need of educational assistance."[189] UNOCHA reported in December 2022 that only "46% of schools were functional and only 54% of students were enrolled for the 2022-2023 academic year."[190] In addition to that, the Norwegian Refugee Council stated that "by the end of the 2022-23 school year, thousands of schools were closed in Cameroon"[191] due to attacks from the non-state armed groups or

---

[185] Cameroon's Anglophone conflict: Children should be able to return to school, International Crisis Group, September 20, 2022, https://www.crisisgroup.org/africa/central-africa/cameroon/cameroons-anglophone-conflict-children-should-be-able-return-school, (last visited July 24, 2024).

[186] Cameroon's Anglophone conflict: Children should be able to return to school, International Crisis Group, September 20, 2022, https://www.crisisgroup.org/africa/central-africa/cameroon/cameroons-anglophone-conflict-children-should-be-able-return-school, (last visited July 24, 2024).

[187] Cameroon's Anglophone conflict: Children should be able to return to school, International Crisis Group, September 20, 2022, https://www.crisisgroup.org/africa/central-africa/cameroon/cameroons-anglophone-conflict-children-should-be-able-return-school, (last visited July 24, 2024).

[188] Cameroon: Separatist Abuses in Anglophone Regions, Human Rights Watch, June 27, 2022, https://www.hrw.org/news/2022/06/27/cameroon-separatist-abuses-anglophone-regions, (last visited July 24, 2024).

[189] West and Central Africa: Alarming rise in school closures, Norwegian Refugee Council, September 09, 2024, https://www.nrc.no/news/2024/september/central-and-west-africa-education/, (last visited on November 14, 2024).

[190] COI Focus Cameroon: Anglophone Regions: Security Situation, The Commissioner General for Refugees and Stateless Persons (Belgium), pg. 32, https://www.ecoi.net/en/file/local/2102302/COI_Focus_Cameroun_R%C3%A9gions_anglophones_Situation_s%C3%A9curitaire_20230220.pdf , (last visited July 31, 2024).

[191] Right to Safe and Quality Education still Denied to Millions of Children in Cameroon, Norwegian Refugee Council, September 2023, https://reliefweb.int/report/cameroon/right-safe-and-quality-education-still-denied-millions-children-cameroon-september-2023, (last visited July 24, 2024).

due to teachers fleeing the violence and a lack of availability, or parents being afraid to send their children to school.[192] A 2024 report by the Global Coalition to Protect Education from Attack highlighted the following incidents:

> During the reporting period, GCPEA identified at least 54 attacks on schools in Cameroon, mostly in North-West or South-West regions. In comparison, during the previous reporting period the UN verified 18 attacks on schools in 2021 and 20 in 2020. In North-West and South-West regions, in September 2022 and 2023 there were spikes in attacks around the start of the school year, when non-state armed groups imposed a two-week lockdown to delay the start of the school year. . . In 2023, the UN reported 40 attacks on schools. . . On September 5, 2023, a primary school in Bamumka village, Ngoketunjia division, North-West region was burned; the school had recently been renovated, as reported by OCHA. Around November 23, 2023, in Soueram, Logone-et-Chari department, Far North region, an IED was reportedly detonated near a primary school.[193]

The Global Protection Cluster reported in an October 2024 situation update that:

> Attacks against education increased in the months leading up to the resumption of the new academic year in September. In the last week of August, contending NSAG factions called for different lockdowns between the 2nd and 30th of September aimed at disrupting the resumption of schools in the NWSW regions. Across the two regions, teachers and school children were attacked and abducted by NSAGs in a bid to enforce the lockdowns. In one incident in Nkambe, both school children on their way to school and traders on their way to the market were accused by NSAGs of promoting government activities and had their personal items – money, phones and school items extorted by the NSAGs.[194]

*Healthcare Security*

According to the EUAA, in November 2023, issues surrounding healthcare in Cameroon were exacerbated by the ongoing Anglophone crisis, particularly as healthcare workers in the Anglophone regions have been accused of being complicit with separatists.[195] In March 2024, the EUAA further assessed that Cameroonian security forces suspended the activities

---

[192] Right to Safe and Quality Education still Denied to Millions of Children in Cameroon, Norwegian Refugee Council, September 2023, https://reliefweb.int/report/cameroon/right-safe-and-quality-education-still-denied-millions-children-cameroon-september-2023, (last visited July 24, 2024).

[193] Education under Attack 2024; Cameroon, Global Coalition to Protect Education from Attack, 2024, https://protectingeducation.org/wp-content/uploads/eua_2024_cameroon.pdf, (last visited September 06, 2024).

[194] PROTECTION MONITORING UPDATE, July-September 2024, Global Protection Cluster, October 2024, https://globalprotectioncluster.org/sites/default/files/2024-10/pm_quarterly_update_jul-sept.pdf, (last visited November 18, 2024).

[195] Treatment of healthcare workers by the state in Northwest and Southwest (Anglophone) regions, including whether healthcare workers are perceived as part of separatist groups by the state, European Agency for Asylum, November 17, 2023, https://coi.euaa.europa.eu/administration/easo/PLib/2023_11_EUAA_COI_Query_Response_Q62_Cameroon_Treatment_of_Healthcare_Workers_by_the_State.pdf, (last visited July 22, 2024).

of groups such as Doctors Without Borders due to believing they were "complicit with separatist groups."[196] Moreover, according to Human Rights Watch:

> Humanitarian access was restricted in the Anglophone and Far-North regions and humanitarian workers have been victims of attacks by both government forces and armed groups. . . humanitarian actors continued to operate under severe constraints including repeated lockdowns, harassment at checkpoints, and the risk of improvised explosive devices by armed separatist fighters in the Anglophone regions.[197]

UNOCHA further noted, "in 2022 the number of [violent] incidents on healthcare tripled in comparison to 2021."[198]  By the end of 2023, during the current reporting period, there were at least thirty violent incidents that had taken place that year.[199] Furthermore, in August 2023, UNICEF indicated in a report that, "apart from the 'recent disease outbreaks,' 'frequent attacks on medical personnel and facilities have made effective healthcare delivery even more challenging,"[200] It has also been reported that "defence and security forces have carried out 'a campaign of reprisals' against individuals they believe support armed fighters. Humanitarian workers, and health workers were included in categories particularly targeted by violence."[201]

Additionally, healthcare providers and facilities have been subjected to harm by all parties within the conflict, including but not limited to, abductions and arbitrary arrests and detentions.[202] As recently as August 2024, humanitarian aid workers were kidnapped by

---

[196] Treatment of individuals perceived to be separatists by the state, European Union Agency for Asylum, pg.7, March 04, 2024,
https://www.ecoi.net/en/file/local/2105170/2024_03_EUAA_COI_Query_Response_Q20_Treatment_of_Individuals_Perceived_as_Separatists_by_the_State_Cameroon.pdf, (last visited on July 19, 2024).
[197] World Report 2023 – Cameroon, Human Rights Watch, January 12, 2023, https://www.hrw.org/world-report/2023/country-chapters/cameroon, (last visited July 16, 2024).
[198] Cameroon: Situation Report, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA),pg. 2, October 26, 2023, https://www.unocha.org/attachments/4cace29e-c28c-4a18-a205-7834a5a63f88/Situation Report - Cameroon - 2 Oct 2023.pdf, (last visited July 23, 2024).
[199] Cameroon: Violence Against Health Care in Conflict 2023, Insecurity Insight and Safeguarding Health in Conflict, September 05, 2024, https://insecurityinsight.org/wp-content/uploads/2024/08/Cameroon-2023-SHCC-Press-Release.pdf, (last visited November 14, 2024).
[200] Humanitarian Situation Report No. 2 - Reporting Period 1 January to 30 June 2023, United Nations Children's Fund (UNICEF), August 22, 2023, https://www.unicef.org/media/144176/file/Cameroon-Humanitarian-SitRepMid-Year-2023.pdf, (last visited November 14, 2024).
[201] Treatment of healthcare workers by the state in Northwest and Southwest (Anglophone) regions, including whether healthcare workers are perceived as part of separatist groups by the state, European Union Agency for Asylum, pg. 04, December 01, 2023,
https://www.ecoi.net/en/file/local/2100804/2023_11_EUAA_COI_Query_Response_Q62_Cameroon_Treatment_of_Healthcare_Workers_by_the_State.pdf, (last visited November 14, 2024).
[202] Impact of the conflict on availability and accessibility of healthcare facilities in the Southwest region, European Union Agency for Asylum, November 14, 2023,
https://www.ecoi.net/en/file/local/2100578/2023_11_EUAA_COI_Query_Response_Q39_Cameroon_Access_to_healthcare.pdf, (last visited November 14, 2024).

separatist groups after being accused of "encouraging voter registration for the upcoming presidential elections."[203]

*Health Conditions*

According to the EUAA, other issues related to health have also been exacerbated by the ongoing Anglophone crisis, for instance, mental health issues and substance abuse.[204] Specifically, "mental health conditions go undiagnosed and untreated due to prevailing societal norms relating to mental health issues."[205] Furthermore, "very little medical care" is available for individuals with mental health related issues[206] and "mental health issues in Cameroon were seen as connected to witchcraft and people affected by them faced stigmatization and were rejected by society"[207] or even abandoned by their families.[208]

---

[203] PROTECTION MONITORING UPDATE, July-September 2024, Global Protection Cluster, October 2024, https://globalprotectioncluster.org/sites/default/files/2024-10/pm_quarterly_update_jul-sept.pdf, (last visited November 18, 2024).

[204] Situation of individuals with mental health issues in Northwest and Southwest (Anglophone) regions; treatment by state and non-state actors and by society; availability of state protection, European Union Agency for Asylum, pg.2, December 08, 2023, https://www.ecoi.net/en/file/local/2102335/2023_11_EUAA_COI_Query_Response_Q68_Cameroon_Mental+health+issues.pdf, (last visited July 23, 2024).

[205] Situation of individuals with mental health issues in Northwest and Southwest (Anglophone) regions; treatment by state and non-state actors and by society; availability of state protection, European Union Agency for Asylum, pg.3, December 08, 2023, https://www.ecoi.net/en/file/local/2102335/2023_11_EUAA_COI_Query_Response_Q68_Cameroon_Mental+health+issues.pdf, (last visited July 23, 2024).

[206] Situation of individuals with mental health issues in Northwest and Southwest (Anglophone) regions; treatment by state and non-state actors and by society; availability of state protection, European Union Agency for Asylum, pg.5, December 08, 2023, https://www.ecoi.net/en/file/local/2102335/2023_11_EUAA_COI_Query_Response_Q68_Cameroon_Mental+health+issues.pdf, (last visited July 23, 2024).

[207] Situation of individuals with mental health issues in Northwest and Southwest (Anglophone) regions; treatment by state and non-state actors and by society; availability of state protection, European Union Agency for Asylum, pg.8, December 08, 2023, https://www.ecoi.net/en/file/local/2102335/2023_11_EUAA_COI_Query_Response_Q68_Cameroon_Mental+health+issues.pdf, (last visited July 23, 2024).

[208] Situation of individuals with mental health issues in Northwest and Southwest (Anglophone) regions; treatment by state and non-state actors and by society; availability of state protection, European Union Agency for Asylum, pg.8, December 08, 2023, https://www.ecoi.net/en/file/local/2102335/2023_11_EUAA_COI_Query_Response_Q68_Cameroon_Mental+health+issues.pdf, (last visited July 23, 2024).

App.156-CASA

In addition to that, UNOCHA noted that a cholera outbreak that started in October 2021 and continued into 2022 had spread to six of Cameroon's ten regions.[209] In March 2023, EUAA noted that the cholera cases had continued to increase.[210] In November 2023, the International Federation of Red Cross and Red Crescent Societies (IFRC) further reported that cholera had spread to all regions of the country.[211] In October 2024, UNICEF reported, "Due to the lack of access to water, hygiene and sanitation services throughout the country and the existence of a cholera epidemic in. . .Cameroon, the risk of an epidemic in [neighboring] Chad is high."[212] In October 2024, the World Health Organization reported that "the global stockpile of Oral Cholera Vaccine (OCV) is depleted, with no remaining doses available. Although more doses are expected in the coming weeks [as of Oct. 18, 2024], this shortage poses significant challenges to outbreak response efforts and hampers efforts to control the spread of the disease."[213] In November 2024, the European Commission's Directorate General for European Civil Protection and Humanitarian Aid Operations (ECHO) indicated that the cholera outbreak had continued.[214]

Furthermore, according to a May 2024 query response from the EUAA, approximately "half a million people in Cameroon are HIV positive."[215] The "most affected regions are South, East, Adamawa, North-West, South-West, and Centre."[216] An HIV positive diagnosis often comes with stigmatization, discrimination, and a lack of resources in rural communities.[217]

---

[209] Brief report on the humanitarian situation (covering March and April 2022), UN Office for the Coordination of Humanitarian Affairs (UNOCHA), May 12, 2022, https://www.ecoi.net/en/file/local/2073332/cameroon_humanitarian_bulletin_marchapril_2022_vf.pdf, (last visited November 14, 2024).

[210] Security situation in the Far North, Northwest and Southwest regions, European Union Agency for Asylum, pg.9, October 11, 2023, https://coi.euaa.europa.eu/administration/easo/PLib/2023_10_EUAA_COI_Query_Response_Q44_Cameroon_Security_situation.pdf, (last visited July 22, 2024).

[211] Cameroon: Cholera & Monkeypox, DREF Final Report (MDRCM032), International Federation of Red Cross and Red Crescent Societies (IFRC), November 27, 2023, https://reliefweb.int/report/cameroon/cameroon-cholera-monkeypox-dref-final-report-mdrcm032, (last visited November 15, 2024).

[212] UNICEF Chad Flash Update No. 3 (Floods) - 02 October 2024, UNICEF, October 03, 2024, https://reliefweb.int/report/chad/unicef-chad-flash-update-no-3-floods-02-october-2024, (last visited November 15, 2024).

[213] Multi-country outbreak of cholera, External Situation Report n. 19, published 18 October 2024, World Health Organization, October 18, 2024, https://www.who.int/docs/default-source/coronavirus/situation-reports/20241008_multi-country_outbreak-of-cholera_sitrep_-19.pdf?sfvrsn=be9f29ce_3, (last visited November 14, 2024).

[214] Cameroon - Cholera outbreak (DG ECHO, Ministry of Health) (ECHO Daily Flash of 12 November 2024), November 12, 2024, https://erccportal.jrc.ec.europa.eu/ECHO-Products/Echo-Flash#/daily-flash-archive/5212, (last visited November 15, 2024).

[215] Cameroon; Treatment by society of people with HIV/AIDS in Cameroon [Q30-2024], European Union Agency for Asylum, pg.2, May 22, 2024, https://www.ecoi.net/en/file/local/2109580/2024_05_EUAA_COI_Query_Response_Q30_Cameroon_Treatment_of_people_with_HIV_AIDS.pdf, (last visited September 06, 2024).

[216] Cameroon; Treatment by society of people with HIV/AIDS in Cameroon [Q30-2024], European Union Agency for Asylum, pg.2, May 22, 2024, https://www.ecoi.net/en/file/local/2109580/2024_05_EUAA_COI_Query_Response_Q30_Cameroon_Treatment_of_people_with_HIV_AIDS.pdf, (last visited September 06, 2024).

[217] Cameroon; Treatment by society of people with HIV/AIDS in Cameroon [Q30-2024], European Union Agency for Asylum, pgs. 2-3, May 22, 2024,

---

Finally, in August 2024, Cameroon was identified as one of the several countries impacted by not only the ongoing monkey pox outbreak currently occurring throughout Africa, but as one of the countries impacted by a new variant of Mpox (monkey pox).[218]

*Food Insecurity[219]*

A February 2024 report from the World Food Programme stated that in Cameroon "between October-December 2023, 2.9 million people were severely food-insecure, similar to data in 2022."[220] Food insecurity is also reportedly an issue due to the ongoing Anglophone crisis, as separatist groups imposed "lockdowns which reduced access to basic products, such as fish."[221]

In October 2023, UNOCHA corroborated that "severe acute malnutrition and high rates of stunting in conflict areas, including the Far North and the NWSW regions."[222] The numbers of Cameroonians experiencing food insecurity remained consistent throughout 2023.[223] Furthermore, it is estimated that "1.6 million of the 3 million individuals facing acute food insecurity in Cameroon, reside in the Far North region."[224] The Far North region also suffers from "water scarcity" and has been "marked as water insecure per the United Nations.[225]

---

https://www.ecoi.net/en/file/local/2109580/2024_05_EUAA_COI_Query_Response_Q30_Cameroon_Treatment_of_people_with_HIV_AIDS.pdf, (last visited September 06, 2024).

[218] Mapped: New mpox cases reported. What countries have it now?, Al Jazeera, August 22, 2024, https://www.aljazeera.com/news/2024/8/22/mapped-which-countries-have-reported-mpox-cases-so-far, (last visited November 15, 2024).

[219] May 2022 reporting from UNOHCA predicted that the Russian-Ukraine conflict, which broke out in February 2022, would have repercussions for Cameroon, including food insecurity as both countries were major trade partners for Cameroon. Brief report on the humanitarian situation (covering March and April 2022), UN Office for the Coordination of Humanitarian Affairs (UNOCHA), May 12, 2022, https://www.unocha.org/publications/report/cameroon/cameroon-humanitarian-bulletin-issue-n-31-march-april-2022, (last visited on July 30, 2024).

[220] WFP Cameroon Country Brief, February 2024, World Food Programme, April 16, 2024, https://reliefweb.int/report/cameroon/wfp-cameroon-country-brief-february-2024, (last visited September 06, 2024.)

[221] Innovative ways to supply fish to Bamenda despite Cameroon's anglophone crisis, Radio Fresh Internationale, July 10, 2022, https://www.rfi.fr/en/africa/20220710-supplying-fish-to-bamenda-during-cameroon-s-anglophone-crisis, (last visited July 31, 2024).

[222] Cameroon: Situation Report, UN Office for the Coordination of Humanitarian Affairs (UNOCHA) (internal citations omitted), Lasted updated October 02, 2023, https://reports.unocha.org/en/country/cameroon/#cf-6uLXJidzlOd69QvtnFq1MQ, (last visited July 23, 2024).

[223] Unprecedented acute hunger affects millions of people in Cameroon, December 2023, Action contre la Faim France, Famine Early Warning System Network, Food and Agriculture Organization of the United Nations, Food Security Cluster, Norwegian Refugee Council, World Food Programme, January 16, 2024, https://reliefweb.int/report/cameroon/unprecedented-acute-hunger-affects-millions-people-cameroon-december-2023, (last visited November 15, 2024).

[224]Curbing Feuds over Water in Cameroon's Far North, International Crisis Group, April 25, 2024, https://www.crisisgroup.org/africa/central-africa/cameroon/b197-curbing-feuds-over-water-cameroons-far-north, (last visited on July 24, 2024).

[225] Curbing Feuds over Water in Cameroon's Far North, International Crisis Group, April 25, 2024, https://www.crisisgroup.org/africa/central-africa/cameroon/b197-curbing-feuds-over-water-cameroons-far-north, (last visited on July 24, 2024).

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Refugee, Asylum and International Operations Directorate
STAR Division, Research Branch
5900 Capital Gateway Drive
Camp Springs, MD 20529



**Cameroon Temporary Protected Status Country Conditions Addendum[1]**

*Security Situation & Armed Conflict*

RAIO Research did not find any new COI on the requested information within the limited time parameters.

*Impact of the Conflicts, including the impact on Vulnerable Populations*

- "Regionally, Cameroon is benefiting from initiatives spearheaded by the ECOWAS [The Economic Community of West African States] Peace and Security Architecture, which has made significant strides in promoting women's roles in conflict resolution... The International Organization for Migration (IOM) has been instrumental in advancing the women, peace, and security agenda in Cameroon. Through its PBF-funded project, IOM has initiated transformative actions that empower women in Disarmament, Demobilization, and Reintegration (DDR) processes. A significant achievement of this project was the comprehensive mapping of women's organizations in the Far North region, ensuring that targeted support reaches those directly engaged in peacebuilding." *Women, Peace, and Security in Cameroon: Bridging gaps for lasting change*, Sept. 27, 2024. https://www.iom.int/news/women-peace-and-security-cameroon-bridging-gaps-lasting-change

---

[1] This is an overview of recent country conditions with a primary focus on published from November 2024 to late February 2025; however, relevant information relevant information published shortly before November 2024 may be included.

1

App.159-CASA

- "Given the population dynamics noted through the verification exercise, the number of forcibly displaced in Cameroon had decreased to 1.9 million in 2021, slightly increase in 2022 to 2 million and is expected to progressively fall to 1.4 million by the end of 2026." *Cameroon Multi-Country Office*, UNHCR, Dec. 2024. https://reporting.unhcr.org/operational/operations/cameroon-multi-country-office#:~:text=To%20enable%20refugees%20and%20asylum,UNHCR%20supervisory%20and%20coordination%20functions.

- "The second generation [National Action Plan] NAP also cites positive steps forward, such as the increased representation of women in political decision-making roles, with more women elected and appointed to leadership positions; and enhanced involvement of [civil society organizations] CSOs, particularly women-led organizations, in promoting the Women, Peace, and Security (WPS) agenda and advocating for gender equality." *DEUXIEME PLAN D'ACTION DU CAMEROUN POUR LA MISE EN ŒUVRE DES RESOLUTIONS 1325 ET CONNEXES (2023-2027)*, United Nations, [Accessed on Feb. 26, 2025] est. 2022-23: https://1325naps.peacewomen.org/index.php/cameroon/

### *Ability to Return Safely*

- "To enable refugees and asylum seekers to rebuild their lives by returning to their respective countries of origin, when conditions allow, or in the country of asylum, or third countries, UNHCR will facilitate the implementation of durable solutions, such as [to] facilitate the return and reintegration of Cameroonian refugee returnees from Chad - 5,000 in 2023, 20,000 in 2024, and 5,000 in 2025..." *Cameroon Multi-Country Office*, UNHCR, Dec. 2024. https://reporting.unhcr.org/operational/operations/cameroon-multi-country-office#:~:text=To%20enable%20refugees%20and%20asylum,UNHCR%20supervisory%20and%20coordination%20functions.

### *Humanitarian Conditions (Including Education, Healthcare Security, Health Conditions, & Food Insecurity)*

- "Cameroon has officially become a member of the Global Alliance for Literacy (GAL), on the occasion of the 2024 International Literacy Day celebration. The announcement was made during the Alliance's annual meeting, held in Yaoundé, Cameroon, where Ms Asheri Kilo Fofung, Secretary of State to the Minister of Basic Education, Cameroon, emphasized the significance of GAL to the strengthening of

2

the country's literacy policies and programmes." *Cameroon Joins Global Alliance for Literacy* , UNESCO, Sept. 19, 2024: https://www.unesco.org/en/articles/cameroon-joins-global-alliance-literacy

- A year ago, Cameroon kicked off a wave of ground-breaking malaria vaccination campaigns. With nearly 140,000 kids now vaccinated across the country, authorities are already seeing the impact... Moreover, nationwide, 13% fewer children aged under five died, from any cause, in 2024 than in 2023. *Cameroon's historic malaria vaccine introduction shows signs of success, one year on*, VaccinesWork, Jan. 21, 2025.

### *Economy and Infrastructure*

- "GDP growth is projected to reach 4.1% in 2024 and 4.4% in 2025 thanks to a gradual increase in domestic gas production and higher world commodity prices. Inflation is projected to fall to 6.3% in 2024 and 4.3% in 2025 due to the continued tightening of monetary policy by the Bank of Central African States. The budget deficit is projected to further improve to 0.5% in 2024 and 0.2% in 2025 thanks to continued tax reforms and rationalization of public spending." *Cameroon Economic Outlook*, African Development Bank. May 30, 2024. https://www.afdb.org/en/countries-central-africa-republic-cameroun/cameroon-economic-outlook

- "Cameroon's economic growth shows signs of recovery after its slowdown in 2023... While growth prospects are more favorable, risks remain, including the upcoming presidential elections [which are set to be held in October 2025] and commodity price volatility." *Cameroon*, World Bank, Oct. 1, 2024. https://thedocs.worldbank.org/en/doc/bae48ff2fefc5a869546775b3f010735-0500062021/related/mpo-cmr.pdf

- "The medium-term outlook is moderately positive, with real GDP growth projected to 3.7 percent in 2024 and slightly above four percent in 2025 and 2026. This is driven by the following factors that should have a knock-on effect on other economic sectors: (i) an improved energy supply from the full commissioning of the Nachtigal hydroelectric dam which represents one-third of the current energy supply, and (ii) scaled-up public investment, especially in infrastructure, with the aim to reach 7.0 percent of GDP by 2027 from 3.9 percent in 2023." *Cameroon*, World Bank, Oct. 1, 2024. https://thedocs.worldbank.org/en/doc/bae48ff2fefc5a869546775b3f010735-0500062021/related/mpo-cmr.pdf

3

- "In 2025, as in 2024, Cameroon's economic growth should be underpinned by agri-food, forestry and services, as well as by mining and gas. In particular, the development of natural gas exports (15.5% of exports in 2023 vs. 8.5% in 2021), thanks to improved production capacity at the Hilli Episeyo platform, and the multiplication of iron ore mining projects will partially offset the decline in the oil sector, on which the country is still largely dependent (33.3% of exports and 4% of GDP in 2023). Such a reorganisation of the extractive industry will be supported by a dynamic construction sector, thanks to the pursuit of major investment projects in transport (extension of the Kribi industrial-port zone, extension of the rail and motorway networks) and energy infrastructure (forthcoming commissioning of the Nachtigal hydroelectric power station, which should supply 30% of national electricity production), in line with the 2020-2030 ten-year plan (National Development Strategy). At the same time, the State is continuing its efforts to reduce its dependence on imports and strengthen its food self-sufficiency (PIISAH import-substitution plan)." *Cameroon Outlook*, Coface, Webpage Last Updated July 2024 [Last Visited Feb. 26, 2025]. https://www.coface.com/news-economy-and-insights/business-risk-dashboard/country-risk-files/cameroon
- "Resilient Economic Growth: We expect real GDP growth to increase to 3.7% in 2024 from 3.2% in 2023. We forecast growth at 4.0% in 2025 and 4.1% in 2026, driven by agriculture, construction, and the coming on-stream of infrastructure and electricity projects." *Rating Report-Cameroon*, Fitch Ratings, Nov. 21, 2024. https://www.fitchratings.com/research/sovereigns/cameroon-21-11-2024

***Tourism***

- "Cameroonian tourist arrivals are expected to see a substantial increase over the next five years. Projections indicate that by 2028, the country will welcome approximately 1.27 million visitors, up from around 1.15 million in 2023." *Cameroon Tourism Industry Outlook 2024 – 2028*, Report Linker, [Accessed on Feb. 26, 2025]: https://www.reportlinker.com/clp/country/6226/726317
- "In Lonely Planet's Best in Travel 25, the trusted travel brand reveals its pick of 30 must-see destinations across the globe for the year ahead. Topping the country list is Cameroon, followed by Lithuania, Fiji, Laos and Kazakhstan—all countries which are lesser-explored destinations and can be considered off the main tourist trails." Travel Trends Report 2025: Frontier Travel, Forbes, Dec. 23, 2024: https://www.forbes.com/sites/angelinavillaclarke/2024/12/23/travel-trends-report-2025-frontier-travel/

4

PRE-DECISIONAL/DELIBERATIVE

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009



April 3, 2025

**DECISION**

MEMORANDUM FOR THE SECRETARY

FROM:          Kika M. Scott
                   Senior Official Performing the Duties of Director

SUBJECT:     **Temporary Protected Status for Cameroon**



PRE-DECISIONAL/DELIBERATIVE

App.163-CASA

App.164-CASA

App.165-CASA

App.166-CASA

App.167-CASA

App.168-CASA

App.169-CASA

App.170-CASA

App.172-CASA

App.173-CASA

App.174-CASA

App.175-CASA

**Secretary's Decision:**

3. *Terminate*:  Terminate Cameroon's designation

Approve/date _[signature]_  4-07-25

App.176-CASA

PRE-DECISIONAL/DELIBERATIVE

**Attachment A - Temporary Protected Status (TPS) Legal Authority**

Pursuant to section 244(b)(1) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254a(b)(1), the Secretary of Homeland Security, after consultation with appropriate agencies of the Government, may designate a foreign state (or part thereof) for TPS. The Secretary may then grant TPS to eligible nationals of that foreign state (or in the case of an alien having no nationality who last habitually resided in that state). INA § 244(b)(1) sets forth three possible bases on which the Secretary may designate a foreign state for TPS:

- Ongoing armed conflict in the foreign state and, due to such conflict, requiring the return of aliens who are nationals of that state would pose a serious threat to their personal safety;
- An earthquake, flood, drought, epidemic, or other environmental disaster in a foreign state has resulted in a substantial, but temporary, disruption of living conditions in the area affected, the foreign state is unable to handle adequately the return of aliens who are nationals of the state, *and* the foreign state has officially requested TPS designation; or
- Extraordinary and temporary conditions exist in the foreign state that prevent nationals of the state from returning in safety, unless the Secretary finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

An initial TPS designation is at the discretion of the Secretary but may not be less than 6 months or exceed 18 months. INA § 244(b)(2).

At least 60 days before the expiration of a TPS designation, the Secretary, after consultation with appropriate agencies of the Government, shall review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met and, if so, the length of an extension of the TPS designation (6-, 12-, or 18- months). *See* INA § 244(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for the TPS designation, she or he must terminate the designation. *See* INA § 244(b)(3)(B). Although the Secretary must make her or his determination on extension or termination at least 60 days before the expiration of the TPS designation, publication of the required *Federal Register* notice announcing the decision must be "on a timely basis." INA § 244(b)(3)(A). If the Secretary does not make a decision under INA § 244(b)(3)(A) that the foreign state no longer meets the conditions for designation, there is an automatic, minimum six-month extension of a country's TPS designation.
*See* INA § 244(b)(3)(C).

After the Secretary designates a country for TPS, nationals of the country (and persons without nationality who last habitually resided in the country) may apply for TPS, but they must individually demonstrate their eligibility pursuant to the criteria established in INA § 244(c) and the TPS regulations at 8 CFR § 244.1 *et seq*. These criteria include, but are not limited to, requirements that the applicant show continuous physical presence in the United States since the effective date of the country designation and continuous residence since such date as the Secretary determines; admissibility as an immigrant (with limited exceptions); that the applicant

PRE-DECISIONAL/DELIBERATIVE

App.177-CASA

PRE-DECISIONAL/DELIBERATIVE

Attachment A: TPS Legal Authority
Page 2

is not ineligible under certain mandatory criminal history, terrorism, and national security bars as specified in INA § 244(c)(2)(A)-(B); and that the applicant is registering for TPS in accordance with regulatory procedures in 8 CFR §§ 244.2–244.9.

If granted TPS, the alien receives employment authorization and an Employment Authorization Document, if requested, that is valid for the duration of the TPS designation. TPS is a temporary benefit that does not, by itself, provide aliens with a basis for seeking lawful permanent resident (LPR) status or any other immigration status. However, receipt of TPS benefits will not bar an otherwise eligible alien from adjusting to LPR status or acquiring another lawful immigration status. When a TPS country's designation ends, TPS beneficiaries return to the same immigration status, if any, that they held prior to TPS (unless that status has expired or been terminated) or any other status they may have acquired while registered for TPS.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| CASA, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>KRISTI NOEM, Secretary of Homeland Security, in her official capacity, and UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>*Defendants*. | **Case No.**: 8:25-cv-1484 |

### AMENDED DECLARATION OF GEORGE ESCOBAR, CHIEF OF PROGRAMS AND SERVICES, CASA, INC.

I, George Escobar, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.     I am the Chief of Programs and Services of CASA, Inc. ("CASA").  I have worked at CASA for fourteen years.  In my role, I oversee CASA's portfolio of community-facing direct services, including its health, legal, and educational services; employment and workforce development programs; financial literacy and tax programs; and parent engagement programs.  An important part of my role is to understand the needs and experiences of our members so that I can work with my staff to design appropriate interventions to address those needs.  I therefore speak frequently with community members and receive feedback from my staff regarding CASA members' fears, concerns, and decisions.

2.     This declaration amends the one I previously signed in this case (ECF No. 2-2) to include information about additional CASA members who are Afghan Temporary Protected Status ("TPS") holders and the harms those individuals face as a result of the termination of TPS for

Afghanistan.

3.      I make this statement based upon personal knowledge, files, and documents of CASA that I have reviewed (such as case files, reports, and collected case metrics), as well as information supplied to me by employees of CASA whom I believe to be reliable.  These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting CASA business.

4.      CASA is a nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia.

5.      Founded in 1985, CASA has more than 173,000 lifetime members from across the United States.  CASA's members are predominantly noncitizens in a variety of immigration statuses.

**<u>CASA's Mission and Activities</u>**

6.      A CASA member is a person who shares CASA's values, envisions a future where we can achieve full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in our working-class and immigrant communities. CASA members play an important role in deciding what campaigns we work on and how CASA serves the community.

7.      CASA membership is voluntary. In order to become a member, an individual must apply for membership, pay dues, and subscribe to the principles of CASA.  CASA members also must self-identify as members of an immigrant or working-class community.

8.      Currently, the annual fee for CASA membership is $35.  Alternatively, individuals may pay a recurring membership fee of $5 per month.  The membership fee can be waived for individuals who experience financial hardship or are otherwise unable to pay.  Members are also

offered the opportunity, for an additional $5, to obtain a CASA ID. This is a physical, picture identification card that contains basic information about the member. For many of our immigrant members, this card may be the only type of picture identification they have, other than documents from their home country. In certain jurisdictions, CASA IDs are recognized for the purposes of engaging with certain government agencies, including the police.

9.     CASA's mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. From CASA's beginnings in a church basement, we have envisioned a future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all.

10.     In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia. CASA also offers a more limited suite of services remotely to our members across the United States. Those individuals who are not geographically close to a physical CASA office are offered the opportunity to join a national organizing committee, whose members are entitled to vote on CASA's organizational priorities and integrated into our member-led system of internal democratic governance. CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying a variety of government benefits. In addition, CASA provides our members with free remote legal assistance, including free legal consultations on immigration issues.

**Harm to CASA's Members From Uncertainty in the Cameroon Designation and from the Attempted Afghanistan Termination**

11.     CASA has approximately 100 members from Afghanistan and more than 5,700

members from Cameroon, many of whom are TPS holders.

12.     Because of the services that we provide our members, we are acutely aware of the harms that Secretary Noem's reported Cameroon TPS termination and her May 13, 2025, Afghanistan TPS termination will cause to Cameroonian and Afghan TPS holders.

13.     Since its founding, CASA has provided direct assistance on approximately 1,000 TPS applications for our members, including providing legal services to over 300 Cameroonian members seeking TPS.  Beyond that, many more CASA members have obtained TPS without being directly represented by CASA.

14.     In addition to the legal services that CASA offers members seeking TPS, the organization is also a leader in advocating for TPS nationally.  CASA serves as a founding member of the TPS Funding Collaborative, which has raised more than $3 million to support organizations advocating for TPS.

15.     Based on CASA's records, I have determined that the following individuals are TPS holders. Where noted, these individuals hold TPS-based work authorization, which they will lose as a result of TPS termination.  Additionally, based on inquiries of our members, I have identified the following additional harms that these individuals are incurring as a result of the uncertain status of Cameroon TPS and the attempted termination of Afghanistan TPS:

16.     J.K. is a CASA member and TPS holder from Cameroon.[1]  She is a grandmother and resides in Maryland.  Under her TPS-based work authorization, J.K. currently works as a home health aide, helping to care for the elderly.  Although she has not had a conversation with her employer about what will happen if her TPS-based work authorization ends, she thinks that her employer will not allow her to continue working.  As a senior she will have great difficulty

---

[1] To protect the privacy and security of our members, I am using initials to identify them.  The identity of each of these individuals is known to me personally.

supporting herself without being able to work, because she is not entitled to benefit from government assistance.  J.K. suffers from numerous health issues, including circulatory issues, diabetes, pterygium (which affects her eyesight), and frequent bouts of pneumonia, which can be life-threatening.  She currently has charity care to cover the costs of her medical care, but that health insurance is not guaranteed—it is at the discretion of the provider to renew each year.  Without TPS protections, including the associated work authorization, she fears that she would not be able to secure or afford the necessary medical care in the future.  J.K. is also afraid that she could be removed to Cameroon, a country she fled more than two decades ago.  J.K. believes her life could be in danger in Cameroon: she was caught in the middle of country's civil conflict, with one Anglophone parent and one Francophone parent, leading her to be targeted by both sides and not accepted anywhere.  And physical safety concerns aside, J.K. would not be able to get the health care in Cameroon that she needs to survive.

17.     O.M. is a 66-year-old CASA member and TPS holder from Cameroon.  O.M. also has TPS-based work authorization.  O.M. fled violence in Cameroon and is currently living in Maryland.  She works as a home health assistant, helping people with disabilities.  She relies on TPS for her work authorization.  O.M. is afraid of losing TPS protections because it would put her livelihood in danger.  Although she has not had a conversation with her employer about what will happen when her work permit expires, she was required to provide her work permit when she was hired and understands that she won't be able to work once it expires.  In addition, losing TPS would expose her to the risk of being forced to return to a country where she does not feel safe.  When living in Cameroon, she was subjected to physical abuse due to her religious faith.  O.M. fears that if she is forced to return to Cameroon, she could suffer further abuse.

18.     C.N. is a CASA member and TPS holder from Cameroon.  C.N. lives in Maryland

and works as a hairstylist. She is very active in her community, volunteering with local charities and distributing clothing to those in need. C.N. fled violence in Cameroon and is afraid to return, in part because she has been a vocal activist in the Cameroonian community in the U.S and her family has warned her that she could be in danger if she returns. Although she does not currently rely on her TPS for work authorization, C.N. may need to rely on it in the future. Accordingly, both her livelihood and personal safety would be at risk if she were to lose TPS protection.

19.    D.L. is a CASA member and TPS holder from Cameroon. D.L. lives in Maryland and currently works as a ride-share driver. Previously he worked in home health services. D.L. is active with CASA's community organizing work and in his Pentecostal church. He fled Cameroon after experiencing persecution and experienced ICE detention after entering the U.S. His wife, who is pregnant, and his younger brother, neither of whom are TPS holders, depend on him for their family's income. Although he currently has work authorization through another mechanism, he is not confident that he will be able to maintain that authorization and would thus need to rely on TPS-based work authorization in the future, since he has no other status to rely upon. Losing TPS and the related risk of removal threatens to separate D.L. from his family members and would place the whole family, including his pregnant wife, at risk financially.

20.    D.T. is a CASA member and TPS holder from Cameroon who fled violence there. D.T. lives in Maryland and works as a caregiver in an assisted living community. He is a loving husband and the father of three children, two of whom are United States citizens. His third child and his wife are also TPS beneficiaries. D.T. proudly pays his taxes and supports his community, and he is a vocal advocate for Cameroonians in the United States. If D.T. and his family lose their TPS protections, D.T. is afraid his family will not be able to support themselves and that their lives could be at risk if they were forced to leave the United States. He also fears that TPS termination

could separate him from his children, with the two children who are United States citizens able to remain in the United States while his other child might be forced to leave the country with D.T. and his wife. In addition, though neither D.T. nor his wife currently rely on their TPS for work authorization, they are afraid that their other basis for working legally in the United States could expire or be revoked, thus forcing them to seek and rely on TPS-based work authorization.

21.     A.F. is a CASA member and Afghanistan TPS holder who lives in Virginia. He has an engineering degree and works as a project manager under his TPS-based work authorization. A.F. thus depends on work authorization through TPS to support himself and to be able to send money to his mother and brother. A.F. is afraid that when his current TPS-based employment authorization ends, his employer could terminate him or, at best, place him on a lengthy unpaid administrative leave as a precursor to firing him. He cannot afford either option. His employer has already begun the process of preparing to transition A.F.'s work to other employees, in anticipation of his inability to work. A.F. has had to advocate for himself with the employer's HR Department, educating them about his immigration status. In addition, A.F. fears being vulnerable to removal to Afghanistan. Although he is a citizen of Afghanistan, he has never lived there and has spent only around five weeks of his life in the country, when he was a child. A.F. has no immediate family in Afghanistan and no prospects of building a safe or stable life there.

22.     M.A. is a CASA member and TPS holder from Afghanistan who left the country in 2021 as its government collapsed. M.A. was awarded an educational scholarship and obtained his master's degree; he currently lives in Virginia and works at a consulting firm. M.A. relies on TPS for his work authorization. He fears that he will have to quit his job or will be fired when his TPS-based employment authorization ends. M.A.'s employment is his only source of income. That

income is also, in turn, the sole financial support for his wife and two young children in Afghanistan, providing them a lifeline from the country's oppressive restrictions on women and children.  Moreover, because M.A. receives health insurance through his employer, and is not eligible for insurance otherwise, he fears losing access to health care when his TPS ends.  M.A. is afraid of being targeted by the Taliban if he is forced to return to Afghanistan, particularly because he worked on United States-funded programs when he was in Afghanistan and because he studied and worked in the United States.  He is fearful that his wife and children's lives would also be endangered if he reunited with them in Afghanistan, as any physical threats against him would likely extend to his family.

23.    B.S. is a CASA member and TPS holder from Afghanistan.  She lives in Washington with her husband and two young children, all of whom also have TPS.  While in Afghanistan, B.S. faced death threats due to her work as an interpreter for international and United States agencies, and she was forced to move homes several times.  She is a trained medical doctor and worked for a county public health department in the United States for a period of time.  B.S. currently cares for her children full time, and her husband works as a ride-share driver to support their family financially.  If B.S. and her family lose their TPS protections, B.S. is terrified that their lives will be at risk if they are forced to leave the United States.  She especially fears that she will be handed over to the Taliban.  Based on the threats of violence that she previously received in Afghanistan, along with the current realities of the Taliban's oppressive government and reports of Taliban retribution against individuals associated with the United States, B.S. is sure that she and her family would not be safe in Afghanistan.  In addition, although B.S.'s family does not rely on TPS-based work authorization, they would be unable to rely, if necessary, on TPS-based work authorization in the future if Afghanistan TPS is terminated.  These circumstances are causing B.S.

significant anxiety and worsening the Post-Traumatic Stress Disorder she suffers from her experiences in Afghanistan.

24.     As these individuals' circumstances demonstrate, the communities and members that CASA serves will be harmed by the uncertainty of Cameroon's TPS designation and its reported termination, as well as by the attempted termination of Afghanistan TPS.

25.     CASA members who receive TPS for Afghanistan and Cameroon face irreparable harm, including if the members (and other TPS holders) are deported.  CASA members may lose their jobs, businesses, and homes.  They may be left unable to support their families.  They may lose access to critical medical care and basic services. And they may be separated from their families and deported to a country where they may face political repression and abuse.

26.     Since the initial reports of TPS terminations for Cameroon and Afghanistan, and continuing after the Secretary's notice announcing the Afghanistan TPS termination, we have observed the impact on our members.  As described above, members have expressed fear over the loss of protection from removal and face increasing anxiety about potential deportation.  In addition, members face severe mental anguish at the prospect of losing work authorization as a result of TPS termination, as they rely on their income to provide basic needs and critical medical care for themselves and their family members.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  May 19, 2025                    Respectfully submitted,

_____
                                                                George Escobar

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

CASA, INC.,

       Plaintiff,

       v.

KRISTI NOEM,
*Secretary of Homeland Security,*
*in her official capacity*, and
U.S. DEPARTMENT OF
HOMELAND SECURITY,

       Defendants.

Civil Action No. 25-1484-TDC

## MEMORANDUM OPINION

On May 13, 2025, approximately 11,700 nationals of Afghanistan residing in the United States under temporary protected status ("TPS"), an immigration status established to allow foreign nationals to remain lawfully in the United States when it would be unsafe to return to their native countries due to an ongoing armed conflict or for other extraordinary reasons, were informed through a public notice that their legal right to remain in the United States would be terminated in 60 days. On June 4, 2025, approximately 5,200 nationals of Cameroon with TPS were similarly informed that their legal status would end in 60 days. Plaintiff CASA, Inc. ("CASA") has filed suit against Defendants Secretary of Homeland Security Kristi Noem and the United States Department of Homeland Security ("DHS"), challenging those TPS terminations under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706, the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution. CASA has filed a Motion for Partial

Summary Judgment or a Stay of Agency Action, and Defendants (collectively, "DHS") have filed

a Cross Motion for Summary Judgment and Motion to Dismiss, both of which are fully briefed.

On June 24, 2025, the Court held a hearing on the Motions. For the reasons set forth below,

CASA's Motion will be DENIED, and DHS's Motion will be DENIED.

**BACKGROUND**

## I.    Temporary Protected Status

The Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–1537, governs the

admission of foreign nationals to the United States. In 1990, Congress amended the INA to

establish TPS to provide temporary immigration relief, including legal status, work authorization,

and protection against removal, for foreign nationals in the United States who cannot return to

their home countries because of temporary and extraordinary circumstance in those nations.

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, 5030 (codified at 8 U.S.C. § 1254a

("the TPS statute")). Specifically, the Secretary of Homeland Security ("the Secretary") may

provide a TPS designation for a foreign nation, or part of a foreign nation, for an initial period of

between 6 and 18 months if at least one of three conditions have been met, the following two of

which are at issue in this case:

> (A) the [Secretary] finds that there is an ongoing armed conflict within the state
> and, due to such conflict, requiring the return of aliens who are nationals of that
> state to that state (or to the part of the state) would pose a serious threat to their
> personal safety; [or]
>
> ***
>
> (C) the [Secretary] finds that there exist extraordinary and temporary conditions in
> the foreign state that prevent aliens who are nationals of the state from returning to
> the state in safety, unless the [Secretary] finds that permitting the aliens to remain
> temporarily in the United States is contrary to the national interest of the United
> States.

2

App.189-CASA

8 U.S.C. § 1254a(b)(1), (b)(2)(B); 6 U.S.C. § 557 (conferring certain authorities granted by statute to the Attorney General, including those relating to TPS, to the Secretary of Homeland Security).

For an individual from a designated foreign nation to be eligible for TPS, that person must, among other requirements, have maintained continuous physical presence in the United States since the effective date of the TPS designation, have maintained continuous residency since a designated date, be "admissible" as an immigrant, and not have a prior conviction for certain criminal offenses. 8 U.S.C. § 1254a(c).

When a foreign nation has been designated for TPS, the TPS statute requires that the Secretary periodically review the designation and determine whether it should be extended or terminated. Specifically, the statute requires that at least 60 days before the expiration date of a TPS designation period, the Secretary, in consultation with appropriate federal agencies, must review the conditions in the foreign nation and determine whether the required conditions for a TPS designation continue to be met. *Id.* § 1254a(b)(3)(A). Notice of the Secretary's determination must be published in the Federal Register "on a timely basis." *Id.* If the conditions are no longer met, the Secretary is required to terminate the TPS designation through the publication of the notice of the Secretary's determination. *Id.* § 1254a(b)(3)(B). Any termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* If the Secretary fails to make the required determination, the TPS designation is automatically extended for a period of 6 months, or a period of 12 or 18 months at the discretion of the Secretary. *Id.* § 1254a(b)(3)(C).

## II.    Executive Orders

On January 20, 2025, President Donald J. Trump signed two executive orders of relevance to the present TPS terminations. Executive Order 14,150, entitled "America First Policy Directive

3

to the Secretary of State," declared that "the foreign policy of the United States shall champion core American interests and always put America and American citizens first." Exec. Order No. 14,150, § 1, 90 Fed. Reg. 8337 (Jan. 20, 2025). It directed the Secretary of State to "issue guidance bringing the Department of State's policies, programs, personnel and operations in line with an American First foreign policy, which puts America and its interests first." *Id.* § 2.

Executive Order 14,159, entitled "Protecting the American People Against Invasion," declared that "[i]t is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people." Exec. Order No. 14,159, § 2, 90 Fed. Reg. 8443 (Jan. 20, 2025). More specifically, it directed the Secretary of State, the Attorney General, and the Secretary of Homeland Security to "rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States." *Id.* § 16. As to TPS, Executive Order 14,159 directed those same officials to ensure that "designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. [§] 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." *Id.* § 16(b).

## III.    TPS Designations and Terminations

### A.    Afghanistan

On May 20, 2022, Secretary of Homeland Secretary Alejandro Mayorkas designated Afghanistan for TPS for an initial period of 18 months, effective through November 20, 2023, based on findings of both an "ongoing armed conflict" and "extraordinary and temporary conditions" that would pose a serious threat to the personal safety of Afghan nationals if they were required to return to Afghanistan. Am. Compl. ¶¶ 40–44, ECF No. 41; Designation of Afghanistan

4

for Temporary Protected Status, 87 Fed. Reg. 30976, 30977 (May 20, 2022). Specifically, the notice of this designation described the armed conflict between the Taliban and ISIS-K, an insurgent group designated by the United States as a foreign terrorist organization, as well as further dangerous conditions, including internal displacement, economic instability, the inaccessibility of food and healthcare, and violence targeting woman and girls. 87 Fed. Reg. at 30978–84. On September 25, 2023, Secretary Mayorkas extended the Afghanistan TPS designation for an additional 18-month period, until May 20, 2025, and also redesignated the country for TPS, which allowed Afghan nationals who had not previously received TPS to register for that status. Am. Compl. ¶ 45; Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65728, 65729 (Sept. 25, 2023). The public notice of the Secretary's determination cited continuing armed conflict between the Taliban and ISIS-K and ongoing extraordinary and temporary conditions, including growing repression by the Taliban conducted in part through the killing and physical abuse of opponents of its regime and sexual violence against women and girls. 88 Fed. Reg. at 65730–33.

On March 21, 2025, Secretary of Homeland Security Kristi Noem signed an internal decision memorandum, prepared by United States Citizenship and Immigration Services ("USCIS"), a component agency of DHS, through which she approved the termination of Afghanistan's TPS designation on the basis that Afghanistan "no longer me[t] the extraordinary and temporary conditions statutory standard" and that there were "improved conditions as it relates to ongoing conflict." Joint Record ("J.R.") 140-41, ECF No. 64-2 to 64-22.

The memorandum was supported by several attachments and other related documents, including: (1) a November 2024 USCIS memorandum entitled "Afghanistan: Temporary Protected Status (TPS) Considerations" ("the Afghanistan TPS Considerations Memorandum")

5

that addressed the period from June 1, 2023 to November 13, 2024; (2) an undated USCIS Addendum to the Afghanistan TPS Considerations Memorandum covering the period from November 14, 2024 to February 20, 2025; (3) a November 20, 2024 letter and accompanying State Department recommendation memorandum from Secretary of State Antony Blinken to Secretary Mayorkas in which he recommended the extension and redesignation of Afghanistan for TPS for 18 months; and (4) an undated letter from Secretary of State Marco Rubio to Secretary Noem in which he recommended that the TPS designation for Afghanistan be terminated.

On May 13, 2025, seven days before Afghanistan's TPS designation was set to expire, a public notice entitled "Termination of the Designation of Afghanistan for Temporary Protected Status" ("the Afghanistan Notice"), 90 Fed. Reg. 20309 (May 13, 2025), was published in the Federal Register. The Afghanistan Notice stated that the Afghanistan TPS designation was being terminated effective July 14, 2025, 60 days after the date of the Afghanistan Notice. *Id.* at 20312. According to the Afghanistan Notice, Secretary Noem had determined that there had been "notable improvements in the security and economic situation such that requiring the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety due to armed conflict or extraordinary and temporary conditions." *Id.* at 20310. In support of this determination, the Afghanistan Notice cited, among other factors, a decrease in the number of Afghan nationals in need of humanitarian assistance, improvements in the Afghanistan economy, and an increase in foreign tourists to Afghanistan, particularly tourists from China. *Id.* The Afghanistan Notice also stated that Secretary Noem had concluded that permitting Afghan nationals to remain in the United States pursuant to TPS was "contrary to the national interest of the United States." *Id.* In discussing the national interest, the Afghanistan Notice referenced the part of Executive Order 14,159 in which the President directed federal officials to rescind policies that increase or continue

App.193-CASA

"the presence of "illegal aliens in the United States" and to ensure that TPS designations are "made for only so long as may be necessary to fulfill the textual requirements of that statute." *Id.* at 20311. Referencing Executive Order 14,150, the Afghanistan Notice further stated that the Afghanistan TPS designation was contrary to the national interest because "U.S. foreign policy interests are best served and protected by curtailing policies that facilitate or encourage destabilizing migration." *Id.* The Afghanistan Notice also stated that, in making her determination, Secretary Noem considered that "DHS records indicate that there are Afghan nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security." *Id.*

## B. Cameroon

On June 7, 2022, Secretary Mayorkas granted a TPS designation to Cameroon, with an initial designation period of 18 months, to run through December 7, 2023, based in part on an ongoing armed conflict between government forces and armed separatists as well as deadly attacks by terrorist organizations, including Boko Haram. Designation of Cameroon for Temporary Protected Status, 87 Fed. Reg. 34706, 34708–09 (June 7, 2022). On October 10, 2023, Secretary Mayorkas extended TPS for Cameroon for an additional 18 months until June 7, 2025 and also redesignated the country for TPS. Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69945, 69949 (Oct. 10, 2023). As justification for the extension, Secretary Mayorkas cited ongoing armed conflict between the government and both non-state armed groups and Anglophone separatists groups, which had led to widespread killing, kidnapping, displacement, and destruction of civilian infrastructure that left many Cameroonians without access to health services and education. *Id.* at 66947–48.

App.194-CASA

On April 7, 2025, Secretary Noem signed an internal decision memorandum prepared by USCIS through which she approved the termination of the Cameroon TPS designation. J.R. 4393. The memorandum's attachments included: (1) a USCIS memorandum entitled "Republic of Cameroon: Temporary Protected Status (TPS) Considerations ("the Cameroon TPS Considerations Memorandum"), addressing the period from June 15, 2023 to November 30, 2024; (2) a USCIS Addendum to the Cameroon TPS Considerations Memorandum covering the period from November 2024 to late February 2025, and (3) a December 2, 2024 letter and accompanying State Department recommendation memorandum from Secretary of State Blinken, through which he recommended the extension of the Cameroon TPS designation for 12 months.

On June 4, 2025, three days before Cameroon's TPS designation was set to expire, a public notice entitled "Termination of the Designation of Cameroon for Temporary Protected Status" ("the Cameroon Notice"), 90 Fed. Reg. 23697 (June 4, 2025), was published in the Federal Register. The Cameroon Notice stated that the TPS designation for Cameroon was being terminated effective August 4, 2025, 60 days after the date of the Cameroon Notice. *Id.* at 23698. As justification for the termination, the Cameroon Notice stated that present conditions "do not pose a serious threat to individual safety due to ongoing armed conflict" and do not render it unsafe for Cameroonians to return in part because although two major conflicts remain active, they are contained and only impact three of ten regions in Cameroon. *Id.* The notice further found that generalized criminal activity in those regions did not form a sufficient basis for extraordinary and temporary conditions for TPS and noted that Cameroon presently accepts the return of nationals with final removal orders. *Id.* It also concluded that regardless of whether such conditions exist, it is contrary to the national interest to permit Cameroonian nationals to remain temporarily in the

United States. *Id.* Like the Afghanistan Notice, the Cameroon Notice, in referencing the national interest, cited to Executive Order 14,159. *Id.*

## IV.    Plaintiff's Claims

Plaintiff CASA is a national nonprofit, membership-based immigrant rights organization that has more than 173,000 lifetime members who are predominantly noncitizens and include more than 100 members from Afghanistan and more than 5,700 members from Cameroon. Among the services that CASA provides are full legal representation and free legal consultations for members applying for TPS. Many of CASA's members are directly affected by the terminations at issue in this case. For example, A.F., M.A., and B.S. are Afghan CASA members who depend on TPS for their work authorizations to support their families. A.F. would suffer hardship if removed to Afghanistan because he has never lived there and has no familial or other ties to Afghanistan. M.A. and B.S. fear that they and their families would be targeted by the Taliban if they had to return to Afghanistan because of their connections to the United States, with B.S. particularly at risk because she had previously faced threats of violence while in Afghanistan.

J.K., O.M., C.N., D.L., and D.T. are Cameroonian CASA members. J.K. suffers from serious health issues and depends on TPS for work authorization to be able to afford her required medical care. O.M., who suffered physical abuse in Cameroon, and C.N. both fear that returning to Cameroon would put them in danger of physical violence. D.L. previously experienced persecution in Cameroon and depends on his TPS work authorization to support himself, his wife who is pregnant, and his brother. If D.T. loses TPS and is removed, he would be separated from his U.S. citizen children, who would then face significant economic hardship.

On May 7, 2025, based on media reports that Secretary Noem had made determinations that the TPS designations for Afghanistan and Cameroon were to be terminated, but prior to the

9

App.196-CASA

publication of any related notices in the Federal Register, CASA filed its original Complaint in this case. On May 13, 2025, the Afghanistan Notice was published.

On May 20, 2025, CASA filed an Amended Complaint to which it filed a Supplement on June 5, 2025 following the publication of the Cameroon Notice on June 4, 2025 (collectively, "the Complaint"). The presently operative Complaint asserts eight causes of action. In Counts 1 and 6, CASA asserts that DHS's termination of the TPS designations for Afghanistan and Cameroon, respectively, violated the APA because Secretary Noem did not comply with a statutory requirement to publish notices of the terminations in the Federal Register at least 60 days before the designations were set to expire. In Counts 3 and 4, CASA seeks a declaratory judgment, pursuant to the Declaratory Judgment Act, that because of the failure to meet those deadlines, the TPS designations for Afghanistan and Cameroon are automatically extended by at least six months pursuant to 8 U.S.C. § 1254a(b)(3)(C).

In Counts 2 and 7, CASA asserts that the terminations of the Afghanistan and Cameroon TPS designations violated the APA because they were arbitrary and capricious and not in accordance with law, on the grounds that they were part of a preordained decision by the President to reduce the number of non-white immigrants in the United States. In Counts 5 and 8, CASA alleges that the terminations violate the equal protection component of the Due Process Clause of the Fifth Amendment to the Constitution, because they were motivated in part by discrimination against non-white immigrants based on race, ethnicity, or national origin.

On May 20, 2025, CASA filed the present Motion for Partial Summary Judgment or a Stay of Agency Action. On June 3, 2025, Defendants filed a Cross Motion for Summary Judgment and Motion to Dismiss. On June 24, 2025, the Court held a hearing on the Motions.

App.197-CASA

## DISCUSSION

In its Motion for Partial Summary Judgment or a Stay of Agency Action, CASA seeks summary judgment on Counts 1, 3, 4, and 6 (collectively, "the timing claims") as well as Counts 2 and 7 (collectively, "the APA claims"), and thereby seeks an order declaring unlawful and setting aside the terminations of the TPS designations for Afghanistan and Cameroon and extending the TPS designations for at least six months from the otherwise applicable expiration dates. In the alternative, CASA seeks a stay under the APA, pursuant to 5 U.S.C. § 705, of the effective dates of the terminations pending additional factual development. CASA presently seeks no relief relating to Counts 5 and 8 (collectively, "the equal protection claims").

In its Cross Motion for Summary Judgment and Motion to Dismiss, DHS seeks dismissal or summary judgment on all counts on the grounds that the Court lacks jurisdiction over CASA's claims because the TPS statute includes a bar on judicial review of TPS determinations, as set forth in 8 U.S.C. § 1254a(b)(5)(A), and the INA includes a bar on injunctive relief relating to CASA's claims, as set forth in 8 U.S.C. § 1252(f)(1). DHS also seeks summary judgment on the merits on the timing claims in Counts 1, 3, 4, and 6 and the APA claims in Counts 2 and 7.

In its reply brief, DHS for the first time seeks dismissal of all of those counts on the separate ground that CASA failed to state a plausible claim for relief pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court need not address that argument, particularly where CASA did not have the opportunity to respond to it. *See De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 531 (4th Cir. 2022) ("Generally, 'new arguments cannot be raised in a reply brief' before the district court." (quoting *United States v. Smalls*, 720 F.3d 193, 197 (4th Cir. 2013))). Nevertheless, where the Court's analysis relating to summary judgment will necessarily address the Rule 12(b)(6) argument, the Court will address that argument as well.

11

App.198-CASA

I.    **Legal Standards**

As to DHS's Motion to Dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), it is the plaintiff's burden to show that subject matter jurisdiction exists. *Evans v. B.F. Perkins Co., Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). Rule 12(b)(1) allows a defendant to move for dismissal when it believes that the plaintiff has failed to make that showing.  When a defendant asserts that the plaintiff has failed to allege facts sufficient to establish subject matter jurisdiction, the allegations in the complaint are assumed to be true under the same standard as in a Rule 12(b)(6) motion, and "the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).  When a defendant asserts that facts outside of the complaint deprive the court of jurisdiction, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *Kerns*, 585 F.3d at 192.

To defeat a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Legal conclusions or conclusory statements do not suffice. *Id.*  The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).  When considering a Rule 12(b)(6) motion, a court may consider only the complaint and its attachments, as well as other documents that are integral to and explicitly relied upon in the complaint and that

12

are of unchallenged authenticity. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015). Here, the Court finds that the Afghanistan Notice and the Cameroon Notice, which are specifically referenced in the Complaint, are integral to the Complaint.

As for the parties' Cross Motions for Summary Judgment pursuant to Rule 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing a summary judgment motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II. Bars on Judicial Review

In its Motion, DHS seeks dismissal of all claims based on the argument that this Court cannot adjudicate any of CASA's claims because two provisions in the INA, 8 U.S.C. § 1254a(b)(5)(A) and 8 U.S.C. § 1252(f)(1), bar courts from doing so. The Court will consider each provision in turn.

App.200-CASA

A.      8 U.S.C. § 1254a(b)(5)(A)

DHS first argues that all of CASA's claims are barred by 8 U.S.C. § 1254a(b)(5)(A), a provision within the TPS statute which states that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A). DHS asserts that this language "commits to the Secretary's unreviewable authority any and all determinations concerning TPS designation, extension, and termination." Defs.' Opp'n & Cross Mot. at 9, ECF No. 53.

In assessing whether a statute bars judicial review of an Executive Branch action, a court should apply the "well-settled and strong presumption [that] when a statutory provision is reasonably susceptible to divergent interpretation," the court is to "adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *Lovo v. Miller*, 107 F.4th 199, 206 (4th Cir. 2024) (quoting *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020)). "The presumption can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." *Id.* (quoting *Guerrero-Lasprilla*, 589 U.S. at 229).

In assessing whether such evidence exists, a court must first consider the "relevant text." *Id.* Notably, the United States Supreme Court, in considering similar language within different provisions of the INA, declined to find absolute bars to judicial review of any claim arising from the relevant statutory provisions. *See, e.g.*, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 483–84 (1991); *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993). In *McNary*, the Court considered whether 8 U.S.C. § 1160(e) precluded a district court from exercising jurisdiction over an action alleging "a pattern or practice of procedural due process violations" by the Immigration

14

and Naturalization Service ("INS") in its administration of the special agricultural worker ("SAW") amnesty program, which "required the Attorney General to adjust the status of any alien farmworker" under certain circumstances. *McNary*, 498 U.S. at 483. Section 1160(e) provides in relevant part that "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection" and permits "judicial review of such a denial only in the judicial review of an order of exclusion or deportation." 8 U.S.C. § 1160(e)(1), (3)(A). Focusing on the "critical words" of § 1160(e), specifically "a determination," "an application," and "judicial review of such a denial," the Court found that the provision applied to "a single act rather than a group of decisions or a practice or procedure employed in making decisions." *Id.* at 491–92. The Court thus concluded that § 1160(e) barred "direct review of individual denials of SAW status" but not review of "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications," including the failure to provide applicants with the opportunity to challenge adverse evidence, the denial of the opportunity to present witnesses, and the failure to provide interpreters needed by applicants. *Id.* at 488, 492.

In reaching this conclusion, the Court further reasoned that "had Congress intended the limited review provisions of [§ 1160(e)] to encompass challenges to INS procedures and practices, it could easily have used broader statutory language," such as language in other provisions barring judicial review of "all causes . . . arising under any of the provisions" of a statute, or prohibiting review "on all questions of law and fact" arising from the statute. *Id.* at 494 (quoting 8 U.S.C. § 1329 and 38 U.S.C. § 211(a)). The Court also relied in part on the fact that the plaintiffs had no other means by which "to obtain meaningful judicial review" of their claims, because in light of the limited language of § 1160(e) and the "well-settled presumption favoring interpretations of

15

statutes that allow judicial review of administrative action," it was "most unlikely that Congress intended to foreclose all forms of meaningful judicial review." *Id.* at 496. Finally, the Court considered the fact that in their claims, the plaintiffs did not "seek a substantive declaration that they [were] entitled to SAW status" but instead, if successful, would "only be entitled to have their case files reopened and their applications reconsidered in light of the newly prescribed INS procedures." *Id.* at 495.

Similarly, in *Reno*, the Supreme Court considered whether 8 U.S.C. § 1255a(f)(1), which provides that "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection," barred judicial review of a challenge to the legality of INS regulations relating to a legalization program established pursuant to the Immigration Reform and Control Act of 1986, Pub. L. 99-603, 100 Stat. 3359, under which undocumented immigrants who met certain requirements for continuous physical presence and residency in the United States could apply for temporary resident status and later for permanent resident status. *Reno*, 509 U.S. at 46. The Court held that § 1255a(f)(1) did not bar review of the plaintiffs' claim, which asserted that INS regulations relating to the program, including one addressing when "brief, casual, and innocent absences from the United States" prevent an immigrant from meeting the continuous physical presence requirement, were inconsistent with the statute. *Id.* at 47–48. The Court noted that, as in *McNary*, the "critical language" in § 1255a(f)(1) was "a determination respecting an application for adjustment of status," which referred to a "single act rather than a group of decisions or a practice or procedure employed in making decisions." *Id.* at 55–56 (quoting *McNary*, 498 U.S. at 492). Accordingly, it concluded that the district court could review the plaintiffs' claim because it did not challenge a "determination" on a single application but instead presented a challenge to

App.203-CASA

"the legality of a regulation" that could be asserted "without referring to or relying on the denial of any individual application." *Id.* at 56.

Here, the language in the TPS statute identifying the type of government action for which judicial review is barred is nearly identical to the comparable language at issue in *McNary* and *Reno*: "any determination . . . with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A). Applying *McNary* and *Reno*, the Court concludes that this language is best read as barring judicial review only of "a single act rather than a group of decisions or a practice or procedure employed in making decisions," specifically the act of authorizing, extending, or terminating a TPS designation for a particular foreign state. *Reno*, 509 U.S. at 56 (quoting *McNary*, 498 U.S. at 492). As in *McNary*, the language of the bar on judicial review is notably narrower than other similar provisions within the INA, such as 8 U.S.C. § 1252(b)(9), which bars judicial review of "all questions of law and fact, including interpretation and application of constitutional and statutory provisions," arising from any removal action, except as provided in 8 U.S.C. § 1252. *See McNary*, 498 U.S. at 494. Thus, the text of the statute supports the conclusion that § 1254a(b)(5)(A) does not bar challenges to a general policy, practice, or procedure used by DHS in making TPS determinations. This conclusion is bolstered by the fact that, as acknowledged by DHS at the hearing, there is no other means by which judicial review of any aspect of a TPS designation can be advanced, and the fact that CASA seeks only new determinations to be made without applying the allegedly impermissible policy or practice, not judicial orders barring the terminations. *See id.* at 495–96.

Various federal district courts have relied on *McNary* or *Reno* to reach similar conclusions. *See Centro Presente v. U.S. Dep't of Homeland Security*, 332 F. Supp. 3d 393, 402–04, 408–09 (D. Mass. 2018) (finding that § 1254a(b)(5)(A) did not bar a challenge to DHS's "new policy"

17

allegedly applied across three different TPS determinations); *Saget v. Trump* ("*Saget I*"), 345 F. Supp. 3d 287, 295 (E.D.N.Y. 2018) (concluding that § 1254a(b)(5)(A) "refers to an individual designation, termination, or extension of a designation with respect to a particular country" and not to DHS's "determination practices" or the "adoption of general policies or practices employed in making such determinations"); *Ramos v. Nielsen* ("*Ramos I*"), 321 F. Supp. 3d 1083, 1102 (N.D. Cal. 2018) (in resolving a motion to dismiss, concluding that § 1254a(b)(5)(A) does not bar judicial review of "general procedures or criteria," "collateral practices and policies," or DHS's "general interpretation of the TPS statute"); *Ramos v. Nielsen* ("*Ramos II*"), 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) (in resolving a motion for a preliminary injunction, incorporating the conclusion of *Ramos I*), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023); *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-CV-1464 (BMC), 2025 WL 1808743, at *5–6 (E.D.N.Y. July 1, 2025) (concluding that § 1254a(b)(5)(A) does not apply to a challenge to "a pattern or practice" or to the "procedures followed in making TPS decisions" that are "collateral to and distinct from" a specific TPS designation). Although *Ramos II* was vacated by a panel decision of the United States Court of Appeals for the Ninth Circuit that was itself later vacated in advance of *en banc* review, the initial three-judge panel, relying on *McNary*, adopted a similar distinction in concluding that § 1254a(b)(5)(A), while precluding judicial review over the Secretary's determinations, does not bar claims that broadly challenge DHS's "procedures or practices," or a "pattern or practice" that is "collateral to, and distinct from, the specific TPS decisions and their underlying rationale." *Ramos v. Wolf*, 975 F.3d 872, 891–92 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

App.205-CASA

The Court therefore concludes that § 1254a(b)(5)(A), while barring judicial review of the Secretary's specific determinations on TPS designations, extensions, or terminations relating to Afghanistan and Cameroon, does not bar challenges to general policies, procedures, or practices used by DHS in making TPS determinations. It does not, however, find that the text of § 1254a(b)(5)(A) and *McNary* establish that it can review a challenge to a TPS determination simply because it contests "the process of the adjudication and whether an evidence-based determination" was made. Pl.'s Opp'n & Reply at 3–5, ECF No. 58 (citing *Saget I*, 345 F. Supp. 3d at 294–96, and *Saget v. Trump* ("*Saget II*"), 375 F. Supp. 3d 280, 332 (E.D.N.Y. 2019))).

Turning to whether CASA's claims are of the type barred by § 1254a(b)(5)(A), the Court addresses three categories of claims asserted in the Complaint: (1) the timing claims in Counts 1, 3, 4, and 6; (2) the APA claims in Counts 2 and 7; and (3) the equal protection claims in Counts 5 and 8. First, as to the timing claims, the Court finds that they are not barred by § 1254a(b)(5)(A) because they do not challenge the "determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" in that they in no way contest the Secretary's analysis and decision to terminate the TPS designation. 8 U.S.C. § 1254a(b)(5)(A). Rather, they challenge a collateral issue, specifically the proper interpretation and application of the timing requirements of the TPS statute. The claim is therefore more akin to the legal questions at issue in *Reno*, in which the plaintiffs raised a challenge to whether regulations interpreting the INA were consistent with the statutory language without "referring to or relying on the denial of any individual application." *Reno*, 509 U.S. at 47–48, 56; *see also Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 831 (N.D. Cal. 2025) (concluding that a challenge to DHS's "decision to vacate" a prior grant of an extension of a TPS designation only two weeks after it was approved by a prior Secretary of Homeland Security was not barred by § 1254a(b)(5)(A) because that decision was

App.206-CASA

"literally and textually, not a 'designation, or termination or extension of a designation, of a foreign state under this subsection'"), *stay granted*, *Noem v. Nat'l TPS All.*, No. 24A1059, 2025 WL 1427560 (U.S. May 19, 2025).

Further, the timing claims, which are asserted as to the terminations of the TPS designations of both Afghanistan and Cameroon, effectively challenge "a group of decisions or a practice or procedure employed in making decisions," *McNary*, 498 U.S. at 492, specifically, the practice of failing to grant an automatic six-month extension pursuant to § 1254a(b)(3)(C) when the termination notice is published in the Federal Register within 60 days of the expiration date of the TPS designation. Because the timing claims advance a legal challenge to DHS's interpretation of the provisions governing the timing of terminations and extensions and do not seek review of the Secretary's individual determinations on whether to terminate the TPS designations, the Court finds that judicial review of these claims is not barred by § 1254a(b)(5)(A).

Second, as to the APA claims in Counts 2 and 7, the Court finds that they are not barred if construed narrowly. Based on CASA's arguments in its briefs, Counts 2 and 7 arguably advance direct challenges to the Secretary's determinations to terminate the TPS designations for Afghanistan and Cameroon, including contesting Secretary Noem's analysis and ultimate conclusions. For example, CASA appears to argue in part that the termination of the Afghanistan TPS designation should be set aside in part because Secretary Noem considered and relied in part on "vague presidential pronouncements" relating to placing "American interests first," overly relied upon the assessment that the TPS designation "was contrary to the national interests of the United States," and relied on the fact that certain Afghan TPS holders "have been the subject of administrative investigations for fraud, public safety, and national security" without adequately explaining the relevance of this fact or why this issue could not be mitigated through other means.

App.207-CASA

Pl.'s Mot. at 24–25, ECF No. 42-1. To the extent that these APA claims seek to set aside Secretary Noem's terminations of the TPS designations based on such facts, they directly challenge the Secretary's determinations and would likely be subject to the bar on judicial review.

At the hearing, however, CASA clarified that Counts 2 and 7 are limited to the more general claim that the TPS terminations were the result of a "preordained decision" by the President, which the Complaint characterizes as part of a "broader effort to reduce the number of non-white immigrants in this country." Am. Compl. ¶ 119. To the extent that these claims are construed as alleging and challenging a general policy or practice to terminate TPS designations on a preordained basis in order to reduce the number of non-white immigrants in the United States, they are not barred by § 1254a(b)(5)(A) because they contest not "a single act" but "a group of decisions or a practice or procedure employed in making decisions." *McNary*, 498 U.S. at 492.

Several federal district courts have found, based on *McNary*, that a challenge to a general policy or practice used in making TPS determinations was sufficiently collateral to the determination itself that it was not barred by § 1254a(b)(5)(A). *See, e.g.*, *Centro Presente*, 332 F. Supp. 3d at 408–09 (concluding that the plaintiffs' APA claim was not barred where it challenged, in relation to three separate TPS determinations relating to three different countries, an allegedly "new policy that TPS designation determination are to be made solely on the basis of whether the conditions that created the initial designation persist rather than a broader view of whether the country is safely able to accept returning nationals"); *Ramos I*, 321 F. Supp. 3d at 1092, 1099–1100, 1104 (finding that a claim contesting the termination of the TPS designations for four countries was not barred by § 1254a(b)(5)(A) where the challenge was to the alleged adoption of a "new interpretation of the TPS statute" that prohibited consideration of "intervening natural disasters, conflicts, and other serious social and economic problems as relevant factors when

App.208-CASA

deciding to continue or instead terminate a TPS designation" and instead based determinations on racial animus and "alleged disdain for non-white immigrants"). Accordingly, the Court concludes that CASA's APA claims in Counts 2 and 7, narrowly construed to be limited to challenging the alleged policy or practice or making preordained determinations to terminate TPS designations in order to reduce the number of non-white immigrants in the United States, are not barred by § 1254a(b)(5)(A).

Third, although CASA does not through its Motion seek relief on the equal protection claims in Counts 5 and 8, DHS appears to seek dismissal of these claims as barred by § 1254a(b)(5)(A). Where these claims overlap significantly with the APA claims in Counts 2 and 7 in that they allege that the terminations of the TPS designations were based on racial animus, the Court finds that for the same reasons discussed above in relation to those counts, Counts 5 and 8 are not barred by § 1254a(b)(5)(A) to the extent they are construed as asserting a challenge to a general policy or practice of terminating TPS designations based on racial animus.

Further, the claims may proceed because 8 U.S.C. § 1254a(b)(5)(A) does not clearly preclude judicial review of constitutional claims. Generally, the "presumption in favor of judicial review is particularly important in regards to constitutional claims." *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 317 (D. Md. 2018). Thus, DHS must make a "heightened showing" that Congress intended this provision to bar review of constitutional challenges in order "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988). Here, the fact that § 1254a(b)(5)(A) does not contain any "clear congressional language mandating preclusion" of constitutional claims supports CASA's argument that it does not bar review of the equal protection claims. *McNary*, 498 U.S. at 484 (relying in part on the lack of such language in

22

the judicial review provision relating to the SAW amnesty program in concluding that it did not bar review of the plaintiff's constitutional claims). Indeed, the absence of any such language contrasts with other provisions of the INA that explicitly bar judicial review of constitutional claims, such as 8 U.S.C. § 1252(b)(9), which specifically precludes review of "all questions of law and fact, including interpretation and application of constitutional and statutory provisions" except as provided in that section. *Id.*

Moreover, the fact that, as DHS acknowledged at the hearing, there is no other forum in which a plaintiff may advance constitutional challenges relating to the TPS designation also weighs against precluding judicial review of CASA's equal protection claims. *See McNary*, 498 U.S. at 496. Notably, based on these same or similar considerations, multiple courts have held that that § 1254a(b)(5)(A) does not bar constitutional challenges. *See, e.g., CASA de Maryland, Inc.*, 355 F. Supp. 3d at 321 (holding that "§ 1254a(b)(5)(A) does not bar review of Plaintiffs' Equal Protection, Substantive Due Process, or Administrative Procedure Act claims"); *NAACP v. U.S. Dep't of Homeland Security*, 364 F. Supp. 3d 568, 575 (D. Md. 2019) ("Plaintiffs' claim is a constitutional challenge to the Secretary's determination, which the scope of 8 U.S.C. § 1254a(b)(5)(A) does not clearly prohibit."); *Ramos I*, 321 F. Supp. 3d at 1106, 1108 ("Section 1254a does not reflect a clear Congressional intent to preclude this Court from reviewing Plaintiffs' constitutional challenges to the Secretary's determinations."). DHS has identified no contrary legal authority. Accordingly, where Counts 5 and 8 are properly construed to challenge a general policy or practice of race discrimination in TPS determinations and assert constitutional claims, the Court will not dismiss them as barred by 8 U.S.C. § 1254a(b)(5)(A).

App.210-CASA

**B.    8 U.S.C. § 1252(f)(1)**

DHS also argues that CASA's claims should be dismissed because 8 U.S.C. § 1252(f)(1)

bars this Court from granting CASA's requested injunctive relief.  8 U.S.C. § 1252, entitled

"Judicial review of orders of removal," includes the following subsection:

> Regardless of the nature of the action or claim or of the identity of the party or
> parties bringing the action, no court (other than the Supreme Court) shall have
> jurisdiction or authority to enjoin or restrain the operation of the provisions of part
> IV of this subchapter, as amended by the Illegal Immigration Reform and
> Immigrant Responsibility Act of 1996, other than with respect to the application of
> such provisions to an individual alien against whom proceedings under such part
> have been initiated.

8 U.S.C. § 1252(f)(1).  Section 1252(f)(1) falls within Subchapter II, of Chapter 12 of Title 8 of

the United States Code.  Part IV of Subchapter II is entitled "Inspection, Apprehension,

Examination, Exclusion, and Removal."  Here, the conduct at issue in CASA's Motion—the

termination of a foreign state's TPS designation—is governed by 8 U.S.C. § 1254a, which falls

outside of Part IV and is instead located in Part V, entitled "Adjustment and Change of Status."

Thus, based on the plain language of the statute, it is not subject to the bar of § 1252(f).

Nevertheless, DHS argues that "the U.S. Code is inconsistent with the INA, wherein the

TPS provisions in Section 244 appear in Chapter 4 . . . of title II of the INA."  Defs.' Opp'n &

Cross Mot. at 12 n.7.  Although 8 U.S.C. § 1252(f)(1) does not refer to Chapter 4 of Title II and

instead refers to "part IV of this subchapter" in the United States Code, DHS points to the text of

the original public law that enacted this provision, which refers to "chapter 4 of title II," and an

additional provision that appears to move the TPS statute into chapter 4 of the INA.  *See* Illegal

Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104–208,

Div. C, §§ 306, 308, 110 Stat. 3009-546, 3009-611, 3009-614.  Although the Court understands

the basis for DHS's argument, the Supreme Court has repeatedly and consistently identified the

App.211-CASA

portion of the INA subject to the bar on injunctive relief in § 1252(f)(1) as either "part IV of subchapter II" or as "8 U.S.C. §§ 1221–1232," the specific sections that are presently contained within Part IV of Subchapter II. *See Biden v. Texas*, 142 S. Ct. 2528, 2538–39 (2022); *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064 (2022); *Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999). Although these cases did not necessarily address the precise argument presently offered by DHS, this Court will not deviate from the Supreme Court's longstanding reading of § 1252(f)(1).

Further, the Court agrees with CASA that there is no basis to conclude that Congress intended for § 1252(f)(1) to apply to TPS designations and terminations made under 8 U.S.C. § 1254a. Whether § 1252(f)(1) is construed as applying to "part IV of this subchapter" of the United States Code, or as applying to "chapter 4 of title II" of the INA, both Part IV and Chapter 4 are entitled "Inspection, Apprehension, Examination, Exclusion, and Removal," and 8 U.S.C. § 1252 itself is entitled "Judicial review of orders of removal." The provisions identified by the Supreme Court as subject to § 1252(f)(1) all relate to "the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Aleman Gonzalez*, 142 S. Ct. at 2064 (discussing 8 U.S.C. §§ 1221–1232). In contrast, the TPS statute, 8 U.S.C. § 1254a, addresses the designation of foreign states and the eligibility of individuals from those nations to receive TPS but does not address inspection, apprehension, examination, or removal of noncitizens and thus bears no relationship to the topics covered by Part IV, Chapter 4, and § 1252, or those identified in *Aleman Gonzalez*. *See Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (recognizing section headings as tools available for ascertaining the meaning of a statute). Indeed, section 306 of IIRIRA, in which the provision in question was included, is entitled "Appeals from Orders of Removal," a category that

25

cannot fairly be construed to be related to the authorities in the TPS statute. *See* § 306, 110 Stat. at 3009-607. Notably, where § 1252(f)(1) includes an exception in that it does not apply "with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated," 8 U.S.C. § 1252(f)(1), the TPS statute does not relate to individual proceedings against an alien. In contrast, the TPS statute is significantly related to Part V, "Adjustment and Change of Status," which includes numerous other provisions that govern the means by which to adjust the status of a noncitizen in order to have lawful presence in the United States. *See, e.g.,* 8 U.S.C. §§ 1255–1258. The fact that 8 U.S.C. § 1254a is not presently in Part IV and bears no relationship to the other provisions in Part IV further supports the conclusion that § 1252(f)(1) does not apply to bar CASA's claims.

Finally, even if 8 U.S.C. § 1252(f)(1) were to apply to 8 U.S.C. § 1254a, that provision only "withdraws a district court's 'jurisdiction or authority' to grant a particular form of relief," specifically injunctive relief. *Biden*, 142 S. Ct. at 2539. "It does not deprive the lower courts of all subject matter jurisdiction over claims" brought pursuant to the covered provisions in cases where, as here, plaintiffs seek forms of relief beyond injunctive relief, including declaratory relief and vacatur. *Id.*; *see Brito v. Garland*, 22 F.4th 240, 252 (1st Cir. 2021) (concluding that "declaratory relief remains available under section 1252(f)(1)"); *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022) ("As an initial matter, § 1252(f)(1) does not apply to vacatur."); *Nat'l TPS All.*, 773 F. Supp. 3d at 824–29 (rejecting the "contention that § 1252(f)(1) is a bar to Plaintiffs' request for relief" in the context of a challenge seeking vacatur of DHS's actions involving Venezuela's TPS designation); *Haitian Evangelical Clergy Ass'n*, 2025 WL 1808743, at *7 (distinguishing orders of vacatur under 5 U.S.C. § 706(2) from injunctions in finding that § 1252(f)(1) did not bar a challenge to the partial vacatur of Haiti's TPS designation). Thus,

26

regardless of whether § 1252(f)(1) can apply to limit the available remedies in this case, it does not provide a basis for outright dismissal of this case. *See Biden*, 142 S. Ct. at 2539.

For the reasons stated above, the Court will not dismiss CASA's claims as barred by either 8 U.S.C. § 1254a(b)(5)(A) or 8 U.S.C. § 1252(f)(1) and will deny DHS's Motion to the extent that it relies on either provision.

### III.    The Timing Claims

Both CASA and DHS seek summary judgment on the timing claims, through which CASA seeks a ruling that the termination of the TPS designations for Afghanistan and Cameroon must be extended by six months because Secretary Noem failed to publish notices of termination in the Federal Register within 60 days of the expiration dates of those designations. CASA argues that this result is required by the procedural requirements for reviewing, extending, and terminating TPS designations set forth in 8 U.S.C. § 1254a(b)(3). Section 1254a(b)(3)(A) ("subparagraph (A)"), entitled "Periodic review," requires that:

> At least 60 days before [the] end of the initial period of designation, and any extended period of designation, of a foreign state (or part thereof) under this section the [Secretary], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met. The [Secretary] shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register.

8 U.S.C. § 1254a(b)(3)(A).

Under 8 U.S.C. 1254a(b)(3)(B) ("subparagraph (B)"), entitled "Termination of designation," if the Secretary determines under subparagraph (A) that a foreign state "no longer continues to meet the conditions" for TPS designation, then the statute requires that:

27

> [T]he [Secretary] shall terminate the designation by publishing notice in the Federal
> Register of the determination under this subparagraph (including the basis for the
> determination). Such termination is effective in accordance with subsection (d)(3),
> but shall not be effective earlier than 60 days after the date the notice is published
> or, if later, the expiration of the most recent previous extension under subparagraph
> (C).

*Id.* § 1254a(b)(3)(B).

Under 8 U.S.C. § 1254a(b)(3)(C) ("subparagraph (C)"), entitled "Extension of

designation," if the Secretary "does not determine under subparagraph (A) that a foreign state . . .

no longer meets the conditions for designation . . . the period of designation of that foreign state is

extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of

12 or 18 months)." *Id.* § 1254a(b)(3)(C).

CASA argues that these provisions, read together, require the Secretary to review a foreign

state's TPS designation, make a determination on whether that designation may continue, and

publish a notice of the determination in the Federal Register no later than 60 days prior to the

expiration date of the TPS designation, and that the failure to publish the notice by that 60-day

deadline triggers the automatic six-month provision referenced in § 1254a(b)(3)(C). In contrast,

DHS argues that the plain language of these provisions within § 1254a(b)(3) establishes that, in

order to terminate a country's TPS designation, the Secretary need only complete the periodic

review and make a determination on whether the conditions for TPS continue to be met by the

deadline of 60 days prior to a country's TPS expiration date, then provide for publication in the

Federal Register of that determination "on a timely basis" after it is made. *Id.* § 1254a(b)(3)(A).

DHS asserts that because Secretary Noem signed decision memoranda through which she made

the determinations that the statutory conditions for TPS were no longer met for Afghanistan and

Cameroon in advance of the respective 60-day deadlines, the terminations pursuant to §

1254a(b)(3)(B) that were later effectuated through the publication of the Afghanistan Notice and

App.215-CASA

the Cameroon Notice (collectively, "the TPS notices") were timely, and no automatic six-month

extensions of the TPS designations are warranted.

This dispute presents a matter of first impression. The parties have not identified, and the

Court has not found, any opinion by any federal court addressing this issue of statutory

interpretation. When interpreting a statute, courts must "begin with the plain language." *Hately

v. Watts*, 917 F.3d 770, 784 (4th Cir. 2019) (quoting *In re Total Realty Mgmt., LLC*, 706 F.3d 245,

251 (4th Cir. 2013)). "To determine a statute's plain meaning," courts "not only look to the

language itself, but also 'the specific context in which the language is used, and the broader context

of the statute as a whole.'" *Id.* (quoting *In re Total Realty Mgmt., LLC*, 706 F.3d at 251); *see

Schilling v. Schmidt Baking Co.*, 876 F.3d 596, 601–02 (4th Cir. 2017) (in interpreting a federal

statute, considering the interplay of the various subsections based on the principle that the analysis

is "informed by the specific context in which that language is used, and the broader context of the

statute as a whole").

Based on the plain language of the relevant subparagraphs in § 1254a(b)(3), the Court

agrees with DHS's reading. Starting with subparagraph (A), the first sentence of that provision

establishes a deadline of "[a]t least 60 days before" the end of a period of TPS designation, but

only as to the requirements that the Secretary "shall *review* the conditions" of the foreign state in

question "after consultation with appropriate agencies of the Government," and "shall *determine*

whether the conditions for such designation . . . continue to be met." 8 U.S.C. § 1254a(b)(3)(A)

(emphasis added). There is no reference in that sentence to publication of a notice of that

determination. Such publication is referenced in the next sentence, which states that the Secretary

"shall provide on a timely basis for the publication of notice of each such determination . . . in the

Federal Register." *Id.* The construction of this subparagraph as split into two sentences

App.216-CASA

demonstrates that the publication of the notice in the Federal Register is a distinct requirement, separate and apart from the 60-day deadline established in the prior sentence. Indeed, the use of separate timing language, "on a timely basis," in relation to the publication requirement demonstrates that the Federal Register notice has a different, more flexible, timing requirement. *Id.*; *Timely*, Webster's New World Dictionary 1401 (3d College ed., Simon & Schuster, Inc. 1988) (defining "timely" as "happening, done, said, etc. at a suitable time; well-timed; opportune" or "appearing in good time; early"); *see United States v. Santos*, 553 U.S. 507, 511 (2008) (using dictionaries in statutory construction); *Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 129 (4th Cir. 2023) ("Searching for the plain meaning of a statute's text often starts with reading dictionaries published close in time to when it was enacted.").

CASA argues that the phrase "timely basis" incorporates the 60-day requirement in the preceding sentence and thus means that the publication must occur before the 60-day deadline. While not entirely implausible, such a reading is far from the most natural reading of the statute. If Congress had meant for the 60-day deadline to apply to the requirement of publication of the notice, it could have done so through multiple other means that more clearly conveyed that intent. It could have included the publication notice requirement in the preceding sentence, in which the 60-day deadline was established, or it could have directly referenced that 60-day deadline in the same sentence in which the publication notice requirement was established. *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 156 (2013) ("We have recognized, as a general rule, that Congress's use of 'certain language in one part of the statute and different language in another' can indicate that 'different meanings were intended.'" (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004)). *Cf. Dean v. United States*, 556 U.S. 568, 573 (2009) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is

30

generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))). Where Congress instead placed the requirements of a "determination" and "publication of notice" into two separate sentences with different language relating to timing, the most reasonable reading of subparagraph (A) is that the 60-day deadline applies only to the "determination." 8 U.S.C. § 1254a(b)(3)(A).

This reading is confirmed upon consideration of subparagraph (B), which addresses the termination of a TPS designation by providing that if, upon the Secretary's statutorily mandated review under subparagraph (A), the Secretary "determines . . . that a foreign state . . . no longer continues to meet the conditions for designation," the Secretary "shall terminate the designation by publishing notice in the Federal Register of the determination." *Id.* § 1254a(b)(3)(B). Significantly, this subparagraph specifies that such a termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension under subparagraph (C)." *Id.* If, as CASA argues, subparagraph (A) requires the Secretary to publish the notice in the Federal Register 60 days prior to the expiration of a TPS designation in order to effectuate a termination of that designation, Congress did not need to include the first part of this provision and could have instead stated only that the effective date of a termination would be the date of the expiration, as that date would always be 60 or more days after the publication of the notice. Where CASA's reading of the statute would render unnecessary and superfluous the phrase "shall not be effective earlier than 60 days after the date the notice is published," it runs afoul of the canon against surplusage, pursuant to which courts generally do not adopt a reading that renders part of a statute superfluous over a reading that give effect to a statute's "every clause and word." *See United States v. Simms*, 914 F.3d 229, 241 (4th Cir. 2019) (quoting *United States v. Mensache*, 348 U.S. 528, 539–38 (1955)). Rather, the inclusion of the

31

language stating that the termination "shall not be effective earlier than 60 days after the date the notice is published," which sets a minimum period of 60 days between the date of the publication of the notice and the effective date of the termination, makes sense only as a means to ensure that such a minimum period would apply even when the publication of the notice occurs within the 60-day period prior to an expiration, a circumstance that is permissible under only DHS's reading of the statute.

Finally, the plain language of subparagraph (C), which addresses extensions of a TPS designation, further supports this reading. This subparagraph provides that if the Secretary "does not *determine* under subparagraph (A) that a foreign state . . . no longer meets the conditions for designation," the period of designation of that foreign state "is extended" for an additional period of 6, 12, or 18 months. 8 U.S.C. § 1254a(b)(3)(C) (emphasis added). This provision makes no reference to the publication of the notice in the Federal Register. Congress's use of the word "determine" is notable because it is a direct reference to the use of the word "determine" in § 1254a(b)(3)(A). *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning."). Where, as discussed above, subparagraph (A) draws a distinction between the Secretary's determination that a foreign state no longer meet the conditions for TPS designation on the one hand and the publication of a notice of that determination on the other, the plain language of subparagraph (C) necessarily bases the imposition of an automatic extension on a failure to make the determination prior to the 60-day deadline referenced in subparagraph (A), not a failure to publish the notice by the deadline.

Based on this analysis, the Court finds that, under the plain language of § 1254a(b)(3), the 60-day deadline applies only to the Secretary's determination of whether the conditions necessary

App.219-CASA

for TPS designation continue to apply, and if that determination is timely made, there is no automatic six-month extension under § 1254a(b)(3)(C).

Nevertheless, CASA offers several arguments to convince the Court to adopt its position. First, CASA argues that under DHS's reading, and as occurred here, the Secretary's setting of the effective dates of the Afghanistan and Cameroon TPS terminations at 60 days after the issuance of the TPS notices amounted to a 55-day extension for Afghanistan (from May 20, 2025 to July 14, 2025) and a 58-day extension for Cameroon (from June 7, 2025 to August 4, 2025). Such extensions, CASA argues, run afoul of § 1254a(b)(3)(C), which requires that any extensions must be made in increments of 6, 12, or 18 months. This argument fails because in setting the effective dates of the terminations at 60 days after the publication of the TPS notices, Secretary Noem specifically invoked subparagraph (B), which addresses the procedures for "Termination of designation," and with which those timelines are fully consistent, not subparagraph (C), which addresses the requirements for an "Extension of designation." 8 U.S.C. §§ 1254a(b)(3)(B), (C); Afghanistan Notice, 90 Fed. Reg. at 20312; Cameroon Notice, 90 Fed. Reg. at 22699; *see also Florida Dep't of Revenue*, 554 U.S. at 47 (recognizing section headings as tools available for ascertaining the meaning of a statute). Indeed, the setting of an effective date for a termination is contemplated by both subparagraph (B) and 8 U.S.C. § 1254a(b)(2)(B), the latter of which provides that a TPS designation "shall remain in effect until the effective date of the termination of the designation." *Id.* Where, as here, Secretary Noem was terminating a designation, set an effective date consistent with the requirements of subparagraph (B), and did not refer to her action as an extension or otherwise rely on authority relating to extensions, the procedures and timelines set forth in subparagraph (C) do not apply.

App.220-CASA

CASA also argues that its reading better aligns with congressional intent because setting a 60-day deadline for publication of the Federal Register notice "ensures that TPS holders receive adequate notice of any termination so that they can make the necessary arrangements to reorder their lives," and permitting such publication within the last 60 days prior to an expiration date would upend the certainty Congress attempted to afford TPS holders. Pl.'s Mot. at 17–20. In particular, CASA notes that under DHS's reading, those individuals would be forced to continue to check for the publication of a Federal Register notice during the final 60 days of the TPS designation period. While CASA persuasively argues that DHS should provide TPS holders with well more than 60 days of notice of the effective date of a termination, even under CASA's reading, there are circumstances under which a termination could take effect only 60 days after public notice of that termination, specifically, if the Federal Register notice was issued exactly 60 days before the expiration date and DHS declined to extend the effective date as a matter of discretion to provide "for an orderly transition." 8 U.S.C. § 1254a(d)(3). The fact that Congress chose to allow for a termination with only 60 days of public notice undermines CASA's claim that DHS's interpretation is contrary to legislative intent regarding the provision of advanced notice. Further, under either reading, there would necessarily be a period of time during which TPS holders would have to endure uncertainty over whether the TPS designation would be extended, and there is no particular reason that such a period must end 60 days before the expiration of the designation rather than on the expiration date itself.

Although CASA also notes that DHS's reading may allow for the period of uncertainty to extend even beyond the expiration date, as DHS arguably could delay the publication of a notice of a termination made more than 60 days before the expiration date until after the expiration, DHS would have little incentive to do so because such an action would just further delay the effective

App.221-CASA

date of the TPS termination, which under § 1254a(b)(3)(B) cannot occur until 60 days after the publication of the notice.

CASA also argues that its reading of the statute is consistent with past agency practices, under which Federal Register termination notice have generally been issued more than 60 days before the expiration of the TPS designation, and notices issued less than 60 days before the expiration, or after the expiration, have typically granted at least a six-month extension. CASA acknowledges, however, that on February 8, 1993, a TPS designation for Lebanon set to expire on March 28, 1993 was terminated pursuant to the same procedure employed in the present case— through the publication of a Federal Register notice less than 60 days before the expiration date that set an effective date of 60 days after the date of publication. *See* Termination of Designation of Lebanon Under Temporary Protected Status Program, 58 Fed. Reg. 7582 (Feb. 8, 1993). Although CASA has identified multiple examples in which a notice of a TPS termination was published within the 60-day window and the effective date of the termination was set to occur at least six months later, in those instances, DHS characterized the granting of a later effective date as appropriate to "provide for an orderly transition," a discretionary basis recognized in 8 U.S.C. § 1254a(d)(3), and did not state that it was a required extension under 8 U.S.C. § 1254a(b)(3)(C) resulting from a late Federal Register notice. *See, e.g.*, Termination of the Designation of Nicaragua for Temporary Protected Status, 82 Fed. Reg. 59636, 59637 (Dec. 15, 2017); Termination of the Designation of Sudan for Temporary Protected Status, 82 Fed. Reg. 47228, 47230 (Oct. 11, 2017)).

Indeed, when DHS has invoked an "automatic" extension under 8 U.S.C. § 1254a(b)(3)(C), the Federal Register notices have explicitly stated that the Secretary did not make a determination prior to the 60-day statutory deadline on whether the conditions for a TPS designation continued

App.222-CASA

to be met. *See, e.g.*, Extension of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 19217, 19217 (May 6, 2025) (in a Federal Register notice published three days after the expiration date, stating that the TPS designation was "automatically extended" for an additional six months because the Secretary "was unable to make an informed determination" by the 60-day statutory deadline); Extension of the Designation of Honduras for Temporary Protected Status, 82 Fed. Reg. 59630, 59631 (Dec. 17, 2017) (in a Federal Register notice published 22 days before the expiration date, extending the TPS designation for an additional six months because the Secretary "did not make a determination on Honduras's designation by November 6, 2017, the statutory deadline").

Such cases include several in which the Federal Register notice was not issued until after the expiration date for the TPS designation. *See, e.g.*, Termination of Bosnia-Herzegovina Under the Temporary Protected Status Program, 65 Fed. Reg. 52789, 52789 (Aug. 30, 2000) (in a Federal Register notice published 20 days after the expiration date, stating that "because this determination was not made at least 60 days before the termination date, the designation of Bosnia-Herzegovina for TPS is automatically extended for a period of 6 months, valid until February 10, 2001"); Six-Month Extension and Termination of Designation of Guinea-Bissau Under the Temporary Protected Status Program, 65 Fed. Reg. 15016 (Mar. 20, 2000) (published 10 days after the expiration date); *see also* Termination of Designation of Rwanda Under Temporary Protected Status Program After Final 6-Month Extension, 62 Fed. Reg. 33442 (June 19, 1997) (published 13 days after the expiration date and granting a final six-month extension with the termination effective at the expiration of that extension). However, CASA has not cited, and this Court has not found, any instance in which a Federal Register notice published less than 60 days before the expiration date stated directly or indirectly that the failure to publish the notice before that 60-day

App.223-CASA

deadline required an automatic extension of six months. Thus, past agency practices, even if relevant to the Court's determination, do not provide a basis to adopt an interpretation that is inconsistent with the plain language of the statute.

CASA also argues that under DHS's reading, 8 U.S.C. § 1254a(b)(3)(A) "serves no practical purpose" because its "sole function is to set a deadline for the Secretary to make a secret determination" not available to the public. Pl.'s Opp'n & Reply at 12. Although CASA is correct that the results of the Secretary's determination are not necessarily made public until the publication of the Federal Register notice, there is nothing illogical about Congress's imposition of an internal deadline for the completion of the periodic review and determination, particularly where the next step in the process, publication in the Federal Register, requires actions by entities outside of DHS's direct control, such as the Office of the Federal Register within the National Archives Records Administration and the Office of Management and Budget ("OMB"). *See* 44 U.S.C. §§ 1502, 1505 (designating the Archivist of the United States and the Office of the Federal Register as responsible for publication of the Federal Register); U.S. Gov't Accountability Off., GAO-20-134, Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions 30, 32 & n.53 (2020) (stating that "once the Secretary of Homeland Security makes a TPS decision, time frames for publishing the Federal Register notice may vary" due in part to OMB interagency review).

Indeed, courts have previously referenced the determination on a TPS designation as a separate event that predated the publication of a notice in the Federal Register by days or weeks. *See, e.g., Saget I*, 345 F. Supp. 3d at 292–93 (stating that the Secretary terminated Haiti's TPS designation on November 20, 2017 as referenced in a press release and that the Federal Register notice was published on January 18, 2018); *Ramos II*, 336 F. Supp. 3d at 1083 (stating that "in

App.224-CASA

early September 2017" the Secretary made the decision to terminate Sudan's TPS designation, but the Federal Register notice was published on October 11, 2017, and that on or about November 5, 2017 the Secretary made the decision to terminate Nicaragua's TPS designation, but the Federal Register notice was published on December 15, 2017); *see also Documented v. Dep't of Homeland Security*, No. 21-cv-3142, 2024 WL 4253130, at *2 (D.D.C. Sept. 20, 2024) (describing the Secretary's decision memoranda relating to TPS); U.S. Gov't Accountability Off., GAO-20-134, *supra*, at 27 & n.47 (noting that, in GAO's study of 26 TPS decisions, "DHS provided memorand[a] or notices documenting the Secretary's decisions for all 26 decisions" consisting of either signed memoranda or signed draft Federal Register Notices).

The related claim that DHS's reading allowing for an internal "determination" to satisfy the 60-day requirement "would render enforcement of the statute's procedural requirements nearly impossible" does not alter the Court's conclusion. Pl.'s Opp'n & Reply at 13. Under either reading, there would be a minimum of 60 days from the public notice of a termination until the effective date of the termination during which a challenge could be brought. Where, as here, the public notice was issued late enough to raise a question whether the determination was timely, DHS would have the burden to produce evidence to demonstrate the timeliness of the determination, and as has occurred in this case, the decision memoranda memorializing the determination can be identified and considered.

In the end, although CASA offers persuasive arguments that DHS's reading allows for termination of a TPS designation on a timeline that does not afford TPS holders a reasonable amount of time to react to such a termination and may cause great upheaval in their lives, the Court cannot find that any such arguments allow it to overlook the plain language of 8 U.S.C. § 1254a(b)(3), which clearly provides that DHS may terminate a TPS designation with only 60 days

App.225-CASA

of notice, provided that the Secretary makes a determination more than 60 days before its expiration that the conditions for such a designation do not continue to be met, even if the publication of the notice of that determination occurs within 60 days of that expiration date. In turn, if the Secretary's determination is made before that 60-day deadline, even if the notice is published after that deadline, there is no automatic six-month extension of the TPS designation pursuant to 8 U.S.C. § 1254a(b)(3)(C).

Here, DHS has presented redacted decision memoranda, signed by Secretary Noem and dated at least 60 days prior to the expiration of the TPS designations for Afghanistan and Cameroon, that state that she approved the termination of TPS for Afghanistan on the basis of "improved conditions as it relates to ongoing conflict" and "no longer meeting the extraordinary and temporary conditions statutory standard," J.R. 140–41, and that she approved the option to "[t]erminate Cameroon's designation," J.R. 4393. CASA stated at the hearing that for purposes of the pending Motions, it is not disputing that the decision memoranda establish that Secretary Noem made those determinations on the identified dates. Accordingly, the Court declines to grant summary judgment to CASA on the timing claims in Counts 1, 3, 4, and 6 seeking automatic six-month extensions of the TPS designations.

Although the Court agrees with DHS's interpretation of the statute, it will not grant summary judgment to DHS on these claims because the record is insufficiently complete to find that there are no genuine issues of material fact. For example, although CASA is not presently contesting whether the decision memoranda actually effectuated a determination by Secretary Noem on whether the conditions for TPS designations continued to be met, CASA has not had the opportunity to review the unredacted decision memoranda to confirm that final determinations were actually made on the identified dates. Indeed, where DHS has described those memoranda

App.226-CASA

as subject to the deliberative process privilege reserved for predecisional documents, the Court cannot presently make a definitive finding in favor of DHS. Accordingly, DHS's Cross Motion for Summary Judgment will be denied as to the timing claims in Counts 1, 3, 4, and 6.

## IV.   The APA Claims

As to the APA claims in Counts 2 and 7, the parties each seek summary judgment on these counts. In Counts 2 and 7, CASA asserts that DHS's terminations of the Afghanistan and Cameroon TPS designations violate the APA, which requires a court to "hold unlawful and set aside agency action" that was "arbitrary [and] capricious" or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency rule or action may be deemed arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983). Arbitrary-and-capricious review is "highly deferential, with a presumption in favor of finding the agency action valid" but does not "reduce judicial review to a rubber stamp of agency action." *Casa de Maryland v. U.S. Dep't of Homeland Security*, 924 F.3d 684, 703 (4th Cir. 2019) (quoting *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012)).

As discussed above, construed so as to be subject to judicial review, Counts 2 and 7 assert that the TPS terminations were unlawful because DHS relied on factors not intended to be considered by applying a general policy or practice of terminating TPS designations on a preordained basis as part of a broader effort to reduce the number of non-white immigrants in the United States. *See supra* part II.A. For its part, DHS "emphatically rejects" CASA's characterization of DHS's actions and motivations. Defs. Opp'n & Cross Mot. at 15 n.8.

To the extent that DHS seeks dismissal or summary judgment in its favor on these claims, the Court finds that CASA has alleged sufficient facts to state an APA claim on this basis. First,

App.227-CASA

CASA has asserted facts in support of the conclusion that DHS acted with an intent to reduce the number of non-white immigrants in the United States. In the Complaint, CASA recounts numerous public statements made by President Trump, during his presidential campaign and as president, in which he disparately disparaged non-white immigrants. For example, in June 2024, President Trump described "a series of horrific murders" by individuals who "come in here so illegally, they just walk across, not vetted not checked," "from the Congo and Africa," "from Asia," "from the Middle East," "from South America," "from all over the world," and who are "in many cases, very, very bad, very bad people." Am. Compl. ¶ 87; *id.* Ex. P at 233, ECF No. 41-2. CASA asserts that in September 2024, President Trump falsely claimed that Haitian immigrants in Springfield, Ohio were "eating the pets of the people that live there," Am. Compl. ¶ 89, and that on February 7, 2025, President Trump stated that "[m]any, many, thousands and thousands of murderers" had entered United States and falsely claimed that countries from Africa, Asia, and South America had "allowed every single prisoner" to be put on buses or planes to be sent to the United States. *Id.* ¶ 90; *id.* Ex. T at 330, ECF No. 41-2.

Further, CASA emphasizes President Trump's repeated statements that immigrants are "poisoning the blood of our country" and asserts that they track the rhetoric of white supremacists. Am. Compl. ¶¶ 94–95 (citing Russell Contreras, *Axios Explains: The Racist History of Trump's "Poisoning the Blood,"* Axios (Dec. 30, 2023), Am. Compl. Ex. CC at 507, ECF No. 41-2)). For example, in December 2023, President Trump stated that the Biden Administration had allowed "15, 16 million people into our country" who are "poisoning the blood of our country," referenced South America, and stated that they were coming "from Africa, from Asia, all over the world." Am. Compl. ¶ 95; *id.* Ex. FF at 529, ECF No. 41-2. By contrast, in April 2024, President Trump made a statement "lamenting the dearth of immigrants from nice countries like Denmark,

App.228-CASA

Switzerland, and Norway." Am. Compl. ¶ 99 (citing Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants From 'Nice' Countries*, N.Y. Times (Apr. 7, 2024), Am. Compl. Ex. KK at 551, ECF No. 41-2).

For her part, Secretary Noem has stated that Venezuela "emptied their prisons and sent criminals to America" and stated at her January 2025 confirmation hearing that the extension of TPS to Venezuelans "is alarming when you look at what we've seen in different states including Colorado with gangs doing damage and harming the individuals and the people that live there." Am. Compl. ¶ 103 (citing *Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025), Am. Compl., Ex. OO at 551, ECF No. 41-2).

Second, CASA has identified multiple examples of actions by the Trump Administration to curtail immigration from countries viewed as having non-white populations. Since January 2025, DHS has sought to vacate the most recent extensions of TPS designations for Haiti and Venezuela. DHS has also "announced the termination of parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela" and "revoked over 1,000 visas for students participating in the Student and Exchange Visitor Information System Program," which would most affect students from "India, China, South Korea, Saudi Arabia, Nigeria, Nepal, Bangladesh, [Colombia], Mexico, and Iran." *Id.* ¶¶ 71, 72.

By contrast, CASA alleges that the Trump Administration has removed immigration barriers for white immigrants. Specifically, President Trump directed the Secretary of State and Secretary of Homeland Security to take action to allow white Afrikaners from South Africa who were allegedly victims of race discrimination through land expropriation laws to be admitted to the United States through the United States Refugee Admissions Program ("USRAP"), and on May 12, 2025, after having their applications expedited, the first group arrived on a flight chartered

App.229-CASA

by the U.S. government. *Id.* ¶ 73. CASA also references President Trump's proposed "gold card" visa program, pursuant to which noncitizens would be able to "purchase a visa for $5 million that allows them to live permanently in the United States and provides them with a pathway to citizenship." *Id.* ¶ 75. CASA alleges that because Western Europe has the highest percentage of millionaires outside the United States, this program would "disproportionately reduce immigration barriers to white individuals." *Id.* ¶ 75.

Third, CASA has identified facts relating to the process leading to Secretary Noem's termination decisions that circumstantially support its claim that they were "preordained by White House directive," potentially in service of the policy or practice of reducing the number of non-white immigrants. Pl.'s Mot. at 23. For example, the Afghanistan Notice relies significantly on overarching policies of the Trump Administration that arguably preordain the termination of TPS designations, specifically Executive Order 14,150, which provides that "the foreign policy of the United States shall champion core American interests and always put America and American citizens first," and Executive Order 14,159, which directs the Secretary of Homeland Security and other Cabinet officials to "rescind policies that led to increased or continued presence of illegal aliens in the United States," including by "ensuring that the TPS designations are consistent with the TPS statute and are 'made for only so long as may be necessary to fulfill the textual requirements of that statute.'" Afghanistan Notice, 90 Fed. Reg. at 20311 (quoting Exec. Order 14,150, § 1, 90 Fed. Reg. at 8337, and Exec. Order 14,159, § 16, 90 Fed. Reg. at 8446). The Cameroon Notice relies on the same part of Executive Order 14,159. Cameroon Notice, 90 Fed. Reg. at 23697. At the same time, where TPS holders have legal status in the United States and thus are not actually "illegal aliens," invocation of the stated policy of Executive Order 14,159 of curtailing illegal immigration reveals a "mismatch between the decision the Secretary made and

43

the rationale [she] provided." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (considering such a mismatch as relevant to the issue of whether the stated reason for a decision was pretextual or contrived).

Further, CASA alleges that DHS "bypassed the standard process for conducting TPS reviews." Am. Compl. ¶ 76; *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (in considering a claim of race discrimination, noting that "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role"). Although "TPS review typically begins with career specialists preparing an objective conditions report, a process spanning months," Am. Compl. ¶ 77, and by statute requires consultation with the State Department and other appropriate agencies, DHS itself has claimed that Secretary Noem made her determinations to terminate the Afghanistan and Cameroon TPS designations on March 21, 2025 and April 7, 2025, respectively, less than three months into the Trump Administration. Indeed, in the Addendum to the Afghanistan TPS Considerations Memorandum, which was prepared to provide updated information relating to the most recent time period of November 2024 to February 2025, USCIS provided no additional information relating to eight listed topics of analysis on the grounds that it was not able to gather new information "within the limited time constraints," including on the topics of "International Aid and Corruption," "Internal Displacement," "Infrastructure Challenges," "Explosive Remnants of War including Landmines," "Taliban Governance – Damage to Security and Society," "Challenges for Women and Girls," "Lack of Access to Healthcare," and "Challenges for Persons with Disabilities." J.R. 143–46. Likewise, the comparable USCIS Addendum to the Cameroon TPS Considerations Memorandum, covering the same time period, noted that USCIS was not able to gather new information on a key topic, "Security Situation & Armed Conflict," "within the limited

44

App.231-CASA

time parameters." Cameroon Administrative Record ("A.R.") 45, ECF No. 70-3. The compressed timeline that prevented a key agency from gathering current information on identified topics for analysis provides additional support for CASA's claim that the TPS terminations were made as part of the alleged preordained practice.

Finally, Secretary Noem's findings appear to be inconsistent with certain information in the administrative record. For example, in the Afghanistan TPS Considerations Memorandum covering the time period from June 1, 2023 to November 13, 2024, USCIS concluded that:

> Afghanistan's civilian population faces dire challenges, including a collapsing economy and health care system, ubiquitous food insecurity exacerbated by drought, and widespread insecurity due to decades of armed conflict and insurgency that is entering a new, dangerous phase. The Taliban's August 2021 takeover continues to pose substantial impediments to meeting these challenges. Taliban authorities violently target citizens and foster continued armed conflict and inter-ethnic strife. International cooperation and the receipt of aid have been compromised, leading to the further displacement of civilians. The severe restrictions, ranging from education to employment, on women foreclose the meaningful participation of half the population in remedying these concerns.

J.R. 182. In the November 20, 2024 letter from Secretary of State Blinken to Secretary Mayorkas which was accompanied by a seven-page State Department memorandum analyzing the conditions in Afghanistan, Secretary Blinken recommended that DHS extend and redesignate Afghanistan for TPS for 18 months based in part on the "ongoing armed conflict in Afghanistan, primarily between the Taliban and ISIS-K," which "continues to result in significant violence and instability" and has "caused numerous civilian casualties," and on the humanitarian situation which "has continued to deteriorate." J.R. 120–28. Although Secretary Noem later received an undated letter from Secretary of State Rubio recommending that DHS terminate the Afghanistan TPS designation based on the conclusion that "the armed conflict in Afghanistan has abated to such an extent that it is now possible to return Afghan nationals to Afghanistan without posing a serious threat to their

personal safety," J.R. 129–30, that letter provided no specific facts in support of that conclusion and was not accompanied by a State Department memorandum.

As to Cameroon, Secretary Noem had access to a December 2, 2024 letter from Secretary Blinken to Secretary Mayorkas, accompanied by a 12-page memorandum, in which he recommended that DHS extend the Cameroon TPS designation for 12 months in part because of "ongoing armed conflict" between the Government of Cameroon and terrorist groups such as Boko Haram, "ongoing violence" between the Government and multiple armed separatist groups, and human rights abuses by both Government forces and armed groups. *See* Cameroon A.R. 49–50. Unlike for Afghanistan, there is no evidence that Secretary Noem received a letter or other updated State Department recommendation from Secretary Rubio relating to Cameroon. The fact that Secretary Noem's findings appear to be in conflict with key facts and recommendations from the State Department and USCIS provides additional circumstantial support for CASA's assertion that DHS was acting pursuant to a general policy or practice of making preordained terminations to reduce the number of non-white immigrants. *Cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

As to DHS's request for dismissal or summary judgment, the Court must view the allegations and facts in the light most favorable to CASA and draw all reasonable inferences in its favor. *See Albright*, 510 U.S. at 268; *Lambeth*, 407 F.3d at 268. Upon consideration of the allegations and facts described above that were contained in the Complaint and its attachments, as well as the TPS notices which are fairly construed as integral to the Complaint, the Court finds that CASA has plausibly alleged an APA violation on the grounds that the Afghanistan and

App.233-CASA

Cameroon terminations were made pursuant to a general policy or practice of engaging in preordained terminations of TPS designations in order to reduce the number of non-white immigrants and thus were arbitrary and capricious in that they relied on factors Congress did not intend for it to consider. *See State Farm*, 463 U.S. at 43. Indeed, in challenges to TPS terminations based on similar theories, federal district courts have relied on similar allegations in denying motions to dismiss. *See CASA de Maryland, Inc.*, 355 F. Supp. 3d at 326, 328 (denying a motion to dismiss APA and equal protection claims where the plaintiff had alleged that the termination of El Salvador's TPS designation was motivated by race discrimination, based in part on statements of racial animus by the President); *NAACP*, 364 F. Supp. 3d at 577–78 (denying a motion to dismiss equal protection claims where the plaintiff had alleged that the termination of Haiti's TPS designation was motivated by race discrimination, based in part on statements of racial animus by the President); *Centro Presente*, 332 F. Supp. 3d at 402–04, 415 (denying a motion to dismiss APA and equal protection claims where the plaintiff had alleged that the terminations of the TPS designations of El Salvador, Haiti, and Honduras were made pursuant to an "unreasoned shift" to a new policy motivated by race discrimination, based in part on statements of racial animus by the President and the inconsistency of the Secretary's determinations with conditions in the countries); *Saget I*, 345 F. Supp. 3d at 299 (concluding that the plaintiffs had "plausibly alleged that to the extent [DHS] engaged in any process of review, it was to identify facts to support a pre-determined decision to terminate TPS for Haiti"). Any motion to dismiss Counts 2 and 7 will therefore be denied.

DHS's Cross Motion for Summary Judgment on these counts will also be denied because the addition to the analysis of the facts from the administrative record discussed above only bolsters CASA's arguments such that, when the present record is viewed in the light most favorable

App.234-CASA

to CASA, the Court cannot conclude that DHS is entitled to judgment as a matter of law on these claims. Further, any grant of summary judgment is premature at this time where the factual record cannot be deemed complete for purposes of the Motions. The administrative records for the Afghanistan and Cameroon TPS determinations were submitted only during or, in the case of Cameroon, after the completion of briefing on the Motions, such that the parties have not had a full opportunity to present arguments based on those records. Moreover, neither the Court nor the parties have had the opportunity to consider whether additional factual development is warranted in this case.

At the same time, based on the present record, the Court will not grant summary judgment to CASA on these claims. Although CASA's allegations and identified facts are sufficient to permit these claims to proceed, they are not sufficient to entitle CASA to judgment as a matter of law at this time or, as relevant below, to demonstrate that they are likely to succeed on the merits of these claims. *See infra* part V. While the statements by the President and Secretary Noem relating to immigrants provide some evidence in support of a discriminatory animus, they do not relate specifically to the TPS determinations at issue, and where many are intertwined with assertions of general policy interests in curtailing immigration or concerns about crime by immigrants, such statements are not alone sufficient to demonstrate a discriminatory intent in relation to these TPS designations. While the favorable treatment of white South Africans in relation to a different program, USRAP, draws a stark contrast that appears difficult to explain, the parties have not yet presented facts relating to the similarities and differences between the standards for that program as compared to TPS, or the specific facts underlying that decision, to allow for any conclusion that these TPS designations amount to disparate treatment motivated by race discrimination. *Cf. Myers v. Hose*, 50 F.3d 278, 284 (4th Cir. 1995) (stating that where a

App.235-CASA

protected class and another class of persons are subject to disparate treatment and "the classes are similarly situated in most relevant respects except their protected status (e.g., gender or race), there arises a rational inference of discrimination on the basis of that status").

Moreover, the executive orders referenced by the TPS notices, even while expressing a policy position that illegal immigration and migration more generally should be curtailed, notably do not preordain any particular determinations relating to TPS designations. Rather, Executive Order 14,159, on its face, directs only that the Secretary "ensur[e] that designations of Temporary Protected Status are consistent with the provisions of . . . 8 U.S.C. § 1254a . . . and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." Exec. Order 14,159, § 16, 90 Fed. Reg. at 8446.

Further, the record reflects that the TPS notices made specific findings on the two relevant statutory bases for a TPS designation, that any "ongoing armed conflict" did not pose "a serious threat to [the] personal safety" of TPS holders returning to those nations, and that there were not "extraordinary and temporary conditions . . . that prevent" such safe return, which cannot support a TPS designation if allowing the TPS holders to remain in the United States was "contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1); *see* Afghanistan Notice, 90 Fed. Reg. at 20309–12; Cameroon Notice, 90 Fed. Reg. at 23697–99. The Afghanistan Notice referenced specific facts in support of both bases, including that although armed conflict continues to occur, there is "a reported decrease in armed conflict since the end of the Taliban's insurgency" and "large-scale violence is at its lowest level in decades," and that there has been a significant decrease in the number of Afghans in need of humanitarian assistance. *See* Afghanistan Notice, 90 Fed. Reg. at 20310. Indeed, the Addendum to the Afghanistan TPS Considerations Memorandum includes certain information consistent with these conclusions, including that "[t]he

49

overall security situation in Afghanistan has significantly improved since the end of large-scale conflict in 2021," as evidenced by a 60 percent drop in reports by households of "conflict-related shocks" since 2021. J.R. 144.

As for the Cameroon Notice, it states that while there remain armed conflicts in Cameroon, "they are contained in limited regions that primarily impact only three of the ten regions comprising Cameroon." Cameroon Notice, 90 Fed. Reg. at 23698. CASA has not identified any statement within the administrative record that contradicts this fact. Indeed, although Secretary Blinken recommended a 12-month extension of the Cameroon TPS designation, he affirmatively did "not recommend that Cameroon be redesignated for TPS" and recommended a reevaluation in 12 months, Cameroon A.R. 49–50, and the State Department memorandum attached to his letter stated that "Nationals of Cameroon can return in safety to much of the country, including the two most populous cities," even while it was "unsafe to return to some parts of the country," *id.* at 61.

Finally, particularly where the Secretary made findings on the other statutory factors, CASA's criticism of the TPS notices' references to the "national interest," a recognized consideration that can preclude a TPS designation pursuant to the "extraordinary and temporary conditions" basis set forth in 8 U.S.C. § 1254a(b)(1)(C) and that largely falls within the purview of the Executive Branch, is of limited impact. Although the Afghanistan Notice's reference to examples of Afghan TPS holders having been the subject of investigations relating to fraud, public safety, and national security may not be a particularly compelling fact, CASA has not demonstrated how consideration of this fact is impermissible or unrelated to the national interest. Where Counts 2 and 7 require more than a demonstration that the TPS determinations were not well-reasoned or were inconsistent with certain facts in the administrative records, but instead require a showing that, whether because they were particularly flawed or otherwise, they must

50

App.237-CASA

have been made as part of an impermissible general policy or practice of automatically terminating TPS designations in order to reduce the number of non-white immigrants in the United States, CASA's criticisms of the TPS notices and their inconsistency with certain other facts provide only limited evidence in support of such a conclusion.

Accordingly, the Court finds that based on the present arguments and record, CASA is not entitled to summary judgment on Counts 2 and 7 and that, as relevant below, it has not established a likelihood of success on these claims. *See infra* part V. As discussed above in relation to DHS's Cross Motion for Summary Judgment, the Court likewise concludes that a ruling on summary judgment is also premature because the factual record was not sufficiently developed at the time of the briefing on the Motions and may still require further development. The Court will therefore deny summary judgment to either party at this time.

## V.    Motion for a Stay of Agency Action

In the alternative, CASA seeks a stay of the TPS terminations pursuant to the APA, which provides that "[o]n such conditions as may be required, and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay. *See Humane Soc'y of United States v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009); *Cronin v. U.S. Dep't of Agriculture*, 919 F.2d 439, 446 (7th Cir. 1990); *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *Dist. of Columbia v. U.S. Dep't of Agriculture*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020)). Correspondingly, to obtain a stay of agency action pursuant to 5 U.S.C. § 705, moving parties must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence

App.238-CASA

of preliminary relief; (3) the balance of equities tips in their favor; and (4) a stay is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).

CASA's request for a stay fails based on the first factor. As discussed above, the Court agrees with DHS on the proper interpretation of the timing requirements relating to a TPS termination set forth in 8 U.S.C. § 1254a(b)(3)(C). *See supra* part III. Accordingly, the Court cannot conclude that CASA has presently demonstrated a likelihood of success on the merits of the timing claims in Counts 1, 3, 4, and 6.

As to the APA claims in Counts 2 and 7, as discussed above, although the Court finds that CASA has stated plausible claims for relief as required by Rule 12(b)(6), it has concluded that neither party is presently entitled to summary judgment on these claims, and that CASA has not demonstrated that it is likely to succeed on the merits of these claims. *See supra* part IV; *see Winter* 555 U.S. at 20. Where proof of these claims requires more than just a showing that the TPS termination decisions were rushed, based on incomplete information, or based on conclusions that were inconsistent with certain facts made available to the Secretary, but instead requires that the Court find that these decisions were actually made pursuant to a policy or practice of terminating TPS designations on a preordained basis in order to reduce the number of non-white immigrants in the United States, the Court cannot conclude that CASA has presently made the required showing.

As discussed above, several courts that have considered similar claims grounded in part on the allegation that TPS determinations were motivated by racial animus have found that plaintiffs have made sufficient allegations to state a plausible claim for relief. *See, e.g., CASA de Maryland,*

App.239-CASA

*Inc.*, 355 F. Supp. 3d at 326, 328; *NAACP*, 364 F. Supp. 3d at 577–78; *Centro Presente*, 332 F. Supp. 3d at 415–16; *Saget I*, 345 F. Supp. 3d at 299.  However, courts that have issued preliminary injunctions or stays relating to TPS terminations in cases involving similar claims have done so only after the development of a more robust record including specific evidence that more directly addressed the relevant issues. *See, e.g., Ramos II*, 336 F. Supp. 3d at 1092–1104 (concluding that the plaintiffs were "entitled to a preliminary injunction based on their showing on the merits of the APA claim" where based on an extensive record including testimony of former agency officials, numerous internal emails regarding designation decisions, and numerous decision memoranda relating to the TPS designation terminations at issue, there was a "wealth of record evidence to support Plaintiffs' position that the DHS changed its practices with regard to TPS designations" and "serious questions on the merits on the Equal Protection Claim"); *Saget II*, 375 F. Supp. 3d at 347–53, 360–61 (concluding that the plaintiffs were "likely to succeed in their claim [DHS] violated the TPS statute by failing to make a 'real merits determination' and by instead issuing 'a pretextual edict,'" on the basis of "significant evidence," including a "bench trial" in which the court "heard testimony from eight witnesses" and an administrative record that included the Secretary's handwritten notes and emails to and from the Secretary).  Here, by contrast, the present record is significantly more limited.

Because a likelihood of success on the merits is a necessary element for the requested stay of agency action, the Court must deny the Motion for a Stay regardless of the remaining factors. The Court notes, however, that certain CASA members will likely face irreparable harm from these actions.  For example, B.S., an Afghan TPS holder, faced death threats in Afghanistan because of her work as an interpreter for United States and international agencies, such that she may well face retribution from the Taliban if forced to return.  M.A., another Afghan TPS holder

App.240-CASA

who fled Afghanistan in 2021 after having worked on U.S.-funded programs in Afghanistan, also reasonably fears retribution if he returns.

In light of such grave risks, even considering the national interests articulated by DHS, the balance of the equities and the public interest likely weigh in CASA's favor, especially in light of the United States' long and proud history as a haven for the displaced and dispossessed. *See Foley v. Connelie*, 435 U.S. 291, 294 (1978) ("As a Nation we exhibit extraordinary hospitality to those who come to our country, which is not surprising for we have often been described as 'a nation of immigrants.'" (footnote omitted)). This is particularly true where CASA's primary request is for the postponement of the effective date of any termination by six months in order to allow for a more humane transition, and the United States, acting as the good and generous nation that it typically strives to be, has regularly provided transition periods that have significantly exceeded the statutory minimum of two months of notice when terminating a TPS designation. *See, e.g., Ramos I*, 321 F. Supp. 3d at 1095–98 (noting that the TPS terminations for Haiti, El Salvador, Nicaragua, and Sudan were announced over a year in advance of their effective dates); Cameroon Notice, 90 Fed. Reg. at 23699 n.15 (identifying four TPS terminations with transition periods between 6 and 18 months). More specifically, in the case of Afghanistan, there is also the moral imperative of protecting Afghans who participated in actions that directly or indirectly supported American troops and interests, because great nations do not leave their allies behind.

In light of these public interests, the President and the Secretary can still extend the effective dates of the terminations if they so choose, *see* 8 U.S.C. § 1254a(d)(3), which would allow for full consideration of claims for other forms of immigration relief asserted by TPS holders, particularly those from Afghanistan who face persecution or retribution for having provided assistance to American troops and interests. Congress could also take additional actions, as it has

54

in the past, to protect such individuals. *See, e.g.*, Afghan Allies Protection Act of 2009, Pub. L. No. 111–8, § 602, 123 Stat. 807, 807–811. Nevertheless, because the requirements for a stay have not all been satisfied, this Court may not grant the requested relief. The Motion for a Stay will be denied.

## CONCLUSION

For the foregoing reasons, CASA's Motion for Partial Summary Judgment or a Stay of Agency Action, will be DENIED, and DHS's Cross Motion for Summary Judgment and Motion to Dismiss will be DENIED. A separate Order shall issue.

Date: July 10, 2025

THEODORE D. CHUANG
United States District Judge

App.242-CASA

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

CASA, INC.,

      Plaintiff,

      v.

KRISTI NOEM,
*Secretary of Homeland Security,*
*in her official capacity,* and
U.S. DEPARTMENT OF
HOMELAND SECURITY,

      Defendants.

Civil Action No. 25-1484-TDC

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby
ORDERED that:

1.    Plaintiff CASA Inc.'s Motion for Partial Summary Judgment or a Stay of Agency
Action, ECF No. 42, is DENIED.

2.    Defendants' Cross Motion for Summary Judgment and Motion to Dismiss, ECF
No. 53, is DENIED.

3.    Defendants are directed to file an Answer to the Amended Complaint within **14
days** of the date of this Order.

Date:  July 10, 2025

THEODORE D. CHUANG
United States District Judge

*Institute for*
**Constitutional Advocacy and Protection**

GEORGETOWN LAW

July 11, 2025

<u>**VIA CM/ECF**</u>

Judge Theodore D. Chuang
U.S. District Court for the District of Maryland
6500 Cherrywood Lane, Suite 245
Greenbelt, MD 20770

<u>**Re: Motion for a Stay of Agency Action Pending Appeal**</u>

Dear Judge Chuang,

Plaintiff CASA intends to appeal to the Fourth Circuit this Court's denial of a stay of agency action pursuant to 5 U.S.C. § 705. *See* Mem. Op. & Order 51–55, ECF No. 76; Order, ECF No. 77. In anticipation of this forthcoming appeal, CASA respectfully requests permission to file a motion pursuant to Rule 62(d) of the Federal Rules of Civil Procedure for a stay of agency action pending appeal. Given the timeline, CASA further requests that this Court treat this letter as CASA's motion. CASA asked Defendants for their position on the relief requested in this letter, but Defendants were unable to provide their position before Monday.

Without an immediate injunction, current TPS holders will be faced with a devastating choice—abandoning their homes, relinquishing their employment, and uprooting their lives to return to a country they fear, or remaining in the United State in a state of legal uncertainty while they wait for other immigration processes to play out.

Rule 62(d) allows a court to "grant an injunction" "[w]hile an appeal is pending from an interlocutory order" that "refuses . . . an injunction." Fed. R. Civ. P. 62(d). Although the standard governing an injunction pending appeal is similar to the standard governing a preliminary injunction (or stay under 5 U.S.C. § 705), *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987), there are important differences.

To begin, the mere fact that the Court has determined that CASA did not meet the likelihood-of-success-on-the-merits prong of the test for Section 705 relief does not necessarily foreclose granting CASA relief pending appeal. Rule 62(d) "contemplates that there will be situations where district courts can grant injunctions pending appeal even after denying a preliminary injunction," and therefore "a court may issue an injunction pending appeal even when it believes its analysis in denying preliminary injunctive relief is correct." *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1235 (N.D. Cal. 2025) (internal quotation marks and alterations omitted). Thus, the "Court need not change its mind as to the correctness of its prior ruling; it need merely determine whether [the losing party's] appeal presents an admittedly difficult legal question." *Maryland v. U.S. Dep't of Agric.*, No. CV JKB-25-0748, 2025 WL 1020224, at *2 (D. Md. Apr. 4, 2025) (internal quotation marks omitted). "[O]therwise, a district court would *never* stay an order pending appeal, as 'every court that renders a judgment does so in the belief that its judgment is the correct one.'" *Id.* (quoting *Woollard v. Sheridan*, 863 F. Supp. 2d 462,

477 (D. Md. 2012), *rev'd on other grounds sub nom. Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013)).

This case presents the sort of "difficult legal question" that warrants preservation of the status quo pending appeal. *Maryland v. U.S. Dep't of Agric.*, 2025 WL 1020224, at *2. This Court has found that CASA "has plausibly alleged an APA violation on the grounds that the Afghanistan and Cameroon terminations were made pursuant to a general policy or practice of engaging in preordained terminations of TPS designations in order to reduce the number of non-white immigrants." Mem. Op. 46–47. Among other things, the Court noted that "CASA has asserted facts in support of the conclusion that DHS acted with an intent to reduce the number of non-white immigrants in the United States," *id.* at 41, including "numerous public statements made by President Trump, during his presidential campaign and as president, in which he disparately disparaged non-white immigrants.," *id.*; that there are "multiple examples of actions by the Trump Administration to curtail immigration from countries viewed as having non-white populations," *id.* at 42; that "CASA has identified facts relating to the process leading to Secretary Noem's termination decisions that circumstantially support its claim that they were 'preordained by White House directive,' potentially in service of the policy or practice of reducing the number of non-white immigrants," *id.* at 43; and that "Secretary Noem's findings appear to be inconsistent with certain information in the administrative record," *id.* at 45. Although this Court did not view that evidence as sufficient to establish a likelihood of success on the merits, *id.* at 53, the fact that this Court found that evidence sufficient to state a plausible APA claim shows that it is at least a close call with which the Fourth Circuit might well disagree. Moreover, although the Court also disagreed with CASA's argument that, under 8 U.S.C. § 1254a, the TPS period was automatically extended for six months, the Court noted that it was "a matter of first impression." *Id.* at 29.

The imminent irreparable harm faced by those losing TPS protection strongly supports a stay of agency action pending appeal. "In cases where the risk of irreparable harm is especially great, an injunction pending appeal may be warranted even though it does not appear that there is a strong likelihood that the party will succeed on the merits." *MediNatura, Inc. v. FDA*, No. CV 20-2066 (RDM), 2021 WL 1025835, at *6 (D.D.C. Mar. 16, 2021) (internal quotation marks omitted). Further, federal courts have the inherent power to maintain the status quo pending appeal. *E.g.*, Wright & Miller's 11 Fed. Prac. & Proc. Civ. § 2904; *Newton v. Consol. Gas Co. of N.Y.*, 258 U.S. 165, 177 (1922) ("Undoubtedly, after appeal the trial court may, if the purposes of justice require, preserve the status quo until decision by the appellate court."); *Universitas Educ., LLC v. Avon Cap., LLC*, 124 F.4th 1231, 1242 (10th Cir. 2024) ("Limited residual authority to maintain the status quo during an appeal is deeply rooted in our jurisprudence.").

Absent a stay of agency action, Afghanistan's TPS designation will terminate on Monday, July 14, 2025. Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,309 (May 13, 2025). Cameroon's TPS designation will terminate shortly thereafter on August 4, 2025. Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,597, 23,697 (June 4, 2025). If those terminations go into effect TPS holders from those countries will immediately lose their lawful status in this country and will be subject to detention and/or removal and will no longer have work

authorization. *See* 8 U.S.C. § 1254a(a)(1)(A)–(B), (d)(4), (f)(4). TPS holders accordingly face "grave risks" absent emergency relief from this Court. Mem. Op. 54 (noting that CASA member B.S. "faced death threats in Afghanistan because of her work as an interpreter for [the] United States and international agencies such that she may well face retribution from the Taliban if forced to return"); *id.* (noting that CASA member M.A. "reasonably fears retribution if he returns to Afghanistan" based on his work on U.S.-funded programs in that country). This Court has accordingly already recognized that "the balance of the equities and the public interest likely weigh in . . . favor" of a stay of administrative action. *Id.*

CASA therefore requests that this Court grant a stay of agency action pending appeal, so that Cameroonian and Afghan TPS holders are not forced to endure the irreparable harms that this Court recognized while CASA appeals this Court's decision on the likelihood of success on the merits.

In the alternative, CASA requests that the Court issue a temporary, 14-day postponement of the effective date of agency action to allow CASA to seek relief from the Court of Appeals. This temporary delay is necessary to preserve the status quo and prevent irreparable harm until the Court of Appeals has an opportunity to consider CASA's request. *See, e.g.*, *Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-306 (RDM), 2025 WL 1825431, at *56 (D.D.C. July 2, 2025) ("The Court will postpone the effective date of its class-wide order for fourteen days to permit Defendants to seek a stay pending appeal from the Court of Appeals and to prepare to implement the Court's order.").

CASA respectfully requests the Court issue a decision on this request as soon as possible, so that it can seek relief from the Fourth Circuit to prevent irreparable harm to its members.

Sincerely,


_____/s/_____
Jonathan L. Backer
Senior Counsel
Institute for Constitutional Advocacy and Protection
Georgetown University Law Center
Phone: (202) 661-6671
jb2845@georgetown.edu